**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE JENNIFER CHOE-GROVES**

GOVERNMENT OF CANADA, et al.,

        Plaintiffs,

  and

CANFOR CORPORATION, et al.,

        Plaintiff-Intervenors,

  v.

UNITED STATES,

        Defendant,

  and

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,

        Defendant-Intervenors.

**NON-CONFIDENTIAL**
Business Proprietary
Information Removed from
Pages 5-7, 12-15, and 17-21

Consol. Court No. 23-00187

## PLAINTIFFS AND PLAINTIFF-INTERVENORS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

In accordance with the scheduling order entered in this consolidated action,[1] Plaintiffs

Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing, Ltd.

(collectively, "Canfor" or "Plaintiffs"), and Plaintiff-Intervenors as Tolko Industries, Ltd., Tolko

Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., Carrier Forest Products Ltd., Carrier

Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, the Ontario Forest Industries

---

[1] Scheduling Order, *Government of Canada v. United States*, Consol. Ct. No. 23-00187
(Jan. 17, 2024), ECF No. 98.

Association, the Conseil de l'Industrie Forestiere du Quebec, Resolute FP Canada Inc., and the British Columbia Lumber Trade Council (collectively "Plaintiff Intervenors") hereby move for judgment on the agency record in this consolidated action with respect to issues specific to the calculation of Canfor's dumping margin.

Plaintiff and Plaintiff Intervenors challenge the *Final Results* issued by the U.S. Department of Commerce ("Commerce") in *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) ("*Final Results*") in the following respects. Commerce's adjustment to Canfor's byproduct revenue offset for chips is unsupported by substantial evidence and otherwise not in accordance with law. Commerce's determination to apply the transactions disregarded rule and its adjustment to Canfor's reported cost of electricity at its Prince George sawmill is also unsupported by substantial evidence on the record and is otherwise not in accordance with law. The legal and factual grounds for this motion are set forth in the brief accompanying this motion. A proposed order is also attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and (1) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law; (2) remand this case to Commerce for a redetermination consistent

with the judgment and findings of this Court; and (3) grant such other relief as the Court shall

deem just and proper.

Respectfully submitted,

**Morris Manning & Martin LLP**
1333 New Hampshire Ave, NW
Suite 800
Washington, D.C. 20036
(202) 216-4819

/s/ R. Will Planert
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
Stephen A. Morrison
*Counsel to Canfor Corporation,*
*Canadian Forest Products, Ltd., and*
*Canfor Wood Products Marketing,*
*Ltd.*

Dated: April 5, 2024

*/s/ Henry D. Almond*
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko*
*Marketing & Sales Ltd. and Gilbert*
*Smith Forest Products*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry

Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc. and Olympic Industries ULC*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de l'Industrie forestiere du Quebec and Ontario Forest Industries Association*

*/s/ Amy J Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW.
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com
*Counsel to the British Columbia Lumber Trade Council*

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  HONORABLE JENNIFER CHOE-GROVES

GOVERNMENT OF CANADA, et al.,

        Plaintiffs,

    and

CANFOR CORPORATION, et al.,

        Plaintiff-Intervenors,

    v.

UNITED STATES,

        Defendant,

    and

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,

        Defendant-Intervenors.

Consol. Court No. 23-00187

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of

Plaintiff and Plaintiff-Intervenors, and all other pertinent papers, it is hereby:

**ORDERED** that Plaintiff and Plaintiff-Intervenors' Motion is granted; and it is further

**ORDERED** that the *Final Results* that the U.S. Department of Commerce ("Commerce")

issued in *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty*

*Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106

(Dep't Commerce Aug. 1, 2023) ("*Final Results*") are unsupported by substantial evidence and otherwise not in accordance with law; and it is further

ORDERED that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion in this matter.

SO ORDERED.

_____
Jennifer Choe-Groves, Judge

Dated: _____
New York, New York

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE JENNIFER CHOE-GROVES

GOVERNMENT OF CANADA, et al.,

                Plaintiffs,

   and

CANFOR CORPORATION, et al.,

                Plaintiff-Intervenors,

   v.

UNITED STATES,

                Defendant,

   and

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,

                Defendant-Intervenors.

**NON-CONFIDENTIAL**
Business Proprietary
Information Removed from
Pages 5-7, 12-15, and 17-21

Consol. Court No. 23-00187

## PLAINTIFFS AND PLAINTIFF-INTERVENORS' BRIEF IN SUPPORT OF THE MOTION FOR JUDGMENT ON THE AGENCY RECORD

**MORRIS MANNING & MARTIN LLP**
1333 New Hampshire Ave, NW, Suite 800
Washington, D.C. 20036
(202) 216-4819

Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
Stephen A. Morrison

Dated: April 5, 2024

*Counsel to Plaintiff-Intervenors Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing, Ltd.*

*/s/ Henry D. Almond*
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko Marketing & Sales Ltd. and Gilbert Smith Forest Products*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc. and Olympic Industries ULC*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de l'Industrie forestiere du Quebec and Ontario Forest Industries Association*

*/s/ Amy J Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW.
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com
*Counsel to the British Columbia Lumber*
*Trade Council*

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT .................................................................................. 2

II.     ISSUES OF LAW PRESENTED .................................................................... 2

III.    STATEMENT OF FACTS ............................................................................... 3

        A.      Byproduct Revenue Offset.................................................................... 4

        B.      Value of Electricity Purchases by the PG Sawmill................................ 8

IV.     SUMMARY OF ARGUMENT ..................................................................... 10

V.      STANDARD OF REVIEW ........................................................................... 11

VI.     ARGUMENT ................................................................................................ 11

        A.      Commerce's Decision To Adjust Canfor's Reported Wood Chip Revenue Is Not
                Supported By Substantial Evidence And Not In Accordance With Law ............. 12

        B.      Commerce's Decision To Adjust The Reported Cost Of Electricity At The PG
                Sawmill Is Not Supported By Substantial Evidence And Not In Accordance With
                Law        ................................................................................................... 21

VII.    CONCLUSION AND RELIEF REQUESTED ............................................. 26

VIII.   CERTIFICATE OF COMPLIANCE............................................................. 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Best Mattresses Int'l Co. Ltd. v. United States,*
 622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ..........................................................16

