**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| The Government of Canada, *et al.*,<br><br>Plaintiffs,<br><br>Canfor Corporation, *et al.*,<br><br>and<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations,<br><br>Consolidated Plaintiffs,<br><br>Canfor Corporation, *et al.*,<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>The United States,<br><br>Defendant,<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, *et al.*,<br><br>Defendant-Intervenors. | Consol. Court No. 1:23-cv-00187-JCG |

## ORDER

Upon consideration of the Motion for Judgment on the Agency Record Regarding Application of Differential Pricing Analysis pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("USCIT Rules") filed by the Government of Canada; the Governments of Alberta, Ontario, and Québec; the British Columbia Lumber Trade Council, the Conseil de l'Industrie Forestière du Québec, and the Ontario Forest Industries Association; as well as

Canfor Corporation, Canadian Forest Products, Ltd., Canfor Wood Products Marketing Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, Fontaine, Inc., Interfor Corporation, Interfor Sales & Marketing Ltd., Resolute FP Canada Inc., Tolko Industries Ltd., Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., West Fraser Mills Ltd., Chaleur Forest Products, Inc., Chaleur Forest Products, L.P., J.D. Irving, Limited, Delco Forest Products, Ltd., Devon Lumber Co., Ltd., H.J. Crabbe & Sons, Ltd., Langevin Forest Products, Inc., Marwood, Ltd., North American Forest Products, Ltd., and Twin Rivers Paper Co. (collectively, the "Canadian Parties"), and all responses thereto, and all other relevant record information, it is hereby:

ORDERED that the Canadian Parties' USCIT Rule 56.2 Motion for Judgment on the Agency Record Regarding Application of Differential Pricing Analysis is GRANTED; and it is further

ORDERED that the final determination by the U.S. Department of Commerce in the fourth administrative review of the antidumping duty order on softwood lumber products from Canada, *see Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023), as amended by *Certain Softwood Lumber Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in Part; 2021*, 88 Fed Reg. 61,511 (Dep't Commerce Sept. 7, 2023), is reversed and remanded to Commerce for disposition consistent with the opinion of the Court.

By: _____
The Honorable Jennifer Choe-Groves, Judge

Dated: _____
New York, New

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

The Government of Canada, *et al.*,

        *Plaintiffs*,

Canfor Corporation, *et al.*,

    and

Committee Overseeing Action for Lumber International Trade Investigations or Negotiations,

        *Consolidated Plaintiffs*,

Canfor Corporation, *et al.*,

        *Plaintiff-Intervenors*,

     v.

The United States,

        *Defendant*,

Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, *et al.*,

        *Defendant-Intervenors*.

**Consol. Court No. 1:23-cv-00187-JCG**

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information deleted on pages: 17, 18, 21–23, 38, 43, 44, 52–57, 68, 69, and 72

**THE CANADIAN PARTIES' MOTION FOR JUDGMENT ON THE AGENCY RECORD REGARDING APPLICATION OF DIFFERENTIAL PRICING ANALYSIS AND ACCOMPANYING MEMORANDUM OF LAW AND POINTS OF AUTHORITIES**

April 5, 2024

*/s/ Eric S. Parnes*
Eric S. Parnes
Joanne E. Osendarp
Lynn Kamarck
Alan Kashdan
Tyler Kimberly
**Blank Rome LLP**
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-5479
Email: eric.parnes@blankrome.com
*Counsel to the Government of Canada*

*/s/ H. Deen Kaplan*
H. Deen Kaplan
Jonathan T. Stoel
**Hogan Lovells US LLP**
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
Tel: (202) 637-5799
Email: deen.kaplan@hoganlovells.com
*Counsel to the Government of Ontario*

*/s/ Amy J. Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW.
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com
*Counsel to the British Columbia Lumber Trade Council*

*/s/ Lynn Fischer Fox*
Lynn Fischer Fox
Gina M. Colarusso
Archana Rao P. Vasa
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5601
Email: lynn.fischerfox@arnoldporter.com
*Counsel to the Government of Alberta*

*/s/ Nancy Noonan*
Nancy Noonan
**ArentFox Schiff LLP**
1717 K Street, NW.
Washington, DC 20006
Tel: (202) 857-6479
Email: nancy.noonan@afslaw.com
*Counsel to the Government of Québec*

*/s/ Mark B. Lehnardt*
Mark B. Lehnardt
**Law Offices of David L. Simon, PLLC**
1025 Connecticut Avenue, NW.
Suite 1000
Washington, DC 20036
Tel: (202) 642-4850
Email: MarkLehnardt@DLSimon.com
*Counsel to Fontaine Inc.*

*/s/ Diana Dimitriuc-Quaia*
Matthew Nolan
Diana Dimitriu Quaia
Mario Torrico
**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6291
Email: diana.dimitriuc-quaia@afslaw.com
*Counsel to Interfor Corporation, Interfor*
*Sales and Marketing Ltd., Chaleur Forest*
*Products, Inc. and Chaleur Forest Products,*
*L.P.*

*/s/ R. Will Planert*
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
Stephen A. Morrison
**Morris, Manning & Martin, LLP**
1333 New Hampshire Avenue, NW.
Suite 800
Washington, DC 20036
Tel.: (202) 216-4819
Email: wplanert@mmmlaw.com
*Counsel to Canfor Corporation, Canadian*
*Forest Products, Ltd., and Canfor Wood*
*Products Marketing Ltd.*

*/s/ Henry D. Almond*
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko*
*Marketing & Sales Ltd., and Gilbert Smith*
*Forest Products*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de*
*l'Industrie forestiere du Québec and Ontario*
*Forest Industries Association*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
Tel:202-688-3610
Email: trade@mowrygrimson.com
*Counsel to Carrier Forest Products Ltd. and*
*Carrier Lumber Ltd., Olympic Industries, Inc.*
*and Olympic Industries ULC*

/s/ Donald Harrison
Donald Harrison
**Gibson, Dunn & Crutcher, LLP**
1050 Connecticut Avenue, NW.
Suite 900
Washington, DC 20036-5306
Tel: (202) 955-8560
Email: dharrison@gibsondunn.com
*Counsel to West Fraser Mills Ltd.*

/s/ Jay Charles Campbell
Jay Charles Campbell
Allison Kepkay
Walter Spak
**White & Case, LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807
Tel: (202) 626-3632
Email: jcampbell@whitecase.com
*Counsel to J.D. Irving, Limited*

/s / Rajib Pal
Rajib Pal
**Sidley Austin LLP**
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8329
Email: rpal@sidley.com
*Counsel to Delco Forest Products Ltd.,*
*Devon Lumber Co. Ltd., H.J. Crabbe & Sons*
*Ltd., Langevin Forest Products Inc.,*
*Marwood Ltd., North American Forest*
*Products Ltd., and Twin Rivers Paper Co.*
*Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... iiiiii

I.      STATEMENT PURSUANT TO USCIT RULE 56.2 ...................................................... 2

      A.     Administrative Determination Under Review ........................................................ 2

      B.     Issues Presented .................................................................................................... 2

II.     STATEMENT OF FACTS .......................................................................................... 3

      A.     Procedural History ................................................................................................ 3

      B.     Commerce's Differential Pricing Methodology and Use of Cohen's *d* ................. 5

III.    STANDARD OF REVIEW .......................................................................................... 9

IV.    ARGUMENT ............................................................................................................. 13

      A.     Commerce's Unreasonable and Unprincipled Application of Cohen's *d* to Identify Significant Price Differences Is Not in Accordance With Law ............................ 13

           1.     Fundamental Statistics Principles and the Statistics Literature on which Commerce Relies Require that the Assumptions Be Satisfied to Produce a Meaningful *d* Coefficient ........................................................................ 14

                a.     As a Parametric Measure of Effect Size, Cohen's *d* Depends on the Statistical Normality of the Measured Distributions .................... 15

                b.     Interpretations of Cohen's *d* Depend on the Fact that It Is a Parametric Method ...................................................................... 23

           2.     Commerce Fails to Provide Adequate Explanation for Its Misapplication of Cohen's *d* .......................................................................................... 29

                a.     *Stupp II* and the Statistics Literature Require Commerce to Satisfy the Assumptions to Reasonably Calculate Cohen's *d* ................. 30

                      i.     Commerce's Supposed Use of Full Populations of Data Is One of Many Red Herrings ............................................... 31

                        ii.    The "Operational Thresholds" are Not Independent of the *U* Measures or the Assumptions ....................................... 34

                      iii.   Subsequent Steps in the DPM Cannot Ameliorate the Flaws in Commerce's Cohen's *d* Test ......................................... 39

        b.     Commerce's Methodology and Explanation for Calculating the Denominator of the *d* Coefficient Are Unreasonable ................... 45

    3.     The Data to Which Commerce Applied Cohen's *d* Fail to Meet the Underlying Assumptions ........................................................................ 51

B.     Commerce Fails To Meaningfully Consider and Address the Hedges Report ..... 58

C.     Commerce's Application of A-T Based on Differences Among Time Periods Is Unsupported by Substantial Evidence and Contrary to Statutory Requirements . 64

    1.     Commerce Fails to Adequately Address Record Evidence that Variations in the Mandatory Respondents' Pricing Were Due to Price Volatility, Not Targeted Dumping .................................................................................. 65

    2.     Commerce Cannot Explain Why Application of the Preferred A-A Methodology Does Not Account for Significant Price Differences Over Time ...................................................................................................... 72

    3.     Commerce's Methodology Does Not Result in Fair Price Comparisons . 73

D.     The Court Should Direct Commerce to Apply Any Downward Adjustments to The Mandatory Respondents' Margins to the Rate Assigned to the Non-Selected Companies.............................................................................................................. 75

CONCLUSION AND PRAYER FOR RELIEF ........................................................................ 77

# TABLE OF AUTHORITIES

**Authority**                                                                                                   **Page(s)**

**Cases**

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) .............................. 75

*Algoma Steel Corp. v. United States*, 865 F.2d 240 (Fed. Cir. 1989).......................... 42

*Anshan Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236 (Ct. Int'l 2004) ...................... 58

*APEX Exps. v. United States*, 777 F.3d 1373 (Fed. Cir. 2015)................................... 10

*APEX Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) ...................... 71

*Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017)........................................... 11

*Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019)......................... 76

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974)...... 12, 62, 70, 71

*Chemtall, Inc. v. United States*, 878 F.3d 1012 (Fed. Cir. 2017)................................... 62

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)................................ 10

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 11

*City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013) ................................................ 10

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197 (1938) ..................................................... 9

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ..................................... 11, 12

*DAK Ams., LLC v. United States*, 456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ......................... 48

*Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2023 WL 3222683 (Ct. Int'l Trade Apr. 20, 2023)................................................................. 76

*Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ................................. 63, 64

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................. 70, 71

*Diamond Sawblades Mnfs.' Coal. v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) ...... 38, 66, 71

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020)..................................... 44

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ...................... 58

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997). ............................................ 9

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) .................................. 11

*Hebei Metals & Minerals Imp. & Exp. v. United States*, 366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005) ........................................................................................................................................... 58

*Husteel Co. v. United States*, 471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ................................ 76

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) .......................................... 69, 70

*Marmen Inc. v. United States*, 545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021)............................... 13

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) ................................................ 59, 63, 64

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ............. passim

*Mid Continent Steel & Wire, Inc. v. United States*, 628 F. Supp. 3d 1316 (Ct. Int'l Trade 2023) ............................................................................................................................................... 47, 50

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019) .................... 12

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) .................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ... 11, 58, 64, 65

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016).................................... 32

*NEXTEEL Co. v. United States*, 569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022)....................... 63, 64

*NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022) ......................................... 12

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)................................... passim

*NLRB v. CNN Am., Inc.*, 865 F.3d 740 (D.C. Cir. 2017) ............................................................. 37

*Qingdao Sentury Tire Co. v. United States*, 539 F. Supp. 3d 1278 (Ct. Int'l Trade 2021).......... 76

*Ramaprakash v. F.A.A.*, 346 F.3d 1121 (D.C. Cir. 2003)............................................................. 37

*Samsung Int'l v. United States*, 887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012) ................. 61, 62, 63

*SCM Corp. v. United States*, 487 F. Supp. 96 (Cust. Ct. 1980).................................................... 10

*SeAH Steel Corp. v. United States*, 539 F. Supp. 3d 1341 (Ct. Int'l Trade 2021) ....................... 13

*Shandong Rongxin Imp. & Exp. Co. v. United* States, 163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) ............................................................................................................................................... 38

*Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357 (Fed. Cir. 2022) ................................ 11

*SKF USA, Inc. v. United States,* 263 F.3d 1369 (Fed. Cir. 2001)........................................... 12, 37

*Stupp Corp. v. United States*, 359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ................................ 12

*Stupp Corp. v. United* States, 5 F.4th 1341 (Fed. Cir. 2021) ................................................... passim

*Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) .......................... 39, 44

*The Timken Co. v. United States*, 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016).............. 66, 67, 70

*Timex V.I. Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)................................................. 10

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ................................... 11, 65

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996).............................................. 37

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ...................................................... 9, 38

*Yangzhou Bestpak Gifts & Crafts Co. Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..... 11

## Statutes and Legislation

19 U.S.C. § 1516a(b)(1)(B) ...................................................................................................... 9, 10

19 U.S.C. § 1673d(c)(5)(A).............................................................................................................75

19 U.S.C. § 1677b(a)(1)(A) ......................................................................................................... 73

19 U.S.C. § 1677f-1(d)(1)(A) ......................................................................................................... 5

19 U.S.C. § 1677f-1(d)(1)(B) ................................................................................................. passim

19 U.S.C. §1677f(i)(3)(A) ............................................................................................................ 11

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H. R.
Doc. No. 103-316 (1994) ...................................................................................................... 65, 66

## Administrative Determinations

*Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty
Administrative Review; 2012–2013*, 79 Fed. Reg. 51,309 (Dep't Commerce Aug. 28, 2014) ....
............................................................................................................................................................37

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of
Antidumping Duty Administrative Review, 2014–2015*, 81 Fed. Reg. 62,717 (Dep't Commerce
Sept. 12, 2016) ........................................................................................................................... 37

*Stupp Corp. et al. v. United States*, Consol. Court No. 15-00334 (CIT October 8, 2021), Final
Results of Redetermination Pursuant to Court Remand, A-580-876 (Apr. 4, 2022).... 39, 40, 41

## Regulations and Rules

19 C.F.R. § 351.414(c) .............................................................................................. 5

19 C.F.R. § 351.414(d)(3) ......................................................................................... 72

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012) .............................................................. 5, 6

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) ............................................................................................................... 5

*Differential Pricing Analysis: Request for Comments*, 79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014) ............................................................................................................ 42

## Scholarly Literature

Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2ed 1988) ............... passim

James Algina, *et al.*, *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 Psychological Methods 317 (2005) ........................................................... 23, 33, 50

Johnson Ching-Hong Li, *Effect size measures in a two-independent-samples case with nonnormal and nonhomogeneous data*, 48 Behavioral Research 1560 (2016) ....................... 23

Larry V. Hedges, Ingram Olkin, *Overlap Between Treatment and Control Distributions as an Effect Size Measure in Experiments* (2015) ..................................................... 38, 61

Myles Hollander, Douglas A. Wolfe, Eric Chicken, *Nonparametric Statistical Methods* (3rd ed. 2014) ........................................................................................... 19, 23, 61

Paul D. Ellis, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* (2010) ....................................................... 34, 50

Robert Coe, *It's the Effect Size, Stupid: What effect size is and why it is important*, presented at the Annual Conference of the British Educational Research Association (Sept. 2002).... passim

Robert J. Grissom, John J. Kim, *Effect Sizes for Research, Univariate and Multivariate Applications* (2ed 2012) ....................................................... 21, 23, 27, 52

S. R. Searle, *Linear Models* (1971) ................................................................. 60

S. Weisberg, *Applied Linear Regression* (3rd ed. 2005) .................................................. 60

**Other Authorities**

Cambridge Dictionary (online ed.) ............................................................................ 75

Supreme Court of the United States Docket No. 22-1219, *Relentless, Inc. v. Department of Commerce*, Question Presented ............................................................................... 10

Supreme Court of the United States Docket No. 22-451, *Loper Bright Enterprises v. Raimondo*, Question Presented.................................................................................................. 10

**THE CANADIAN PARTIES' MOTION FOR JUDGMENT ON THE AGENCY RECORD
REGARDING APPLICATION OF DIFFERENTIAL PRICING ANALYSIS AND
ACCOMPANYING MEMORANDUM OF LAW AND POINTS OF AUTHORITIES**

The Government of Canada; the Governments of Alberta, Ontario, and Québec; the

British Columbia Lumber Trade Council, the Conseil de l'Industrie Forestière du Québec, and

the Ontario Forest Industries Association; as well as Canfor Corporation, Canadian Forest

Products, Ltd., Canfor Wood Products Marketing Ltd., Carrier Forest Products Ltd., Carrier

Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, Fontaine, Inc., Interfor

Corporation, Interfor Sales & Marketing Ltd., Resolute FP Canada Inc., Tolko Industries Ltd.,

Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., West Fraser Mills Ltd.,

Chaleur Forest Products, Inc., Chaleur Forest Products, L.P., J.D. Irving, Limited, Delco Forest

Products, Ltd., Devon Lumber Co., Ltd., H.J. Crabbe & Sons, Ltd., Langevin Forest Products,

Inc., Marwood, Ltd., North American Forest Products, Ltd., and Twin Rivers Paper Co.