*Burlington Truck Lines, Inc. v. United States,*
 371 U.S. 156 (1962)........................................................................................................11

*PT Zinus Global Indonesia v. United States,*
 628 F. Supp 3d 1252 (Ct. Int'l Trade 2023) ...........................................................16

*Rebar Trade Action Coalition v. United States,*
 398 F.Supp.3d 1359 (Ct. Int'l Trade 2019) ...........................................................15, 16, 25

*SKF USA Inc. v. United States,*
 630 F.3d 1365 (Fed. Cir. 2011).....................................................................................15

*Universal Camera Corp. v. Nat'l Labor Rels. Bd.*,
 340 U.S. 474 (1951)........................................................................................................11

*Viraj Group v. United States,*
 476 F.3d 1349 (Fed. Cir. 2007)......................................................................................14

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) (2020) ........................................................................................11

19 U.S.C. § 1677b(f)(2) (2015) ............................................................................ *passim*

**Other Authorities**

*Certain Hot-Rolled Steel Flat Products from Brazil, Final Determination of Sales
 at Less than Fair Value and Final Affirmative Determination of Critical
 Circumstances, in Part*, 81 Fed. Reg. 53,424 (Dep't Commerce Aug. 12,
 2016) .......................................................................................................................................3

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping
 Duty Administrative Review and Final Determination of No Shipments; 2021*,
 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023)................................................... *passim*

*Chlorinated Iscoyanurates From Japan: Final Determination of Sales at Less
 Than Fair Value*, 79 Fed. Reg. 56,059 (Dep't Commerce Sept. 18, 2014) ............................24

*Certain Hot-Rolled Steel Flat Products from Brazil, Final Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 53,424 (Dep't Commerce Aug. 12, 2016) ........................................................................................................3, 15

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,539 (Dep't Commerce April 2, 2002) ........................................................................................20

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood Lumber Products From Canada*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) ................................................................................4, 15

*Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France*, 70 Fed. Reg. 54,359 (Dep't Commerce Sept. 14, 2005) ..........................................................................................5, 16

*Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 7,710 (Dep't Commerce Feb. 11, 2008) ............................................................................16

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE JENNIFER CHOE-GROVES

GOVERNMENT OF CANADA, et al.,

                    Plaintiffs,

    and

CANFOR CORPORATION, et al.,

                    Plaintiff-Intervenors,

       v.

UNITED STATES,

                    Defendant,

    and

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,

                    Defendant-Intervenors.

**NON-CONFIDENTIAL**
Business Proprietary
Information Removed from
Pages 5-7, 12-15, and 17-21

Consol. Court No. 23-00187

## PLAINTIFFS AND PLAINTIFF-INTERVENORS' BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, and this Court's January 17, 2024 Scheduling Order, ECF No. 98, Plaintiffs Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing, Ltd. (collectively, "Canfor" or "Plaintiff"), and Plaintiff-Intervenors Tolko Industries, Ltd., Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, the Ontario Forest Industries Association, the Conseil de l'Industrie Forestiere du Quebec, Resolute FP Canada Inc., and the British Columbia Lumber Trade Council (collectively "Plaintiff-Intervenors") hereby submit their Motion for Judgment on the Agency

Record and supporting memorandum of points and authorities addressing Canfor-specific issues raised in Canfor's complaint in this action.  As discussed herein, and in Plaintiff Government of Canada's ("GOC") April 5, 2024 Rule 56.2 Brief ("GOC Br."), which Canfor hereby incorporates by reference, the U.S. Department of Commerce's ("Commerce") *Final Results* in the antidumping duty ("AD") administrative review of softwood lumber products from Canada make adjustments that are unsupported by substantial evidence on the record and are otherwise not in accordance with law.  They should be remanded to Commerce for a redetermination consistent with the arguments made herein.

## I.   RULE 56.2 STATEMENT

The administrative determination under review is *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) ("*Final Results*") (P.R. 611) and accompanying Issues and Decision Memorandum ("*Final Results IDM*") (P.R. 585).[2]  The period of review ("POR") is January 1, 2021 through December 31, 2021.

## II.   ISSUES OF LAW PRESENTED

Canfor raises the following issues of fact and law:

1.  Whether Commerce's adjustment to Canfor's actual chip byproduct revenue offset is unsupported by substantial evidence on the record and is otherwise not in accordance with law; and

---

[2] Citations to the administrative record shall be to the public or confidential record document number ("P.R." or "C.R.").

2. Whether Commerce's determination to apply the transactions disregarded rule and its adjustment to Canfor's reported cost of electricity at its Prince George sawmill is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## III. **STATEMENT OF FACTS**

To determine whether merchandise is being sold at less than fair value in the United States, Commerce calculates the "normal value" of the merchandise in the home market. As part of this determination, Commerce calculates the cost of production ("COP"). *See* 19 U.S.C. § 1677b (2015). Where elements of COP are acquired from an affiliated party, Commerce must determine whether the transaction with the affiliate was at a so-called "arm's-length" or market price or whether the price was affected by the affiliation. Pursuant to 19 U.S.C. § 1677b(f)(2), Commerce may disregard transactions between affiliated persons if those transactions do not fairly reflect market prices in the market under consideration (*i.e.*, if they are not made on an arm's-length basis).

In applying this statutory provision, known as the "transactions disregarded rule," Commerce compares the average transfer price for an input or service paid to an affiliated supplier with the market price for that input or service. *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from Brazil, Final Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 53,424 (Dep't Commerce Aug. 12, 2016), and accompanying Issues and Decision Memorandum ("*Hot-Rolled Steel from Brazil IDM*") at Comment 7. Commerce's stated preference for measuring market value is the price the respondent paid for the good or service to unaffiliated parties. *Id.* If the transfer price between affiliates is lower than the market price, Commerce may disregard that

reported price and use the market price instead, resulting in an increase to the respondent's COP. Commerce applied this rule to Canfor's byproduct revenue offset and to electricity purchases at the PG Sawmill, as discussed further below.