(collectively, the "Canadian Parties") submit the following Motion for Judgment on the Agency

Record Regarding Application of Differential Pricing Analysis and Accompanying

Memorandum of Law and Points of Authorities in accordance with Rule 56.2(c) of the Rules of

the U.S. Court of International Trade ("USCIT Rules").  For the reasons set forth below, the

Canadian Parties respectfully request that the Court reverse the challenged determination of the

U.S. Department of Commerce ("Commerce") and remand with instructions for Commerce to

reconsider its methodology for calculating the dumping margins for the mandatory respondents

Canfor Corporation ("Canfor") and West Fraser Mills Ltd. ("West Fraser"), and to reconsider the

rate assigned to non-selected companies.

## I.   STATEMENT PURSUANT TO USCIT RULE 56.2

### A.   ADMINISTRATIVE DETERMINATION UNDER REVIEW

The Canadian Parties seek review of the final results of the fourth administrative review of the antidumping duty order on certain softwood lumber products from Canada,[1] as amended.[2]

### B.   ISSUES PRESENTED

This appeal presents eight issues:

1) Whether Commerce reasonably measures the difference between U.S. prices, as required by 19 U.S.C. § 1677f-1(d)(1)(B)(1), when calculating Cohen's *d* using data that violate the assumptions of normality, equal variances, and equal size;

2) Whether Commerce reasonably measures the difference between U.S. prices, as required by 19 U.S.C. § 1677f-1(d)(1)(B)(1), when it departs from the statistics literature in calculating the denominator of the Cohen's *d* coefficient;

3) Whether Commerce's application of its differential pricing methodology ("DPM") to the respondents' data is reasonable or otherwise in accordance with law and supported by substantial evidence despite the data not meeting the Cohen's *d* assumptions;

4) Whether Commerce adequately engages with the Hedges Report and provides sufficient reasons for disregarding it such that its reasons for using Cohen's *d* are supported by substantial evidence and otherwise in accordance with the law;

5) Whether Commerce adequately addresses the evidence that the mandatory respondents' pricing variations were the result of market forces and not the result of targeted dumping;

6) Whether Commerce provides a sufficient explanation for why application of the preferred average-to-average ("A-A") methodology cannot account for observed price differences over time;

---

[1] *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) (P.R. 611) ("*Final Results*"), and accompanying Issues and Decision Memorandum (P.R. 585) ("I&D Mem.")

[2] *Certain Softwood Lumber Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in Part; 2021*, 88 Fed Reg. 61,511 (Dep't Commerce Sept. 7, 2023) (P.R. 597) ("*Amended Final Results*").

7) Whether Commerce conducts fair comparisons when it applies the average-to-transaction ("A-T") methodology to dumping calculations based on price differences over time; and

8) Whether Commerce correctly calculates the rate assigned to non-selected companies given the errors identified above in the methodology used to calculate rates for the mandatory respondents.

For the reasons explained below, Commerce's decisions with respect to each of these issues are unsupported by substantial evidence and otherwise not in accordance with law.

## II.   STATEMENT OF FACTS

### A. Procedural History

On March 9, 2022, Commerce initiated the fourth administrative review of the antidumping duty order concerning certain softwood lumber products from Canada, covering the period of review calendar year 2021 (the "POR").[3]  On April 29, 2022, Commerce selected Canfor and West Fraser as the mandatory respondents.[4]

Anticipating that Commerce would rely on its differential pricing methodology ("DPM") to purportedly "unmask" targeted dumping,[5] the Canadian Parties submitted information establishing that fluctuations in the mandatory respondents' pricing during the POR were the result of market conditions, not targeted dumping.[6]  The Government of Canada also filed an

---

[3] *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 13,252, 13,254–55 (Dep't Commerce Mar. 9, 2022) (P.R. 507).

[4] Respondent Selection Mem. (Apr. 29, 2022) (C.R. 7, P.R. 279).

[5] For a detailed description of Commerce's DPM, please see Part I of the Argument section below.

[6] *See* West Fraser's Response to April 29, 2022 Section A Initial Antidumping Duty Questionnaire (West Fraser) (May 20, 2022) ("West Fraser Sec. A QR"), Exh. WF-AR4-A-23 (P.R. 298); Canadian Parties' Response to PMS Allegation (Dec. 6, 2022) ("Canada's PMS Submission"), Exh. PMS-9, Attach. 32 (P.R. 445); Government of Canada's Submission of New Factual Information (Dec. 27, 2022) ("Canada's NFI Submission"), Exh. 11 (C.R. 438); Canada's PMS Submission, Exh. PMS-23 at 8 (C.R. 399, P.R. 444).

expert assessment by Professor Larry V. Hedges, a leading authority on statistical methods and effect-size measures, addressing Commerce's misuse of the statistical measure Cohen's *d* in its DPM.[7]

Commerce did not address this evidence in its *Preliminary Results*.[8] Commerce applied the DPM, preliminarily found that both mandatory respondents engaged in targeted dumping during the POR, and determined their margins entirely by the A-T methodology, with zeroing.[9]

In case briefs responding to the *Preliminary Results*, the Canadian Parties demonstrated that Commerce failed to address evidence detracting from its targeted dumping findings, including evidence that the mandatory respondents' pricing variations were the result of market conditions.[10] The Canadian Parties also established that Commerce was required to consider the Hedges Report and in light of such evidence, reconsider its use of the DPM.[11]

Commerce issued the *Final Results* on August 1, 2023. In the *Final Results*, Commerce continues to use the DPM to allegedly "unmask" targeted dumping by the mandatory

---

[7] *See* Canada's NFI Submission, Exh. 1 (C.R. 435, P.R. 501) (Review and Analysis of the Cohen's *d* Test as Used in the U.S. Department of Commerce's Differential Pricing Methodology, Prof. Larry V. Hedges) ("Hedges Report").

[8] *Certain Softwood Lumber Products From Canada: Preliminary Results of Antidumping Duty Administrative Review; 2021* 88 Fed. Reg. 5,306 (Dep't Commerce Jan 27, 2023) (P.R. 526) ("*Prelim. Results*"), and accompanying Decision Memorandum for Preliminary Results (Jan. 23, 2023) (P.R. 518) ("Prelim. Mem.").

[9] Prelim. Mem. at 10; *Prelim. Results*, 88 Fed. Reg. at 53,06.

[10] *See* Case Brief of the Gov't of Canada (Feb. 27, 2023) at 38–41 (C.R. 494, P.R. 548, 549) ("Canada's Case Brief"); Canfor's Case Brief (Feb. 27, 2023) at 17–19 (C.R. 493, P.R. 547); Central Canada's Case Brief (Feb. 27, 2023) at 27–32 (P.R. 544) ("Central Canada's Case Brief"); Case Brief of West Fraser Mills Ltd. (Feb. 27, 2023) at 7–10 (C.R. 488, P.R. 545) ("West Fraser's Case Brief").

[11] Canada's Case Brief at 8–14, 23–30; Central Canada's Case Brief at 6; West Fraser's Case Brief at 2.

respondents, and uses the A-T methodology to calculate their margins.  Commerce weight averages the mandatory respondents' margins to calculate the rate assigned to non-selected companies.  Commerce fails to adequately address evidence detracting from its targeted dumping findings, the Hedges Report, and various arguments raised in the Canadian Parties' case briefs.[12]  These consolidated appeals followed.

### B.    Commerce's Differential Pricing Methodology and Use of Cohen's *d*

In antidumping duty investigations and reviews, the legally preferred methodology for calculating dumping margins is to compare weighted averages of normal values to weighted averages of U.S. prices.[13]  This methodology is commonly referred to as the "average-to-average" or "A-A" methodology,[14] and in this methodology, Commerce does not use "zeroing."[15]  However, in certain exceptional circumstances, the statute allows Commerce to calculate dumping margins "by comparing the weighted average of the home market normal values, to the export prices (or constructed export prices) of individual sale transactions in the

---

[12] *See* I&D Mem. at 15–35.

[13] *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012) ("*Weighted-Averaging Dumping Margin*").

[14] The Tariff Act of 1930, as amended (the "Tariff Act") provides that, as a general matter, Commerce may choose between two alternative methodologies:  A-A methodology or transaction-to-transaction ("T-T") methodology.  19 U.S.C. § 1677f-1(d)(1)(A).  However, Commerce uses the A-A methodology unless it "determines another method is appropriate in a particular case," and will use the T-T methodology "only in unusual cases."  19 C.F.R. § 351.414(c).

[15] Zeroing is the practice of setting to "zero" any margin for which the U.S. price is greater than normal value (i.e., non-dumped sales) before combining the margins to calculate a weighted-average margin.  *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) (final modification).

U.S. market for comparable merchandise," also referred to as the "average-to-transaction" or "A-T" methodology.[16]  When it uses the A-T methodology, Commerce always uses zeroing—it sets to zero any transactions in which the U.S. price is above normal value.[17]

To dispense with the normal A-A method and instead use an alternative methodology, Commerce must satisfy two conditions.  First, it must find that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time."[18]  Second, Commerce must "explain{} why such differences cannot be taken into account" using the preferred A-A methodology.[19]  To satisfy these conditions, Commerce applies the two-stage DPM.

In the first stage of the DPM, Commerce applies two tests, which it claims establish whether a pattern of significantly different pricing exists for certain categories of sales.  First, Commerce purports to apply the "Cohen's *d* test."  Commerce uses the Cohen's *d* test to compare groups of U.S. prices and determine whether they differ significantly by time periods, regions, or purchasers.[20]

---

[16] 19 U.S.C. § 1677f-l(d)(l)(B).

[17] *See, e.g.*, *Weighted-Averaging Dumping Margin*, 77 Fed. Reg. at 8,104.  Depending on the results of the DPM, Commerce may use a mix of the A-A and A-T methodologies (the "mixed methodology") (the A-T and mixed methodologies, collectively, are referred to as "alternative methodologies").

[18] 19 U.S.C. § 1677f-l(d)(l)(B)(i).

[19] 19 U.S.C. § 1677f-l(d)(l)(B)(ii).

[20] *See* Prelim. Mem. at 9.

Cohen's *d* is a measure of "effect size," which is the difference between two groups in terms of some observed (or measured) value.[21]  The observed values could be just about anything:  the heights or IQs of every person in two different groups, as in two of the examples referenced by Professor Cohen;[22] the test scores of every student in two different classes, as discussed by Professor Coe;[23] or the prices charged in two different time periods, to two sets of customers, or in two sets of regions, as in the case of Commerce's use of Cohen's *d*.  Effect size measures the "effect" that being in one group rather than the other has on the observed value, and expresses that measurement in units of standard deviation.

Effect size is sometimes referred to as a "standardized mean difference" because it expresses the difference between the means of two groups in a standardized measure divorced from the values being compared (whether they be heights in inches, IQs, test scores or prices).[24]  A standardized measure of effect size is a "pure (unitless) number."[25]  The Cohen's *d* measure expresses the difference in the means of two groups in units of the variability of those groups (*i.e.*, their standard deviations).  Cohen's *d* can provide meaningful information about how large

---

[21] *See* Canada's NFI Submission, Exh. 7 (C.R. 436, P.R. 501) (Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* at 20–22 (2ed 1988) ("Cohen, *Statistical Power Analysis*"))

[22] *Id.* at 26–27.

[23] Canada's NFI Submission, Exh. 8 (C.R. 436, P.R. 501) (Robert Coe, *It's the Effect Size, Stupid: What effect size is and why it is important*, presented at the Annual Conference of the British Educational Research Association at 2–3 (Sept. 2002) ("Coe, *It's the Effect Size, Stupid*"))

[24] *Id.* at 3.

[25] *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent II*"), 31 F.4th 1367, 1372 (Fed. Cir. 2022).

the differences are between two groups and how much larger the difference is in one comparison than it is in another.[26]

Professor Cohen identifies three thresholds to assess the significance of the *d* coefficient (*i.e.*, the standardized mean difference between the two groups): small, medium, and large, which correspond to Cohen's *d* cut-offs of 0.2, 0.5, and 0.8 respectively.[27] In Commerce's methodology, comparisons resulting in a *d* coefficient with an absolute value of 0.8 or greater "pass" the Cohen's *d* test (*i.e.*, Commerce finds a significant price difference between the groups being compared).[28]

Commerce then applies its ratio test.[29] According to Commerce, the ratio test identifies whether there is a "pattern" of export prices that differ significantly among purchasers, regions, or periods of time.[30] Commerce aggregates the value of U.S. sales that pass the Cohen's *d* test, and divides that value by the total value of all of the respondent's U.S. sales in the period.[31] The results of the ratio test dictate whether Commerce proceeds to the second stage of the DPM, and if so, what methodology Commerce uses to calculate the respondent's margin in that stage.

In the second stage of the DPM, Commerce applies its meaningful-difference test, where it purports to determine whether the preferred A-A methodology can account for the significant differences in U.S. prices among purchasers, regions, or time periods as found in the first stage

---

[26] *See* Cohen, *Statistical Power Analysis* at 21.

[27] *Id.* at 21–22.

[28] Prelim. Mem. at 9.

[29] *Id.*

[30] *Id.*

[31] *Id.*

of the DPM by comparing the dumping margin determined by using the A-A methodology to the margin determined by using an alternative methodology.[32]  Commerce explained its evaluation of this comparison as follows:

> A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted- average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the de minimis threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the de minimis threshold.[33]

Commerce concluded "that the average-to-average method cannot account for such differences" in this case and, therefore, use of an alternative methodology is appropriate.[34]

## III.    <u>STANDARD OF REVIEW</u>

The Tariff Act requires that Commerce's findings and conclusions be supported by substantial evidence on the record and otherwise in accordance with the law.[35]  Substantial evidence means "more than a mere scintilla" of evidence, or "such evidence as a reasonable mind might accept as adequate to support a conclusion."[36]  The substantial evidence standard requires Commerce to account for evidence that detracts from its determinations.[37]  When Commerce fails to address evidence and arguments that fairly detract from its findings, those

---

[32] *See id*. at 9–10.

[33] *Id.* at 9–10.

[34] *Id.* at 10.

[35] 19 U.S.C. § 1516a(b)(1)(B)(i).

[36] *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

[37] *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487–88 (1951); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

findings cannot be sustained.[38]  Courts should conduct "thorough, probing, in-depth review" of Commerce's determinations, and independently assess whether the evidence that Commerce has cited does in fact substantially support its conclusions.[39]

Next, it is axiomatic that an administrative agency must act consistently with its governing statute.  In determining whether Commerce's actions are consistent with the governing statute here, courts follow the two-step framework set forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*.[40]  The reviewing court first determines whether, applying the ordinary tools of statutory construction, Congress has spoken to the precise question at issue.[41]  Only if the meaning of the governing statutory language is not judicially ascertainable should a court proceed to the second step of *Chevron*, under which it determines whether the agency's interpretation and implementation of the relevant statute is reasonable.[42]  To determine whether Commerce's construction is reasonable, a court considers whether the construction is "consistent with the goals of the statute," reflects "Commerce's long-standing practice,"[43] and whether the

---

[38] *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ("To determine if substantial evidence exists, we review the record as a whole, including evidence that fairly detracts from the substantiality of the evidence.") (citation omitted).

[39] *SCM Corp. v. United States*, 487 F. Supp. 96, 99–100 (Cust. Ct. 1980); 19 U.S.C. § 1516a(b)(1)(B)(i).

[40] 467 U.S. 837 (1984).  The Supreme Court of the United States has granted review this term in two cases to consider whether to overrule or clarify *Chevron*.  *See* Supreme Court of the United States Docket No. 22-451, *Loper Bright Enterprises v. Raimondo*, Question Presented, *available at* https://www.supremecourt.gov/docket/docketfiles/html/qp/22-00451qp.pdf; Supreme Court of the United States Docket No. 22-1219, *Relentless, Inc. v. Department of Commerce*, Question Presented, *available at* https://www.supremecourt.gov/qp/22-01219qp.pdf.

[41] *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013).

[42] *Timex V.I. Inc. v. United States*, 157 F.3d 879, 881–82 (Fed. Cir. 1998).

[43] *APEX Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015).

issue implicates the agency's expertise in a meaningful way.[44]  Courts do not defer to an

agency's interpretation that is "arbitrary, capricious, or manifestly contrary to the statute."[45]

Finally, Commerce must engage in reasoned decision-making and provide a coherent

explanation for the basis of its determination.[46]  Commerce must "examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made."[47]  Commerce must then provide an explanation that is

adequate to enable the Court to determine whether Commerce's choices are actually reasonable

by "examin{ing} the record and articulat{ing} a satisfactory explanation for its action." [48]  A

reviewing court in turn, analyzes the record in order to confirm the veracity of Commerce's

explanation.[49]  Commerce's determination cannot be sustained where its rationale cannot be

---

[44] *Aqua Prod., Inc. v. Matal*, 872 F.3d 1290, 1324 (Fed. Cir. 2017) ("The point of *Chevron* is to encourage courts to defer to agencies on issues that 'implicate{} agency expertise in a meaningful way.'") (quoting *Sandoval v. Reno*, 166 F.3d 225, 239 (3d Cir. 1999)).