### A.  <u>Byproduct Revenue Offset</u>

The manufacture of softwood lumber generates byproducts including woodchips, shavings, bark, and sawdust.  Canfor generates revenue by selling these byproducts.  In such circumstances, Commerce reduces, or offsets, the cost of manufacturing ("COM") included in the COP for lumber by the revenue earned on the sale of these byproducts.  The most valuable byproduct from softwood lumber production is woodchips, or "chips."  Chips are the primary input into the production of pulp used in the paper industry.  Given the value of woodchips and other lumber byproducts, the computation of the byproduct revenue offset is a significant element of the calculation of the COP for softwood lumber.

Canfor's byproduct revenue for chips consists of sales of woodchips to both affiliated and unaffiliated pulp mills, which use the chips as raw material to produce pulp for the production of paper.  These chip sales are thus subject to the transactions disregarded rule described above and must be shown to be at arm's-length – that is, at market prices.  If the sales prices do not represent a market price, Commerce is permitted to adjust the byproduct offset to reflect a representative market price.

When evaluating sales of byproducts to affiliated purchasers, Commerce's practice is to use sales prices to unaffiliated purchasers as the measurement of market price.  However, Commerce will not use such prices where the sale to the unaffiliated purchaser is not comparable or there is "evidence of unusual circumstances surrounding such unaffiliated purchases."  *Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood Lumber*

*Products From Canada*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) and

accompanying Issues and Decision Memorandum ("*Lumber IV* Review IDM") at Comment 12;

*see also Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched*

*Uranium From France*, 70 Fed. Reg. 54,359 (Dep't Commerce Sept. 14, 2005), and

accompanying Issues and Decision Memorandum ("*Low Enriched Uranium From France IDM*")

at Comment 3.  In this case, Canfor submitted evidence demonstrating that certain of its chip

sales to unaffiliated parties were made under circumstances not reflective of current market

conditions.  During the POR, Canfor was contractually obligated to sell all of the chips produced

in its Radium and Elko sawmills to [                          ], an unaffiliated pulp mill, at prices

established pursuant to a long-term supply contract.  That contract was entered into in 2012 with

[          ], the former owner of the [                          ] pulp mill.  When Canfor purchased the

Elko and Canal Flats sawmills from [              ] in 2012, a contractual stipulation in the sale

agreement obligated Canfor to continue to supply chips from those sawmills, along with the

Radium sawmill, to [                                   ] pulp mill under a long-term supply contract at

prices that [                                        ].  C.R. 181 (P.R. 320) at D-24–D-27.  When

[              ] subsequently sold the [                            ] to [                        ] in 2013, it

assigned the supply contract to [                            ], which purchased chips from Canfor's Elko

and Radium sawmills during the POR pursuant to that supply contract.  *Id.* at D-26.  Because the

terms of that supply contract set prices on terms that did not reflect the current market conditions

for chip sales during the POR, Canfor argued that these chip sales should not be included in

Commerce's benchmark for establishing market prices for chips purposes of applying the

transactions disregarded rule.

To provide alternative evidence of a market price and to demonstrate that the prices from Radium and Elko set by the long-term supply contract were aberrational, Canfor provided the prices paid for chips by Canfor's affiliate Canfor Pulp Products Inc. ("CPPI"), a major pulp producer in British Columbia ("BC"), on its purchases from unaffiliated chip suppliers. Canfor explained that (with the exception of the sales made by Radium and Elko under the long-term legacy contract) Canfor negotiates prices with affiliated and unaffiliated companies alike, that woodchips can vary in size and grade, and that these differences affect prices. C.R. 181 (P.R. 320) at D-25. The location of the pulp plants in relation to the sawmills also influences whether the lumber mill can sell its chips to a pulp plant in the first place and impacts the sales price. *Id.*

In the *Preliminary Results*, Commerce applied the transactions disregarded methodology to adjust Canfor's reported wood chip revenue received from sales to affiliates in BC to prices that "reflect the market price" by using Canfor's sales price for chips to unaffiliated parties. *See* C.R. 473 (P.R. 520). In doing so, Commerce included the prices for chip sales from the Radium and Elko mills to [                    ] under the long-term supply contract in its calculation of a "market price." *See* P.R. 585.

In its case brief before Commerce, Canfor argued that the record demonstrates that the unusual circumstances surrounding the sales of chips from the Radium and Elko mills to unaffiliated purchasers render those unaffiliated sales prices unrepresentative of market prices and thus, not usable for purposes of computing an adjustment to the affiliated sales price. C.R. 493 (P.R. 547). Specifically, as explained above, the prices for chips sold by those mills were set by Canfor's agreement with [          ], which did not [

                              ]. *See id.* (citing C.R. 185 (P.R. 322) at Exhibit

6

D-14).  Canfor called attention to an overall goal of the agreement, evident from its preamble, which was to provide [            ], the seller of the Elko and Radium sawmills, assurance that the supply of woodchips from those mills to [            ] own pulp mills would continue at stable prices for a period of at least ten years after the sale.  *Id.*  Thus, Canfor argued that the chip prices set in the agreement were fixed for a ten-year period with very limited possible adjustments and that these adjustments do not consider market conditions for chips.  *Id.*

Additionally, Canfor argued that record evidence of other chip prices between unaffiliated parties during the period, which were not similarly constrained by long term contracts, established that the prices of chips sold by the Elko and Radium mills in fact were not representative of the market price for chips.  This evidence included the prices CPPI paid for purchasing chips from unaffiliated parties and the prices at which another respondent lumber company sold its chips to unaffiliated parties in the BC pulp market.  *Id.*  Canfor argued that, in the *Final Results*, Commerce should either exclude the prices at which Elko and Radium sold woodchips to [                ] from its calculation of market value or, alternatively, adjust the Radium and Elko chip prices to bring them in line with market prices and account for the fact that the supply contract is not indicative of prevailing market conditions.

In the *Final Results*, Commerce continued to adjust Canfor's reported costs using the prices of chips sold to all unaffiliated parties, and included sales by the Elko and Radium mills in the calculation of  the "market price" used to evaluate whether  the Canfor's chip sales to affiliates were at arm's length prices.  Commerce asserted that the long-term contract "appears to allow for periodic adjustments to the wood chip prices by reference to industry publications." P.R. 585.  Because, according to Commerce, the contract allowed for "revisions in response to changes in market conditions," sales pursuant to the long-term supply contract were not

"unrepresentative of a market price for purposes of {the} transactions disregarded analysis." *Id.* Thus, Commerce continued to find that an adjustment to Canfor's byproduct offset to its reported costs is necessary to reflect that market price.