[45] *Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1361 (Fed. Cir. 2022) (citation omitted).

[46] *See* 19 U.S.C. §1677f(i)(3)(A) ("{Commerce} shall include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties . . . concerning the establishment of dumping or a countervailable subsidy{.}").

[47] *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

[48] *Yangzhou Bestpak Gifts & Crafts Co. Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013); *see CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376–77 (Fed. Cir. 2016).

[49] *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) (emphasizing the responsibility of the court to reverse a determination where "the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making" (footnote omitted)); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (finding that a presumption that an administrative agency acts with regularity "is not to shield {its} action from a thorough, probing, in-depth review").

reasonably discerned.[50]  If Commerce fails to adequately explain its determination, Commerce's

determination should be remanded for further explanation.[51]

     In reviewing the rationale underlying a determination, a court should not blindly defer to

an agency's claim that it is applying expertise to a complex issue.  The U.S. Court of Appeals for

the Federal Circuit ("Federal Circuit") has mandated the opposite approach to complexity:

"{t}he more complex the statute, the greater the obligation on the agency to explain its position

with clarity."[52]  This principle, requiring more clarity for greater complexity, is all the more

applicable when the complexity is of Commerce's own making, as with the DPM and

Commerce's strained rationalizations for its use of Cohen's *d*.  Commerce is required to explain

what it is doing in comprehensible and persuasive terms: "If the Court of International Trade and

this court are to play their statutorily required roles in reviewing Commerce's determinations, it

is important that we have clear guidance from Commerce as to what is actually happening."[53]

     The U.S. Court of International Trade ("CIT") and the Federal Circuit are now applying

exacting scrutiny specifically when reviewing Commerce's DPM, rejecting claims of complexity

as justification for the broad deference that Commerce claims in antidumping cases.[54]  This

---

[50] *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

[51] *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 534 (Fed. Cir. 2019).

[52] *CS Wind Vietnam*, 832 F. 3d at 1376 (quoting *SKF USA, Inc. v. United States,* 263 F.3d 1369, 1382–83 (Fed. Cir. 2001)).

[53] *Id.* (citation omitted).

[54] *See NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) (vacating CIT decision upholding Commerce's use of the Cohen's *d* test and remanding for further proceedings); *see also Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent I*"), 940 F.3d 662, 672 (Fed. Cir. 2019); *Mid Continent II*, 31 F.4th at 1381; *Stupp Corp. v. United States* ("*Stupp II*"), 5 F.4th 1341, 1357, 1359 (Fed. Cir. 2021) (quoting 19 U.S.C. § 1677f-1(d)(1)(B)) (reversing and remanding, in part, *Stupp Corp. v. United States*, 359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019)); *SeAH Steel Corp. v. United States*, 539 F. Supp. 3d 1341, 1351 (Ct.

Court should continue to demand from Commerce comprehensible and coherent explanations for its decisions that are consistent with its statutory mandate and with the science—in this case, statistics—that Commerce claims to apply. The Court will not find such explanations in Commerce's *Final Results* in this case.

## IV. <u>ARGUMENT</u>

### A. Commerce's Unreasonable and Unprincipled Application of Cohen's *d* to Identify Significant Price Differences Is Not in Accordance With Law

When Commerce compares groups of prices to determine whether they differ significantly, it purports to calculate Cohen's *d* and treats values greater than 0.8 as establishing significant difference between the two groups of prices. The only reason that Commerce has ever articulated for using 0.8 as the threshold for significant price difference is that Professor Cohen described a Cohen's *d* of 0.8 as a "large" effect size and the threshold has been "widely used."[55] As a measure of effect size—a standardized mean difference—Cohen's *d* provides reliable and consistent information about two groups of observations only when those groups meet particular assumptions. Without those standard assumptions, Cohen's *d* ceases to provide a standardized mean difference. When Commerce applies Cohen's *d* to data that do not conform to the three essential assumptions (normality, equal variances, and equal size) and when Commerce departs from a standardized calculation of the denominator for the *d* coefficient, Commerce does not measure what the statute requires it to measure, what Commerce says it measures, or what Professor Cohen measured. Commerce has never stood on firm ground in its application of the DPM, and the more that parties have delved into the statistical underpinnings

---

Int'l Trade 2021); *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1320 (Ct. Int'l Trade 2021).

[55] *See, e.g.*, I&D Mem. at 23–24.

of the DPM—particularly, Cohen's *d*—the more apparent it has become that there is no ground at all for the DPM to stand on. It is arbitrary and unreasonable at every level, down to its foundation.[56]

In *Stupp II*, *Mid Continent I*, and *Mid Continent II*, the Federal Circuit directed Commerce to explain its infidelity to statistical principles amidst its claims to be applying a statistical test. Commerce has never articulated—and cannot articulate—an explanation for how a formula for calculating a standardized mean difference under non-standard conditions reasonably identifies significant differences among groups of prices. This unprincipled and unreasonable use of Cohen's *d* has significant consequences in this case. The evidence shows that nearly all of the comparisons that "passed" Commerce's Cohen's *d* test were of groups that did not satisfy the assumptions required for calculating a meaningful Cohen's *d*. In these circumstances, Commerce's Cohen's *d* test does not reasonably indicate differences between U.S. prices as required by the statute.[57]

> **1.     Fundamental Statistics Principles and the Statistics Literature on Which Commerce Relies Require that the Assumptions Be Satisfied to Produce a Meaningful *d* Coefficient**

In various other proceedings and the review challenged in this case, Commerce has purported to rely on the statistical measure Cohen's *d* while assiduously evading the statistics principles underlying that measure and its interpretive value. Cohen's *d* has the meaning that Professor Cohen ascribed to it (and that Commerce presumes it to have) only when it is applied to data meeting the assumptions that Professor Cohen clearly articulated. When Commerce

---

[56] *See Mid Continent II*, 31 F.4th at 1381 (describing Cohen's *d* as the foundation of the DPM).

[57] *See id.* (rejecting arguments that fail to "address the fact that Professor Cohen derived his interpretive cutoffs under the assumption of normality").

purports to calculate Cohen's *d* using data that does not meet those assumptions, Commerce does not derive a Cohen's *d* in any meaningful sense. Likewise, when Commerce grafts Professor Cohen's threshold for "large" effect size onto values of *d* calculated without regard to the underlying assumptions, Commerce cannot reasonably claim that it is relying on Professor Cohen's threshold.

To address Commerce's obfuscatory, conclusion-driven, and unprincipled explanations for its use of Cohen's *d*, we begin by offering a transparent, objective account of the statistical principles underlying Professor Cohen's measure of effect size. First, we explain the critical concepts of distributions and overlap. Normal distributions with equal variances have unique properties and these properties are necessary for using "parametric" methods to compare two distributions. Second, we demonstrate that the literature is unequivocal that Cohen's *d* is a parametric measure and produces meaningful results only for comparisons of groups that are normally distributed with equal variances.

> a. **As a Parametric Measure of Effect Size, Cohen's *d* Depends on the Statistical Normality of the Measured Distributions**

At a basic level, a distribution is a set of numbers or observations. "For example, a set of numbers can be prices, where each price is a data point in the set (or an observation, if the set is a sample)."[58] Distributions are often depicted using graphical plots.[59] The shape of the plotted distribution and the spread of values in the graph provide important information about the values being graphed. One particular type of distribution—the normal distribution—exhibits unique characteristics that are important to statistical analyses. A "normal distribution has some special

---

[58] Hedges Report at 4.

[59] *Id.*

mathematical properties not shared by other distributions" in that a normal distribution "is completely determined (and therefore all of its properties are determined) by its mean ($\mu$) and its standard deviation ($\sigma$) together."[60]  A normal distribution plots as a bell curve in which approximately 68 percent of the observations "are less than one standard deviation from the mean."[61]  **Figure 1** depicts a normal distribution, with a mean of 0 and a standard deviation of 1.

**Figure 1**[62]



Because the distribution is normal, there is an equal frequency of observations within a given standard deviation in either direction,[63] and the arithmetic mean is thus equal to the median and

---

[60] *Id.* at 7.

[61] *Id.* at 6.

[62] *See id.* at 5.

[63] For example, for normally distributed test results in Class A, if the mean score is 80 and the standard deviation is 5, then one knows that 34.1 percent of scores are between 80 and 85 (i.e.,

the mode.[64]  Knowing only the mean and standard deviation for each of two normally distributed groups, one can determine the share of observations (e.g., test scores, heights, or prices) in one group that are larger or smaller than the mean observation in the other group.  That is not true for non-normal distributions.  Given that the mean and standard deviation for each of two groups are the only data from which Cohen's *d* is derived, this fact is critical to understanding why Cohen's *d* produces consistent effect size measures (i.e., standardized mean differences) for normal distributions, but not for other distributions.

Compare **Figure 1** to the example of a nonnormal distribution in **Figure 2**.  This plot is of the data in the test group for Canfor's CONNUM **[                                        ]** for the **[                    ]:**

one standard deviation), 13.6 percent are between 85 and 90, and only 2.1 percent are between 90 and 95.  The same holds for scores below the mean:  34.1 percent are between 75 and 80, 13.6 percent are between 70 and 75, and 2.1 percent are between 65 and 70.

[64] *See* Hedges Report at 6.

**Figure 2**[65]



Notice that the mean [      ] and standard deviation [        ] in **Figure 2** do not provide the same information about the distribution as the mean and standard deviation in **Figure 1**. There are not an equal number of observations within one, two, or three standard deviations from the mean in either direction, and the mean does not equal the median (or other measures of central tendency). The mean and standard deviation of a nonnormal distribution do not provide the

---

[65] The data underlying this and other graphs of Canfor's data are contained in Canfor's Secs. B–D Initial Questionnaire Response (June 21, 2022), Exh. B-1 (C.R. 66) ("Canfor's U.S. Sales Database"). *See* Canfor's Analysis Mem. (July 26, 2023) at 1 (C.R. 513, P.R. 589) ("Canfor's Analysis Mem.") (explaining that Commerce calculates Canfor's margins using Canfor's U.S. Sales Database). The net prices graphed in the calculations are the results of running the data through Commerce's SAS programming. *See* Canfor's Analysis Mem., Attach. 2 (SAS System). Commerce's analysis of the comparison of this test group is contained in Canfor's Analysis Memorandum, Attachment 2 at 136–37 (C.R. 516, 517, 519).

same information about the rest of the properties of that distribution as when the distribution is normal.[66]  It should not be surprising, therefore, that a calculation based entirely on mean and standard deviation will not have the same meaning when applied to non-normal distributions as when applied to normal distributions.

The differences between normal and nonnormal distributions are important in determining how to compare two distributions (i.e., measuring effect size).[67]  Methods for comparing distributions (and measuring effect size) are either parametric or nonparametric. Statisticians refer to methods developed assuming that the distributions being compared are normal with equal variances as "parametric methods."[68]  Methods "for comparing distributions when it is not possible to assume that the distributions being compared are normally distributed"[69] are nonparametric methods.[70]

Professor Hedges explains that for two normal distributions with equal variances, the means and the common standard deviations "completely determine the frequency of observations in both distributions over their combined ranges" such that *all properties* (*i.e.*, "parameters") of the two distributions relative to one another "are determined by the ratio of the mean difference to the standard deviation (Cohen's *d*)."[71]  Conversely, nonnormal distributions and their

---

[66] *See* Hedges Report at 7.

[67] *See, e.g.*, *id.*

[68] *See id.* at 8–9.

[69] *Id.* at 9.

[70] *See id.*; Canada's NFI Submission, Exh. 4 (C.R. 435, P.R. 501) (Myles Hollander, Douglas A. Wolfe, Eric Chicken, *Nonparametric Statistical Methods* at 1–2 (3rd ed. 2014) ("Hollander, *Nonparametric Statistical Methods*")).

[71] Hedges Report at 7.

properties are *not* "completely characterized by their means and standard deviations, even if those distributions are similar."[72] Thus, "the properties of two nonnormal distributions relative to one another" cannot be determined by the mean and standard deviation alone.[73] Mean and standard deviation, however, are the sole inputs to Cohen's *d*. One cannot measure nonparametric data using a parametric method and obtain a valid result.

The difference between parametric methods and nonparametric methods is apparent in how they measure nonoverlap. Nonoverlap is "{t}he most fundamental measure{} of difference between distribution{s}."[74] Essentially, a measure of nonoverlap expresses the extent to which the observations in two distributions do not overlap.[75] For example, the most common measure of nonoverlap is called $U_3$,[76] which measures the share of observations in one distribution that are less than the mean of the other distribution. To illustrate, in **Figure 3** below, $U_3$ would measure the number of observations in Distribution C that are less than $\mu_e$ (the mean of Distribution E).

---

[72] *Id.*

[73] *Id.*

[74] *Id.* at 9.

[75] *See id.* at 10 (Figure 3); Cohen, *Statistical Power Analysis* at 21–22.

[76] The *U* measures ($U_1$, $U_2$, and $U_3$) reflect the degree of overlap or nonoverlap that is measured by the Cohen's *d* coefficient.

**Figure 3**[77]



The percentage of values Distribution C that are below the mean of Distribution E ($\mu_e$) will remain constant so long as the distributions are normal with similar standard deviations, regardless of what is being measured. Because of this unique property, a comparison of the nonoverlap in two distributions with the same parameters (normality and similar standard deviations) can be standardized and contextualized (*i.e.*, measured in units of variability).[78] This is not true of nonnormal distributions.

Compare **Figure 3** to **Figure 4** below, which overlays two nonnormal distributions with unequal standard deviations. This plot represents the Cohen's *d* comparison Commerce performed for Canfor's CONNUM [                                        ] for [

].

---

[77] *See* Canada's NFI Submission, Exh. 5 (C.R. 435, P.R. 501) (Robert J. Grissom, John J. Kim, *Effect Sizes for Research, Univariate and Multivariate Applications* at 62 (2ed 2012) ("Grissom & Kim, *Effect Sizes for Research*")) (the distribution labels have been added for clarity).

[78] Cohen, *Statistical Power Analysis* at 20.

**Figure 4**[79]



The test group has a mean of **[**     **]** and a standard deviation of **[**     **]**. The base group has a mean of **[**     **]** and a standard deviation of **[**     **]**. Unlike **Figure 3**, one cannot glean any information as to the number of observations within one standard deviation of either mean of the distributions in **Figure 4**. In other words, the means and standard deviations, by themselves, do not allow one to measure the degree of nonoverlap. Thus, the degree of difference between distributions cannot be computed and interpreted as if they are normally distributed with equal variances.[80]

---

[79] *See* Canfor Analysis Mem., Attach. 2 at 153–54; *see also supra* note 65, and accompanying text.

[80] Hedges Report at 15.

### b. Interpretations of Cohen's *d* Depend on the Fact that It Is a Parametric Method

The literature is clear that Cohen's *d* is a parametric method.[81] The assumptions of normality and equal variances are necessary to meaningfully interpret the results of the test. Indeed, Professor Cohen "is unequivocal in every chapter of his book" that the *d* coefficient he describes has consistent interpretive value only when "comparing two normal distributions with equal standard deviations and {in} no other" situation.[82] When any of the assumptions are not satisfied, the *d* coefficient does not correspond to the measures of nonoverlap, which are the foundation of Professor Cohen's interpretive thresholds.

Professor Hedges provides a useful analogy to understand the necessity of assumptions for parametric methods, such as Cohen's *d*.[83] As he explains, boxes can be arranged in order (from least to greatest) based on volume, surface area, and weight.[84] However, how one orders

---

[81] *See* Hedges Report at 11 ("Cohen's *d* is an effect size measure created to compare two normal population distributions having the same standard deviation."); Canada's NFI Submission, Exh. 2 (C.R. 435, P.R. 501) (Johnson Ching-Hong Li, *Effect size measures in a two-independent-samples case with nonnormal and nonhomogeneous data*, 48 Behavioral Research 1560, 1566 (2016)) (describing Cohen's *d* as parametric); Canada's NFI Submission, Exh. 3 (C.R. 435, P.R. 501) (James Algina, *et al.*, *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 Psychological Methods 317, 318 (2005) ("Algina, *An Alternative to Cohen*")) (presenting

[

]); Grissom & Kim, *Effect Sizes for Research* at 66 (concluding that when the assumption of normality is not satisfied, "the usual interpretation of" Cohen's *d* "would be invalid"); Coe, *It's the Effect Size Stupid* at 14 ("It has been shown that the interpretation of the 'standardised mean difference' measure of effect size is very sensitive to violations of the assumption of normality. For this reason, a number of more robust (non-parametric) alternatives have been suggested."); Hollander, *Nonparametric Statistical Methods* at 115–50 (explaining that alternatives to Cohen's *d* should be used when the assumption of normality is not satisfied).

[82] Hedges Report at 15; *see generally* Cohen, *Statistical Power Analysis*.

[83] Hedges Report at 8.