### B. Value of Electricity Purchases by the PG Sawmill

Canfor operates four facilities on contiguous land located in Prince George, BC ("PG"). These facilities are the PG Sawmill and its associated chip plant, the Northwood Pulp Mill (part of CPPI); JD Little Orchard, which is a division of Canadian Forest Products Ltd. ("CFP"); and Canfor's PG Headquarters. C.R. 27 (P.R. 290) at A-18–A-19. BC Hydro, the electric utility supplier in BC, supplies electrical power to all of these facilities via a single transmission line. *See* C.R. 186 (P.R. 322) at Exhibit D-34. Because there is a single electrical power line from the utility to the Canfor properties, BC Hydro sends a single consolidated invoice to CPPI's Northwood Pulp Mill for the electricity supplied to all four of these Canfor facilities. The Northwood Pulp Mill then splits the bill according to each entity's usage, which is measured on Canfor's internal meters, and notifies each entity of its share. The PG Sawmill pays its share of the invoice to the Northwood Pulp Mill, which then pays BC Hydro the collective invoice. *See* C.R. 27 (P.R. 290) at A-18–A-19.

In the *Preliminary Results*, Commerce treated this internal apportionment of the electricity bill as if CPPI, the owner of the Northwood Pulp Mill, were supplying electricity to Canfor's PG Sawmill. Commerce therefore applied the transactions disregarded rule and made an adjustment to Canfor's COM for the PG Sawmill to account for what it determined were purchases of electricity from CPPI "that were not at arm's length prices." C.R. 473 (P.R. 520). In Commerce's view, rather than an internal allocation of the actual electricity charged from BC Hydro to the PG Sawmill, CPPI is purchasing electricity from BC Hydro and then re-

selling that electricity to the PG Sawmill. P.R. 585 at 58. Commerce therefore calculated a constructive "cost of production" for CPPI for the electricity "sold" to the PG Sawmill, which consisted of the actual price paid to BC Hydro plus an allocation for CPPI's selling, general and administrative ("SG&A") costs. C.R. 473 (P.R. 520). Commerce then compared this constructed "cost of production" to the "transfer price" CPPI charged the PG Sawmill (*i.e.*, the amount charged by BC Hydro and passed through to the PG Sawmill) and concluded that CPPI provided electricity to the PG Sawmill below cost. *Id.* Pursuant to 19 U.S.C. § 1677b(f)(2), Commerce adjusted upward the PG Sawmill's actual cost of electricity to equal this alleged "market price." *Id.*

In its case brief to the agency, Canfor argued that Commerce's methodology was distortive and unreasonably elevated a bookkeeping convenience into a transaction for the sale of electricity. C.R. 493 (P.R. 547). Canfor noted that the record evidence establishes that the PG Sawmill purchased electricity from an unaffiliated supplier (BC Hydro) and paid the price set by BC Hydro. *Id.* Canfor further argued that CPPI is not an affiliated reseller, as CPPI does not take title to the electricity from BC Hydro or recognize any sales revenue for the electricity that utility supplies to the PG Sawmill, and that Commerce has declined to apply the transactions disregarded rule in similar circumstances. *Id.* (citing *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17,422 (Dep't Commerce Mar. 26, 2012) and accompanying Issues and Decision Memorandum at Comment 28 ("*Bottom Mount Refrigerator-Freezers from Mexico*")). In short, Canfor argued, there was no transaction to disregard and, therefore, no reason to apply the transactions disregarded methodology or otherwise adjust Canfor's actual electricity cost.

In the *Final Results*, however, Commerce held that "a transaction for electricity took place between the PG sawmill and CPPI," and therefore CPPI should be considered an affiliated reseller of electricity. P.R. 585. Commerce determined that an analysis pursuant to the transactions disregard rule was appropriate and continued to value the electricity purchased by the PG Sawmill as the actual purchase price plus CPPI's constructive SG&A expenses. C.R. 511 (P.R. 587). In addition, Commerce agreed with an argument made by Petitioner to include in CPPI's SG&A calculation an amount for CPPI's total asset impairment. P.R. 585. The application of the transactions disregarded adjustment increased Canfor's actual cost for electricity at the PG Sawmill and therefore its total reported COP for the mill.

## IV.    SUMMARY OF ARGUMENT

1.    Commerce failed to recognize the impact of the contractual terms of Canfor's sales of chips by the Radium and Elko sawmills had on the prices of those chips. Canfor was contractually obligated to sell the chips produced by these sawmills to a particular party at prices that were established pursuant to a long-term supply contract set some nine years before the period of review. Contrary to Commerce's conclusion the contract did not permit price adjustments to reflect current market conditions. Accordingly, Commerce should have excluded chip sales from the Radium and Elko sawmills in calculating the market price to be used as the benchmark for Canfor's chip sales to affiliated parties.

In similar circumstances, in the 2003-2004 review of *Softwood Lumber from Canada*, where Commerce agreed with Canfor that the "fair market value" Canfor's mills obtained for sales of chips to unaffiliated purchases was "clearly distorted due to its contractual agreements," Commerce chose to compare Canfor's chip sales to affiliated

parties in BC to the weighted-average market price of the other respondents' wood chip sales in BC. Commerce's use of distorted chip prices in this review for purposes of the transactions disregarded adjustment is unsupported by substantial evidence and contrary to law.

2. Commerce unjustifiably increased the cost of manufacturing at Canfor's PG Sawmill by on account of an affiliated "transaction" where no transaction existed. By treating an internal allocation of electricity charged by the unaffiliated electric utility as a purchase and re-sale of electricity by CPPI, Commerce elevated form over substance and ignored economic reality. Commerce's finding that CPPI supplied electricity to Canfor, and its adjustment of the "price" in that putative transaction, are unsupported by substantial evidence.

## V.   **STANDARD OF REVIEW**

In reviewing a challenge to Commerce's final determination in an AD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2020).