[84] *Id.*

the boxes depends on what dimensions of the boxes are being measured—the box with the greatest weight may have the least volume, and the box with the greatest surface area may have a smaller volume than some other boxes.[85]  Ordering based on one property of the boxes will not provide any information as to the other properties.  This changes if one assumes that all the boxes are cubes "whose contents have the same density."[86]  Then, the boxes can be compared and ordered by any dimension because measuring one dimension will provide information about the others.  Absent assumptions about the shape and density of the boxes, one is not performing an apples-to-apples comparison.  The same is true of Cohen's *d*:  when the assumptions about the parameters of the data are not satisfied, the test does not provide measurements of the group that can be interpreted as if the assumptions were satisfied.[87]

The parametric nature of Cohen's *d* is confirmed by the equations Professor Cohen provides to calculate *d*:

(2.2.1) $$\mathbf{d} = \frac{\mathbf{m_A} - \mathbf{m_B}}{\boldsymbol{\sigma}}$$

for the directional (one-tailed) case, and

(2.2.2) $$\mathbf{d} = \frac{|\mathbf{m_A} - \mathbf{m_B}|}{\boldsymbol{\sigma}}$$

for the nondirectional (two-tailed) case,
where **d** = ES index for **t** tests of means in standard unit,
$\mathbf{m_A, m_B}$ = population means expressed in raw (original measurement) unit, and
$\boldsymbol{\sigma}$ = the standard deviation of either population (since they are assumed equal).[88]

---

[85] *Id.*

[86] *Id.*

[87] *Cf. id.* at 3–4 ("The relations between Cohen's *d* and measures of overlap used to interpret *d* do not hold when the distributions being compared do not have equal standard deviations or are not normally distributed.").

[88] Cohen, *Statistical Power Analysis* at 20.

In both equations, the standard deviation of the test group or comparison group can be used as the denominator because they are assumed to be equal—the assumption of equal variances is satisfied. The denominator provides a common scale of measurement that contextualizes the difference between the means. As Professor Cohen explains, the denominator allows one to express the size of the difference between the means in a "unit of variability."[89] Professor Cohen then defines the *d* coefficient in terms of all three assumptions and the *U* measures:

> **d** as Percent Nonoverlap: The **U** Measure. If we maintain the *assumption* that the populations being compared are *normal* and with *equal variability*, and conceive them further as *equally numerous*, it is possible to *define measures of nonoverlap (U)* associated with **d** which are intuitively compelling and meaningful.[90]

Thus, the assumptions and the *U* measures cannot be divorced from the Cohen's *d* test.

To interpret *d*, Professor Cohen provides conventions—values for *d* that can be interpreted as small, medium, and large effect sizes.[91] Professor Cohen provides those conventions in a table with different values for *d* correlating to *U* measures:[92]

---

[89] *Id.* at 20–21.

[90] *Id.* at 21 (emphasis in italics added).

[91] *See* Hedges Report at 12.

[92] Cohen, *Statistical Power Analysis* at 22; *see also* Hedges Report at 9 (explaining that "Cohen describe{s} conventions for deciding if a *d* value was small, medium, or large" using "levels of nonoverlap between distributions"). The "r" variables in this table represent an alternative variable to express mean differences. Cohen, *Statistical Power Analysis* at 23.

**Table 2.2.1**

Equivalents of d

| d | $U_1$ | $U_2$ | $U_3$ | r | $r^2$ |
|---|---|---|---|---|---|
| 0 | 0.0% | 50.0% | 50.0% | .000 | .000 |
| .1 | 7.7 | 52.0 | 54.0 | .050 | .002 |
| .2 | 14.7 | 54.0 | 57.9 | .100 | .010 |
| .3 | 21.3 | 56.0 | 61.8 | .148 | .022 |
| .4 | 27.4 | 57.9 | 65.5 | .196 | .038 |
| .5 | 33.0 | 59.9 | 69.1 | .243 | .059 |
| .6 | 38.2 | 61.8 | 72.6 | .287 | .083 |
| .7 | 43.0 | 63.7 | 75.8 | .330 | .109 |
| .8 | 47.4 | 65.5 | 78.8 | .371 | .138 |
| .9 | 51.6 | 67.4 | 81.6 | .410 | .168 |
| 1.0 | 55.4 | 69.1 | 84.1 | .447 | .200 |
| 1.1 | 58.9 | 70.9 | 86.4 | .482 | .232 |
| 1.2 | 62.2 | 72.6 | 88.5 | .514 | .265 |
| 1.3 | 65.3 | 74.2 | 90.3 | .545 | .297 |
| 1.4 | 68.1 | 75.8 | 91.9 | .573 | .329 |
| 1.5 | 70.7 | 77.3 | 93.3 | .600 | .360 |
| 1.6 | 73.1 | 78.8 | 94.5 | .625 | .390 |
| 1.7 | 75.4 | 80.2 | 95.5 | .648 | .419 |
| 1.8 | 77.4 | 81.6 | 96.4 | .669 | .448 |
| 1.9 | 79.4 | 82.9 | 97.1 | .689 | .474 |
| 2.0 | 81.1 | 84.1 | 97.7 | .707 | .500 |
| 2.2 | 84.3 | 86.4 | 98.6 | .740 | .548 |
| 2.4 | 87.0 | 88.5 | 99.2 | .768 | .590 |
| 2.6 | 89.3 | 90.3 | 99.5 | .793 | .628 |
| 2.8 | 91.2 | 91.9 | 99.7 | .814 | .662 |
| 3.0 | 92.8 | 93.3 | 99.9 | .832 | .692 |
| 3.2 | 94.2 | 94.5 | 99.9 | .848 | .719 |
| 3.4 | 95.3 | 95.5 | ✿ | .862 | .743 |
| 3.6 | 96.3 | 96.4 | ✿ | .874 | .764 |
| 3.8 | 97.0 | 97.1 | ✿ | .885 | .783 |
| 4.0 | 97.7 | 97.7 | ✿ | .894 | .800 |

✿ **Greater than 99.95**

While Professor Cohen allows the reader "to use whichever of these **U** measures he finds most meaningful," Professor Cohen does not contemplate that a reader might disregard the *U* measures entirely.[93]

    Professor Cohen relies on this table in defining and calibrating his small, medium, and large thresholds (0.2, 0.5, and 0.8) to interpret *d*. With respect to the small effect size (0.2),

---

[93] Cohen, *Statistical Power Analysis* at 23.

Professor Cohen explains that the "operational definition of a small difference between means can be seen in Table 2.2.1. When **d** = .2, *normally distributed populations of equal size and variability* have only 14.7% of their combined area which is not overlapped (**U₁**)."[94] In providing the definition for a medium effect size (0.5), Professor Cohen again refers to Table 2.2.1 and explains that a *d* of 0.5 indicates a $U_1$ of 33%, a $U_2$ of 59.9%, and a $U_3$ of 69.1%.[95] Professor Cohen provides a similar explanation for the definition of a large effect size (*d* = 0.8). According to Table 2.2.1, a large effect size must correlate to a $U_1$ of 47.4%, a $U_2$ of 65.5%, and a $U_3$ of 78.8%.[96]

This is how the results of the Cohen's *d* test are meant to be interpreted—correlating to measures of nonoverlap and satisfying the assumptions. The thresholds for interpreting *d* are only meaningful when the assumptions are satisfied such that the *U* measures correspond to the measures of nonoverlap provided in Table 2.2.1.[97] "{Professor} Cohen never suggest{s} using *d* to compare distributions that were not normal and it would not be accepted statistical practice to do so."[98]

Professor Cohen acknowledges that, when the assumption of equal variances is violated to a minor extent (*i.e.*, the standard deviations of the two groups differ slightly), the *d* coefficient

---

[94] *Id.* at 25 (emphasis in italics added). Similarly, Grissom and Kim conclude that when the assumption of normality is not satisfied, "the usual interpretation of" Cohen's *d* "would be invalid." Grissom & Kim, *Effect Sizes for Research* at 66.

[95] Cohen, *Statistical Power Analysis* at 26.

[96] *Id.*

[97] *See* Hedges Report at 4.

[98] *Id.* at 15.

may still be calculated to contextualize the difference between means.[99]  However, Professor

Cohen makes clear that under these circumstances the assumption of equal size must still be

observed.[100]  If the assumption of equal size is also violated, then there is no method endorsed by

Professor Cohen for calculating Cohen's *d*.  In other words, when the assumptions are violated,

the denominator of the *d* coefficient does not quantify the magnitude of the difference between

the means "in units of variability" (*i.e.*, using a single, common scale)[101] and the *d* coefficient no

longer measures what Professor Cohen intended when he proposed his thresholds.  One cannot

meaningfully compare a Cohen's *d* calculated for groups that meet the assumptions with one

calculated for groups that do not.  In essence, such results are numbers expressed in different

units of measurement.[102]

It is true that Professor Cohen used certain real-world observations to illustrate the

differences indicated by the interpretive thresholds.[103]  However, the types of observations that

he used as illustrations—heights and IQs—are notably different than the pricing data to which

Commerce applies Cohen's *d*.  Heights and IQs are well known to be normally distributed and of

roughly equal variance across different samples or populations.[104]  That is not true of prices

---

[99] Cohen, *Statistical Power Analysis* at 43–44.

[100] *Id.* at 43 (defining the group sizes as equal for this scenario) .

[101] *Id.* at 21, 23.

[102] *See Stupp II*, 5 F.4th at 1360 (observing that violating the assumptions may transform the *d* coefficient "into a meaningless comparator").

[103] *See* Cohen, *Statistical Power Analysis* at 24–27  (comparing, for example, the heights of 13-year-old and 18-year-old girls, and IQs for holders of Ph.D. degrees and typical college freshmen).

[104] *See* Hedges Report, App'x II at xiii ("It is important to recognize that the empirical evidence Cohen used to support these thresholds is entirely from the behavioral sciences, not international

collected in antidumping proceedings. The data that Professor Cohen uses for the examples resemble **Figure 3**, not **Figure 4**.[105] Thus, Professor Cohen's use of these data to demonstrate the perceptible differences indicated by the thresholds reinforces the conclusion that any data used in the Cohen's *d* test must conform to the assumptions.

### 2. Commerce Fails to Provide Adequate Explanation for Its Misapplication of Cohen's *d*

As demonstrated above, the data being compared must satisfy the assumptions of normality, equal variances, and equal size if Commerce is to use Cohen's *d* to identify prices "that differ significantly among purchasers, regions, or periods of time."[106] When Commerce uses Cohen's *d* in violation of the assumptions, it does not actually apply Cohen's *d*, but a test masquerading as Cohen's *d*. Commerce, however, has erected a series of diversions to avoid complying with the statistics principles articulated in the scholarly literature.

Commerce bifurcates its justification for how it uses Cohen's *d* into two separate discussions. First, Commerce attempts to support its use of Cohen's *d* in violation of the "statistical criteria" (i.e., the three assumptions of normality, equal variances, and equal and sufficient size). Second, Commerce claims that it may simple average the denominator of the *d* coefficient. However, the two issues are closely intertwined. Commerce's struggles to rationalize its approach for calculating the coefficient's denominator flow from the cardinal error

---

trade, economics, or sales data. In the context of the behavioral sciences, the typical cases—the 'real world' observations—are expected to meet Cohen's assumptions of normality.").

[105] Commerce claims that when data was collected on the IQs of Ph.D. holders and college freshman, data was only collected as to samples, not populations. I&D Mem. at 25. While this is likely true, it is beside the point. The data conformed to the assumptions of normality and equal variances as required to produce a valid measure from a parametric method.

[106] 19 U.S.C. § 1677f-1(d)(1)(B)(i).

of treating the assumptions as optional.  The denominator problems identified in the *Mid Continent* litigation do not arise when the assumptions are met and are thus, symptoms of the underlying pathology infecting Commerce's application of Cohen's *d*.  Whether Commerce merely departs from the assumptions underlying Cohen's *d* or compounds that departure by deviating from prescribed methods of calculating the denominator, the values that Commerce calculates are not comparable to the values that Professor Cohen calculated.  Professor Cohen's thresholds have no meaning when applied to Commerce's calculations.

Below we explain why Commerce's explanations for continuing to use Cohen's *d* are unreasonable.  First, we address Commerce's responses to the Federal Circuit's concerns that violating the assumptions transforms the *d* coefficient "into a meaningless comparator" that cannot be interpreted by Professor Cohen's thresholds.[107]  Commerce misconstrues the literature and fails to demonstrate that its application of Cohen's *d* measures what the statute requires Commerce to measure.  Second, we respond to Commerce's rationale for simple averaging the denominator of Cohen's *d*.  Contrary to Commerce's claims, nothing in the literature supports simple averaging when the assumptions are not satisfied.

    a.    **_Stupp II_ and the Statistics Literature Require Commerce to Satisfy the Assumptions to Reasonably Calculate Cohen's _d_**

Pursuant to *Stupp II*, Commerce must "explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied . . . or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications."[108]  Here, Commerce attempts to satisfy the latter option and offers the following

---

[107] *Stupp II*, 5 F.4th at 1360.

[108] *Id.*

explanations in support of its approach: (1) Commerce's use of full populations of data obviates the need to adhere to the assumptions; (2) the "operational thresholds" established by Professor Cohen do not depend on the $U$ measures of nonoverlap or the assumptions; and (3) the Cohen's $d$ test must be understood in conjunction with the ratio test and the meaningful-difference test.

None of these explanations is plausible. The first two contentions depend on the unsupported and erroneous premise that Professor Cohen conceived of the Cohen's $d$ test as operating in two distinct ways. Namely, that the Cohen's $d$ test may satisfy the assumptions and correspond to the $U$ measures, or the test may violate the assumptions and depart from the $U$ measures. There is simply no support in the literature or logic for the latter approach. Commerce's third contention, that subsequent steps in the DPM launder any deficiencies in its application of Cohen's $d$ is incorrect as a matter of mathematics and logic, and fails to satisfy the Federal Circuit's concerns that the Cohen's $d$ test does not detect significant price differences, as required by the statute.

### i. Commerce's Supposed Use of Full Populations of Data Is One of Many Red Herrings

Commerce insists that it uses full populations of data to calculate the Cohen's $d$ coefficient, and that the use of full populations obviates the need to adhere to the assumptions.[109] Commerce maintains that the assumptions are only useful to determine the "reliability of {the}

---

[109] I&D Mem. at 21. Commerce's claim that it is using full populations is dubious at best. *See* Hedges Report, App'x II at v ("In my opinion, Commerce is mischaracterizing the groups as two separate populations because the comparisons they make involve subsets of the entire corpus of data—such subsets would ordinarily be considered samples in statistics.").

sample results."[110]   However, because Commerce purports to use full populations, it claims the assumptions are irrelevant to its application of Cohen's *d*.[111]

This is a red herring.  Even if Commerce is using full populations of data, that does not give Commerce license to claim that the *d* coefficient can be reasonably interpreted using Professor Cohen's thresholds when the assumptions are violated.  Distinctions between populations and samples are distractions in this context.  Cohen's *d* is a parametric method—it requires that the distributions be normal and the variances equal.[112]  Nothing in the literature indicates that the parametric nature of Cohen's *d* depends on the use of populations as opposed to samples.  Professor Hedges explains that *d* cannot be interpreted as if the assumptions were satisfied when they are not.[113]  "This statement is true regardless of whether populations or samples {are} being used to compute *d*."[114]  It is simply "a matter of mathematics."[115]

Indeed, Commerce's position is contradicted by Professor Cohen's description of Cohen's *d*:

> If we maintain the assumption that the ***populations*** being compared are normal and with equal variability, and conceive them further as equally numerous, it is possible

---

[110] I&D Mem. at 21.

[111] *Id.* at 21–22.

[112] *See supra*, Section IV.A.1.b.

[113] Hedges Report, App'x II at v; *see also id.*, App'x II at iii.

[114] *Id.*, App'x II at xi.

[115] *Id.*, App'x II at iii; *see also id.*, App'x II at xviii ("Because Cohen's conventions assume that the distributions being compared are normal with the same standard deviation, those conventions cannot be used to establish practical importance of *d* values computed from population or sample data in which the assumptions are violated."); *cf. Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016) ("Our case law and the statute thus teach that a Commerce determination . . . is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence . . . .").

to define measures of nonoverlap *(U)* associated with **d** which are intuitively compelling and meaningful.[116]

Commerce has never attempted to reconcile its use of Cohen's *d* with Professor Cohen's description of Cohen's *d*, which requires that the assumptions be satisfied when using "populations."

As the Federal Circuit explained in *Stupp II*, violating the assumptions "can subvert the usefulness of the interpretive cutoffs."[117]  The Federal Circuit discussed the literature at length and found that the Cohen's *d* coefficient should be interpreted differently based on whether the groups being compared adhere to assumptions of normality and equal variances.[118]  A *d* coefficient of 0.8 provides meaningful information about the difference between two groups when the assumptions are met.  The same coefficient does not describe the same differences when the groups do not meet the assumptions.  This is true regardless of whether one accepts Commerce's premise that it is using populations rather than samples.

Commerce merely disputes the Federal Circuit's assessment of the literature and incorrectly asserts that Professor Cohen's insistence on normality is only relevant when using samples of data, *contrary to Professor Cohen's own words*.  Commerce then compounds that error by failing to offer an explanation that "clarif{ies} its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable

---

[116] Cohen, *Statistical Power Analysis* at 21 (emphasis in italics added).