## VI.   **ARGUMENT**

In making a determination, Commerce must "consider the whole record," including evidence in the record that "fairly detracts from {the} weight" of the evidence on which Commerce relied. *Universal Camera Corp. v. Nat'l Labor Rels. Bd.*, 340 U.S. 474, 485-88 (1951). Moreover, the Court must be able to find that Commerce "articulate{d} {a} rational connection between the facts found and the choice made" by Commerce. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Where, as here, Commerce's

determination contradicts and ignores record evidence, the Court should remand for Commerce to reconsider its determination in light of the whole record.

### A. Commerce's Decision To Adjust Canfor's Reported Wood Chip Revenue Is Not Supported By Substantial Evidence And Not In Accordance With Law

In the *Final Results*, Commerce adjusted Canfor's actual revenue from wood chip sales to affiliates in BC to reflect what Commerce deemed to be "market value" for chips sold in BC between unaffiliated parties. The statutory "transactions disregarded" rule in 19 U.S.C. § 1677b(f)(2) provides that Commerce may disregard Canfor's sales of chips to its affiliate "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2); P.R. 585. To arrive at its estimate of the amount "usually reflected" in sales of chips, Commerce compared average per-unit sales prices at which Canfor sold chips to affiliated parties and unaffiliated parties during the POR. *See* C.R. 473 (P.R. 520). Commerce then adjusted downward the revenues earned on sales to affiliated parties by the difference between that amount and the average of the revenue earned on sales to unaffiliated parties.

In doing so, however, Commerce included in its analysis, without adjustment, the prices at which chips were sold from Canfor's Elko and Radium sawmills to [                    ], a company that operated a pulp mill in the vicinity. P.R. 585 at 55. Those chip prices, while made to an unaffiliated party, nevertheless do not "fairly reflect the amount usually reflected in sales of chips in the market under consideration" because the chips were sold pursuant to a long-term supply contract at prices negotiated nine years prior to the POR, in 2012. That supply contract was bargained-for consideration in Canfor's agreement to purchase of the Elko and Canal Flats sawmills from [          ] (the then-owner of those mills). These contractual terms resulted in

chip prices that were considerably less than the prevailing market price for woodchips in BC during the POR, as measured by other sales of chips between unaffiliated parties during the POR. Including those aberrational prices in the calculation of the market price for chips used in the transactions disregarded analysis understated the actual market price for chips in BC during the POR and led Commerce to erroneously adjust downward the by-product revenue on the substantial portion of its chip sales that were made to affiliated pulp mills. As a result, Commerce unreasonably increased Canfor's cost of manufacturing lumber by [          ] the byproduct revenue offset that should have been applied to Canfor's costs. Record evidence establishes that the chip sales from Elko and Radium do not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration, and Commerce's decision to include them in the comparison to Canfor's affiliated party chip transactions was therefore unsupported by substantial evidence and contrary to law.

　　　To demonstrate that the Elko and Radium prices were not representative of current market conditions, Canfor submitted the terms of the applicable supply contract as well as evidence that other market prices between unaffiliated parties were significantly higher than the Elko and Radium chip prices during the period. Commerce did not, however, address this analysis in its final determination. To the contrary, the only explanation Commerce provided in the *Final Results* for its determination that the Elko and Radium chip sales at issue were not "unrepresentative of a market price for purposes of {the} transactions disregarded analysis" is the assertion that the long term supply contract "appears to allow for periodic adjustments to the wood chip prices by reference to industry publications" and therefore allegedly "permit{s}

revisions in response to changes in market conditions."[3]  P.R. 585 at 55.  This explanation is

cursory at best, and fails provide substantial evidence that the Elko and Radium chip sales "fairly

reflect the amount usually reflected in sales of merchandise under consideration in the market

under consideration" for purposes of 19 U.S.C. § 1677b(f)(2).

Commerce's final determination ignores record evidence that the chip sales prices

established in the long term supply contract were negotiated in 2012—outside of the POR—at

prices that expressly were intended to [                                    ] as

consideration in Canfor's purchase of the Elko and Canal Flats mills from [          ].  C.R. 185

(P.R. 322) at Exhibit D-14.  That these prices are not consistent with the market conditions

prevailing during the POR is confirmed by the fact that the chip prices from Elko and Radium

are [                              ] of other chip sales transactions in BC between unaffiliated

parties during the POR:  The average per-unit chip prices from Elko and Radium, respectively,

are [                    ] per ton whereas the other unaffiliated chip prices on the record range

from [          ] per ton, at the lowest, to [            ] per ton.  C.R. 185 (P.R. 322) at Exhibit D-

15; C.R. 152 (P.R. 319) at Exhibit WF-AR4-D4.  Given the record as a whole, Commerce's

explanation in the *Final Results* fails to explain how the chip sales from Elko and Radium "fairly

reflect the amount usually reflected in sales of chips" as required by 19 U.S.C. § 1677b(f)(2).

19 U.S.C. § 1677b(f)(2) "allows Commerce to disregard certain transactions between

affiliated companies and to value costs in the transaction based on fair market value, as though

the transaction occurred between unaffiliated companies."  *Viraj Group v. United States*, 476

---

[3] Commerce also notes that the *Final Results* are consistent with its determinations in the 2019 and 2020 administrative reviews of the antidumping duty order on *Softwood Lumber from Canada*, P.R. 585 at 54, but the *Final Results* of both the 2019 and 2020 administrative reviews are not final as they are on appeal before a binational panel pursuant to Article 10.12 of the United States-Mexico-Canada Agreement (USMCA).

F.3d 1349, 1356-57 (Fed. Cir. 2007); *see also SKF USA Inc. v. United States*, 630 F.3d 1365,

1372 (Fed. Cir. 2011) (The transactions disregarded rule "allow{s} Commerce to use the

unaffiliated party transaction price as a proxy for cost in a specific set of circumstances where a

transaction between affiliated entities does not appear to adequately represent the true amount.").

When assessing the prices of transactions between affiliated parties for the purpose of applying

the transactions disregarded rule, Commerce will generally use the higher of transfer price (the

price between the affiliates) or market price. In this case, because wood chip sales revenue is an

offset to cost, Commerce used the lower of transfer price or market price. *See* P.R. 585 at 54;

*see also Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood*

*Lumber Products From Canada*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) and

accompanying Issues and Decision Memorandum at Comment 12 ("*Lumber IV* Review IDM").