[117] *See Stupp II*, 5 F.4th at 1360 (observing that violating the assumptions may transform the *d* coefficient "into a meaningless comparator").

[118] *See id.* at 1357–60; Coe, *It's the Effect Size, Stupid* at 5; Algina, *An Alternative to Cohen* at 317–19.

limitations on the use of the Cohen's *d* test."[119]  In these circumstances, *Stupp II* teaches that Commerce's use of Cohen's *d* is unreasonable because it does not produce a meaningful comparison, regardless of whether Commerce is using populations or samples.

### ii. The "Operational Thresholds" are Not Independent of the *U* Measures or the Assumptions

Commerce insists that Professor Cohen's "operational thresholds" (i.e., the interpretive cutoffs 0.2, 0.5, and 0.8) are independent of the *U* measures and the assumptions.[120]  Despite Professor Hedges's explanation to the contrary, Commerce construes the *U* measures as optional "to interpret a given value for Dr. Cohen's *d* coefficient" but "not used by Dr. Cohen in the development of his proposed thresholds."[121]  To support its position, Commerce cherry-picks excerpts from Professor Cohen and Dr. Ellis that the thresholds, and the 0.8 (large) threshold in particular, are "easy to grasp" and should be found "reasonable by reasonable people."[122]  Commerce claims that the "operational definitions" are not linked to the assumptions "as the 0.8 effect {size}" correlates to the difference in IQs between "all Ph.D. holders and college

---

[119] *Stupp II*, 5 F.4th at 1360.

[120] I&D Mem. at 24–25.

[121] *Id.* at 25 n.142.

[122] *Id.* at 24 n.136 (citing Paul D. Ellis, *The Essential Guide to Effect Sizes:  Statistical Power, Meta-Analysis, and the Interpretation of Research Results* at 41 (2010) ("Ellis, *The Essential Guide to Effect Sizes*"); *id*. at 23–24 (citing Cohen, *Statistical Power Analysis* at 26, 27).  The Government of Canada submitted pages 1, 4, 5, and 5 of Ellis, *The Essential Guide to Effect Sizes* in Canada's NFI Submission, Exhibit 19 (C.R. 439, P.R. 502), but Commerce relies on additional pages not on the record.

freshmen."[123]  Thus, in Commerce's view, Professor Cohen merely provided the $U$ measures and the assumptions "as one approach" to using Cohen's $d$.[124]

Reasoned consideration of Cohen's *Statistical Power Analysis* as a whole simply does not lend support to Commerce's position.  As discussed in Section IV.A.b, above, when Professor Cohen introduces each threshold, he defines it in terms of the $U$ measures such that the interpretive power of $d$ cannot be understood as anything other than a measure of nonoverlap.[125]  Moreover, Professor Cohen relies on Table 2.2.1 (which shows the equivalent $U$ measures of $d$ coefficients) in creating the operational thresholds.[126]  In fact, Professor Cohen "rejects the idea that $d$ is interpretable *per se*."[127]  While Commerce is correct that Professor Cohen uses real-world data to demonstrate differences identified by the thresholds, the data used by Professor Cohen *adhere to the assumptions*.  The real-world examples are *illustrative* of Professor Cohen's thresholds, not *definitional*.  Professor Cohen did not diminish the necessity of the assumptions and the $U$ measures by referring to the real-world data or offering "conventions" that he hoped would be "found reasonable by reasonable people."[128]  Commerce's attempt to cherry-pick certain statements and imply otherwise is a *prima facie* failure to consider the record (or source) as a whole.

---

[123] I&D Mem. at 25.

[124] *Id.* at 24.

[125] *See* Cohen, *Statistical Power Analysis* at 22–27.

[126] *See supra*, notes 92–96, and accompanying text; Cohen, *Statistical Power Analysis* at 40, 43.

[127] Hedges Report at 11; *see also id.*, App'x II at xii (explaining that an interpretation of $d$ cannot be derived solely from arithmetic).

[128] I&D Mem. at 21 & n.115 (quoting Cohen, *Statistical Power Analysis* at 13).

Professor Cohen uses real-world examples where the difference between groups "has *already* been judged to be large or not" to illustrate that his proposed thresholds, including 0.8, are consistent with intuitive perceptions of effect size.[129] Professor Cohen essentially calibrates his thresholds for large, medium, and small effect sizes against examples that his reader will agree exhibit large, medium, and small differences. Once Commerce departs from Professor Cohen's conditions for calculating Cohen's *d*, that calibration falls apart. It is not reasonable for Commerce to assume that a d of 0.8 calculated for groups that are normally distributed and equally variant means the same thing as a *d* of 0.8 calculated for very different distributions of data.

Commerce's reasoning also ignores the Federal Circuit's observation in *Stupp II* that "*{i}n developing {the interpretive} cutoffs, including the 0.8 cutoff*, Professor Cohen noted that 'we maintain the assumption that the populations being compared are normal and with equal variability and conceive them further as equally numerous.'"[130] Therefore, Commerce's characterization of the "operational definitions" is not only contrary to the literature, but also to the Federal Circuit's understanding of that literature.

Even Commerce has previously acknowledged the intrinsic relationship between the degree of overlap (or nonoverlap) between two groups and Cohen's *d*:

> The idea behind the Cohen's *d* coefficient is that *it indicates the degree by which the distribution of prices within the test and comparison groups* overlaps or, conversely, how significant the difference is between the prices in the test and comparison groups. . . . When the difference in the weighted-average sale prices between the two groups is measured relative to the pooled standard deviation, then this value is expressed in standardized units (*i.e.*, the Cohen's *d* coefficient) *based*

---

[129] Hedges Report, App'x II at xii (emphasis in original) (citing Cohen, *Statistical Power Analysis* at 27).

[130] *See Stupp II*, 5 F.4th at 1357 (emphasis added) (quoting Cohen, *Statistical Power Analysis* at 21).

*on the dispersion of the prices within each group, and quantity of the overlap* or, conversely, the significance of the differences, in the prices within the two groups.[131]

Commerce has not provided, and cannot provide, a reasonable explanation supported by the statistics literature to justify changing its position on the importance of the measures of nonoverlap.[132]

Moreover, Commerce fails to grapple with the Hedges Report. In a footnote, Commerce summarily dismisses Professor Hedges's explanations that the assumptions are essential to interpretation.[133] While Commerce concedes that the assumptions must be satisfied to "quantify the measures of non-overlap ($U_1$) and percentile standing ($U_3$)," Commerce insists that it does not rely on the U measures to support its use of the large (0.8) threshold.[134] According to Commerce, the *U* "measures were not used by Dr. Cohen in the development of his proposed thresholds."[135] Nothing in the Hedges Report suggests that the *U* measures are but one approach

---

[131] *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2014–2015*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016), and accompanying Issues and Decision Memorandum at 9 (emphasis added); *Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2012–2013*, 79 Fed. Reg. 51,309 (Dep't Commerce Aug. 28, 2014), and accompanying Issues and Decision Memorandum at 24 (emphasis added).

[132] *See NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (requiring an agency to "come to grips with conflicting precedent" to avoid "an inexcusable departure from the essential requirement of reasoned decision making") (quoting *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)); *SKF*, 263 F.3d at 1382 ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (second alteration in original) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996))).

[133] I&D Mem. at 25 n.142.

[134] *Id.*

[135] *Id.*

among others for interpreting $d$.[136]  To the contrary, Professor Hedges is clear that Cohen's $d$ is a

parametric method and that the assumptions must be satisfied for Cohen's $d$ to provide

meaningful results.[137]  Commerce did not address the pages of analyses in the Hedges Report

directly contradicting its finding that Professor Cohen developed the thresholds independent of

the $U$ measures.[138]  Neither does Commerce respond to the fact that Professor Cohen explicitly

defines each of the thresholds in terms of the $U$ measures.  Consequently, Commerce's

determination is not supported by substantial evidence because it fails address evidence

demonstrating that its use of Cohen's $d$ does not produce a meaningful measure of price

differences.[139]  Neither is Commerce's use of Cohen's $d$ in accordance with law because it is not

actually measuring price difference as required by the statute.[140]

---

[136] Commerce focuses on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence," *Shandong Rongxin Imp. & Exp. Co. v. United* States, 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (citation omitted), and fails the requirement that Commerce "take into account whatever in the record fairly detracts from its" conclusions, *Universal Camera*, 340 U.S. at 488.

[137] *See* Hedges Report at 9; *see also* Canada's NFI Submission, Exh 10 (C.R. 437, P.R. 501) (Larry V. Hedges, Ingram Olkin, *Overlap Between Treatment and Control Distributions as an Effect Size Measure in Experiments* (2015) ("Hedges & Olkin, *Overlap Between Distributions*") (discussing Cohen's $d$ as one measure of overlap and noting that the article **[**
**]**).

[138] *See infra* Section IV.B (discussing Commerce's failure to adequately address the Hedges Report).

[139] *Diamond Sawblades Mnfs.' Coal. v. United States*, 986 F.3d 1351, 1362 (Fed. Cir. 2021) (citing *Nippon Steel*, 337 F.3d at 1379).

[140] 19 U.S.C. § 1677f-1(d)(1)(B)(i).

### iii. Subsequent Steps in the DPM Cannot Ameliorate the Flaws in Commerce's Cohen's *d* Test

Commerce claims that any flaws in the Cohen's *d* test are excusable because subsequent application of the ratio and meaningful-difference tests will correct its earlier errors. Relying on *Stupp Corp. v. United States* ("*Stupp III*"),[141] Commerce claims that "the Cohen's *d* test is only one part of Commerce's {DPM}, which also includes the ratio test and the meaningful difference test."[142] In *Stupp III*, Commerce persuaded the CIT that whatever concerns the Federal Circuit may have about Commerce's reliance on Cohen's *d*, the "test does not operate in a vacuum, but as part of the differential pricing analysis as a whole."[143] The CIT accepted that, when Commerce applies its Cohen's *d* test to datasets that do not meet its underlying assumptions, the operation of the ratio test and the meaningful-difference test ensure "reasonable passing rates" or "relatively few determinations of targeted dumping."[144] *Stupp III* is not dispositive on this issue for three reasons:

First, Commerce's reasoning in *Stupp III* actually demonstrates that it is not measuring price differences in accordance with the statute. In the remand results underlying *Stupp III*,[145] Commerce's explanation came in response to the following hypothetical posed by the Federal Circuit:

---

[141] 619 F. Supp. 3d 1314, 1324 (Ct. Int'l Trade 2023).

[142] I&D Mem. at 26.

[143] *Stupp III*, 619 F. Supp. 3d at 1324.

[144] *Id.* at 1327.

[145] *Stupp Corp. et al. v. United States*, Consol. Court No. 15-00334 (CIT October 8, 2021), Final Results of Redetermination Pursuant to Court Remand, A-580-876 (Apr. 4, 2022) (Barcode 4228853-01) ("*Stupp II* Remand Results").

> Consider, for example, ten purchasers of a product, each of which purchases five units. Assume that the per-unit sales prices for a particular purchaser are not normally distributed and are all the same, or nearly the same (e.g., $100.01, $100.01, $100.01, $100.01, and $99.99). Assume further that the per-unit sales prices across the entire set of purchasers are also very similar, falling within a relatively small range (such as between $99.92 and $101.01).[146]

The Federal Circuit found that applying Cohen's *d* to these hypothetical sales data was "problematic."[147] The variances in the test group are very small (approaching zero), thereby shrinking the denominator.[148] As the denominator shrinks, the *d* coefficient increases and creates an "artificially inflate{d} . . . dumping margin."[149] As a result, Commerce's methodology would indicate a large effect size when clearly the prices between the two groups differ very little. The Federal Circuit also noted that "requiring larger test groups tends to decrease the likelihood that a test group would have sales prices with near-zero variance, and requiring normality also tends to decrease that likelihood as the number of observations increases."[150]

On remand, Commerce conceived of a more "extreme" hypothetical wherein there are two purchasers: with all sales to purchaser A priced at $100 and all sales to purchaser B priced at $101.[151] If the Cohen's *d* test performed on this data, it would produce a *d* coefficient indicating a large difference between the two groups.[152] However, the difference between the

---

[146] *Stupp II*, 5 F.4th at 1359.

[147] *Id*.

[148] *Id*.

[149] *Id*.

[150] *Id*.

[151] *Stupp II* Remand Results at 29–30.

[152] *Id.* at 30.

two prices is clearly not significant.[153]  Recognizing this issue, Commerce insisted that the meaningful-difference test "imposes a contextual interpretation on the results of the Cohen's *d* test" that compensates for this concern.[154]

According to Commerce this comparison will not result in a "meaningful difference" in the DPM because if the normal value is less than $100 then no sales are dumped, but if normal value is greater than $101 then all sales are dumped.[155]  Either way, there is no meaningful-difference when the overall dumping margin is calculated using the A-A or A-T methodology.[156]

The problem with Commerce's reasoning is that the Federal Circuit posed the hypothetical to determine whether the Cohen's *d* test, when applied to data that do not satisfy the assumptions, reasonably indicates significant price differences between groups of U.S. sales.  As Commerce conceded, its application of the Cohen's *d* test in its hypothetical would indicate a large effect size when the two groups of prices do not differ significantly.  Therefore, as Commerce admits, its application of the Cohen's *d* test does not actually measure "significant difference" among prices, which is what Commerce says it measures and what the statute requires Commerce to measure.[157]

Further, the CIT in *Stupp III* did not explicitly confront the issue of whether Cohen's *d* satisfies the statutory mandate to identify significant price differences when the assumptions are not satisfied—which is at issue before the Court in this case.  Thus, the CIT's analysis in *Stupp*

---

[153] *Id.*

[154] *Id.* at 30–31.

[155] *Id.* at 31.

[156] *Id.* at 31–32.

[157] *See* 19 U.S.C. § 1677f-1(d)(1)(B)(i).

*III* does not undermine the Canadian Parties' position that Commerce is not reasonably identifying prices that differ significantly when it applies Cohen's *d* to data that do not satisfy the assumptions.[158]

Second, Commerce cannot reasonably rely on other steps in the DPM to compensate for failures infecting the foundation of the DPM—the Cohen's *d* test.[159] Each of the three tests that form part of the DPM addresses a discrete statutory condition for departing from the A-A methodology for calculating dumping margins:

- **Cohen's *d* test:** determines whether ***prices differ significantly*** among purchasers, regions, or periods of time.[160]

- **Ratio test:** determines whether there is a ***pattern*** of prices that differ significantly.[161]

- **Meaningful-difference test:** determines whether **"such differences"** (i.e., the significant differences in prices) ***cannot be taken into account using the A-A method***.[162]

The three tests do not operate as an amalgamated whole. Each of the three tests is required to establish one of the statutory conditions for Commerce to depart from the A-A methodology. Commerce's use of the Cohen's *d* test serves as the "foundation" because its identification of significant price differences is a necessary prerequisite and input to the ratio test and the

---

[158] This Court is not bound by CIT decisions in other cases. *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

[159] *Mid Continent II*, 31 F.4th at 1381 (describing Cohen's *d* as the foundation of the DPM).

[160] 19 U.S.C. § 1677f-1(d)(1)(B)(i); *Differential Pricing Analysis: Request for Comments*, 79 Fed. Reg. 26,720, 26,722 (Dep't Commerce May 9, 2014) ("*Differential Pricing Analysis*") (Commerce will find "that the difference is significant . . . if the calculated Cohen's *d* coefficient is equal to or exceeds the large threshold").

[161] 19 U.S.C. § 1677f-1(d)(1)(B)(i); *see Differential Pricing Analysis*, 79 Fed. Reg. at 26,722.

[162] 19 U.S.C. § 1677f-1(d)(1)(B)(ii); *see Differential Pricing Analysis*, 79 Fed. Reg. at 26,723.

meaningful-difference test.[163] If Cohen's *d* does not actually identify significant price differences—as in cases where it is applied to data that do not meet its assumptions—then the subsequent tests do not perform any statutory function. Without identification of significant price differences, the ratio test cannot find a pattern of significant price differences and the meaningful-difference test cannot determine whether the A-A methodology accounts for such significant price differences.

Third, the CIT's conclusion in *Stupp III*—that the evidence did not show enough "'false positives' to overcome the 33% threshold" of the ratio test to trigger the use of an alternative methodology (*i.e.*, the mixed methodology) in the meaningful-difference test[164]—is clearly not the case here. As shown in **Tables 1** and **2** in Section IV.A.3, and as the Government of Canada explained in its administrative case brief, the overwhelming majority of Cohen's *d* passes violated at least one of the assumptions.

For example, consider the data underlying Commerce's time-period comparisons for Canfor. Of the **[        ]** passing comparisons, **[                    ]** violate the assumption of equal variance, **[                    ]** violate the assumption of equal size, and **[            ]** violate the assumption of normality.[165] And out of Canfor's **[        ]** passing comparisons, **[            ]** violate at least one assumption.[166]

Time-period comparisons for West Fraser exhibit the same issues. Out of **[        ]** passing comparisons, **[                    ]** violate the assumption of equal variances, **[**

---

[163] *Mid Continent II*, 31 F.4th at 1381.