Commerce's "preference for how to establish market value" first looks at whether the respondent

has transactions with an unaffiliated supplier. *See Rebar Trade Action Coalition v. United*

*States*, 398 F.Supp.3d 1359, 1372 (Ct. Int'l Trade 2019); *see also Hot-Rolled Steel from Brazil*

*IDM* at Comment 7; *Lumber IV* Review IDM at Comment 12. If unaffiliated transactions are

unavailable, it looks to transactions between the affiliate and unaffiliated parties, and lastly it

looks to any reasonable source for market value available on the record. *Rebar Trade Action*

*Coalition*, 398 F. Supp. 3d at 1372.

　　　In view of the evidence placed on the record by Canfor regarding the contractual terms of

these sales and the disparity between the resulting chip prices and chip prices for other

transactions between unaffiliated parties, it was incumbent upon Commerce to explain how the

chip prices from Elko and Radium to [                    ] constitute a reasonable method to

evaluate whether the Canfor's sales of chips to affiliated parties fairly reflect the amount usually

reflected in sales of chips in the market under consideration.  *See Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1384 (Ct. Int'l Trade 2023) (remanding Commerce's interpretation of the "market under consideration" provision of 19 U.S.C. § 1677b(f)(2) where Commerce did not explain why the selection of the respondent's country rather than the affiliated supplier's country constituted a '"reasonable method" to confirm that the affiliated prices reflect arm's length transactions' between {the} respondent and {its} supplier."); *PT Zinus Global Indonesia v. United States*, 628 F. Supp 3d 1252, 1285 (Ct. Int'l Trade 2023) (remanding for Commerce to reconsider whether Commerce selection of the market under consideration "constituted a reasonable method to confirm that the affiliated prices reflect arm's length transactions under 19 U.S.C. § 1677b(f)(2).").

The court has held that Commerce must address situations where the market price that it uses to compare against the affiliated party transactions may be unreliable.  *Best Mattresses*, 628 F. Supp 3d at 1385 (holding "Commerce's interpretation of the transactions disregarded rule is not in accordance with law" where Commerce did not address the potential unreliability of the non-market economy data that it had included in the market price that it compared to the affiliated party transactions at issue).  Commerce itself has recognized that the market value it uses in its comparison must be a reasonable reflection of unaffiliated sales prices in the market:

> Absent evidence that the input purchased (or sold, in the case of byproducts) from unaffiliated suppliers is *not comparable to that purchased from its affiliates, or evidence of unusual circumstances surrounding such unaffiliated purchases*, we deem a respondent's own unaffiliated purchases (or sales, in the case of byproducts) to be our first preference for a market price.

*Lumber IV* Review IDM at Comment 12 (emphasis added); *see also Low Enriched Uranium From France IDM* at Comment 3.  Commerce routinely states that its analysis "seeks to find the market value that best represents the company's own experience in the specific markets in which it operates."  *See, e.g.*, *Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of*

16

*Antidumping Duty Administrative Review*, 73 Fed. Reg. 7,710 (Dep't Commerce Feb. 11, 2008) and accompanying Issues and Decision Memorandum at Comment 7.

      In the instant case, the record demonstrates that the sale of chips from the Elko and Radium sawmills do not fairly reflect the amount usually reflected in sales of chips in the market due to the long-term supply contract. When Canfor purchased the Elko and Canal Flats sawmills from [        ] in 2012, a stipulation of the sawmills' purchase obligated Canfor to supply chips from those sawmills, along with the Radium sawmill, to [             ] pulp mill under a long-term supply contract at prices that [              ]. C.R. 181 (P.R. 320) at D-24–D-27. The chip prices established in that agreement were divorced from market conditions because they were set, in part, as consideration in the bargained-for exchange to complete Canfor's purchase of the Elko and Canal Flats sawmills. Indeed, the negotiation was designed to guarantee a favorable arrangement to [       ] and, thus, facilitate the purchase. [                   ], which was being retained by [     ], was dependent on woodchips from Radium and Elko for its fiber supply necessary for production of its pulp products, and the chip supply contract indicates that [      ] regarded securing that supply at favorable prices as indivisible from the overall deal to sell the mills to Canfor. The preamble to Canfor's and [      ] agreement makes its purpose clear:

     [

                             ]

C.R. 185 (P.R. 322) at Exhibit D-14.  The fact that Canfor, the chip seller, agreed to [

] 

demonstrates that, in setting chip prices for [          ], Canfor was acting under price-

setting constraints not typical in any market driven by supply and demand principles such

that the chip prices from Elko and Radium cannot fairly reflect the amount usually

reflected in the sales of chips in the market under consideration.

      To demonstrate that the Elko and Radium prices were not representative of market prices,

Canfor did not rely on the terms of the contract alone.  Canfor also provided an analysis of those

prices as compared to other unaffiliated chip transactions on the record, which confirmed that the

Elko and Radium prices were substantially lower than other contemporaneous chip sales among

unaffiliated parties.  The chart below shows that the average per-unit price for chips in

unaffiliated party transactions in BC are [                              ] the prices at which Elko and

Radium sold chips pursuant to their legacy agreement.  The chart below, which Canfor included

in its case brief before the agency, includes (i) unaffiliated party sales of chips by Canfor from its

Wynnwood sawmill, (ii) and the prices at which Canfor's affiliate, CPPI purchased chips from

unaffiliated sawmills, and (iii) chip sales to unaffiliated parties in BC made by [

].

### Mill-Specific POR Average Per-Unit Unaffiliated Chip Prices in BC

[

]

C.R. 185 (P.R. 322) at Exhibit D-15; C.R. 152 (P.R. 319) at Exhibit WF-AR4-D4. Thus, the average per-unit chip price from Elko and Radium was approximately [    ] per ton, whereas the average market price for chips in BC in other unaffiliated party transactions during the POR range from [                      ]. Commerce never addressed in detail the impact of the terms of the long-term supply contract or the resulting price differential between the Elko and Radium sales versus the other unaffiliated prices in the record. The failure to meaningfully address this evidence, which detracts from the weight of the evidence on the record, requires reversal and remand to the agency.