[164] *Stupp III*, 619 F. Supp. 3d at 1327–28.

[165] Canada's Case Brief, Attach. 1.

[166] *Id.*

] violate the assumption of equal size, and [                    ] violate the assumption

of normality.[167]  [          ] of the time-period comparisons did not violate any of the

assumptions.[168]  In fact, only [    ] passing comparisons in total did not violate any of the

assumptions (i.e., were not "false positives) for Canfor and West Fraser combined.[169]

        In the *Final Results*, Commerce does not respond to the evidence that [          ] of the

data underlying its Cohen's *d* comparisons violate at least one of the assumptions such that

Cohen's *d* does not reasonably indicate price differences.  Instead, Commerce vaguely refers to

the CIT's opinion in *Stupp III* as if it foreclosed all challenges to Commerce's use of the Cohen's

*d* test.[170]  But the CIT contemplated that the Cohen's *d* test could be unreasonable if there were a

sufficient number of false positives to influence the ratio test.  Thus, even if the Court finds

*Stupp III* persuasive and considers the DPM holistically, the number of false positives in the

Cohen's *d* test overcame the 33 percent threshold of the ratio test, causing Commerce to use the

mixed methodology in the meaningful-difference test.[171]  In fact, the number of false positives

clearly crossed the 66 percent threshold, causing Commerce to compare the margins calculated

using the A-A methodology for Canfor and West Faser (without zeroing) to the margins

calculated using the A-T methodology (with zeroing) for all sales.[172]  Therefore, there can be no

---

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] I&D Mem. at 26–27.

[171] *Cf. Stupp III*, 619 F. Supp. 3d at 1327–28.

[172] The Canadian Parties recognize that in *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325 (Fed. Cir. 2020), the Federal Circuit sustained Commerce's methodology of aggregating sales across categories (purchasers, regions, or time periods) in the ratio test against the challenge raised in that case.  Applying *Chevron*, the Federal Circuit held that the statute was

debate that the number of false positives in Commerce's unreasonable Cohen's *d* test infected the ratio test, and caused Commerce to use an alternative methodology in the meaningful-difference test. In short, Commerce's unreasonable application of Cohen's *d* when the assumptions are not satisfied ultimately and unlawfully inflated the mandatory respondents' margins.

### b. Commerce's Methodology and Explanation for Calculating the Denominator of the *d* Coefficient Are Unreasonable

In *Mid Continent II*, the Federal Circuit found that Commerce departed from the statistics literature in "calculat{ing} the denominator of Cohen's *d*, specifically, in deciding to use simple averaging when the groups differ in size."[173] The Federal Circuit directed Commerce to "either provide an adequate explanation for its choice of simple averaging or make a different choice, such as use of weighted averaging or use of the standard deviation for the entire population."[174]

Commerce continues to use simple averaging to calculate the denominator of the *d* coefficient.[175] Commerce points to Professor Cohen's equation 2.3.2, which calculates the denominator for Cohens *d* as:

$$\sigma' = \sqrt{\frac{\sigma_A^2 + \sigma_B^2}{2}}$$

---

ambiguous or silent as to how Commerce is to determine that there is a pattern of U.S. prices that differ significantly and deferred to Commerce's application of its ratio test to identify such a pattern. *See id*. at 1324–25. However, given that the Supreme Court has granted review this term in two cases to consider whether to overrule or clarify *Chevron*, *see supra* note 40, the Federal Circuit's decision in *Dillinger France* may no longer be controlling by the time this case is fully briefed.

[173] *Mid Continent II*, 31 F.4th at 1381.

[174] *Id*.

[175] *See* I&D Mem. at 28–33.

Where $\sigma_A$ is the standard deviation of population A and $\sigma_B$ is the standard deviation of population B.[176]  Commerce claims that the literature supports the use of equation 2.3.2 when the groups being compared are separate and full populations of data with known standard deviations—which it asserts is the case when Commerce applies its Cohen's *d* test.[177]  Commerce erroneously asserts that "the academic literature only provides for a weighted average of the standard deviations . . . when the 'effect size must be estimated from sample data.'"[178]  Commerce then claims that this conclusion is confirmed by Professor Cohen's discussions of equations 2.5.1 and 2.5.2.[179]  According to Commerce, Professor Cohen uses these equations, not equation 2.3.2, to calculate the denominator and the effect size for sampled data.[180]  Finally, Commerce insists that its conclusion is supported by Professor Algina's characterization of the typical practice with respect to using Greek and Latin variables.[181]  None of this reasoning makes any sense.

The Federal Circuit has already rejected Commerce's assertion that the literature suggests simple averaging when sample sizes are unequal.[182]  Any nuances or distinctions between the Federal Circuit's holding in *Mid Continent II* and Commerce's *Final Results* that the Government or the domestic parties may identify are merely distractions from the fact that

---

[176] *See* Cohen, *Statistical Power Analysis* at 43–44.

[177] I&D Mem. at 29–30.

[178] *Id.* at 32 n.180.

[179] *Id.* at 32 (citing Cohen, *Statistical Power Analysis* at 66–67).

[180] *Id.* (citing Cohen, *Statistical Power Analysis* at 66–67).

[181] *Id.* at 32 n.180.

[182] *Mid Continent II*, 31 F.4th at 1380 ("The cited literature nowhere suggests simple averaging for unequal-size groups.").

Commerce is attempting to avoid compliance with the Federal Circuit's decision in *Mid Continent II*.[183]

Contrary to Commerce's position, the literature is clear that the weight assigned to the standard deviations in equation 2.3.2 must be based on two considerations: whether the standard deviations are equal and whether the group sizes are equal.[184] If the standard deviations are equal, then there is no need to perform a separate denominator calculation—the denominator is just the common standard deviation.[185] If the groups are of equal size, then there is no need to calculate a weighted average standard deviation because a simple average is the same as a weighted average when the number of observations is equal.[186] This is just arithmetic. If neither condition is satisfied, however, as in Commerce's methodology, then the denominator of the *d* coefficient will not contextualize the difference in means in a consistent way, in a way that is comparable to the Cohen's *d* values on which the thresholds are based, or in accordance with the literature.[187]

Equation 2.3.2 provides no defense to Commerce's denominator calculation, as Commerce ignores a precondition for using the equation: that the groups must be of equal

---

[183] *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent III*"), 628 F. Supp. 3d 1316, 1324 (Ct. Int'l Trade 2023) (observing that the Federal Circuit rejected the rationale that Commerce attempted to re-assert on remand).

[184] Cohen, *Statistical Power Analysis* at 43–44.

[185] *Id.* at 20. Even Professor Coe and Dr. Ellis—the other two sources on which Commerce relies—maintain that Cohen's *d* is appropriate only when the variances are roughly equal. Coe, *It's the Effect Size Stupid* at 11 ("{A} pooled estimate of standard deviation depends on the assumption that two calculated standard deviations are estimates of *the same* population value" and differ only slightly "as a result of sampling variation.").

[186] Cohen, *Statistical Power Analysis* at 43–44.

[187] *See, e.g.*, Hedges Report, App'x II at xv–xvi.

size.[188]  This omission is particularly glaring in light of Commerce's claim that the Hedges Report does not address 2.3.2 in the Hedges Report.[189]  To the contrary, Professor Hedges explains that "{e}quation 2.3.2 occurs in section 2.3.3, entitled 'Case 2 $\sigma_A \neq \sigma_B$, $n_A = n_B$,'" which "implies that the entirety of section 2.3.3, including equation 2.3.2 assumes that the two groups are equal in size ($n_A = n_B$)."[190]  Professor Hedges explains that "although the symbols $n_A$ and $n_B$ do not appear in equation 2.3.2, that is only because they cancel in the equation because the group sizes are assumed to be equal."[191]

Commerce is not permitted to make, and the Court cannot not sustain, findings that do not address evidence and arguments that fairly detract from Commerce's findings.[192]  The Hedges Report documents why, as a matter of statistical science, "the use of weighted pooled standard deviations" is more reliable than alternatives.[193]  The principle underlying weight averaging "comes from the definition of variances."[194]  That is, "{t}he variance is the *average* of the squared deviations from the means."[195]  That average is calculated based on the number of

---

[188] *See* Cohen, *Statistical Power Analysis* at 43–44.

[189] I&D Mem. at 32 n.180 ("Dr. Hedges does not address the simple average provided by Dr. Cohen in equation 2.3.2.").

[190] Hedges Report, App'x II at xv.

[191] *Id.*, App'x II at xvi.

[192] *DAK Ams., LLC v. United States*, 456 F. Supp. 3d 1340, 1352 (Ct. Int'l Trade 2020) ("The record as a whole must be examined, including evidence that 'fairly detracts from the substantiality of the evidence.'") (quoting *Nippon Steel*, 337 F.3d at 1379).  *See also infra* Section IV.B.

[193] Hedges Report, App'x II at vi.

[194] *Id.* at 13.

[195] *Id.* (emphasis added).

observations in the distribution.[196]  "The crucial point is that the weighting arises as a consequence of the *definition* of the pooled variance.  It is not arbitrary construction in and of itself."[197]  Thus, "any other computation of a pooled variance within two populations is not just contrary to conventional statistical practice, it is contrary to the conceptual *definition* of the pooled variance within two populations."[198]  Given that Commerce erroneously denies that Professor Hedges submitted analysis on this point,[199] there can be no doubt that Commerce has failed to consider that analysis.[200]  Commerce's determination is, therefore, not supported by substantial evidence because it fails to address evidence detracting from its conclusion.[201]

Next, Commerce's claim that Professor Cohen exclusively uses equations 2.5.1 and 2.5.2 for sampled data suffers from a misunderstanding of the literature.[202]  Importantly, equations

---

[196] *See id.* (provided equations that define the variance).

[197] *Id.* (emphasis in original).

[198] *Id.* (emphasis in original).

[199] I&D Mem. at 32 n.180 ("Dr. Hedges does not address the simple average provided by Dr. Cohen in equation 2.3.2.").

[200] *Id.* at 27 n.150.

[201] *Nippon Steel*, 337 F.3d at 1379.

[202] I&D Mem. at 31–32.  Professor Cohen defines equation 2.5.1 as:

$$d_S = \frac{\overline{X}_A - \overline{X}_B}{S}$$

Where $d_S$ is a distinct effect size index from $d$, $\overline{X}_A$ and $\overline{X}_B$ are "the two sample means," and S is "the usual pooled within sample estimate of the population standard deviation."  Cohen, *Statistical Power Analysis* at 66–67.  Professor Cohen then gives equation 2.5.2 as the definition of "S" (the denominator):

$$S = \sqrt{\frac{\sum\left(X_A - \overline{X}_A\right)^2 + \sum\left(X_B - \overline{X}_B\right)^2}{n_A + n_B - 2}}$$

2.5.1 and 2.5.2 are used to measure $d_S$, which is calculated using experimental data to detect "the palpable characteristics of the sample and their bearing on the null hypothesis."[203] On the other hand, $d$ is used to determine one of four variables that are part of power analysis (the other three variables are $t$, $a$, and $n$).[204] The reason that Professor Cohen does not substitute equation 2.3.2 with equation 2.5.2 when using sample data is that the two equations perform distinct functions. While Professor Coe and Dr. Ellis "prescribe equation (2.5.2) for situations where effect size is being calculated from experimental data," neither "discusses using a simple, unweighted average."[205]

Finally, Commerce asserts that a comment by Professor Algina demonstrates that Professor Cohen used population data in equation 2.3.2. Professor Algina opines that "Cohen used the Latin letter $d$ to refer to the population {effect size}."[206] Purportedly "following more typical practice," Professor Algina uses "$d$ to refer to the sample {effect size} and the Greek letter $\delta$ to refer to the population {effect size}."[207] From this passage, Commerce concludes

---

*Id.* at 67. The Government of Canada submitted pages 1 through 45 of Cohen, *Statistical Power Analysis*, *see* Canada's NFI Submission, Exh. 7, but Commerce cites pages 66 through 67 of Cohen, *Statistical Power Analysis* in its decision, *see, e.g.*, I&D Mem. at 31. Additionally, pages 66 through 67 of Cohen, *Statistical Power Analysis* are discussed in *Mid Continent III*, 628 F. Supp. 3d at 1323–26.

[203] Cohen, *Statistical Power Analysis* at 66.

[204] *Mid Continent III*, 628 F. Supp. 3d at 1325 & n.13.

[205] *Id.* at 1325–26 (citing Coe, *It's the Effect Size Stupid* at 10; Ellis, *The Essential Guide to Effect Sizes* at 10 n.8).

[206] Algina, *An Alternative to Cohen* at 318 n.1.

[207] *Id.*

Professor Cohen's use of the Greek letter σ in equation 2.3.2 demonstrates that Professor Cohen was using population data in equation.[208]

There is no merit to Commerce's claim. That Professor Algina identifies the "typical practice" concerning the use of Greek and Latin variables does not establish that Professor Cohen applied those practices in equation 2.3.2. In fact, Professor Algina's quote demonstrates exactly the opposite: Professor Cohen did not follow the convention of using Greek variables to indicate population values, but instead used Latin variables to indicate population values. Professor Algina's comment, therefore, does not provide any support for the proposition that Professor Cohen used Greek variables to indicate population values.

In any event, the use or misuse of Greek and Latin variables is beside the point. Commerce claims to be using Cohen's $d$ and to rely on the thresholds for effect size that Professor Cohen articulated using his $d$ calculated as he described. Whether Commerce refers to its groups as populations, samples, or anything else, its test purports to use Cohen's standardized system to measure the difference between two groups of prices. That is not, however, what Commerce does when it uses a denominator calculated differently than any of the literature endorses for calculating effect size.

### 3. The Data to Which Commerce Applied Cohen's $d$ Fail to Meet the Underlying Assumptions

As established above, Commerce's application of Cohen's $d$ must satisfy the assumptions of normality, equal variances, and equal size to execute the statutory directive of measuring significant price differences.[209] This is not just an academic exercise. The flaws in Commerce's

---

[208] I&D Mem. at 32–33 n.180.

[209] 19 U.S.C. § 1677f-1(d)(1)(B)(i).

application of the DPM—including Cohen's *d*—are readily apparent from the data.  The data in this case demonstrate that [          ] of Commerce's Cohen's *d* comparisons violated at least one of the required assumptions.  The data underlying Commerce's use of Cohen's *d* bear no resemblance to the data that Professor Cohen intended for his test, and consequently, the Cohen's *d* test does not reasonably indicate price differences.

As discussed above, Cohen's *d* is a parametric measure that is meant to be performed on normal distributions with equal (or roughly equal) variances.  A meaningful Cohen's *d* comparison, performed on distributions that satisfy the assumptions, looks like this:

**Figure 3**[210]



If one performed Cohen's *d* on this data, the result would be *d* = 1, indicating a "large" difference between the distributions.[211]  The data that Commerce uses to test for significant price differences, on the other hand, come in distributions that look like this:

---

[210] *See* Grissom & Kim, *Effect Sizes for Research* at 62 (the distribution labels have been added for clarity).

[211] The mean of Distribution C = 0 and the mean of Distribution E = 1.  Both distributions have a standard deviation of 1.  Thus, $1 = \frac{1-0}{1}$.

**Figure 5**[212]



The test group mean in this comparison is **[      ]**, with a test group standard deviation of **[    ]**. The base group mean is **[    ]**, with a drastically different standard deviation of **[    ]**. Neither group is normally distributed. Using its methodology, Commerce calculates

---

[212] This comparison shows the data used form Commerce's comparison of West Fraser's CONNUM **[                ]** by **[      ]**. The data underlying this graph and other graphs of West Fraser's data are contained in West Fraser's Response to Dec. 19, 2022 Secs. A-D Supplemental Antidumping Duty Questionnaire (Jan. 5, 2023), Exh. Wfmus03.sas7bdat (C.R. 456) ("West Fraser's U.S. Sales Database"). *See* West Fraser's Prelim. Analysis Mem. (Jan. 23, 2023) at 1 (C.R. 475, P.R. 523) ("West Fraser Prelim. Analysis Mem.") (unchanged for *Final Results*) (explaining that Commerce calculates West Fraser's margins using West Fraser's U.S. Sales Database). The net prices graphed in the calculations are the result of running the data through Commerce's SAS programming. *See* West Fraser's Final Analysis Mem. (July 26, 2023) (C.R. 500, P.R. 586) ("West Fraser's Final Analysis Mem."), Attach. II (C.R. 503–04, 510). Commerce's analysis of the comparison is contained in West Fraser's Final Analysis Memorandum, Attachment II at 295–97.

a Cohen's *d* of **[          ]**—which is a "pass" for this comparison.  Is the difference in these two groups of prices "grossly perceptible" as in **Figure 3**?  Commerce cannot answer that question using its methodology, because it is fundamentally flawed.