Commerce nevertheless determined that using the Elko/Radium prices was reasonable because "the contract appears to allow for period adjustments to the wood chip prices by reference to industry publications," and thus permits "revisions in response to changes in market conditions." P.R. 585 at 55. But Commerce's fails to explain how the period adjustments permitted under the agreement render the Elko and Radium prices as fairly reflective of the amount usually reflected in the sales of chips in the market during the POR. [

]. C.R. 185 (P.R. 322) at Exhibit D-14 p.4 and p.14 (emphasis added). Thus the adjustments Commerce references were not permitted under the agreement until after the POR. Dring the POR Canfor instead remained bound to [

]. *Id* at p. 1 and p. 4. That no adjustment for market conditions was applied during the POR is confirmed by the record. The price of chips from Elko and Radium, respectively, during the POR were [

] per ton, which was virtually unchanged from the [

].  C.R. 185 (P.R. 322) at Exhibit D-14 Schedule A Table

A-2.   Meanwhile, as noted, chips sold between unaffiliated parties that were not subject to these

contractual constraints were trading between [                                                        ].  Accordingly, the

adjustment provision cited by Commerce in the *Final Results* does not provide evidence that the

Elko and Radium chip sales fairly reflect the market price of chips during the POR.

Commerce has previously held that terms of certain contractual arrangements can distort

sales prices to unaffiliated parties such that they cannot be considered reflective of market prices.

In the 2001 antidumping duty investigation of Softwood Lumber from Canada, for instance,

Canfor argued that "the nature of a proprietary contractual relationship" and the effect of certain

intra-company transactions distorted the price for chips sold to unaffiliated parties from its

Alberta mills.  *Notice of Final Determination of Sales at Less Than Fair Value: Certain

Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,539 (Dep't Commerce April 2, 2002)

and accompanying Issues and Decision memorandum ("*Lumber IV* Investigation IDM") at

Comment 11.  Therefore, Canfor argued in that case that the prices for chips sold to those

unaffiliated parties could not be accurately compared to prices for chips sold to affiliated parties

from its BC mills.  Commerce agreed, finding that "the fair market value that Canfor's mills

obtain" for chip sales to unaffiliated parties was "clearly distorted due to its contractual

agreements" and could not be used to determine market price.  *Id.*  Like in the *Lumber IV*

Investigation, the chip sales here from Elko and Radium may not be used to determine market

price.

Accordingly, Commerce's determination to include sales of chips from the Elko and

Radium mills in the comparison with Canfor's affiliated chip sales is not supported by

substantial evidence and contrary to law.  The *Final Results* fail to explain how the Elko/Radium

prices reflect the price usually reflected in sales of chips in the market during the POR.  On

remand, Commerce must exclude the prices at which Elko and Radium sold woodchips to

[                              ] from the calculation of market value under the arm's-length test or,

alternatively, adjust the Elko and Radium chip prices to account for the respondent companies'

actual experience in the BC chip market.

**B.  <u>Commerce's Decision To Adjust The Reported Cost Of Electricity At The PG Sawmill Is Not Supported By Substantial Evidence And Not In Accordance With Law</u>**

In the *Final Results*, Commerce made an adjustment to Canfor's total cost of

manufacturing to account for so-called "transactions" it classified as purchases of electricity by

Canfor's PG Sawmill from Canfor's affiliated pulp manufacturer, CPPI.  *See* P.R. 585 at 57; *see

also* C.R. 511 (P.R. 587).  Commerce applied the transactions disregarded rule to adjust these

"transactions" so that Canfor's costs would not be understated by what Commerce deemed to be

transfer prices between affiliated parties rather than market prices between unaffiliated parties.

In the *Final Results*, Commerce treated the internal allocation of the electricity bill from the

unaffiliated party, BC Hydro, as if CPPI was purchasing the electricity from BC Hydro and then

re-selling that electricity to the PG Sawmill.  Specifically, Commerce stated in its Final Cost

Memo that it "computed a cost of production (*i.e.*, cost of manufacturing plus selling, general

and administrative (SG&A) expenses) for the electricity provided by CPPI as an approximation

of the period of review (POR) average market price."  C.R. 511 (P.R. 587) at 1.  In other words,

Commerce calculated a "cost of production" for CPPI for the electricity it allegedly "provided"

to the PG Sawmill by adding CPPI's SG&A expenses to the actual cost of the electricity charged

by (and paid to) BC Hydro.  Commerce thus created a phantom cost to CPPI for splitting the BC

Hydro bill among the Canfor entities at the facility. Commerce then compared this artificial CPPI "cost of production" to the PG Sawmill's actual cost for electricity and concluded that the actual cost should be disregarded and replaced by this artificial cost of production. This determination is unsupported by substantial evidence and contrary to law.

The transactions disregarded rule permits Commerce to disregard "a transaction directly or indirectly between affiliated persons" and only permits Commerce to do so if the transaction "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2). "If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). Here, however, there is no "transaction" exchanging electricity between Canfor and CPPI for Commerce to disregard. The price at which Canfor purchased the electricity from BC Hydro, the unaffiliated electric utility supplier in BC, by definition reflects the amount usually reflected in the sales of electricity in the market under consideration. Accordingly Commerce may not disregard Canfor's purchase price for electricity because it is an arm's length market price. Moreover, even if Commerce were permitted to re-classify the transaction as a purchase of electricity from CPPI rather than from BC Hydro, the second sentence of subsection (f)(2) requires Commerce to use "information available as to what the price would have been if the transaction had occurred between persons who are not affiliated." Here, information on the price of the electricity between unaffiliated persons is on the record in the form of the actual price for electricity charged by BC Hydro to CPPI.

CPPI does not provide electricity to the PG Sawmill. The record establishes that (1) the supplier of electricity is BC Hydro, the electric power company in BC; (2) Canfor is not affiliated with BC Hydro; (3) BC Hydro—not CPPI—sets the price for the electricity consumed by the PG Sawmill; and (4) the PG Sawmill actually paid the value of the electricity it consumed, which was set by BC Hydro. Commerce elevated form over substance to find a transaction where no actual exchange of money for goods or services took place.