The thresholds articulated by Professor Cohen depend on the assumptions, including normal distribution, which is plainly not met in this comparison.  Based on the standard deviations and means for the example depicted in **Figure 5**, the graph would look markedly different if the data were normally distributed, compared to the data that Commerce plugged into the Cohen's *d* formula.  This can be seen in **Figure 6**, which depicts two hypothetical normally distributed datasets having the means of the test and comparison groups:

**Figure 6**[213]



No reasonable decisionmaker could maintain that **Figure 5** resembles **Figure 6**. However, Commerce's calculation of Cohen's *d* presumes that it is working with data in the form of **Figure 6**, when in fact it is based on data in the very different form of **Figure 5**. Without normal distributions, a Cohen's *d* calculated for two sets of means and standard deviations bears no relationship to the Cohen's *d* that Professor Cohen adopted as a threshold for "large" effect size.

An additional example further illustrates how ill-suited the data used by Commerce are for interpreting through the use of Cohen's *d*. **Figure 7** shows a plot of a West Fraser comparison for CONNUM [                    ], [                    ]:

---

[213] *Cf. supra* note 212.

**Figure 7**[214]



Once again, this plot bears no resemblance to the type of data in **Figure 3**. Nor does the plot evidence "grossly perceptible" differences in the two groups of prices such that they conform to any reasonable and consistent definition of "significant." Yet, Commerce calculated a $d$ of [                ], and thus treated the supposed price differences in this comparison as significant.[215]

These examples are not outliers. As shown in **Table 1** below, the majority of the data underlying Commerce's comparisons did not satisfy the assumption of normality.

---

[214] *See* West Fraser Final Analysis Mem., Attach. II at 292–94; *see also supra* note 212, and accompanying text.

[215] *See* West Fraser Final Analysis Mem., Attach. II at 292–94.

Table 1[216]

| Company | Category of Cohen's $d$ Comparison | Percentage of Comparisons that Are Not Normally Distributed |
|---|---|---|
| Canfor | Time Period | [    ] |
| Canfor | Region | [    ] |
| Canfor | Customer | [    ] |
| West Fraser | Time Period | [    ] |
| West Fraser | Region | [    ] |
| West Fraser | Customer | [    ] |

The percentage of comparisons that violated the assumption of equal variances is even more stark:

Table 2[217]

| Company | Category of Cohen's $d$ Comparison | Percentage of Comparisons with Standard Deviations Differing by More than 2% |
|---|---|---|
| Canfor | Time Period | [    ] |
| Canfor | Region | [    ] |
| Canfor | Customer | [    ] |
| West Fraser | Time Period | [    ] |
| West Fraser | Region | [    ] |
| West Fraser | Customer | [    ] |

Thus, a clear majority of the comparisons that Commerce conducted in the Cohen's $d$ test resembled **Figures 4, 5,** and **7**—not **Figures 3** and **6**. According to Professor Cohen and

---

[216] *See* Canada's Case Brief, Attach. 1.

[217] *See id.* This analysis adopts two percent as the threshold for rough equivalence based on Commerce's reliance on the same threshold to determine whether sales to affiliates are comparable to sales to non-affiliates, and thus conducted at arm's length. *See* Prelim. Mem. at 13; Canada's Case Brief at 17–18.

Professor Hedges, such comparisons are not fit for Cohen's *d*. They simply do not indicate whether prices "differ significantly among purchasers, regions, or time periods."[218]

### B.     Commerce Fails To Meaningfully Consider and Address the Hedges Report

The substantial evidence standard requires that Commerce look at the whole record, "including evidence that reasonably detracts from its conclusion," when making a determination.[219] Commerce "has certain core investigatory duties, which cannot be avoided."[220] While a reviewing court may not reweigh the evidence,[221] its task is to ensure that the agency has considered all important aspects of the issues before it.[222] An agency decision that simply ignores relevant evidence on the record, including information and analysis contained in expert reports, is not supported by substantial evidence.[223] Likewise, an agency determination so "implausible that it could not be ascribed to a difference in view or the product of agency expertise" is arbitrary and capricious.[224] Commerce did not consider Professor Hedges's analysis with respect to three important issues concerning its use of Cohen's *d*. Additionally, with respect to the one issue raised by the Hedges Report that Commerce did address, Commerce relied on inapplicable case law to unreasonably evade engaging with Professor Hedges's

---

[218] 19 U.S.C. § 1677f-1(d)(1)(B)(i).

[219] *Nippon Steel*, 337 F.3d at 1379.

[220] *Hebei Metals & Minerals Imp. & Exp. v. United States*, 366 F. Supp. 2d 1264, 1270 (Ct. Int'l Trade 2005).

[221] *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015).

[222] *State Farm*, 463 U.S. at 43.

[223] *See Anshan Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236, 1243 (Ct. Int'l Trade 2004) ("{D}eference is not due an agency determination which relies upon {an} inadequate factual basis or is inconsistent with congressional intent.").

[224] *State Farm*, 463 U.S. at 43.

substantive analysis.  The Court should remand to ensure that the "the agency has made a reasoned decision based on its evaluation" of the Hedges Report.[225]

First, Commerce not only fails to engage with Professor Hedges's analysis of Commerce's use of equation 2.3.2 (simple averaging) to calculate the denominator of *d*, but also incorrectly claims that Professor Hedges did not provide such an analysis.[226]  Therefore, Commerce's claim that it "considered the contents of the Hedges Report and how it relates to the academic literature on this topic"[227] is demonstrably false.  Commerce's failure to address Professor Hedges's analysis or the literature on which it is based renders its determination unsupported by substantial evidence and its use of Cohen's *d* arbitrary and capricious.

Second, Commerce claims that the Hedges Report does not demonstrate that Professor Cohen developed his thresholds based on the assumptions of normality, similarity of variances and sufficient number of observations.[228]  According to Commerce the interpretive cutoffs "were not based on calculated results or statistical analyses, but were threshold numbers that Dr. Cohen proposed because he considered that they {would} be found reasonable by others."[229]

---

[225] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

[226] *See supra* notes 199–201, and accompanying text.

[227] I&D Mem. at 27 n.150.

[228] *Id.* at 27; *see also id.* at 20–21 (asserting that the interpretive cutoffs "were not based on calculated results or statistical analyses, but were threshold numbers that Dr. Cohen proposed because he considered that they will be found reasonable by others"), 24 ("{T}he academic literature provides no evidence that the {interpretive cutoffs} themselves or their use are dependent on statistical analysis or the application of the statistical criteria as argue by the plaintiff in *Stupp II*."), 24–25 (denying that "these limitations" (apparently referring to assumptions) "apply to Dr. Cohen's development of his proposed thresholds themselves"), 26 (claiming that assumptions are only relevant to measuring the percent nonoverlap but are distinct and have nothing to do with the numerical thresholds).

[229] *Id.* at 21.

Commerce acknowledges Professor Hedges's criticism that "when assumptions of normality and equal standard deviations are not met, Cohen's interpretation of *d*, including his conventions for small, medium, and large effect sizes (which are based on those assumptions) cannot be relied upon."[230]  While Commerce agrees that the assumptions must be satisfied to "quantify the measures of non-overlap ($U_1$) and percentile standing ($U_3$)," Commerce claims that it does not rely on the *U* measures to support its use of the large (0.8) threshold, which "is based on Dr. Cohen's 'operational definitions' of these thresholds."[231]  This is nonsense.  Professor Cohen defines the thresholds, and thus his "operational definitions," expressly in relation to the *U* measures of non-overlap.[232]  If Commerce is relying on Cohen's *d*, Commerce is relying on the measures of non-overlap.

Commerce ignores several passages in the Hedges Report in reaching this conclusion. Professor Hedges explains that Professor Cohen intended *d* to be interpreted "in terms of population overlap."[233]  Professor "Cohen's thresholds were based on empirical evidence, but his interpretation of *d* is based on measures of overlap between distributions (his *U* measures)."[234] One cannot ignore the assumptions when applying these thresholds because doing so "distorts the work of Cohen and the behavior-science statisticians who followed."[235]

---

[230] *Id.* at 25 n.142 (quoting Hedges Report, App'x II at iii).

[231] *Id.* (citing Cohen, *Statistical Power Analysis* at 24–27).

[232] *See, e.g.*, Cohen, *Statistical Power Analysis* at 25 ("The implication of **d** = .2 as the operational definition of a small difference between means can be seen in Table 2.2.1.").

[233] Hedges Report, App'x II at iii.

[234] *Id.*, App'x II at xiii.

[235] *Id.*, App'x II at xiii; *see also* Hedges Report at 8–9 (citing, *inter alia*, Canada's NFI Submission, Exh. 6 (C.R. 436, P.R. 501) (S. R. Searle, *Linear Models* (1971)); *id.*, Exh. 13 (C.R. 439, P.R. 502) (S. Weisberg, *Applied Linear Regression* at 32–46 (3rd ed. 2005)); Hollander,

Third, Commerce did not consider Professor Hedges's analysis concerning Commerce's supposed use of full populations of data. Again, Commerce rejects the notion that the statistical criteria are relevant for its purposes because it uses "all prices of comparable merchandise for the test and comparison groups."[236] Additionally, Commerce claims that the statistics literature allows Commerce to simple average the denominator of the $d$ coefficient (even when the groups are of unequal size) because Commerce uses "full populations" of data.[237]

Commerce never acknowledges, much less addresses, Professor Hedges's analyses to the contrary. Professor Hedges explains that "Commerce is mischaracterizing the groups as two separate populations because the comparisons they make involve subsets of the entire corpus of data—such subsets would ordinarily be considered samples in statistics."[238] But, regardless of "{w}hether the groups Commerce uses to compute $d$ are a population or a sample, the interpretation of $d$ given by Cohen and other statistical experts can only be relied upon if the assumptions of normality and equal standard deviations are satisfied."[239]

Finally, Commerce's failure to adequately address the Hedges Report cannot be salvaged by its apparent reasons for assigning the report little weight. Commerce relies on *Samsung International v. United States*,[240] for the proposition that "{e}xpert opinions are merely advisory,

---

*Nonparametric Statistical Methods*, Chs. 1 & 4; Hedges & Olkin, *Overlap Between Distributions*; Grissom & Kim, *Effect Sizes for Research*).

[236] I&D Mem. at 21.

[237] *Id.* at 33.

[238] Hedges Report, App'x II at v.

[239] *Id.*, App'x II at ix; *see also id.*, App'x II at xiv.

[240] 887 F. Supp. 2d 1330, 1338 n.18 (Ct. Int'l Trade 2012).

however, and are given weight only to the extent they are consistent with the lexigraphic and other reliable sources."[241] Commerce never indicates how the quoted passage affects its consideration of the Hedges Report (consequently, rendering the path of Commerce's reasoning undiscernible[242]), but merely declares that "{a}s a general matter, we considered the contents of the Hedges Report and how it relates to the academic literature on this topic."[243]

The issue in *Samsung* was whether U.S. Customs and Border Protection appropriately classified merchandise under a certain subheading of the Harmonized Tariff Schedule of the United States ("HTSUS"). The CIT considered "the 'terms of the heading,'" according to the General Rules of Interpretation.[244] The plaintiff provided expert opinions that "addressed the issue of whether the {North American Free Trade Agreement} definition" applicable to the subheading, "reflect{ed} the common meaning of the" HTSUS subheading under which the merchandise was classified in the {} industry.[245] The CIT rejected the expert's conclusions to the extent that they were inconsistent with dictionary definitions.[246]

The holding in *Samsung* cannot be stretched beyond the particular issue in that case: expert opinions on the meanings of particular HTSUS subheadings differs from the dictionary definitions of those terms.[247] That issue does not resemble the issue addressed in the Hedges

---

[241] I&D Mem. at 27 n.150.

[242] *See Bowman*, 419 U.S. at 286.

[243] I&D Mem. at 27 n.150.

[244] *Samsung*, 887 F. Supp. 2d at 1337.

[245] *Id.* at 1338.

[246] *See, e.g.*, *id.* at 1342.

[247] *See id.* at 1337–40; *cf. Chemtall, Inc. v. United States*, 878 F.3d 1012, 1023 n.5 (Fed. Cir. 2017) ("The Court of Customs and Patent Appeals and the Court of International Trade have

Report and before this Court: whether Commerce's application of a statistical measure, and its justification for that application, conforms to the principles of statistics. Even if *Samsung* were applicable, Professor Hedges's opinions are consistent with "other reliable sources," [248] which are cited extensively in his report.

While the Court may afford some deference to Commerce's weighing of competing evidence and arguments, including expert analyses, that deference is not unlimited. [249] This is not a situation where Commerce reasonably chose to give greater weight to one of multiple competing expert analyses. [250] There is only one expert analysis before Commerce—that of Professor Hedges—and Commerce has, for all practical purposes, ignored its substance.

In analogous circumstances, the CIT has found that Commerce's determination required a remand. [251] In *NEXTEEL*, the expert report at issue explained that Commerce's inclusion of certain data in its model for calculating a particular market situation adjustment rendered the model unstable. [252] Although Commerce provided an explanation for including those data, its

---

held that expert witness opinions may be considered *in determining the meaning of a tariff provision . . . .*") (emphasis added).

[248] *Samsung*, 887 F. Supp. 2d at 1339 n.18.

[249] *See Marsh*, 490 U.S. at 378 ("courts should not automatically defer" to an agency "without carefully reviewing the record"); *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997) ("The deference a court must accord an agency's scientific or technical expertise is not unlimited, however.").

[250] *Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

[251] *NEXTEEL Co. v. United States*, 569 F. Supp. 3d 1354, 1368–69 (Ct. Int'l Trade 2022).

[252] *See id*. at 1367–68.

explanation did not address the expert report.[253]  The CIT remanded for Commerce to explain its inclusion of the offending data.[254]  The CIT's opinion in *NEXTEEL* is consistent with the axiom that an administrative agency cannot base its determinations on unsupported and conclusory statements, "which are directly contradicted by undisputed {expert} evidence in the Administrative Record."[255]  "A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'"[256]

## C.  Commerce's Application of A-T Based on Differences Among Time Periods Is Unsupported by Substantial Evidence and Contrary to Statutory Requirements

Commerce fails to explain why the A-A methodology cannot take into account the purported price differences identified by time period.  The statute provides that Commerce may use the A-T methodology if it finds a "pattern of . . . prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time" *and*  Commerce "explains *why* such differences cannot be taken into account using" the A-A methodology or the T-T methodology.[257]  Commerce must adequately explain why the use of the A-T methodology is a

---

[253] *See id*. at 1368–69.

[254] *See id*. at 1369.

[255] *See Defs. of Wildlife*, 958 F. Supp. at 685 (no deference was due to the U.S. Fish and Wildlife Service's decision that ignored the evidence provided by an expert biologist); *cf. State Farm*, 463 U.S. at 43 (an agency decision is arbitrary and capricious if the agency's explanation "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

[256] *Marsh*, 490 U.S. at 378.

[257] 19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added).

reasonable and necessary course of action to unmask targeted dumping.[258] This is particularly true when the results of the application of Commerce's differential pricing methodology may be explained by external factors like market conditions, as is the case here.[259]

Commerce does not and cannot explain why the price differences it identifies among time periods satisfy the statutory conditions for application of the exceptional A-T methodology. First, in the face of evidence establishing that differences in respondents' prices over the POR tracked market volatility and seasonal trends and were not consistent with targeted dumping, Commerce insists that the law requires nothing more than mechanical application of the DPM without regard to any other facts or explanations. This approach defies the express language of the statute and the legislative direction that Commerce must conduct case-by-case analysis to justify departure from the preferred A-A methodology. Second, Commerce does not and cannot explain why the A-A methodology, which Commerce's regulations require to be applied on a month-by-month basis, cannot account for price differences among calendar quarters. Third, Commerce does not conduct a "fair comparison" as required by statute when it applies the A-T methodology based on differences in prices over time.

> 1. **Commerce Fails to Adequately Address Record Evidence that Variations in the Mandatory Respondents' Pricing Were Due to Price Volatility, Not Targeted Dumping**

Commerce's finding that the mandatory respondents' pricing variations over time periods were targeted dumping is not supported by substantial evidence because Commerce did not

---

[258] *State Farm*, 463 U.S. at 43; *Timken U.S. Corp.*, 421 F.3d at 1355; *see also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H. R. Doc. No. 103-316 at 842–43 (1994) ("Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison.").

[259] *Nippon Steel Corp.*, 337 F.3d at 1379.

adequately address evidence detracting from its conclusion. The substantial evidence standard demands that Commerce consider "the record as a whole, including evidence that . . . fairly detracts from the substantiality of the evidence" supporting Commerce's conclusions.[260] This obligation extends to evidence that the price differences identified by Commerce do not indicate or potentially mask targeted dumping.[261] Commerce did not address such evidence in this review, but instead relied on a mechanical application of its DPM while insisting that it need not consider anything else. This is inconsistent with the intent and language of the statute and with Commerce's obligations thereunder.

The SAA recognizes that Commerce should undertake a searching inquiry as to the reason for alleged significant price differences:

> Before relying on {the A-T} methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.[262]

Commerce's reliance on quantitative analysis and the meaningful-difference test does not excuse a departure from the statute and the failure to make a fair comparison. Commerce is not free to ignore the argument over qualitative factors where respondents have "actually demonstrate{d}

---

[260] *Diamond Sawblades*, 986 F.3d at 1362 (quoting *Nippon Steel*, 337 F.3d at 1379).

[261] *The Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1179 n.12 (Ct. Int'l Trade 2016).