Commerce itself noted in the *Final Results IDM* that the transactions disregarded rule applies to a respondent's purchases of inputs from "an affiliated *supplier*" or "*reseller*," but Commerce's own understanding of the rule is in conflict with how Commerce actually applied the rule here. *See* P.R. 585 at 57-58 (emphasis added). In the *Final Results*, Commerce claims that "a transaction for electricity took place between the PG sawmill and CPPI rather than directly between the sawmill and the unaffiliated electricity supplier" because CPPI acts as the "document handler" and "payment intermediary."[4] P.R. 585 at 58. However, Commerce does not explain how a "transaction" for electricity takes place for purposes of 19 U.S.C. § 1677b(f)(2) where there is no exchange of electricity between Canfor and CPPI. The record evidence demonstrates that CPPI did not *supply* the electricity to the PG Sawmill. BC Hydro is the supplier. Nor is CPPI an affiliated "reseller of electricity" as Commerce erroneously determined because CPPI does not take possession or title to the electricity from BC Hydro and then sell it to the PG Sawmill. Rather, the electricity flows from BC Hydro directly to the PG Sawmill. BC Hydro handles the transportation of the "input" directly to the sawmill, and title passes from BC Hydro to the PG Sawmill.

---

[4] The only record information that Commerce cites to support its explanation is to Canfor's July 28, 2021 supplemental questionnaire response from a different administrative review. P.R. 585 at 58 nn.305-07.

Commerce has previously verified the facts that BC Hydro transmits the electricity to the Canfor facilities via one transmission line and that the volume and value of electricity consumed by the PG Sawmill matches what it pays to CPPI, which CPPI then transfers to BC Hydro. In the investigation segment of this proceeding, Commerce noted that BC Hydro maintains a single power line to the Northwood area by which electricity flows to all four facilities at the location. C.R. 186 (P.R. 322) at Exhibit D-34 p. 19. Commerce reported that the electricity flows through Canfor's, not CPPI's, internal meters so that the electricity usage may be read and allocated between PG Sawmill and CPPI. *Id.* Electricity usage is thus tracked and allocated in the normal course of business. *Id.* The volume of electricity used by the PG Sawmill (measured by kilowatt hour) is the volume of electricity that BC Hydro charged for, and matches the amount the PG Sawmill paid to CPPI to transfer to BC Hydro. *Id.* As Commerce previously verified, CPPI is merely "dividing up the overall BC Hydro bill." *Id.* Like roommates sharing a lease, the four Canfor properties on adjacent land in BC have apportioned their common electric bill based on their individual usage and one of them, CPPI, sends the check to the utility company. The PG Sawmill pays CPPI to cover *its share* of the common electric bill.

Commerce has declined to apply the transactions disregarded rule in similar circumstances. For instance, when the record shows that an affiliate acts only as a "purchase agent" and is not, in fact, the *supplier* of the input, Commerce has found that the respondent transacts only with the unaffiliated input supplier, not with the affiliate. *See, e.g.*, *Chlorinated Iscoyanurates From Japan: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 56,059 (Dep't Commerce Sept. 18, 2014) and accompanying Issues and Decision Memorandum at Comment 4. The PG Sawmill *did* purchase its electricity from an unaffiliated supplier, BC Hydro. Commerce's analysis should have ended there.

Additionally, the purpose of applying the statutory transactions disregarded rule is "to adjust the transfer price for the service or input at issue so that it reflects *the market price*." *Rebar Trade Action Coalition v. United States*, 398 F.Supp.3d 1359, 1372 (Ct. Int'l Trade 2019) (emphasis added). But the PG Sawmill did pay a market price for the input (electricity) at issue. The fact that CPPI facilitates payment of a common bill does not provide evidence that the price that Canfor actually paid for the electricity, or the prices charged by BC Hydro, do not fairly reflect the amount usually reflected in sales of electricity in the market under consideration pursuant to 19 U.S.C. § 1677b(f)(2). Commerce may not disregard a transaction pursuant to the transactions disregarded rule unless it explains how the alleged "transaction" does not fairly reflect the amount usually reflected in sales of electricity in the market. Canfor's purchases of electricity from BC Hydro are at arm's length and fairly reflect the market price of electricity.

To the extent that Commerce disregards Canfor's purchases of electricity at the PG sawmill and Commerce determines "no other transactions are available for consideration," 19 U.S.C. § 1677b(f)(2) provides that Commerce "shall" use as the market price "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). Information as to what the amount for unaffiliated electricity purchases would have been between persons who are not affiliated is on the record. The unaffiliated, arm's length market prices charged by BC Hydro to CPPI for electricity are available on the record and demonstrate what the amount would have been if the transactions for electricity had occurred between unaffiliated persons.

Commerce's treatment of the PG Sawmill's electricity purchases is inconsistent with the statute and in contradiction to the record. Therefore, Commerce's treatment amounts to an arbitrary and unjustified increase in the cost of manufacturing of the PG Sawmill over and above

its actual cost of acquiring electricity from the unaffiliated supplier. The *Final Results* are unsupported by substantial evidence and contrary to law.

## VII.   <u>CONCLUSION AND RELIEF REQUESTED</u>

For the foregoing reasons, Plaintiffs and Plaintiff-Intervenors respectfully request that this Court hold Commerce's *Final Results* unsupported by substantial evidence and otherwise not in accordance with law as demonstrated herein; remand the *Final Results* to Commerce for a redetermination consistent with the judgment and finding of this Court; and grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

**MORRIS MANNING & MARTIN LLP**
1333 New Hampshire Ave, NW
Suite 800
Washington, D.C. 20036
(202) 216-4819

  /s/ R. Will Planert
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
Stephen A. Morrison
*Counsel to Canfor Corporation,*
*Canadian Forest Products, Ltd., and*
*Canfor Wood Products Marketing,*
*Ltd.*

*/s/ Henry D. Almond*
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**

Dated: April 5, 2024

601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko
Marketing & Sales Ltd. and Gilbert
Smith Forest Products*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Carrier Forest Products
Ltd., Carrier Lumber Ltd., Olympic
Industries Inc. and Olympic Industries
ULC*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de
l'Industrie forestiere du Quebec and
Ontario Forest Industries Association*

*/s/ Amy J Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW.
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com

*Counsel to the British Columbia
Lumber Trade Council*

## VIII. <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 7,694 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ R. Will Planert

R. Will Planert

Dated: April 5, 2024