[262] SAA at 843.

that the price differences are not a result of targeting."[263]  The substantial evidence standard "require{s} a different result."[264]

Without discussion, Commerce dismisses the alternative, non-quantitative explanations for price differences.[265]  Nothing in the statute, however, excuses Commerce from its obligation to consider the whole record in reaching a determination as to the adequacy of the A-A methodology to account for price differences.  Commerce's DPM, which applies mechanical calculations without regard to evidence of external causes, effectively creates an irrebuttable factual presumption that any pricing pattern is always caused by targeted dumping and nothing else, which is contrary to the underlying congressional intent and, thus, is unreasonable.[266]

Both mandatory respondents reported that the North American wood products industry is "cyclical and may be characterized by (i) periods of excess product supply due to industry capacity additions, variable production rates or capacity utilization and other factors; and (ii) periods of insufficient demand due to weak general economic conditions."[267]  The price of lumber is highly susceptible to environmental factors, including weather and especially forest fires, and seasons that control harvesting and construction conditions.  Prices typically rise

---

[263] *The Timken Co.*, 179 F. Supp. 3d at 1179 n.12.

[264] *Id.*

[265] *See* I&D Mem. at 40–41.

[266] *See Stupp II*, 5 F.4th at 1351 (holding that the standard for reviewing Commerce's choice of methodology was whether that methodology "reasonably implements a given statutory directive").

[267] Canada's PMS Submission, Exh. PMS-9, Attach. 32 (the North American wood products industry is "cyclical and may be characterized by (i) periods of excess product supply due to industry capacity additions, variable production rates or capacity utilization and other factors; and (ii) periods of insufficient demand due to weak general economic conditions."); *see also* West Fraser Sec. A QR, Exh. WF-AR4-A-23.

during the construction season when there is more demand and fall when inventories build up because there is less construction, suppressing demand. Canadian and U.S. prices typically rise and fall together. During this POR, producers faced additional challenges, including mounting inflationary pressures and the COVID-19 pandemic.

The COVID-19 pandemic drastically altered economic conditions during the POR.[268] This was followed by a large and unanticipated increase in inflationary pressures affecting costs and North American lumber prices.[269] This evidence demonstrates that price differences during the POR were a result of fluctuating market conditions and not targeted dumping.

West Fraser provided evidence and analysis showing that its monthly pricing directly correlates to the fluctuations in U.S. prices.[270] There is a close relationship between West Fraser's monthly prices for each of its four product groups—(1) structural framing 2x4; (2) structural framing 2x6+; (3) light framing; and (4) studs—and the monthly *Random Lengths Data* pricing for framing lumber. The correlation coefficients, which vary from **[**

**]** are overwhelming evidence of a causal relationship between West Fraser's pricing

---

[268] *See* West Fraser Sec. A QR, Exh. WF-AR4-A-23 at 15–16 (describing the impact of the COVID-19 pandemic and inflationary market pressure on prices); Canada's NFI Submission, Exh. 11 (referred to in text as "*Random Lengths Data*"); *see also* Canada's PMS Submission, Exh. PMS-23 at 8.

[269] *See* Canada's NFI Submission, Exh. 11; Canada's PMS Submission, Exh. PMS-23 at 8.

[270] *See* West Fraser's Case Brief at 7–10. In its case brief, West Fraser points out that of its "U.S. export sales prices that 'passed' the Department's {Cohen's *d*} test, **[          ]** of those sales passed the test due to variances in pricing over periods of time." *Id.* at 8. Here, we note that **[          ]** of West Fraser's observations passed based on time periods. *See infra* note 285. The difference is that the Canadian Parties are calculating the time-period passes based on the number of observations that pass while West Fraser calculates the percentage the value of the sales the pass.

and the forces driving pricing changes in the lumber market.[271]  This relationship is further demonstrated in **Figure 8** below, which depicts the correlation between West Fraser's pricing and the *Random Lengths Data*.

**Figure 8**[272]



In response to this evidence, Commerce blithely asserts that the Federal Circuit and the CIT have "found that Commerce is not required to 'determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions,

---

[271] West Fraser's Case Brief at 8–9 & Table 1.

[272] *Id.* at 10.

or time periods.'"[273]  According to Commerce, the only "salient finding is whether" significant

price differences exist.[274]  Commerce, therefore, refuses to engage with the evidence that rebuts

the central conclusion reached through the DPM:  that respondents' pricing masked dumping.[275]

Commerce is confused.  There is a distinction between an obligation to investigate the

intent behind the supposed disparate pricing and the obligation to address evidence

"demonstrate{ing} that the price differences are not the result of targeted dumping."[276]

Commerce may not be required "to determine the intent of targeted dumping" when doing so

would "create a tremendous burden on Commerce that is not required or suggested by the

statute."[277]  But here, the Canadian Parties provided the evidence to Commerce and analyzed the

correlation between West Fraser's pricing and U.S. lumber prices.[278]  Commerce does not

explain how considering this evidence in its analysis would create any burden, much less a

---

[273] I&D Mem. at 35 & n.193 (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015)).

[274] I&D Mem. at 35.

[275] *Id.* at 35–36.

[276] *The Timken Co.*, 179 F. Supp. 3d at 1179 n.12.  The Government of Canada brought this distinction to Commerce's attention in its case brief, Canada's Case Brief at 41, but Commerce did not address the issue, *see* I&D Mem. at 35–36.  This failure, on its own, renders Commerce's decision arbitrary and capricious.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding agency decision to terminate DACA to be arbitrary and capricious where the Department of Homeland Security failed to consider an important aspect of the problem).

[277] *JBF RAK*, 790 F.3d at 1368.

[278] *Cf. The Timken Co.*, 179 F. Supp. 3d at 1179 n.12 ("{S}uch a burden might not exist where a respondent itself provides that information.").

"tremendous burden,"[279] and such an explanation is not reasonably discernible from Commerce's determination.[280]

The Federal Circuit has been clear that "the overarching statutory aim" for permitting "the use of an A-T alternative methodology" is to address "targeted or masked dumping."[281] Commerce cannot explain why prices that merely follow fluctuations in the market over time indicate a pattern of prices that differ significantly among periods of time. In the context of the statutory aim of addressing targeted or masked dumping, why would such price differences be "significant"? Finding targeted dumping and applying the A-T methodology (with zeroing) to the mandatory respondents' sales does not serve that "overarching statutory aim" when the mandatory respondents' prices track the prices in the market. This is particularly true because, absent the DPM and the use of an alternative methodology, the mandatory respondents' margins would have been zero—they did not dump at all.[282]

For the foregoing reasons, Commerce's targeted dumping findings for both mandatory respondents are not supported by substantial evidence because Commerce fails to address evidence fairly detracting from its finding.[283] Moreover, Commerce does not consider an important aspect of the issue, and its decision is arbitrary and capricious.[284]

---

[279] *JBF RAK*, 790 F.3d at 1368.

[280] *Bowman*, 419 U.S. at 286.

[281] *APEX Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1349 (Fed. Cir. 2017).

[282] Canfor's Analysis Mem. at 3; West Fraser's Prelim. Analysis Mem. at 13.

[283] *Diamond Sawblades*, 986 F.3d at 1362.

[284] *Regents*, 140 S. Ct. at 1913 (finding agency decision to terminate DACA to be arbitrary and capricious where the Department of Homeland Security failed to consider an important aspect of

### 2. Commerce Cannot Explain Why Application of the Preferred A-A Methodology Does Not Account for Significant Price Differences Over Time

Commerce's Cohen's *d* test in this case produces the overwhelming majority of passing values across periods of time—specifically, across calendar quarters. [

] of Canfor's Cohen's *d* passes and [                                    ] of West Fraser's were time-period comparisons.[285]

Contrary to the statutory directive, Commerce's meaningful-difference test, by design, does not consider whether "such differences" can be taken into account using the A-A methodology adjusted for time periods.[286] Yet, Commerce's own regulations, which Commerce ignores here, provide an express and mandatory mechanism to ensure that the A-A methodology accounts for any identified pattern of significant price differences among periods of time. In conducting annual reviews, Commerce is required to apply the A-A methodology using monthly time periods.[287] That methodology ensures that any significant price differences that Commerce

---

the problem); *Bowman*, 419 U.S. at 286 (providing that the path of the agency's reasoning must be reasonably discernable to the court).

[285] These percentages were computed by dividing the number of observations that passed Commerce's Cohen's *d* test due to time-period comparisons for Canfor and West Fraser [
        ], respectively, by the total number of observations that passed Cohen's *d* for each respondent [                        ]. The number of passing sales were calculated based on the DP_PERIOD, DP_PURCHASER, and DP_REGION files for Canfor and West Fraser, as generated by Commerce's margin program. *See* Canfor's Analysis Mem., Attach. 2; West Fraser's Final Analysis Mem., Attach. II.

[286] 19 U.S.C. § 1677f-1(d)(1)(B)(ii).

[287] 19 C.F.R. § 351.414(d)(3) ("When applying the average-to-average method in a review, the Secretary normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month.").

identifies between calendar quarters—which is the level at which Commerce tests for differences among periods of time—cannot be masked by differential pricing.

For instance, suppose that Commerce finds that prices for a particular CONNUM were significantly lower in the first quarter (January, February, March) of the year than in the other three quarters (April through December). Under the preferred A-A methodology, the weighted-average normal value for that CONNUM in January, for example, would be compared to the weighted-average U.S. price for the same CONNUM in January (or the next-most contemporaneous month available within Commerce's "-90 / +60" matching period). Comparing average normal value in January to average export U.S. prices in January fully accounts for the differences between quarterly prices that Commerce identified. There is no risk that a monthly-average-to-monthly-average comparison could possibly mask quarter-to-quarter prices differences. Commerce has not in this review explained why its normal A-A methodology cannot account for the quarterly differences in prices that it identifies using Cohen's *d*.

### 3. Commerce's Methodology Does Not Result in Fair Price Comparisons

Commerce's resort to the exceptional A-T methodology based on differences among time period also disregards the statutory requirement that its dumping calculation be based on a "fair comparison."[288] Among the three categories of possible masked or targeted dumping in 19 U.S.C. § 1677f-1(d)(1)(B)(i), only one—time period—is expressly addressed in the trade law as a requirement for "fair comparisons." When Commerce applies the A-A methodology to compare weighted-average to weighted-average prices between Canada and the United States, it

---

[288] *See* 19 U.S.C. § 1677b(a)(1)(A) ("In order to achieve a fair comparison with the export price or constructed export price . . . {t}he normal value of the subject merchandise shall be the price . . . at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price").

is therefore, already required by statute to "take into account" periods of time because the comparisons are to be made—out of concern for fairness— "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." There is no similar provision in U.S. law for comparing purchasers or regions. Hence, the comparisons by time period must be made, by statute, separately from other comparisons (such as region or purchasers)

When pricing for subject merchandise is seasonal, and subject to changes over time, the A-A methodology is the appropriate means to take into account price differences. Commerce had no need for resort to the DPM at all, as the reasons for price differences were apparent from the outset of Commerce's inquiry.[289] A comparison of weighted average prices in Canada to weighted average prices in the United States on a monthly basis, as Commerce's regulations require, makes for a fair comparison because the time periods are comparable. The seasonal effects on lumber prices for one period in the United States will be similar to the seasonal effects on lumber prices for the same period in Canada. The shared continent dictates the same seasons.

When the weighted-average lumber price in Canada for a time period is compared to the price of a single transaction in that period, there is a much higher risk of identifying an aberrant difference in prices. This is because the price of a transaction on any given day may be an outlier compared to a price that is the weighted average of all transactions during a given period. Seasonality magnifies the chances of a single price as an outlier. Thus, the A-T methodology is more likely to produce an unfair comparison for seasonal commodities with price volatility, particularly when zeroing is used because a weighted average inherently produces a number that is different from the outlier prices in a distribution. The targeted dumping provision of the

---

[289] Canada's Case Brief at 39.

statute is not intended to be a solely quantitative exercise. The plain language of the statute asks Commerce to "explain{} why" the A-A comparison is insufficient. An explanation involves more than a numerical computation.[290] Commerce fails to provide such an explanation.

Application of Commerce's methodology in this case yields price differences driven by time periods. The statute's requirement for "fair comparisons" and Commerce's regulation requiring month-to-month comparisons fully explain a "pattern" of differences as exposed using the statutorily preferred A-A methodology. Commerce offers no rationale for resorting to an alternative methodology when the preferred methodology takes into account fully all meaningful differences. Consequently, the *Final Results* are not supported by substantial evidence and are contrary to law.

**D.     The Court Should Direct Commerce to Apply Any Downward Adjustments to The Mandatory Respondents' Margins to the Rate Assigned to the Non-Selected Companies**

Commerce calculates the rate assigned to non-selected companies by weight averaging the margins calculated for mandatory respondents, in accordance with 19 U.S.C. § 1673d(c)(5)(A).[291] For the *Amended Final Results*, Commerce weight averaged the mandatory respondents' margins and calculated a rate of 6.26 percent for the non-selected companies.[292] However, as demonstrated above, Commerce unlawfully calculated the mandatory respondents

---

[290] "Explain" means "to make something clear or easy to understand by describing or giving information about it." *Explain*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/explain (last visited Mar. 5, 2024). Claiming that dumping margins are meaningfully different based on comparison methodologies does not clarify anything about *why* they are different.

[291] *See Final Results*, 88 Fed. Reg. at 50,107–08. The Federal Circuit has clarified that the methods under 19 U.S.C. § 1673d apply to administrative reviews as well as investigations. *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016).

[292] *See Amended Final Results*, 88 Fed. Reg. at 61,511.

margins using the A-T methodology, caused by Commerce's unreasonable application of the DPM. Consequently, the Court should direct Commerce to recalculate the mandatory respondents' margins on remand and recalculate the rate assigned to non-selected companies based on the adjustments to the mandatory respondents' margins.

The CIT recognizes that when the mandatory respondents' margins are adjusted on remand and the rate assigned to non-selected companies is at issue in the appeal, then Commerce must recalculate the rate assigned to non-selected companies based on downward adjustments to the mandatory respondents' margins.[293] Here, the Canadian Parties allege that Commerce unlawfully used the DPM to calculate the mandatory respondents' margins and challenge the rate assigned to the non-selected companies.[294] Consequently, the Court should direct Commerce to recalculate the rate assigned to non-selected companies based on downward adjustments to the mandatory respondents' margins and apply that rate to all non-liquidated entries entered by the non-selected companies in this review.

---

[293] *See, e.g.*, *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2023 WL 3222683, at *8 (Ct. Int'l Trade Apr. 20, 2023) (instructing Commerce that on remand it was to "recalculate the all-others rate" based on adjustments to the mandatory respondents' rates); *Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1371 (Ct. Int'l Trade 2020); *Qingdao Sentury Tire Co. v. United States*, 539 F. Supp. 3d 1278, 1285 (Ct. Int'l Trade 2021); *Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359, 1367 (Ct. Int'l Trade 2019).

[294] *See* Compl. of the Gov't of Canada, the Gov't of Québec, the British Columbia Lumber Trade Council, Fontaine, Inc., Interfor Corporation, Interfor Sales & Marketing Ltd. (Oct. 6, 2023), Case No. 23-187, ¶¶ 29, 31, 33, ECF No. 15; Compl. of Tolko Indus. Ltd., Tolko Marketing and Sales Ltd., and Gilbert Smith Forest Products Ltd. (Oct. 27, 2023), Case No. 23-204, ¶ 16, ECF No. 13; Compl. of Resolute FP Canada Inc., the Conseil de l'Industrie forestière du Québec, and the Ontario Forest Industries Association (Nov. 1, 2023), Case No. 23-206, ¶ 25, ECF No. 23-206.

## CONCLUSION AND PRAYER FOR RELIEF

For the reasons set forth above, the Canadian Parties request that the Court enter judgment on the administrative record in their favor and remand the *Final Results*, as amended by the *Amended Final Results*, with instructions for Commerce to reconsider whether: (1) Commerce can calculate Cohen's $d$ to determine price difference when the data violate the assumptions of normality, equal variances, and equal size; (2) Commerce can simple average the denominator of the $d$ coefficient when the groups have disparate variances and are of unequal size and still reasonably measures the difference between U.S. prices; (3) the DPM, as applied to the mandatory respondents' data, was reasonable given the flaws in Commerce's use of Cohen's $d$; (4) Commerce's analysis of the Hedges Report and Commerce's decision to disregard it; (5) evidence that the mandatory respondents' pricing variations were the result of market forces and not the result of targeted dumping; (6) the A-A methodology can account for observed price differences over time; (7) Commerce conducts fair comparisons when applying the A-T methodology to dumping calculations based on price differences over time; and (8) to recalculate the rate assigned to non-selected companies based on any downward adjustments to the mandatory respondents' margins.

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and 2(B)(2), the undersigned certifies that this brief complies with the limitation requirement of 21,000 words. The word count for the Motion for Judgment on the Agency Record Regarding Application of Differential Pricing Analysis and Accompanying Memorandum of Law and Points of Authorities filed by the Canadian Parties as computed by Blank Rome LLP's word processing system (Microsoft Word) and manual count of words contained in images that are not counted by the word processing system, is 20,725 words.

*/s/* Eric S. Parnes
_____
Eric S. Parnes
