UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| GOVERNMENT OF CANADA, *et al*., <br>      Plaintiffs, <br><br>     and <br><br> CANFOR CORPORATION, *et al*. <br>      Plaintiff-intervenors, <br><br>     v. <br><br> UNITED STATES, <br>      Defendant, <br><br>     and <br><br> COMMITTEE OVERSEEING ACTION FOR <br> LUMBER INTERNATIONAL TRADE <br> INVESTIGATIONS OR NEGOTIATIONS; <br>      Defendant-intervenors. | Consol. Court No. 23-00187 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

<div style="margin-left:45%">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

</div>

Of counsel:
Jared M. Cynamon
Jason Miller
Attorneys
U.S. Department of Commerce
Office of the Chief Counsel
  for Trade  Enforcement and Compliance
Washington, DC

STEPHEN C. TOSINI
Senior Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-5196
Facsimile: (202) 514-7969
E-mail: stephen.tosini@usdoj.gov

Dated: August 22, 2024

*Attorneys for Defendant*

**TABLE OF CONTENTS**

<div align="right"><strong>PAGE</strong></div>

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    Administrative Decision Under Review ................................................ 2

STATEMENT OF FACTS ........................................................................................3

    I.    Legal Framework For Commerce's Differential Pricing Analysis ........................3

    II.    Administrative Proceedings ........................................................................7

SUMMARY OF THE ARGUMENT ........................................................................11

ARGUMENT ........................................................................................................ 14

    I.    Standard Of Review ........................................................................14

    II.    Commerce's Application Of The Cohen's *d* Test And DPA Are Supported By Substantial Evidence ........................................................ 16

        A.    Application Of The Cohen's *d* Test On The Entire Universe Of United States Sales Without Regard To Statistical Sampling Criteria Is Supported By Substantial Evidence ........................................................ 16

            1.    Commerce Explained Its Determination........................................ 16

            2.    Statistical Sampling Criteria Do Not Govern The Cohen's *d* Test Here ........................................................ 20

                a.    The Canadian Parties Misapprehend The Court's Standard Of Review ........................................20

                b.    The Statistical Sampling Criteria Do Not Govern Analysis Of The Full Population Of Sales........................................21

                c.    The Canadian Parties' U Measures Argument And Their Other Attempts To Link The Criteria To The Thresholds Fail ........................................24

                d.    The Cohen's d Test Does Not Yield "False Positives" Here ........................................26

    e. *Stupp III* Is On Point ........................................................... 28

  B. Commerce's Use Of Simple Averaging In The Cohen's *d* Denominator Is Supported By Substantial Evidence............................................................31

    1. Commerce Reasonably Explained Its Methodology..................... 31

    2. Substantial Evidence Supports Use Of Simple Averaging .......... 32

  C. Commerce's Review Of The Hedges Report Is Reasonable And Lawful ................................................................................................................. 33

  D. The Canadian Parties' Remaining DPA Arguments Fail........................... 37

    1. The Canadian Parties' Meaningful Difference Test Argument Fails ................................................................................................37

    2. The Canadian Parties' "Price Volatility" Argument Fails ............. 38

    3. The Canadian Parties' Seasonality Argument Fails ......................39

    4. The Canadian Parties' Directed Recalculation Argument Fails ....39

III. Commerce's Analyses Of The Remaining Issues Pertaining To Costs And Prices Are Supported By Substantial Evidence.................................................................40

  A. Commerce's Decision Not To Adjust U.S. Prices By The Amount Of Deposited Countervailing Duties Is Supported By Substantial Evidence And In Accordance With Law ..................................................................40

    1. Statutory And Regulatory Framework ..........................................40

    2. Commerce Correctly Calculated U.S. Prices................................ 41

  B. Commerce Reliance On Canfor's General And Administrative Expenses Is Supported By Substantial Evidence And In Accordance With Law ........ 43

    1. Legal Framework ..........................................................................44

    2. COALITION Identifies No Error In Commerce's G&A Calculation ...................................................................................... 45

  C. Commerce's Adjustment To Canfor's Wood Chip Byproduct Revenue Offset And Adjustment To Electricity Costs At The Prince George Sawmill Are Supported By Substantial Evidence And In Accordance With Law ......................................................................................................50

1.    Legal Framework ......................................................................... 50

2.    Commerce's Adjustment To Canfor's Wood Chip Byproduct
      Revenue Offset Is Supported By Substantial Evidence ................51

3.    Commerce's Adjustment To Canfor's Cost Of Electricity Is
      Supported By Substantial Evidence............................................. 54

CONCLUSION.................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                        <u>PAGE(S)</u>

*Ad Hoc Comm'n of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*,
    13 F.3d 398 (Fed. Cir. 1994) ................................................................. 42

*AK Steel Corp. v. United States*,
    988 F. Supp. 594 (Ct. Int'l Trade 1997) ................................................ 41, 42, 43

*Al Ghurair Iron & Steel LLC v. United States*,
    65 F.4th 1351 (Fed. Cir. 2023) ............................................................ 34, 35, 54

*Apex Exports v. United States*,
    777 F.3d 1373 (Fed. Cir. 2015) ............................................................ 40, 43

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017) ........................................................... 4, 5, 12, 37

*Asociacion Colombiana de Exportadores de Flores v. United States*,
    704 F. Supp 1114 (Ct. Int'l Trade 1989) ............................................. 49

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ............................................................................. 42

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) .............................................................. 56

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
    5 F.4th 1367 (Fed. Cir. 2021) .............................................................. 15

*Coal. of Am. Millwork Producers v. United States*,
    581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ...................................... 45

*Consol. Edison Co. of N.Y. v. N.L.R.B.*,
    305 U.S. 197 (1938) ............................................................................. 14

*Consolo v. Federal Maritime Comm'n*,
    383 U.S. 607 (1966) ............................................................................. 14

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007) ........................................................... 56, 57

*Dorbest Ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ........................................................... 57

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ........................................................................ 14, 15, 45, 48

*Goodluck India Ltd. v. United States*,
   670 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) ............................................................ 25, 26

*Hoogovens Staal BV v. United States,*
   4 F. Supp.2d 1213 (Ct. Int'l Trade 1998) ................................................................. 41, 42

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
   589 U.S. 178 (2020) .......................................................................................................... 42

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) ....................................................................................... 38

*Koyo Seiko Co., Ltd. v. United States*,
   20 F.3d 1156 (Fed. Cir. 1994) ...................................................................................... 5, 28

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ...................................................................................................... 15

*Marmen Inc. v. United States*,
   627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) ................................................ 7, 11, 21, 24

*Mid Continent Steel & Wire, Inc. v. United States*,
   273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017) .................................................................. 44

*Mid Continent Steel & Wire, Inc. v. United States* (*Mid Continent I*),
   940 F.3d 662 (Fed. Cir. 2019) ......................................................................................... 20

*Mid Continent Steel & Wire, Inc. v. United States (Mid Continent III)*,
   31 F.4th 1367 (Fed. Cir. 2022) .................................................................................. 32, 40

*Mid Continent Steel & Wire, Inc. v. United States*,
   680 F. Supp. 3d 1346 (Ct. Int'l Trade 2024) (*Mid Continent V*) ........................................ 7

*Nan Ya Plastics Corp., Ltd. v. United States*,
   128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) .................................................................. 38

*NEXTEEL Co., Ltd. v. United States*,
   28 F.4th 1226 (Fed. Cir. 2022) ....................................................................................... 39

*NEXTEEL Co., Ltd. v. United States*,
   355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .................................................................. 48

v

*NEXTEEL Co., Ltd. v. United States,*
   569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022) ...................................................... 36

*NEXTEEL Co., Ltd. v. United States,,*
   676 F. Supp. 3d 1345 (Ct. Int'l Trade 2023) ........................................... 7, 15, 21

*Nippon Steel Corp. v. Int'l Trade Comm'n,*
   345 F.3d 1379 (Fed. Cir. 2003) ......................................................................... 39

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006) ......................................................................... 14

*NMB Singapore Ltd. v. United States,*
   557 F.3d 1316 (Fed. Cir. 2009) ......................................................................... 54

*Novosteel SA v. United States,*
   284 F.3d 1261 (Fed. Cir. 2002) ......................................................................... 43

*Nucor Corp. v. United States,*
   633 F. Supp. 3d 1216 (Ct. Int'l Trade 2023) ...................................................... 49

*PAM, S.p.A. v. United States,*
   582 F.3d 1336 (Fed. Cir. 2009) ......................................................................... 14

*Ranchers-Cattlemen Action Legal Found. v. United States,*
   23 C.I.T. 861 (1999) .......................................................................................... 25

*Resolute FP Canada Inc. v. United States,*
   No. 23-00095, 2024 WL 3859816 (Ct. Int'l Trade Aug. 19, 2024) ........................ 33, 34

*Samsung Int'l, Inc. v. United States,*
   887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012) .......................................... 21, 22, 36

*SeAH Steel Corp. v. United States,*
   619 F. Supp. 3d 1309 (Ct. Int'l Trade 2023) ............................................. *passim*

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
   203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) .......................................... 22, 23, 30

*SmithKline Beecham Corp. v. Apotex Corp.,*
   439 F.3d 1312 (Fed. Cir. 2006) ......................................................................... 43

*Stupp Corp. v. United States,*
   5 F.4th 1341 (Fed. Cir. 2021) ................................................................. *passim*

*Stupp Corp. v. United States (Stupp III)*,
    619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ............................................................ *passim*

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    814 F.3d 1309 (Fed. Cir. 2016) ................................................................................ 34

*Torrington Co. v. United States*,
    146 F. Supp. 2d 845 (Ct. Int'l Trade 2001) ............................................................ 44

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
    975 F.2d 807 (Fed. Cir. 1992) ................................................................................ 20

*U.S. Steel Group a Unit of USX Corp. v. United States*,
    998 F. Supp. 1151 (Ct. Int'l Trade 1998) .............................................................. 44

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ................................................................................ 3

*United States v. Life Care Centers of Am., Inc.*,
    114 F. Supp. 3d 549 (E.D. Tenn. 2014) ................................................................ 17

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007) .................................................................... 41, 42, 43

## **STATUTES**

19 U.S.C. § 1516a(b)(1)(B) ............................................................................................ 14

19 U.S.C. § 1673 ............................................................................................................ 3

19 U.S.C. § 1677(35)(A) ................................................................................................ 3

19 U.S.C. § 1677a(a) ...................................................................................................... 3

19 U.S.C. § 1677a(b) ...................................................................................................... 3

19 U.S.C. § 1677a(c) .............................................................................................. 40, 43

19 U.S.C. § 1677a(c)(1)(A) ..................................................................................... 41, 42

19 U.S.C. § 1677a(c)(1)(C) ......................................................................................... 41

19 U.S.C. § 1677a(c)(2) ................................................................................... 13, 40, 41

19 U.S.C. § 1677a(c)(2)(A) ......................................................................................... 41

19 U.S.C. § 1677b(a)(1)(B) ............................................................................................ 40

19 U.S.C. § 1677b(a)(1)(B)(i) ......................................................................................... 3

19 U.S.C. §1677b(a)(6) .................................................................................... 40, 44, 54

19 U.S.C. § 1677b(b)(3)(B) ...................................................................................... 13, 44

19 U.S.C. § 1677b(f)(2) ...................................................................................... 13, 50, 54

19 U.S.C. § 1677f-1(d)(1)(B) .............................................................................. 4, 5, 8, 15

19 U.S.C. § 1677f-1(d)(1)(B)(i) ............................................................................... 15, 40

19 U.S.C. § 1677f-1(d)(1)(B)(ii) .................................................................................... 37

19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii) ............................................................................... 4

28 U.S.C. § 2637(d) ........................................................................................................ 56

## REGULATIONS

19 C.F.R. § 351.309(c)(2) .............................................................................................. 57

19 C.F.R. § 351.414(b)(1) ................................................................................................ 3

19 C.F.R. § 351.414(c)(1) ................................................................................................ 3

19 C.F.R. § 351.414(d)(3) ................................................................................................ 3

## OTHER AUTHORITIES

*Low Enriched Uranium from France,*
    69 Fed. Reg. 46,501, 46,506 (Dep't of Commerce Aug. 3, 2004)............................ 10, 41

*Notice of Final Results of Antidumping Duty Administrative Review: Silicon Metal from Brazil,*
    71 Fed. Reg. 7517 (Dep't of Commerce Feb. 13, 2006) ................................................ 48

*Bottom Mount Refrigerator-Freezers from Korea,*
    77 Fed. Reg. 17,413 (Dep't of Commerce Mar. 26, 2012)....................................... 51, 55

*Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review; 2012–2013,*
    79 Fed. Reg. 51,309 (Dep't Commerce Aug. 28, 2014)................................................. 25

*Chlorinated Isocyanates from Japan*,
   79 Fed. Reg. 56,059 (Dep't of Commerce Sept. 18, 2014). ...................................... 55, 56

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*,
   81 Fed. Reg. 47,347 (Dep't of Commerce July 21, 2016) ................................................ 25

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2014–2015*,
   81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016) .................................................. 25

*Certain Softwood Lumber Products from Canada; Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*,
   82 Fed. Reg. 51,806 (Dep't of Commerce Nov. 8, 2017) ................................................ 25

*Utility Scale Wind Towers from Canada: Final Determination of Sales at less Than Fair Value and Final Negative Determination of Critical Circumstances*,
   85 Fed. Reg. 40,239 (Dep't of Commerce July, 6, 2020)

*Certain Softwood Lumber Products from Canada:  Final Results of Antidumping Duty Administrative Review; 2017-2018*,
   85 Fed. Reg. 76,519 (Dep't of Commerce Nov. 30, 2020) .................................. 25, 47, 48

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*,
   84 Fed. Reg. 16,646 (Dep't of Commerce April 22, 2019) ............................................. 51

*Certain Softwood Lumber Products from Canada:  Final Results of Antidumping Duty Administrative Review; 2017-2018*,
   85 Fed. Reg. 76,519 (Dep't of Commerce Nov. 30, 2020) ........................................ 25, 46

*Ultra-High Molecular Weight Polyethylene from Korea*,
   86 Fed. Reg. 11,497 (Dep't of Commerce Feb. 25, 2021) ............................................. 52

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   87 Fed. Reg. 13,252 (Dep't of Commerce Mar. 9, 2022) .................................................. 8

*Certain Softwood Lumber Products from Canada: Preliminary Results of Antidumping Duty Administrative Review*,
   88 Fed. Reg. 5,306 (Dep't of Commerce Jan. 27, 2023) ......................................... 8, 9, 10

*Certain Softwood Lumber Products From Canada:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*,
   88 Fed. Reg. 50,106 (Dep't of Commerce Aug. 1, 2023) .................................................. 2

*Certain Softwood Lumber Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in Part*,
    88 Fed. Reg. 61,511 (Dep't of Commerce Sept. 7, 2023) ................................................ 11

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| GOVERNMENT OF CANADA, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| CANFOR CORPORATION, *et al.* | ) |
| | ) |
| Plaintiff-intervenors, | ) |
| | ) |
| v. | )      Consol. Court No. 23-00187 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| COMMITTEE OVERSEEING ACTION FOR | ) |
| LUMBER INTERNATIONAL TRADE | ) |
| INVESTIGATIONS OR NEGOTIATIONS; | ) |
| and SIERRA PACIFIC INDUSTRIES. | ) |
| | ) |
| Defendant-intervenors. | ) |
| | ) |

## <u>ORDER</u>

On consideration of plaintiffs' motions for judgment on the administrative record,

defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the motions are denied and, it is further

ORDERED that judgment is entered for the United States.


Dated: _____, 2024      _____

New York, NY                        JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| GOVERNMENT OF CANADA, *et al.*,<br><br>      Plaintiffs,<br><br>      and<br><br>CANFOR CORPORATION, *et al.*<br><br>      Plaintiff-intervenors,<br><br>      v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>      and<br><br>COMMITTEE OVERSEEING ACTION FOR<br>LUMBER INTERNATIONAL TRADE<br>INVESTIGATIONS OR NEGOTIATIONS;<br>and SIERRA PACIFIC INDUSTRIES.<br><br>      Defendant-intervenors. | Consol. Court No. 23-00187 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
<u>MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Defendant, the United States, respectfully responds to motions for judgment on the

administrative record filed by the Government of Canada, *et al.* (Canadian Parties), ECF No. 113

(DPA Br.), Canfor Forest Corp. *et al.*, ECF No. 111 (Canfor Br.), and the domestic interested

parties, ECF No. 109 (COALITION Br.), challenging the Department of Commerce's

(Commerce) final results of the administrative review of the antidumping duty order on softwood

lumber from Canada covering the period January 1, 2021, through December 31, 2021.  The

Court should deny the motions and enter judgment for the United States because the final results are supported by substantial evidence and in accordance with law.

<div align="center"><u>**STATEMENT PURSUANT TO RULE 56.2**</u></div>

**I.**  <u>**Administrative Decision Under Review**</u>

The determination under review is *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 88 Fed. Reg. 50,106 (Dep't of Commerce Aug. 1, 2023) (*Final Results*) and accompanying Issues and Decision Memorandum (IDM) (P.R. 539).

**II.**  <u>**Issues Presented for Review**</u>

1.    Whether Commerce's differential pricing analysis (DPA) is supported by substantial evidence.

2.    Whether Commerce's determination not to deduct countervailing duties (CVD) from the price used to establish the export price (EP) or constructed export price (CEP) of the subject merchandise was supported by substantial evidence.

3.    Whether Commerce's calculation of Canfor's general and administrative (G&A) expense ratio was supported by substantial evidence.

4.    Whether Commerce's adjustment to Canfor's actual chip byproduct revenue offset is supported by substantial evidence.

5.    Whether Commerce's application of the transactions disregarded rule to adjust Canfor's reported cost of electricity at its Prince George sawmill is supported by substantial evidence.

**STATEMENT OF FACTS**

**I.    Legal Framework For Commerce's Differential Pricing Analysis**

The Tariff Act of 1930 establishes a remedial regime to combat unfair trade practices. The antidumping provisions of that act provide relief for domestic manufacturers by imposing duties upon imports of foreign products that are sold in the United States at less than fair value. 19 U.S.C. § 1673.  Commerce evaluates whether imported products are sold in the United States at unfairly low prices.  *Id.*; *see also Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013).  If Commerce finds that the U.S. sales are "at less than fair value" – meaning that the products are dumped into the U.S. market, it will direct U.S. Customs and Border Protection to assess an "antidumping duty."  *Id.*  A sale is at "less than fair value" when, in general, the price charged in the U.S. market, the "U.S. price," is less than the price charged in the home market, "normal value."  19 U.S.C. § 1677b(a)(l)(B)(i); *see also* 19 U.S.C. §§ 1677a(a), (b).  The antidumping duty is equal to the "amount by which the normal value exceeds the {U.S. price} for the merchandise." 19 U.S.C. § 1673.  This amount is called the "dumping margin."  19 U.S.C. § 1677(35)(A).

To calculate the dumping margin in an administrative review, Commerce ordinarily compares "the weighted average of the normal values to the weighted average of the export prices (or constructed export prices) for comparable merchandise," unless it determines another method is appropriate.  19 C.F.R. §§ 351.414(b)(1), (c)(1).  Under this average-to-average (A-to-A) method, Commerce compares a respondent's "weighted-average monthly {U.S. price}" to its "weighted-average normal value for the contemporaneous month."  19 C.F.R. § 351.414(d)(3). These individual dumping margins are then aggregated to determine a producer's or exporter's weighted-average dumping margin.

One downside of the A-to-A method is that it may fail to detect "masked" dumping, which occurs when exporter sell at dumped prices to some customers, regions, or time periods, while selling at higher prices to others. *Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (*Stupp II*) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex II*)). When Commerce uses the A-to-A method, higher-priced U.S. sales can mask lower-priced dumped sales, potentially depriving the domestic industry of relief from unfair trade practices. *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (SAA) at 842 (explaining that, "[i]n part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.' In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").

Contrary to the contention at page 5 of the DPA Brief that the A-to-A method is "preferred," Congress enacted 19 U.S.C. § 1677f-1(d)(1)(B), allowing Commerce to resort to the average-to-transaction (A-to-T) method, specifically to combat masked dumping. This provision allows Commerce to compare "{t}he weighted average of the normal values to the export prices (or constructed export prices) of individual transactions," that is, to use the A-to-T method, "if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-to-A method or transaction-to-transaction method}." 19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii). In other words, it authorizes Commerce to use the A-to-T method, which can identify masked dumping, because, "'{b}y using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above

it.'" *Apex II*, 862 F.3d at 1342 (quoting *Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156, 1159 (Fed. Cir. 1994)).

Commerce applies its three-part DPA to determine whether the statutory criteria under 19 U.S.C. § 1677f-1(d)(1)(B) warrant application of the A-T method.

First, Commerce applies the "Cohen's *d* test" to measure whether average prices to a particular purchaser, region, or time period differ significantly from average prices to all other purchasers, regions, or time periods. *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1322 (Ct. Int'l Trade 2023) (*Stupp III*). Taken from statistical analysis, the Cohen's *d* test measures effect size – a means of quantifying the size of the difference between two groups.

Second, Commerce applies the ratio test, which calculates the proportion of the respondent's United States sales, by value, which "pass" the Cohen's *d* test, to determine if a "pattern" of significantly differing pricing exists. *Id*. If 33 percent or less of respondent's sale values pass, then Commerce finds that no pattern exists and uses the A-to-A method. If 66 percent or more of the respondent's United States sales values pass, then Commerce finds that a pattern exists and uses the A-to-T method, subject to the third test – the meaningful difference test. *Id*. If more than 33 percent but less than 66 percent of the respondent's sales values pass, then Commerce finds that a pattern exists but takes a hybrid approach, applying the A-to-T method to those U.S. sales passing the Cohen's *d* test, and the A-to-A method to the remainder, subject to meeting the meaningful difference test. *Id*.

Third, if more than 33 percent of sales passed the ratio test, then Commerce conducts the "meaningful difference" test to determine whether the A-to-A method can account for the disparate pricing. *Id*. at 1322-23. Commerce applies the meaningful difference test by comparing a respondent's weighted-average dumping margin using both the A-to-A method and

the appropriate alternative comparison method (either the A-to-T method or the hybrid method). *Id*. at 1323. If the A-to-A rate is below the *de minimis* threshold and the rate from the alternative comparison method is greater than the *de minimis* threshold, or if both rates are above the *de minimis* threshold and differ by 25 percent or more, Commerce may then resort to use of the alternative comparison method to calculate the respondent's weighted average dumping margin. Otherwise, Commerce applies the A-to-A method to all U.S. sales. *Id*.

The most significant part of the Canadian Parties' challenge concerns Commerce's use of the Cohen's *d* test under step one above, which involves comparing the product-specific prices of a "test group" to the prices of the "comparison group." *Stupp II*, 5 F.4th at 1346. For each purchaser, region, and time period, Commerce segregates the respondent's United States sales prices for comparable merchandise into two groups, where the "test group" includes all prices of comparable merchandise to a given purchaser, region, or time period, and where the "comparison group" includes all other prices of comparable merchandise. *Id*. For example, Commerce would segregate sales of comparable merchandise to a particular purchaser (a test group) and compare them to all remaining sales of comparable merchandise to all other purchasers (a comparison group). Commerce calculates a Cohen's *d* coefficient by dividing the difference in the groups' means by the variances of the prices within each of the groups (represented by an average of the groups' standard deviations). *Id*.

Accordingly, $d = |\text{mean of test group} - \text{mean of control group}| \div \text{standard deviation}$. Commerce uses a modified version of this formula, substituting for the "standard deviation" the root mean square of the groups' individual standard deviations. *See generally* Cohen, Jacob, *Statistical Power Analysis for the Behavioral Sciences*, (2nd ed. 1988) (Cohen) (P.R. 501, Ex. 7). "Effect size quantifies the size of the difference between two groups and may therefore be said to

be a true measure of the significance of the difference." Coe, Robert, It's the Effect Size Stupid:

What Effect Size Is and Why It Is Important, paper presented at the Annual Conference of the

British Educational Research Association at 7 (September 2002) (*Coe*) (C.R. 434, Ex. 8).

Commerce calculates the Cohen's *d* coefficient for each test group to determine whether

the prices to that test group differ significantly from all other prices of comparable merchandise.

If the *d* value of a test group is equal to or greater than the "large threshold," or 0.8, the prices

within that test group are found to have "passed" the Cohen's *d* test and to differ significantly.

As explained earlier, even if the sale prices of a particular test group pass the Cohen's *d* test, it

does not mean that Commerce will apply an alternative comparison method because the sales

passing the Cohen's *d* test must be sufficiently numerous to also pass the ratio test, that is, to

show that a pattern of such significantly differing prices exists. Further, Commerce must

determine that the standard A-to-A method cannot account for the price differences exhibited by

the respondent's pricing behavior in the U.S. market. The United States Court of Appeals for the

Federal Circuit (Federal Circuit) has sustained both the ratio and meaningful difference tests,

*Stupp II*, 5 F.4th at 1355-56, and this Court has repeatedly sustained use of the Cohen's *d* test.

*Stupp III*, 619 F. Supp. 3d 1314; *SeAH Steel Corp. v. United States*, 619 F. Supp. 3d 1309 (Ct.

Int'l Trade 2023); *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023);

*NEXTEEL Co., Ltd. v. United States*, 676 F. Supp. 3d 1345 (Ct. Int'l Trade 2023); *Mid Continent

Steel & Wire, Inc. v. United States*, 680 F. Supp. 3d 1346 (Ct. Int'l Trade 2024) (*Mid Continent

V*). *Stupp III* is on appeal solely with regard to the Cohen's *d* test. No. 2023-1663 (Fed. Cir.).

## II.    <u>Administrative Proceedings</u>

Commerce initiated an administrative review of the antidumping duty order on softwood

lumber from Canada and selected Canfor and West Fraser as mandatory respondents for

individual examination. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 13,252 (Dep't of Commerce Mar. 9, 2022); P.R. 279.

Commerce then published preliminary results. *Certain Softwood Lumber Products from Canada: Preliminary Results of Antidumping Duty Administrative Review*, 88 Fed. Reg. 5,306 (Dep't of Commerce Jan. 27, 2023) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM), P.R. 518. To determine the comparison method for preliminarily calculating each mandatory respondent's weighted-average dumping margin, Commerce applied its DPA. PDM at 7-10. Applying the first two stages of the DPA, the Cohen's *d* and ratio tests, Commerce preliminarily found that both Canfor's and West Fraser's U.S. sales exhibited a pattern of prices for comparable merchandise that differed significantly among purchasers, regions, or time periods. *Id*. at 10. Applying the third stage of the DPA, the meaningful difference test, Commerce preliminarily determined that the A-to-A comparison method could not account for either mandatory respondent's disparate pricing. *Id*. Because 66 percent or more of the value of both respondents' sales "passed" the Cohen's *d* test, Commerce used the A-to-T method to preliminarily calculate both Canfor's and West Fraser's weighted-average dumping margins. *Id*.; *see also* 19 U.S.C. § 1677f-1(d)(1)(B).

In addition, Commerce calculated export price, constructed export price, and normal value in accordance with the statute and its regulations. PDM 11-17. In relevant part, Commerce calculated EP and CEP without adjusting respondents' reported prices for countervailing duties deposited at the time of entry. PDM at 12. Commerce also calculated Canfor's G&A ratio by allocating the consolidated group's G&A expenses over total cost of goods sold, excluding expenses and costs for a producer of non-subject merchandise. Lastly, Commerce preliminarily adjusted certain costs under the transactions disregarded rule.

Commerce found that an adjustment to Canfor's reported costs was necessary to reflect the market price of wood chips in British Columbia sold to an affiliate. Canfor Preliminary Cost Analysis Memorandum, C.R. 473. Commerce also found that certain electricity transactions between Canfor's Prince George sawmill and an affiliate warranted application of the transactions disregarded rule. Commerce adjusted Canfor's reported costs to reflect the market price of electricity. *Id.* Because Canfor's affiliate had acted as an electricity reseller, Commerce adjusted Canfor's costs by adding to the reported transfer price an amount for the affiliate's selling, general and administrative expenses (SG&A) expenses.

In its *Final Results*, Commerce addressed the Canadian Parties' arguments against using the DPA. IDM at 15-44. Commerce explained, among other things, that use of the Cohen's *d* test as part of the DPA is both reasonable and lawful, and not undermined by Canada's proffered expert report (Hedges Report), P.R. 501, Ex. 1. IDM at 15-33. Commerce also explained that the statute does not require it to determine the reasons why a firm's prices differ significantly before resorting to the A-to-T method, and that, as sustained by the Federal Circuit, the meaningful difference test lawfully implements the statute. IDM at 33-36; 38-41. Commerce thus continued to apply the DPA in *Final Results* and used the A-to-T method to calculate weighted-average dumping margins. *Id.* at 15-44; *see also* C.R. 500; C.R. 513 (West Fraser and Canfor Final Analysis Memoranda).

Commerce further rejected COALITION's argument in its case brief at pages 26-31, that Commerce must adjust U.S. prices by deducting respondents' countervailing duty "costs." C.R. 489; P.R.546. Commerce reasoned that "deducting CVDs from U.S. prices in AD cases would be inconsistent with the context and logic of the statute and its legislative history and would result in a 'double remedy.'" IDM at 46. Moreover, Commerce explained that its decision was

consistent with its practice. *Id.* (citing *Low Enriched Uranium from France,* 69 Fed. Reg. 46,501, 46,506 (Dep't of Commerce Aug. 3, 2004) (final results) (*Low Enriched Uranium From France*). Commerce also rejected COALITION's argument that countervailing duties should be deducted from U.S. price as a "cost, charge or expense," concluding that such duties would be "covered, if at all, by the phrase 'United States import duties'" and not by the more general "costs" provision. IDM at 46.

Commerce further declined to modify Canfor's general and administrative (G&A) expense calculations. Commerce concluded that a G&A ratio based entirely on Canadian Forest Products Ltd.'s (CFP) G&A expenses in the numerator and CFP's total cost of production in the denominator, as suggested by COALITION was unwarranted because it would exclude G&A expenses recorded by Canfor Corporation and Canfor Wood Products Marketing Ltd. (CWPM Ltd.), which are G&A expenses incurred during the production of subject merchandise. *Id.* at 60. Commerce also continued to exclude certain expenses reported for Canfor affiliates Canfor Southern Pine (Canfor Southern) and Canfor Sweden (Forest Products) AB (Canfor Sweden) from the numerator of the G&A ratio because those companies only reported selling expenses, which are not part of the G&A ratio. IDM at 60.

Commerce also continued to find that an adjustment of Canfor's reported costs was necessary under the transactions disregarded rule to reflect the market price of wood chips in British Columbia sold to an affiliate. *Id.* at 54-55. To determine a market price, Commerce continued to rely on Canfor's wood chip sales to an unaffiliated party under a long-term contract executed in 2012 because the contract was subject to periodic adjustment. And, consistent with earlier segments of the proceeding, Commerce continued to find that Canfor's Prince George

(PG) sawmill purchased electricity from an affiliate and that such transactions should be subject to an analysis under the transaction disregarded rule. *Id.* at 55-59.

Commerce calculated final weighted-average dumping margins of 5.25 percent, 6.96 percent, and 6.20 percent for Canfor, West Fraser, and companies not selected for individual examination, respectively. *Final Results*, 88 Fed. Reg. at 50,107. Commerce amended its results to correct a ministerial error, resulting in West Fraser's and the non-examined companies' weighted-average dumping margins changing to 7.06 percent and 6.62 percent, respectively. *Certain Softwood Lumber Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in Part*, 88 Fed. Reg. 61,511 (Dep't of Commerce Sept. 7, 2023).

## SUMMARY OF THE ARGUMENT

Commerce's application of the Cohen's *d* test on the entire universe of United States sales without requiring the Canadian Parties' statistical sampling criteria to be met is reasonable and lawful. IDM at 18-28. The Canadian Parties proffer no meaningful basis to distinguish their arguments from those that this Court has already rejected. *See*, *e.g.*, *Marmen*, 627 F. Supp. 3d 1312. Nor do references to their retained expert's report aid their case. Likewise unavailing are the Canadian Parties' sparse references to sources outside the Hedges Report. The Canadian Parties contend that their proffered expert report and a few other sources must overcome the reliable academic literature on the record. As explained below, this argument fails.

Similarly, the Canadian Parties' attempt to link the use of Dr. Cohen's thresholds to certain statistical sampling criteria through "U measures." The U measures are illustrative of the thresholds and are not definitional. IDM at 24-25. Although the criteria may need to be met to *illustrate* the thresholds in a certain way (that is, with the U measures), it in no way follows that they must be met to use the thresholds themselves.

Similarly inapt is the Canadian Parties' contention that Commerce cannot rely on the other steps of the DPA to compensate for supposed "false positives" generated by the Cohen's *d* test. First and foremost, application of the Cohen's *d* test on the entire universe of U.S. sales does not yield false positives, given the absence of random happenstance associated with statistical sampling methodologies. And even if it did, the Court has expressly held that the other steps of the DPA *can* compensate for any false positives. *Stupp III*, 619 F. Supp. 3d at 1322.

In their attempt to distinguish *Stupp III*, the Canadian Parties maintain that there were sufficient supposed false positives to overcome the 33 percent ratio test threshold. DPA Br. at 43. But the Canadian Parties' evidence is woefully inadequate.

Equally unavailing is their attempt to undermine Commerce's use of simple averaging in the denominator of the Cohen's *d* coefficient. As Commerce demonstrated, the academic literature provides for simple averaging in the conditions under which it applies the Cohen's *d* test. IDM at 28-33.

The Canadian Parties also cannot plausibly contend that Commerce ignored the Hedges Report. Commerce repeatedly addressed this expert report but declined to give it controlling weight given its inconsistencies with the academic literature. IDM at n.142, n.150, n.180.

The remainder of the Canadian Parties' DPA arguments are inapposite. Their challenge to the meaningful difference test overlooks that this test has time and again been upheld by the Federal Circuit. *Stupp II*, 5 F.4th at 1355-56; *Apex II*, 862 F.3d at 1348-49. Their price volatility and seasonality arguments merely request that the Court re-write the statute to fit their preferences. And lastly, the Canadian Parties' plea that the Court direct Commerce to apply the A-to-A method misapprehends the standard and scope of review.

Second, and turning away from DPA-related issues, Commerce's determination not to deduct countervailing duties from U.S. price was lawful.  Pursuant to 19 U.S.C. § 1677a(c)(2), CVDs and CVD deposits are not covered by the term "any costs, charges, or expenses."  19 U.S.C. § 1677a(c)(2).  Moreover, Commerce explained that deducting CVDs and CVD deposits as costs would not only be inconsistent with the context and logic of the statute and its legislative history but would also result in a "double remedy."  IDM at 46.

Third, Commerce's use of Canfor's reported G&A expense ratio is supported by substantial evidence.  Commerce calculated the cost of production including an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product. 19 U.S.C. § 1677b(b)(3)(B).  Commerce appropriately relied on the consolidated audited financial statements of Canfor Corporation as adjusted to derive G&A expenses.  Further, the exclusion of expenses for Canfor Sweden and Canfor Southern Pine from the numerator of the G&A ratio was supported by substantial evidence because those companies did not individually record G&A expenses attributable to the production of subject merchandise.  Thus, Commerce's calculation of Canfor's G&A expense ratio was reasonable because it accounted for all expenses incurred during the production of subject merchandise.

Fourth, Commerce lawfully adjusted Canfor's reported costs to reflect the market price of wood chips, that is, prices at which Canfor's Elko and Radium mills sold wood chips to an unaffiliated party, under the statutory provision to disregard transactions between affiliated persons if those transactions do not fairly reflect the value in the market under consideration.  19 U.S.C. § 1677b(f)(2).  Adjustment of Canfor's reported costs was necessary to reflect the market price of wood chips in British Columbia sold to an affiliate, and the wood chips sold by Canfor's

Elko and Radium sawmills to an unaffiliated party were representative of a market price under the transaction disregarded rule.

Fifth, Commerce lawfully found that transactions between Canfor's PG sawmill and its affiliate should be subject to an analysis under the transaction disregarded rule because Canfor's affiliate Canfor Pulp Products Inc. (CPPI) functioned as a middleman and acted as a payment intermediary and thus the adjusted market price reflected an affiliate's cost of providing services.

## **ARGUMENT**

### I.    **Standard Of Review**

In reviewing Commerce's antidumping duty determinations, the Court "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). That is because "{s}ubstantial evidence" is defined as "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Thus, a Court must sustain the agency's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the conclusion. *Nippon Steel Corp. v. United States*, 458 F.3d 1345,1352 (Fed. Cir. 2006). Even if one can draw two inconsistent conclusions from the evidence contained in the record, this does not mean that Commerce's findings are not

14

supported by substantial evidence. *Id.*; *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

Although the Court's review in this case is limited to whether substantial evidence supports the results, the plaintiffs appear to raise legal challenges to certain methodologies, contending that *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), imposes an "exacting scrutiny" to Commerce's implementation of 19 U.S.C. § 1677f-1(d)(1)(B). DPA Br. at 12. To the contrary, because the statute delegates authority to Commerce, "courts must respect the delegation." *Loper Bright*, 144 S. Ct. at 2273. And "Congress delegated to Commerce the authority to determine where a price difference is significant [under] 19 U.S.C. § 1677f-1(d)(1)(B)(i)." *NEXTEEL*, 676 F. Supp. 3d at 1356. Far from "exacting scrutiny," the Court "must respect the delegation" to Commerce. *Loper Bright*, 144 S. Ct. at 2273.

Further, although *Loper Bright* overruled *Chevron* deference to agency interpretations of silent or ambiguous statutes under the Administrative Procedure Act, it did not disturb the Federal Circuit's longstanding recognition that Commerce determinations in antidumping duty matters are entitled to deference distinct from *Chevron*, due to the statute's complex and technical nature. *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,* 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (recognizing "deference {that} is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise"); *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (same).

II.    **Commerce's Application Of The Cohen's *d* Test And Its DPA Are Supported By Substantial Evidence**

    A.    **Application Of The Cohen's *d* Test On The Entire Universe Of United States Sales Without Regard To Statistical Sampling Criteria Is Supported By Substantial Evidence**

        1.    **Commerce Explained Its Determination**

Commerce explained its application of the Cohen's *d* test without requiring "statistical criteria" of normality of distribution, equality of variances, and sufficient observation size is reasonable and lawful. IDM at 18-28. These criteria only come into play when applying the Cohen's *d* test to data sampled from larger populations, whereas Commerce applies the Cohen's *d* test to the full populations themselves. *Id.*; *see also id.* at 26 (explaining methodology applying Cohen's *d* test to the full populations).

In contrast, if the Cohen's *d* test is applied to two *subsets* of data sampled from larger populations, then these groups would need to satisfy the statistical sampling criteria to ensure that the size of the difference measured between them is representative of the actual size of the difference between the full populations from which they are drawn. *Id.* at 21 (explaining that "the purpose of the statistical criteria is to determine whether the analysis results . . . which are based on sampled data, are representative of the results if the analysis had been based on the full population of data."). In other words, because the effect size measured using sampling is merely an estimate, the role of the statistical criteria is to determine the "'reliability of {the} *sample* results.'" *Id.* (quoting Cohen at 6).

Conversely, if applying the Cohen's *d* test to two groups comprising full populations of data, it is irrelevant whether these groups satisfy statistical sampling criteria. Because Commerce uses full population data, the effect size measured with the Cohen's *d* test is not an *estimate*, but rather the *actual* effect size of the full populations. *Id.* at 26 ("because the sale

16

prices used in Commerce's Cohen's *d* test encompass the full universe of sale prices for each test and comparison group, the parameters {such as effect size} calculated based on the test and comparison groups are not estimates of the population values but are the actual values of the population parameters."). Accordingly, regardless of whether these populations satisfy the statistical criteria, there is no question that the Cohen's *d* coefficient that Commerce calculates from them is "representative" of the actual effect size. Because it *is* the actual effect size. *Id*. Put another way, the role of the statistical criteria is to evaluate whether estimated results calculated from samples are representative of hypothetical actual results that might be calculated from full populations. *Id*. at 21. And because Commerce calculates from full populations, there is "no role for the statistical criteria" to play in its application of the Cohen's *d* test. *Id*.

The following example illustrates the dichotomy between statistical sampling and use of an entire population. *See* Hedges at 7 ("*Populations* are groups of numbers about which we wish to make inferences. *Samples* are subsets of those populations that are observed (known)") (emphasis in original). If one were to use statistical sampling to estimate the rate of COVID infection among New York City's population of 10 million people, one could test 1,000 random New Yorkers to obtain 25 positive tests, thus estimating a rate of infection of 2.5 percent. *Id*. (estimates derived from samples). However, Commerce's analysis did not yield *estimate*s because it is akin to testing the entire population of *all* 10 million New Yorkers and obtaining 249,912 positive tests. If that were the case, then the *actual* (not estimated) rate of infection would be 2.49912 percent. *See also United States v. Life Care Centers of Am., Inc*., 114 F. Supp. 3d 549, 559, 571 (E.D. Tenn. 2014) (explaining statistical sampling and approving "of statistical sampling in complex {False Claims Act} actions where a claim-by-claim review is impracticable.").

In sum, Commerce explained that the results of the population-based Cohen's *d* test it performs are accurate and precise irrespective of statistical *sampling* criteria.

To be sure, the Federal Circuit in *Stupp II* expressed "'significant concerns relating to Commerce's application of the Cohen's *d* test . . . in adjudications in which the data groups being compared.'" do not meet the statistical criteria. IDM at 19 (quoting *Stupp II*, 5 F.4th at 1357). That court noted that:

> Commerce's application of the Cohen's *d* test to data that do not satisfy the assumptions on which the test is based may undermine the usefulness of the interpretive cutoffs. In developing those cutoffs, including the 0.8 cutoff, Professor Cohen noted that "we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous."

*Stupp II*, 5 F.4th at 1357 (quoting Cohen at 6). Thus, the Court grounded its concern in its understanding that Dr. Cohen had developed his thresholds, including the 0.8 threshold, under the assumption that the statistical sampling criteria are met. However, as Commerce explained, the full context for Dr. Cohen's quoted language demonstrates that it relates to calculating measures of nonoverlap between bell curves (U measures), *not* Dr. Cohen's small, medium, and large thresholds:

> If we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous, it is possible to define *measures of nonoverlap (U)* associated with *d* which are intuitively compelling and meaningful.

IDM at 24 (quoting Cohen at 24) (emphasis added). Critically, as Commerce explained, Dr. Cohen provided the U measures as one "approach{} to illustrate his proposed small, medium and large effect size thresholds." *Id*. Accordingly, the U measures are illustrative, not definitional: "the percent non-overlap does not define the small, medium or large thresholds, but only serves

to illustrate" them in a "very understandable" way.  *Id*. at 24-25.  That the statistical criteria may need to be met to *illustrate* his thresholds in a particular way does not demonstrate that they must be met to use the thresholds *themselves*.  *Id*. at 24 ("these limitations {the statistical criteria} do not apply to Dr. Cohen's development of the proposed thresholds themselves").

Indeed, Dr. Cohen also provided other approaches to illustrate his thresholds that "do not link {these} thresholds with the statistical criteria."  *Id*. at 25  These include "real-life situations where small, medium and large effect sizes have been found to exist," such as in the differences between the IQs and heights of various groups of people.  *Id*.  This suggests that the thresholds were not developed for use only when the statistical sampling criteria are met.

Additionally, Commerce reviewed the academic literature on the record to assess what role, if any, the statistical criteria played in the development of Dr. Cohen's thresholds. Commerce determined that "the academic literature, and specifically {*Cohen*}, does not support the proposition that Dr. Cohen developed his thresholds to interpret his *d* coefficient of effect size using the {three statistical sampling criteria}."  IDM 20-21.[1]  Rather, he proposed his 0.2 (small), 0.5 (medium), and 0.8 (large) thresholds as "'conventions,'" which, while necessarily "'arbitrary,'" he expected to "'be found reasonable by reasonable people.'"  *Id*. at 21 (quoting Cohen at 13).  And, in fact, these conventions have been found reasonable by reasonable people.

---

[1] In addition to Cohen, Commerce referred to the following literature: **(1)** Coe; **(2)** Ellis, Paul D., *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results*, Cambridge University Press, 2010 (Ellis); **(3)** Grissom, Robert J. and Kim, John J., *Effect Size for Research, Univariate and Multivariate Applications*, Second Edition, San Francisco State University (2012) (Grissom); and **(4)** Larry Algina, James, Keselman, H.J., and Penfield, Randall D., "An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case," Psychological Methods, Volume 10, Number 3, pp. 317-328 (2005) (Algina).  IDM at 20-21, n.114 (citing exhibits to Canada's new factual information submission (C.R. 434-439, P.R. 500-502)).

As the Federal Circuit has acknowledged, these thresholds have been "'widely adopted.'" IDM at 26 (quoting *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019) (*Mid Continent I*)). Furthermore, with respect to the 0.8 threshold, Dr. Cohen proposed this as a reasonable convention for large effect sizes because it captures differences that are "'grossly perceptible.'" *Id*. at 25 (quoting Cohen at 27). Commerce thus found "no basis to conclude that the statistical criteria, which raised concerns before the Federal Circuit in *Stupp II*, were part of Dr. Cohen's selection of these proposed conventions." *Id*. at 21.

Lastly, Commerce observed that it only applies the Cohen's *d* test in the context of its DPA, in combination with the ratio and meaningful difference tests. IDM at 26-27. As this Court held in *Stupp III*, the additional tests of the DPA can compensate for the supposed issues with the Cohen's *d* test identified in *Stupp II*. IDM at 26-27 (*citing Stupp III*, 619 F. Supp. 3d. 1314). Although Commerce acknowledged the Canadian Parties' disagreement with *Stupp III*, it correctly found that such disagreement "does not render the decision invalid." *Id*. at 27.

In sum, Commerce fully addressed *Stupp II*'s concerns regarding the Cohen's *d* test, inclusive of the 0.8 threshold.

2.    **Statistical Sampling Criteria Do Not Govern The Cohen's _d_ Test Here**

a.    **The Canadian Parties Misapprehend The Court's Standard Of Review**

The Canadian Parties begin with an extended discussion of their Hedges Report. DPA Br. at 15-29. Commerce examined this report and explained why it disagreed with Dr. Hedges' conclusions. By presenting a lengthy synopsis, the Canadian Parties effectively invite the Court to reweigh this evidence, inconsistent with the standard of review. *See Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807 (Fed. Cir. 1992) ("it is not for this court on appeal to reweigh the evidence or reconsider questions of fact anew"). Accordingly,

they wrongly invite it to "interpret the meaning of the academic literature," rather than "determine whether Commerce's methodology is reasonable." *NEXTEEL*, 676 F. Supp. 3d at 1354 (citations omitted).

As explained below, and in contrast to the Canadian Parties' plea that the Court grant their own expert report controlling weight, Commerce weighed all of the record evidence to conclude that its application of the Cohen's *d* test is consistent with the academic literature.

### b.    The Statistical Sampling Criteria Do Not Govern Analysis Of The Full Population Of Sales

The Canadian Parties maintain that Commerce's use of full population data, rather than sampled data, "does not give {it} license" to apply the Cohen's *d* test, inclusive of the 0.8 threshold, "when the {criteria} are violated." DPA Br. at 32. The Court has expressly rejected this argument, holding that "Commerce's application of the Cohen's *d* test . . . was reasonable because Commerce applied the Cohen's *d* test to a population rather than a sample." *Marmen*, 627 F. Supp. 3d at 1322; *see also NEXTEEL*, 676 F. Supp. 3d at 1357; *SeAH Steel Corp.*, 619 F. Supp. 3d at 1313. The Canadian Parties make no attempt to distinguish their argument from one this Court has repeatedly rejected. DPA Br. at 32-34.

Instead, the Canadian Parties ground their argument almost entirely on the Hedges Report, an expert opinion prepared specifically to assist Canada in the underlying administrative review. DPA Br. at 32-33. "Expert opinions are merely advisory, however, and are given weight only to the extent they are consistent with lexicographic and other *reliable* sources." *Samsung Int'l v. United States*, 887 F. Supp. 2d 1330, 1338 n.18 (Ct. Int'l Trade 2012) (emphasis added). As discussed below, Commerce explained that this report's conclusions are inconsistent with "reliable sources," that is, the academic literature on the record. IDM at n.142, n.150, n.180.

Likewise unavailing are the Canadian Parties' references to sources outside the Hedges Report.  DPA Br. at 32-33.  They merely quote the same passage from *Cohen* that Commerce explained relates to the illustrative U measures, not the thresholds themselves.  *Id*. (quoting Cohen at 21); IDM at 24.  Similarly, although they cite Coe and Algina in a footnote, DPA Br. at 33, n.118, these were among the academic sources that Commerce expressly addressed when concluding that "the academic literature . . . does not support the proposition that Dr. Cohen developed his thresholds to interpret his *d* coefficient of effect size using" statistical sampling criteria.  IDM at 20-21 and n.141.  The Canadian Parties may disagree with Commerce's evaluation of these texts but fail to meet their burden to establish that "no reasonable factfinder could reach" Commerce's decision.  *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1340 (Ct. Int'l Trade 2017).

Based on their own expert report and a few other sources, the Canadian Parties jump to the conclusion that "{n}othing in the literature indicates that" the Cohen's *d* test can be used as it is by Commerce.  DPA Br. at 32.  While we explained above that this conclusion is incorrect, we note as an initial matter that, even if it were true, it would support upholding Commerce.  Even if "nothing in the literature indicated" that the Cohen's *d* test can be applied to population data irrespective of whether the statistical sampling criteria are met, that is not the same as the literature prohibiting or precluding this use.  Rather, the lack of any indication about this usage would simply establish that the literature does not address it.

In any event, contrary to the Canadian Parties' claim, the literature supports Commerce's application of the test.  It makes clear that the statistical sampling criteria are used to perform "statistical inference," the assessment of whether estimated results calculated from samples are representative of actual results from entire populations.  *See*, *e.g.*, IDM at 22 (citing Cohen at 19-

20). Consequently, it is apparent from the literature that the need to satisfy the statistical criteria arises only in the sampling context. If applying the Cohen's *d* test to full population data yielding actual results, as in this case, it follows from the literature (and basic logic) that it is irrelevant whether the criteria are satisfied, because there is no need to rely on them to ensure the representativeness of the entire population.

In addition to Cohen, Ellis clarifies that the need to conform to the statistical criteria is only relevant in the sampling context. IDM at 30 (quoting Ellis at 5). Dr. Ellis states that "{t}he best way to measure an effect is to conduct a census of an entire population," but recognizes that this is "seldom feasible in practice." However, he continues, "census-based research may not even be desirable," because researchers can "identify samples" and "then use inferential statistics to determine whether sample-based observations reflect population-level parameters." *Id*. Thus, Dr. Ellis expressly identifies a dichotomy between population- or census-based analyses, like the one performed by Commerce, and sample-based analyses, with meeting the benchmarks of inferential statistics – the statistical criteria – only relevant to this latter category of analysis.

Lastly, the Canadian Parties' reliance on *Stupp II* to question Commerce's use of the 0.8 threshold is misplaced. DPA Br. at 33-34. As discussed above, the definitions of thresholds are not dependent upon statistical criteria; rather, as already explained above, Dr. Cohen proposed his 0.2 (small), 0.5 (medium), and 0.8 (large) thresholds as "'conventions,'" which, while necessarily "'arbitrary,'" he expected to "'be found reasonable by reasonable people.'" IDM. at 21 (quoting Cohen at 13). And it is reasonable to rely on such thresholds to interpret results that accurately represent the full population of data and the actual effect size. Indeed, "Commerce's use of a population, rather than a sample, in the application of the Cohen's *d* test sufficiently

negates the questionable assumptions about thresholds that were raised in *Stupp {II}*."  *Marmen*,

627 F. Supp. 3d at 1322; *SeAH Steel Corp.*, 619 F. Supp. 3d at 1313.

      In sum, this Court's precedent, the academic literature, and basic logic all support

Commerce's application of the Cohen's *d* test, inclusive of the 0.8 threshold.  Nothing the

Canadian Parties argue demonstrates otherwise.

          **c.**      **The Canadian Parties' U Measures Argument And Their Other**
                     **Attempts To Link The Criteria To The Thresholds Fail**

      The Canadian Parties contend that Dr. Cohen's thresholds "are not independent of the U

measures," and, consequently, of the statistical sampling criteria.  DPA Br. at 34.  Their attempt

to link the use of the thresholds to the statistical sampling criteria through the U measures fails.

As discussed, Dr. Cohen used the U measures only as one approach to *illustrating* his thresholds.

He did not use them to "define" these thresholds.  *Id.* at 35.  While the criteria may need to be

met to calculate U measures that can *illustrate* the thresholds in a certain way, it in no way

follows from this that they must be met to use the thresholds themselves.  To the contrary, as Dr.

Cohen recognized, "the conventional definitions of small, medium, and large *d* can also continue

to be used" even when the "U (percent nonoverlap) measures" cannot.  Cohen at 44.

      The Canadian Parties identify nothing in Cohen stating that the U measures "define" or

are "intrinsic" to the thresholds.  DPA Br. at 35-36.  Rather, they infer this, wrongly, from Cohen

Table 2.2.1.  However, in the Canadian Parties' own words, this table merely "shows the

equivalent U measures of *d* coefficients."  DPA Br. at 35.  A conversion table between U

measures and incremental *d* coefficient values does not demonstrate that the *d* coefficient is

defined by or intrinsic to the various U measure values.  Moreover, if Dr. Cohen conceived of

this table of U measure values as definitional of or intrinsic to his thresholds, it is reasonable to

expect that he would have said so.  He did not.

The Canadian Parties next contend that Commerce has "previously acknowledged the intrinsic relationship between" the U measures and the thresholds, and that it is now departing from this established "position" without reasoned explanation. DPA Br. at 36-37. To the contrary, Commerce has categorically rejected the proposition that the U measures define or are intrinsic to the thresholds.[2] Indeed, in neither of the nearly decade-old decisions to which the Canadian Parties cite did Commerce state that such an "intrinsic relationship" exists.[3] And even if it had, two reviews from nearly a decade ago cannot establish Commerce's practice. *See*, *e.g.*, *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 C.I.T. 861, 884-85 (1999) (agency action becomes a practice only "when a uniform and established procedure exists"); *Goodluck India Ltd. v. United States*, 670 F. Supp. 3d 1353, 1374 (Ct. Int'l Trade 2023) ("Goodluck's two cases, however, do not constitute a uniform and established agency practice.").

The Canadian Parties also contend that "nothing in the Hedges Report suggests that the U measures are but one approach to among others for interpreting *d*." DPA Br. at 37-38. However, they fail to explain why Commerce was required to give any weight, let alone dispositive weight,

---

[2] *See*, *e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 47,347 (Dep't of Commerce July 21, 2016) (final determination), and accompanying IDM at Cmt. 5; *Certain Softwood Lumber Products from Canada; Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't of Commerce Nov. 8, 2017) (final determination), and accompanying Final Results of Redetermination Pursuant to Binational Panel Order at 35–82, 106–160; *Utility Scale Wind Towers from Canada: Final Determination of Sales at less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 40,239 (Dep't of Commerce July, 6, 2020) (final determination), and accompanying Final Results of Redetermination Pursuant to Court Remand at 27–28.

[3] *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2014–2015*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016), and accompanying IDM at 9; and *Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review; 2012–2013*, 79 Fed. Reg. 51,309 (Dep't Commerce Aug. 28, 2014), and accompanying IDM at 24.

to a report prepared specifically to assist an interested party. While the Canadian Parties accuse Commerce of "fail{ing} to grapple" with the Hedges Report, *id*. at 37, this is inaccurate.

The Canadian Parties' argument seeking to link the statistical sampling criteria to the thresholds through Dr. Cohen's "real-world examples" is self-defeating. DPA Br. at 35. They themselves acknowledge that these examples are "illustrative of Professor Cohen's thresholds, not definitional." *Id*. Even assuming for argument's sake that these examples "adhere to the" statistical criteria, *id*., the Canadian Parties have conceded that they (and thus, the statistical criteria) do not define the thresholds, but only illustrate them.

Lastly, the Canadian Parties' attempt to link the statistical sampling criteria to the thresholds based on *Stupp II* is unavailing. DPA Br. at 36. As explained above, the language in Cohen concerning the statistical criteria that the Federal Circuit quoted in this "observation" relates to the illustrative U measures, not the thresholds themselves. *Stupp II*, 5 F.4th at 1357 (quoting Cohen at 21).

### d.    The Cohen's d Test Does Not Yield "False Positives"

Contrary to the Canadian Parties' claim, Commerce did not "concede{}" in *Stupp III* that its application of the Cohen's *d* test to the Federal Circuit's small variance hypothetical would generate a "false positive," that is, a finding that prices differ significantly when they in fact do not. DPA Br. at 41. Just the opposite is true. In its hypothetical, the Federal Circuit envisioned a test and comparison group "containing sales prices that hover around the same value." *Stupp II*, 5 F.4th at 1359. However, in *Stupp III*, "Commerce explain{ed} that results which pass Cohen's test under these circumstances are *not* false positives." *Stupp III*, 619 F. Supp. 3d. at 1327 (emphasis added). A small variance "means that a small difference in price will be more significant, and a passing result under these circumstances is not necessarily erroneous." *Id*.

Indeed, the SAA directs Commerce to proceed with assessing the significance of price differences "on a case-by-case basis" precisely because "small differences" in prices "may be significant." SAA at 843. And in any event, the Canadian Parties do not contend that this small variance fact pattern is presented by *any* of the test and comparison groups to which Commerce applied the Cohen's *d* test here.

Moreover, the contention that "Commerce cannot reasonably rely on other steps of the {DPA} to compensate for" supposed false positives fails for two reasons. DPA Br. at 42.

First, Commerce's population-based application of the Cohen's *d* test does not generate false positives. *See SeAH Steel Corp.*, 619 F. Supp. 3d at 1313 (recognizing that the concerns about false positives "described in *Stupp {II}* that might be raised when the Cohen's *d* test is applied to samples are inapplicable because in this case, Commerce applied the Cohen's *d* test to a population"). Again, the results of the population-based Cohen's *d* test that Commerce performs are the actual values of the effect size, and, therefore, are an accurate and precise measure of the difference in the prices between purchasers, regions and time periods. There is nothing incorrect in Commerce interpreting accurate results that meet or exceed the widely accepted 0.8 threshold for large-sized differences between groups as meaning that prices differ significantly between these groups. Indeed, the Canadian Parties fundamentally misapprehend the concept of a "false positive." Returning to the New York City COVID discussion, a "false positive" might involve the case where the sample of 1000 New Yorkers estimated a higher rate of infection in Manhattan than in Brooklyn, whereas the actual tests of all 10 million New Yorkers revealed that Brooklyn had a higher rate of infection. As Ellis explained at page 5, "[t]he best way to measure an effect is to conduct a census of an entire population but this is

27

seldom feasible in practice."   Statisticians thus study "the degree of error with which sample-based estimates are made."  *Id*. (cleaned up).

Second, even if that were not the case, *Stupp III* held that the other steps of the DPA *can* compensate for what the Canadian parties call false positives.  *Stupp III*, 619 F. Supp. 3d. at 1325.  For example, such results would need to be so widespread as to "overcome the 33% threshold" imposed by the ratio test before there is even the potential that they could affect the DPA.  *Id.* at 1327.  Similarly, in addition to the ratio test, the meaningful difference test would address the "low-variance" situations that were of concern to the Federal Circuit.  *Id*. at 1238.  Indeed, the Cohen's *d* coefficient measures *consistent* differences between two sets of data.  And if those differences are consistent but *small*, then the ratio meaningful difference tests would favor an A-to-A comparison.

Furthermore, Canadian Parties' contention that each component test of the DPA implements a different statutory requirement for departing from the A-to-A method does not advance their cause.  DPA Br. at 42.  Simply because these tests focus on different aspects of the relevant statutory provision does not mean that, as the Canadian Parties put it, they "do not operate as an amalgamated whole."  *Id*.  To the contrary, *Stupp III* demonstrated how they interoperate, with the later tests in the DPA generally able to compensate for any supposed false positives generated by the Cohen's *d* test.  619 F. Supp. 3d. at 1325.

### e.    *Stupp III* **Is On-Point**

In attempting to distinguish *Stupp III*, the Canadian Parties suggest that there were enough supposed false positives to overcome the 33 percent ratio test threshold.  DPA Br. at 43.  The fundamental problem with this argument is that Commerce's population-based application of the Cohen's *d* test does not generate false positives.  *SeAH Steel*, 619 F. Supp. 3d at 1313.

28

Moreover, even if false positives were possible, the Canadian Parties have failed to establish that they were widespread here. As the Court explained, the Federal Circuit in *Stupp II* "identified three potential scenarios in which use of Cohen's *d* could be problematic: first, when the distribution of a respondent's sales data is not normal, second, when the test groups have few data points, and third, when there is minimal variance in a respondent's sales." *Stupp III*, 619 F. Supp. at 1323. The Canadian Parties do not contend that *any* of the test and comparison groups had "few data points" or "minimal variance{s}," much less that these scenarios were so prevalent as to overcome the 33 percent ratio test threshold. The Canadian Parties assert only that these groups had unequal variances. They do not contend they had minimal variances that concerned the Federal Circuit in *Stupp II*. DPA Br. at 43, 56.

Even with respect to the one scenario identified by the Federal Circuit that the Canadian Parties do allege is present here – comparisons of nonnormally distributed sales price data – the "evidence" they provide is woefully inadequate to support their claim that such comparisons resulted in pervasive distortions. DPA Br. at 43 and 57, Table 1. The Canadian Parties provide no underlying calculations or source data to support their argument. They merely proffer a table in their brief stating that large percentages of purchaser, region, and time period comparisons were between nonnormally distributed datasets. *Id*. at 57, Table 1.

Further, even taking their comparison percentage figures in their table at face value, the Canadian Parties fail to demonstrate that such comparisons generated false positives. They do not allege, let alone establish, that these percentages reflect comparisons between groups that were nonnormally distributed to *any significant degree* such as to cause a large number of what they define to be false positives. Rather, they simply allege that they reflect "comparisons that are not normally distributed." DPA Br. at 57, Table 1. Even accepting their faulty premise that a

population-based Cohen's *d* test could generate false positives if the data compared are sufficiently nonnormally distributed, the Canadian Parties have failed to show that such comparisons resulted in a sufficiently large number of false positives.

Similar flaws infect their claim that large percentages of Commerce's purchaser, region, and time period comparisons were between groups with variances differing by more than two percent. DPA Br. at 43 and 57, Table 2. The sole support for their assertion is a table in their brief. *Id*. Moreover, even taking the percentages in this table at face value, the Canadian Parties do not explain why a difference of only two percent renders variances sufficiently unequal as to generate false positives. Although Commerce uses a two percent threshold in a different context for assessing whether sales are at arm's length, DPA Br. at 57, n.217, the Canadian Parties fail to explain why that number should govern here. Accordingly, even accepting the claim that some large percentage of Commerce's comparisons were between groups with variances differing by over two percent, that does not establish that these comparisons generated any false positives.

In sum, just as in *Stupp III*, there is no evidence on this record that supposed false positives were prevalent enough to overcome the 33 percent ratio test threshold. *See Stupp III*, 619 F. Supp. at 1325 (explaining that no evidence on the record that false positives occurred with sufficient "frequency" to "overcome the 33% threshold."). Thus, the Canadian Parties' argument fails for precisely the same reason as the plaintiff's argument in *Stupp III* failed. Whatever hypothetically could be the case, the Canadian Parties have failed to show that, *in this case*, the ratio test or the meaningful difference test were incapable of compensating for any supposed false passes of the Cohen's *d* test. *Id*. at 1328. In sum, the Canadian Parties have failed to show that Commerce's use of the Cohen's *d* test in the context of its overall DPA was unreasonable.

**B.      Commerce's Use Of Simple Averaging In The Cohen's *d* Denominator Is Supported By Substantial Evidence**

**1.      Commerce Reasonably Explained Its Methodology**

Commerce explained administratively that its use of simple rather than weighted averaging in the denominator of the Cohen's *d* test is consistent with the statistical literature on the record.[4]  IDM at 28-33 (discussing Algina, Coe, Cohen, and Ellis).  As Commerce found after its literature review, "the academic literature allows for Commerce's use of the simple average . . . as the denominator of the effect size, *i.e.*, the Cohen's *d* coefficient, when," as here, "the actual standard deviation of each population is known and they are unequal."  *Id*. at 33.

Commerce recognized that in Dr. Cohen's "general formulation of effect size," in which the standard deviations of the two populations being compared are assumed to be equal, he used as the denominator the standard deviation of either of these populations.  IDM at 29 (discussing Dr. Cohen's equations 2.2.1 and 2.2.2).  However, where the standard deviations of the populations are unequal, Dr. Cohen called for a different formulation of effect size, equation 2.3.2.  *Id*. (citing Cohen at 43-44 and equation 2.3.2).  In this equation, "the denominator of the effect size should be the *simple average* of the two, unequal standard deviations of populations A and population B."  *Id*. (emphasis added).  And although Commerce acknowledged that the

---

[4] Commerce calculates a *d* coefficient by dividing the difference in the means of the test and comparison groups (the numerator) by the root mean square, that is, "the simple average," of these groups' individual standard deviations (the denominator).  Mathematically, this "simple average" denominator can be expressed as:

$$\sqrt{\frac{\sigma_A^2 + \sigma_B^2}{2}}$$

*See* IDM at 29 (where "$\sigma_A$" and "$\sigma_B$" refer to the standard deviations of the test and comparison groups, respectively).

literature references weighted averaging, it found that the "academic literature provides for the use of a weighted average as a possible approach when estimating the denominator of the effect size when the actual standard deviations are not known, *which is not the situation with Commerce's application of the Cohen's d test.*"  IDM at 33 (emphasis added).

In sum, the academic literature provides for simple averaging in the conditions under which Commerce applies of the Cohen's *d* test, and this literature only provides for weighted averaging under different conditions.  Accordingly, as Commerce reasonably concluded, "the academic literature allows for the use of the simple average to calculate the denominator of the effect size, and it does not necessarily require the use of a weighted average."  IDM at 33.

## 2.    Substantial Evidence Supports Commerce's Use Of Simple Averaging

The Canadian Parties wrongly contend that the Federal Circuit in *Mid Continent III* has already rejected Commerce's literature-based explanation for its use of simple averaging.  DPA Br. at 46 (citing *Mid Continent III*, 31 F.4th 1367 (Fed. Cir. 2022)).  The Federal Circuit has not rejected the explanation Commerce gave in this review, which was issued after *Mid Continent III*.  Commerce extensively reevaluated the academic literature in response to *Mid Continent III*.  IDM at 28-33.  The Federal Circuit has not engaged with, let alone rejected, Commerce's explanation based on its reexamination of the literature here.

The remainder of the Canadian Parties' denominator arguments fail.  First, they wrongly contend that Commerce has not meaningfully addressed the Hedges Report concerning the proper denominator at pages 47-49 of their brief.  IDM at 32-33; *id.* at 32, n. 180.  Similarly, in contrast to their suggestion that "Commerce's claim that Professor Cohen exclusively used equations 2.5.1 and 2.5.2 for sampled data," *id.* at 49, Commerce expressly quoted the language from Cohen demonstrating this to be the case.  IDM at 31 (quoting Cohen at 66-67).  Lastly, the

Canadian Parties concede that their own argument regarding how Commerce understood certain Greek letters used to designate variables is "beside the point." DPA Br. at 51.

### C.    Commerce's Review Of The Hedges Report Is Reasonable And Lawful

A central theme of the Canadian Parties' brief is that Commerce "failed to meaningfully consider and address the Hedges Report." DPA Br. at 58. To the contrary, Commerce substantively engaged with this opinion prepared by a retained expert. *See*, *e.g.*, IDM at n.142, n.150, and n.180. And despite the fact that the Canadian Parties proceed under the assumption "that the Hedges Report constitutes academic literature, it is not a published paper but instead a report specially prepared for the Government of Canada." *Resolute FP Canada Inc. v. United States*, No. 23-00095, 2024 WL 3859816, at *4, n.13 (Ct. Int'l Trade Aug. 19, 2024). Indeed, Commerce did much more here to consider and address the Hedges Report than it did in *Resolute*, which this Court found sufficient. *Id*. at *4. To be sure, the segment under consideration in *Resolute* was an expedited sunset review and that under consideration here is an administrative review. But that is irrelevant. And to the extent that Commerce was required to address this report in greater detail in an administrative review than in an expedited sunset review of that order, Commerce did so here.

Specifically, Commerce addressed it with respect to the exact issues the Canadian Parties highlight – the statistical criteria, the Cohen's *d* denominator, and the use of full population data. DPA Br. at 58-61.

Regarding the statistical criteria, Commerce acknowledged that, in Dr. Hedges' view, "'when {these criteria} are not met, Cohen's {small, medium, and large thresholds} . . . cannot be relied upon.'" IDM at 25, n.142 (quoting Hedges Report, App'x II at (iii)). However, Commerce explained that this view was inconsistent with the academic literature on the record.

Based on its review of this literature, and in particular Cohen itself, Commerce concluded that, contrary to Dr. Hedges' understanding, "the academic literature provides no evidence that" the use of the thresholds is "dependent on . . . the statistical criteria." *Id*. at 24; *see also id*. at 20-28 (addressing literature).  As Commerce further noted, "{n}othing in the . . . Hedges Report demonstrates that Dr. Cohen developed his thresholds based on the assumptions of normality, similarity of variances and sufficient number of observations." *Id*. at 27.  Commerce went even further in engaging with the Hedges Report on this issue, stating that "it does not disagree with Dr. Hedges" that the criteria "are required in order to quantify the measures of non-overlap {U measures}," but explaining that "these measures were not used by Dr. Cohen in the development of his proposed thresholds of small, medium, and large." *Id*. at 25, n.142.  Although the Canadian Parties take issue with Commerce not expressly addressing certain specific passages in the Hedges Report regarding the U measures, DPA Br. at 60, Nevertheless, "Commerce does not need to address 'every argument raised by a party or explain every possible reason supporting its conclusion.'" *Resolute*, No. 23-00095, 2024 WL 3859816, at *4 (quoting *Synopsys, Inc. v. Mentor Graphics Corp*., 814 F.3d 1309, 1322 (Fed. Cir. 2016)).  Rather, "while Commerce must reasonably explain its findings, its explanations are only required to be sufficient to afford adequate review." *Id*. (quoting *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1362 (Fed. Cir. 2023) (cleaned up).  Thus, Commerce meaningfully addressed the Hedges Report with respect to the statistical sampling criteria.  DPA Br. at 59-61.

Commerce also meaningfully addressed the Hedges Report with respect to the use of simple rather than weighted averaging in the denominator of the Cohen's *d* coefficient.  IDM at 32-33, n.180 (citing Hedges Report, App'x II at (vii)).  It noted Dr. Hedges' view that there is "no evidence" in the literature for Commerce's use of simple rather than weighted averaging.  *Id*.

However, Commerce explained that "the academic literature does not agree with Dr. Hedges'

conclusion." *Id*. Based on its review at pages 28-32 of the IDM, Commerce found that "the

academic literature *allows* for Commerce's use of the simple average, *i.e.*, Cohen equation 2.3.2,

as the denominator of the effect size, *i.e.*, the Cohen's *d* coefficient, when the actual standard

deviation of each population is known and they are unequal {the situation in the underlying

review}." *Id*. at 33 (emphasis added). The Canadian parties also assert that Commerce

"incorrectly claims that Professor Hedges did not provide {an analysis of Cohen equation 2.3.2}.

DPA Br. at 59. That is beside the point. Commerce stated that "Dr. Hedges does not address the

*simple average* provided by Dr. Cohen in equation 2.3.2." IDM at 32, n.180 (emphasis added).

In any event, no matter how Commerce characterized Dr. Hedges' discussion of this specific

equation, it engaged with the Hedges Report on the denominator issue. As demonstrated above,

Commerce explained the report was inconsistent with the academic literature on this topic.

Moreover, Commerce found that, "{c}ontrary to Dr. Hedges' understanding . . . the

academic literature only provides for a weighted average . . . when the effect size must be

estimated from *sample* data." *Id*. at 32, n.180 (emphasis added). In short, Commerce explained

that the Hedges Report was inconsistent with the academic literature on the record with respect

to whether simple averaging is allowable and appropriate in the agency's application of the

Cohen's *d* test. Thus, Commerce meaningfully addressed the Hedges Report on this issue,

contrary to the claims at C.P Br. at 59-61.

Commerce also addressed the Hedges Report concerning the use of full population data.

It engaged on this topic in the context of discussing the denominator issue. IDM at 32, n.180

(disagreeing with Dr. Hedges concerning whether the academic literature allows for simple

averaging when "'computing effect size from population data'") (quoting Hedges Report, App'x

II at (vii)).  Commerce explained how the academic literature supports use of the Cohen's *d* test irrespective of whether the statistical sampling criteria are met, because Commerce is using the test to measure differences between full populations of data.  *Id*. at 21.  Thus, Commerce meaningfully addressed the Hedges Report concerning this issue.

The Canadian Parties err in suggesting that Commerce wrongly relied on *Samsung* in assessing the Hedges Report.  DPA Br. at 61-62 (citing *Samsung*, 887 F. Supp. 2d at 1338 n.18).  Commerce evaluated this report based on its consistency with the academic literature, and cited *Samsung* in support of its determination to do so.  IDM at 27, n.150.  *Samsung* supports Commerce's approach to the Hedges Report.  As the Court held, "{e}xpert opinions are merely advisory, however, and are given weight only to the extent they are consistent with lexicographic and other reliable sources."  *Samsung*, 887 F. Supp. 2d at 1338 n.18. And nothing in *Samsung* indicates that it is cabined to its facts.  DPA Br. at 61-62.  The Court did not limit its holding that expert opinions are "merely advisory" and only given weight to the extent that they are consistent with "reliable sources" just to expert opinions about customs classifications, or just to reliable sources on that topic.  This holding unequivocally supports Commerce's decision to test the probative value of a party's "expert opinion{}" against the benchmark of "reliable sources," that is, the neutral academic literature on the record.

Lastly, the contention that this Court has remanded in purportedly "analogous circumstances" is inapt.  DPA Br. at 63-64 (citing *NEXTEEL Co., Ltd. v. United States*, 569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022) (*NEXTEEL I*)).  *NEXTEEL I* and this case are not "analogous."  In that case, as the Canadian Parties concede at page 64 of their brief, the Court remanded for not addressing an expert opinion *at all*.  *NEXTEEL I*, 569 F. Supp. 3d at 1368-69.

Here, in contrast, Commerce not only addressed the Hedges Report, but did so multiple times and in multiple respects. IDM at n.142, n.150, n.180.

In sum, Commerce did not "ignore{}" the Hedges Report. DPA Br. at 58. Commerce repeatedly addressed it, but simply declined to give it controlling weight due to its inconsistencies with the academic literature on the record. *See*, *e.g.*, IDM at n.142, n.150, and n.180. The Canadian Parties have failed to demonstrate that Commerce's weighing of this evidence was in any way unreasonable.

### D.    The Canadian Parties' Remaining DPA Arguments Fail

#### 1.    Substantial Evidence Supports The Meaningful Difference Test

The Canadian Parties contend that the meaningful difference test does not reasonably implement 19 U.S.C. § 1677f-1(d)(1)(B)(ii), which requires Commerce to explain why the A-to-A method cannot account for significantly disparate pricing before it resorts to the A-to-T method. DPA Br. at 64; 72-73. However, as Commerce explained in response to the same argument below, the Federal Circuit has repeatedly held that the meaningful difference test *does* reasonably implement this provision. *See* IDM at 40 (citing *Stupp II*, 5 F.4th at 1355-5656; *Apex II*, 862 F.3d at 1348-49). The Court should decline the Canadian Parties' invitation to depart from settled and binding precedent.

Moreover, the Canadian Parties' hypothetical example in which they contend that "apply{ing} the A-to-A methodology using monthly time periods" can account for significant price differences between time periods is irrelevant. DPA Br. at 72-73. Commerce's determination that the A-to-A method cannot account for the disparate pricing exhibited in the U.S. market here is not drawn into question by whatever might be the situation in some

hypothetical scenario. And in any event, the Federal Circuit would need to address this question *en banc* given that this Court does not review binding appellate precedent.

## 2.    The Canadian Parties' "Price Volatility" Argument Fails

The Canadian Parties contend that Commerce was required to determine whether the mandatory respondents' significantly different pricing during different time periods of the period of review was the result of "price volatility" in the U.S. lumber market, and that Commerce did not perform such an analysis. DPA Br. at 65-71. This wrongly engrafts a requirement onto the statute that Commerce to determine why a firm's sales prices differ significantly between time periods before applying the A-to-T method. Section 1677f-1(d)(1)(B) nowhere prescribes assessing the root cause of divergent pricing, much less specifically assessing whether this behavior can be explained by pricing volatility in the market. As Commerce observed, "{t}he Federal Circuit has found that Commerce is not required to 'determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods.'" IDM at 35 (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015)). Try as they might at pages 69 to 71 of their brief, the Canadian Parties cannot overcome the binding holding that the "statute does not require Commerce to determine the reasons why" prices differ significantly. *JBF RAK*, 790 F.3d at 1368; *see also See Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345, 1358 (Ct. Int'l Trade 2015) (same). To that end, nothing imposes a "burdensomeness" requirement on Commerce – that is, a requirement that Commerce perform a root cause analysis so long as doing so is not overly burdensome – as the Canadian Parties wrongly suggest. DPA Br. at 70. In sum, the Court should reject this request to re-write the statute.

### 3.    The Canadian Parties' Seasonality Argument Fails

The Court should likewise reject the Canadian Parties' request to read a non-existent carve-out into the statute.  They contend that "when pricing for subject merchandise is seasonal, and subject to changes over time, the A-A methodology is the appropriate means to take into account price differences."  DPA Br. at 74.  But the statute does not identify seasonality as a bar to applying the A-to-T method.  The Court should again reject this attempt to re-write the statute.

### 4.    The Court Should Not Direct Recalculation In Contravention Of The Statute

Lastly, the Canadian Parties suggest that, because Commerce's DPA was supposedly unlawful, the Court should "direct" Commerce on remand to recalculate the mandatory respondents' weighted-average dumping margins using the A-to-A method, resulting in a downward adjustment both to their margins and to the weighted-average dumping margin applied to the non-examined companies.  DPA Br. at 75-76.  This argument fails for two reasons.

First, Commerce's use of the A-to-T method was lawful because the determination was based on the DPA, which lawfully implements the statutory criteria for whether to use the A-to-T method.  Consequently, no weighted-average dumping margins need to be recalculated.

Second, it would be erroneous to "direct" Commerce to recalculate weighted-average dumping margins using a different comparison method.  Absent extraordinary circumstances, remands instruct agencies to further explain their decisions and methods; remands directing any particular outcome are generally erroneous.  *See, e.g., Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1380-82 (Fed. Cir. 2003) (Court exceeded its authority by directing a particular outcome on remand); *NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226, 1241 (Fed. Cir. 2022) ("vacat{ing} the {C}ourt's opinion to the extent it directs Commerce to reach a certain outcome").  Furthermore, "Commerce's job is not to follow a statistical test as explained in

published literature for its own sake, but to implement the statutory mandate to determine when prices of certain groups 'differ significantly.'" *Mid Continent III*, 31 F.4th at 1380-81 (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)).  Even if some part of or the entire DPA were to go away, Commerce would still have to do its "job" to determine whether certain prices "differ significantly," *id*., which might result in reimposition of the A-to-T method.

III.    **Commerce's Analyses Of The Remaining Issues Pertaining To Costs And Prices Are Supported By Substantial Evidence**

A.    **Commerce's Decision Not To Adjust U.S. Prices By The Amount Of Deposited Countervailing Duties Is Supported By Substantial Evidence And In Accordance With Law**

COALITION wrongly contends that Commerce should have reduced respondents' U.S. prices because CVDs paid on imports of subject merchandise are "costs" within the meaning of 19 U.S.C. § 1677a(c).  COALITION Br. at 9.  The plain language of 19 U.S.C. § 1677a(c)(2) does not include countervailing duties deposited on importation of subject merchandise and are not covered by the term "costs, charges, or expenses."  19 U.S.C. § 1677a(c)(2).  Commerce's determination not to deduct countervailing duties from U.S. price is consistent with the statute, longstanding practice, and Court precedent, and should be sustained.

1.    **Statutory And Regulatory Framework**

An overreaching goal of the antidumping duty calculation is to "arrange an apples-to-apples comparison between the domestic and foreign price of merchandise."  *Apex Exports v. United States*, 777 F.3d 1373, 1374 (Fed. Cir. 2015) (*Apex I*).  Both export price and normal value are subject to adjustments "so that they closely reflect the price of subject merchandise at a common point in the chain of commerce."  *Id.* at 1374 (citing 19 U.S.C. § 1677b(a)(1)(B), 19 U.S.C. § 1677a(c)(2); 19 U.S.C. §1677b(a)(6)).

40

One such adjustment includes reducing EP and CEP by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties."  19 U.S.C. § 1677a(c)(2)(A).  The terms "costs, charges and expenses" and "United States import duties" are not defined in the statute.  19 U.S.C. § 1677a(c)(2)(A); *see also Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359-60 (Fed. Cir. 2007) ("Congress has not defined or explained the meaning or scope of 'United States import duties' as set forth in 19 U.S.C. § 1677a(c)(2)); *AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. Int'l Trade 1997) (*AK Steel*) (deferring to Commerce's reasonable interpretation of "United States import duties"); *Hoogovens Staal BV v. United States,* 4 F. Supp.2d 1213 (Ct. Int'l Trade 1998) (holding that "United States import duties" and "costs, charges and expenses" are unclear).  Commerce's longstanding interpretation of section 1677a(c)(2)(A) is that it does not include antidumping or countervailing duties.  *Low Enriched Uranium from France,* 69 Fed. Reg. 46,501.

## 2.    Commerce Correctly Calculated U.S. Prices

Commerce's lawfully declined to deduct CVDs from U.S. price under the statute's plain language.  Had Congress intended that Commerce deduct CVDs, it would have included them in section 1677a(c)(2)(A).  The term "countervailing duties" is used extensively throughout the statute yet is not used when discussing section 1677a(c)(2)(A) adjustments.

Indeed, although the term "countervailing duties" is absent from section 1677a(c)(2)(A), it is used within the same subsection of the statute under section 1677a(c)(1)(C), which provides that U.S. price shall be increased by "the amount of any *countervailing duty* imposed on the subject merchandise."  19 U.S.C. § 1677a(c)(1)(C) (emphasis added).  The terms "costs, charges, and expenses" are also used in section 1677a(c)(1)(A), *separately* from the term "countervailing duties" in section 1677a(c)(1)(C), signifying that countervailing duties are not covered under

"costs, charges, and expenses." *See* 19 U.S.C. § 1677a(c)(1)(A) (providing that U.S. price shall be "increased by – when not included in such price, the cost of all containers and coverings and all other *costs, charges, and expenses*…") (emphasis added).

Of course, Courts "generally presume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 186 (2020) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994)); *see also Ad Hoc Comm'n of AZ-NM-TX-FL Producers of Gray Portland Cement v. United* States, 13 F.3d 398, 401 (Fed. Cir. 1994) (rejecting argument that U.S. price adjustment was warranted where Congress "included specific language in one section of a statute but . . . omitted it from another, related section of the same Act"). Thus, Commerce's longstanding practice of not deducting CVDs from U.S. price is lawful.

Further, as noted above, the Court has repeatedly sustained this practice. For example, in *AK Steel*, the Court sustained Commerce's decision not to deduct countervailing duties from U.S. price as reasonable because to do otherwise would "result in double-counting." *AK Steel*, 988 F.Supp. at 607; *see also Hoogovens,* 4 F. Supp.2d at 1220 (sustaining "Commerce's long-standing policy and practice {} not to treat estimated or final antidumping or countervailing duties as import duties or costs" as a "permissible construction of the statute").

Moreover, *Wheatland Tube* counsels against deducting countervailing duties. There, the Federal Circuit sustained Commerce's determination not to adjust U.S. price for section 201 safeguard duties under section 1677a(c)(2)(A) based on Commerce's determination that these duties are similar to antidumping duties, which Commerce does not treat as "United States import duties." *Wheatland Tube*, 495 F.3d at 1361-63. The Court acknowledged Commerce's analysis of the legislative history, which refers to "United States import duties" as normal

customs duties and refers to antidumping duties as "special dumping duties" that are treated

differently from normal customs duties.  *Id.* at 1361.

Because it cannot – and does not – contend that CVDs are "United States import duties,"

COALITION had waived this argument.  *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d

1312, 1319 (Fed. Cir. 2006) (citation omitted); *Novosteel SA v. United States*, 284 F.3d 1261,

1273-74 (Fed. Cir. 2002).  Instead, COALITION urges the Court to accept its contention that

CVDs are "costs" under 19 U.S.C. § 1677a(c).

First, COALITION's plain meaning argument at pages 10-14 of its brief lacks merit

because, as explained above, the statute uses the term "countervailing duties" extensively, even

within the same subsection (*see* section 1677a(c)(1)(C)), and yet, it is not included as one of the

adjustments Commerce must make to U.S. price under section 1677a(c)(2)(A).

Second, countervailing duties are special duties that would have been covered, if at all,

by the term "United States import duties" and not "costs, charges or expenses." IDM at 46.

Thus, under the plain language of the statute, countervailing duties are not "costs" as

COALITION suggests.  The Court has rejected COALITION's position.  *See, e.g., AK Steel*, 988

F. Supp. at 607-08, n. 12 (rejecting argument that if antidumping and countervailing duties are

not "United States import duties," then they should be deducted as "costs, charges, and

expenses"); *Apex I*, 777 F.3d at 1379 (because "antidumping duties are not deducted from export

price as United States import duties, it is reasonable for Commerce to likewise refuse to deduct

antidumping duties as costs, charges, or expenses") (cleaned up).

### B.    Commerce's Reliance On Canfor's General And Administrative Expenses Is Supported By Substantial Evidence And In Accordance With Law

COALITION contends that "Commerce failed to base Canfor's G&A expense ratio on

the G&A expenses incurred by CFP," and instead, Commerce wrongly relied on a G&A expense

ratio constructed using the expenses and costs of "CFP Legal." COALITION Br. at 15-20. COALITION also suggests that Commerce "distorted" its calculations further by failing to include expenses incurred by Canfor Southern and Canfor Sweden in the numerator of the G&A ratio. COALITION's assertions are misplaced because, as explained below, Commerce's reliance on Canfor's G&A expense ratio is supported by substantial evidence.

### 1. **Legal Framework**

Commerce calculates the cost of production (COP) of subject merchandise as part of its normal value calculation under 19 U.S.C. § 1677b(b)(3)(B). COP is the sum of an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question. *Id*. G&A expenses are those expenses that relate to the general operations of the company as a whole, rather than to the production process. *U.S. Steel Group a Unit of USX Corp. v. United States*, 998 F. Supp. 1151, 1154 (Ct. Int'l Trade 1998) (citation omitted); *see also Torrington Co. v. United States*, 146 F. Supp. 2d 845, 885 (Ct. Int'l Trade 2001).

To compute a per-unit amount for G&A expenses, Commerce first calculates a ratio based on data in company financial statements. The numerator of the G&A expense ratio consists of the respondent's full-year G&A expenses and the denominator is the respondent's full-year cost of goods sold. Commerce then multiplies the total costs of manufacture for each product assigned a control number by Commerce. *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1161, 1166 (Ct. Int'l Trade 2017), *aff'd in part, remanded in part*, 940 F.3d 662 (Fed. Cir. 2019). Commerce is afforded "significant deference" in the calculation of G&A expenses because "it is a determination 'involv{ing} complex economic and accounting

decisions of a technical nature.'" *Coal. of Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2022) (quoting *Fujitsu*, 88 F.3d at 1039).

### 2.    Substantial Evidence Supports Commerce's G&A Calculation

Consistent with all prior segments of the proceeding, Commerce collapsed Canfor Corporation., CWPM Ltd., and CFP into one entity.  PDM at 5.  Canfor Corporation is a holding company for all Canfor companies, and its consolidated financial statements (Canfor Corporation Consolidated) include the operations of its holdings, including CFP, CWPM Ltd., CPPI, Canfor Southern Pine, and Canfor Sweden.  Canfor Section A Response at A-8-A-11, P.R. 290; C.R. 27. CFP is the principal operating entity within Canfor Corporation responsible for producing softwood lumber in Canada.  *Id*.  CWPM Ltd., Canfor Southern Pine, and Canfor Sweden are wholly-owned subsidiaries of CFP.  *Id*. at A-9-A-11.  CPPI produces and sells non-subject pulp and paper.  Unlike other companies held by Canfor Corporation, CPPI has its own separate audited financial statements.  *Id*. at A-8, n. 10.

Although these companies are separate legal entities, Canfor Corporation performs certain corporate functions and thus incurs G&A expenses for its holdings.  *Id*. at A-8.  Evidence provided by Canfor also demonstrates that these G&A expenses related to production and sales of softwood lumber only appear in the Canfor Corporation Consolidated financial statement as they are not charged to CFP.  *See* Canfor's Section A Supp. Resp. at 10-11 ("there is only one financial statement for the consolidated company and none of the Canadian legal entities within Canfor (including Canfor Corporation) prepare unconsolidated financial statements on a legal entity basis, there is no charge from Canfor Corporation to CFP or other Canadian within Canfor. Rather, those corporate expenses are found only on the books of Canfor Corporation."), P.R. 364; C.R. 209; *see also Certain Softwood Lumber Products from Canada:  Final Results of*

*Antidumping Duty Administrative Review*; 2017-2018, 85 Fed. Reg. 76,519 (Dep't of Commerce Nov. 30, 2020) (*Softwood Lumber from Canada AR1*) and accompanying IDM at 20 (companies owned by Canfor Corporation are "heavily intertwined operationally and by transactions" such that "they are treated as one accounting entity" to "efficiently account for costs").

Due to Canfor's financial reporting, where most G&A expenses undertaken on behalf of the individual companies constituting the consolidated entity are incurred by Canfor Corporation, Commerce could not rely solely on CFP's tax returns to isolate its G&A expenses.  IDM at 60; *see also* Canfor Section A Supp. Resp. at 7 (explaining that if G&A expenses "were limited to CFP, the expenses charged directly to CWPM, Ltd. and to Canfor Corporation would not be included.").  Additionally, because Canfor Corporation's financial records do not itemize G&A expenses except for those of CPPI, Commerce could not identify the G&A expenses Canfor Corporation incurred on behalf of CFP.  IDM at 60; Canfor's Section D Supp. Resp. at Ex. D-37 at 1, P.R. 488; C.R. 423 (160-72 of .pdf).

Accordingly, Commerce calculated Canfor's G&A ratio based on a numerator consisting of all of Canfor Corporation Consolidated's G&A expenses, except those of CPPI, and a denominator consisting of Canfor Corporation Consolidated's cost of goods sold, aside from those of CPPI, and with other adjustments made.  IDM at 60.  CFP refers to this calculation as the "CFP Legal Roll-Up."  Canfor's Section A Supplemental Response at 7.  In particular, Commerce included G&A expenses and costs for each member of the collapsed entity, Canfor Corporation, CWPM Ltd., and CFP, as those expenses were incurred during the production of subject merchandise.  *See* Canfor's Section D Supp. Resp. at Ex. D-37 (including all G&A expenses only in consolidated financials).  Because the only SG&A expenses specifically recorded for Canfor Southern or Canfor Sweden were selling expenses, Commerce excluded

these.  *See* IDM at 60; Canfor's Section D Supp. Resp. at Ex. D-37.  Commerce also removed

the G&A expenses and costs for CPPI from the numerator and denominator of the G&A ratio

calculation, because those expenses and costs were separately itemized and related entirely to the

production of non-subject merchandise (pulp and paper).  IDM at 60; Canfor's Section D Supp.

Resp. at Ex. D-37.  In sum, Canfor's calculated G&A ratio achieved an apples-to-apples

comparison between the numerator and denominator, was supported by the record, and

reasonably accounted for Canfor's complex and interconnected business operations.

 COALITION nevertheless maintains that "Commerce failed to base Canfor's G&A

expense ratio on the G&A expenses incurred by CFP, the company producing softwood lumber

in Canada" and "{i}nstead Commerce strayed from its established practice and relied on a G&A

expense ratio constructed using the expenses and costs of 'CFP Legal,' a made-up entity."

COALITION Br. at 16-19.  In addition, COALITION contends that Commerce further

"distorted" the calculations by excluding G&A expenses for Canfor Southern and Canfor

Sweden, thereby failing to "capture all of the G&A expenses incurred by the 'CFP Legal' entity

as a whole."  *Id*. at 19-20.  Each assertion lacks merit.

 First, Commerce did not arbitrarily stray from established practice.  In *Solar Cells from

Taiwan*, which COALITION cites, Commerce stated that its normal practice is to calculate the

G&A ratio by allocating company-wide G&A expenses incurred by the producing company

allocated over the producing company's company-wide cost of goods sold.  *Certain Crystalline

Silicon Photovoltaic Products from Taiwan:  Final Results of Antidumping Duty Administrative

Review; 2014-2016*, 82 Fed. Reg. 31,555 (Dep't of Commerce July 7, 2017), and accompanying

IDM at 30.  But Commerce will depart from this practice if a respondent "provides case-specific

facts that clearly support a departure."  *See generally Silicon Metal From Norway:  Affirmative

*Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Dep't of Commerce Mar. 8, 2018), and accompanying IDM at Cmt. 8.  Here, the only financial statements capturing all softwood lumber costs reported to Commerce are the consolidated audited financial statements of Canfor Corporation and in particular the G&A expenses are not itemized by the company on behalf of which Canfor Corporation incurred the G&A expenses.  Therefore, it was not possible to calculate the G&A ratio specific to CFP as the producing entity and Commerce appropriately relied on the consolidated financial statements with adjustments to derive G&A expenses for the collapsed entity.

For these reasons, COALITION's argument that it was "unnecessary" for Commerce to include G&A costs other than those reported by CFP in its unconsolidated tax return is incorrect. COALITION Br. at 17.  COALITION disregards that due to Canfor's operational structure certain G&A expenses attributable to CFP's operations were not booked directly to CFP and thus would not have been reflected in CFP's tax return.  Canfor's Section D Supplemental Response at Exhibit D-37.  Commerce correctly and necessarily included these expenses despite them being recorded only in the accounting records of companies other than CFP.  IDM at 60; *see also NEXTEEL Co., Ltd. v. United States*, 355 F. Supp. 3d 1336, 1360 (Ct. Int'l Trade 2019) ("The court affords Commerce deference in developing a methodology for including G&A expenses in the constructed value calculation because it is a determination involving complex economic and accounting decisions of a technical nature"); *Fujitsu*, 88 F.3d at 1039.  Indeed, Commerce has recognized that holding companies may incur G&A expenses related to the production of subject merchandise.  *See, e.g. Notice of Final Results of Antidumping Duty Administrative Review: Silicon Metal from Brazil*, 71 Fed. Reg. 7517 (Dep't of Commerce Feb. 13, 2006), and

accompanying IDM at Cmt. 3 ("For calculating G&A, the Department requires a respondent to report not only its own G&A expenses, but also the share of its parent's G&A expense incurred on the reporting entity's behalf, even when not directly invoiced by the parent.").

Second, Commerce lawfully excluded expense amounts for Canfor Sweden and Canfor Southern Pine from the numerator of the G&A ratio. Commerce explained that these companies only recorded selling expenses rather than G&A expenses attributable to the production of subject merchandise. IDM at 60; Canfor's Section D Supp. Resp. at Ex. D-37 at tab "Summary - G&A 2021," tab, column G; *see also* Canfor's Sec. A Supp. Resp. at 6-7. As a result, Commerce reasonably determined that those selling expenses should be excluded from the numerator of the G&A ratio because selling expenses are not G&A expenses. COALITION cites no evidence detracting from Commerce's decision but instead asserts without basis at page 19 of its brief that it "strains credulity" to believe that Canfor Sweden and Canfor Southern incurred no G&A expenses related to the production of subject merchandise. This disregards Canfor's consolidated financial reporting structure where Canfor Corporation incurs G&A expenses on behalf of its consolidated holdings. Therefore, there is nothing inherently inaccurate about Canfor Sweden and Canfor Southern not explicitly recording G&A expenses and COALITION's "{m}ere allegations" to the contrary is not evidence. *See Nucor Corp. v. United States*, 633 F. Supp. 3d 1216, 1224 (Ct. Int'l Trade 2023); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp 1114, 1117 (Ct. Int'l Trade 1989) (holding that "speculation is not support for a finding") (internal brackets omitted). Therefore, Canfor's G&A expense ratio accounted for all expenses incurred during the production of subject merchandise and removed selling expenses and thus constitutes substantial evidence supporting Commerce's determination.

**C.**    **Commerce's Adjustment To Canfor's Wood Chip Byproduct Revenue Offset And Adjustment To Electricity Costs At The Prince George Sawmill Are Supported By Substantial Evidence And In Accordance With Law**

Canfor contends that Commerce wrongly applied the transactions disregarded test with respect to affiliated transactions for wood chips and electricity. Canfor Br. at 11- 26. As explained below, 19 U.S.C. § 1677b(f)(2) permits Commerce to disregard transactions between affiliated persons if those transactions do not fairly reflect the value in the market under consideration. Here, Commerce applied its transactions disregarded test and, in accordance with that statutory test and record evidence, adjusted Canfor's reported costs to reflect the market price of wood chips. Commerce also lawfully applied the transactions disregarded test to Canfor's purchases of electricity from CPPI, because the record evidence established CPPI acted as an affiliated reseller of electricity from an unaffiliated supplier to the PG sawmill.

**1.**    **Legal Framework**

In determining the cost of production of subject merchandise, the statute incorporates a "transactions disregarded" rule addressing transactions between affiliated parties, which states:

> A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2). Commerce disregards transactions between affiliated persons if those transactions do not fairly reflect the value in the market under consideration, that is, if they are not made on an arm's-length basis.

In applying the transactions disregarded rule, Commerce compares the average transfer price for an input or service paid to an affiliated supplier with the market price for that input or service. Commerce's preference for establishing a market value is a respondent's own purchases of the input or service from unaffiliated suppliers, and when such purchases are unavailable, Commerce uses the affiliated supplier's sales to unaffiliated customers. *See, e.g., Bottom Mount Refrigerator-Freezers from Korea*, 77 Fed. Reg. 17,413 (Dep't of Commerce Mar. 26, 2012), IDM at Cmt. 17 (final determ.). In the case of resellers, available market prices may consist of an affiliated reseller's average acquisition price plus the affiliated reseller's SG&A expenses. *Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16,646 (Dep't of Commerce April 22, 2019), and accompanying IDM at Cmt. 5. Where the transfer price is below its market price, Commerce normally adjusts the respondent's costs to reflect the market values on the record.

### 2. Commerce's Adjustment To Canfor's Wood Chip Byproduct Revenue Offset Is Supported By Substantial Evidence

Commerce correctly relied on home market sales as the basis for determining normal value by analyzing whether Canfor's transactions with affiliated parties were at arm's length and evaluating the market price of wood chips in its comparison. IDM at 54-55. Here, Canfor's sales revenue from wood chips offset its costs, and Commerce sought to ensure that the offset was valued at the lower of the transfer or market price. *Id.* Commerce found that an adjustment to Canfor's reported costs was necessary to reflect the market price of wood chips in British Columbia sold to an affiliate. *Id*. at 55. Commerce analyzed the price at which Canfor's Elko and Radium sawmills sold wood chips to an unaffiliated party and determined, in line with its practice of relying on a respondent's own unaffiliated purchases or sales where available, that the sales at issue were representative of a market price for purposes of the transaction disregarded

analysis.  *Id*.  Thus, Commerce reasoned that it was necessary to adjust Canfor's reported costs to reflect the market price of wood chips by including the sales from the Elko and Radium sawmills.  *Id*.

Canfor contends that the inclusion of sales of chips from the Elko and Radium mills in comparison with Canfor's affiliated chip sales is unsupported by substantial evidence and is contrary to law.  Canfor Br. at 12-21.  Canfor maintains there are unusual circumstances surrounding the sale of chips from Canfor's Elko and Radium sawmills during the period of review because it was contractually obligated to sell all chips produced at those sawmills to an unaffiliated pulp mill at prices established pursuant to a long-term supply contract entered in 2012.  *Id.*  However, Commerce the contract in question permitted periodic adjustments to the wood chip prices by reference to industry publications during the period of review.  IDM at 55; Canfor's Section D Initial Questionnaire Resp. Ex. D-14, (Contract), C.R. 185.  For example, the Contract at page 15 (5.5) and Schedule A controverts Canfor's bare assertion that price adjustments "were not permitted under the agreement until after the POR."  Canfor Br. at 19.  Thus, Commerce reasoned that "even if the contract was executed in 2012, the provisions permit revisions in response to changes in market conditions."  IDM at 55; *see also* COALITION Rebuttal Case Brief at 10-13 (identifying confidential contractual provisions that controvert Canfor's position), C.R. 495.

And relying on prices set in long-term contracts as market prices may be reasonable.  "Even if {} sales were based on long-term contracts, it would not necessarily be unreasonable to rely on these prices.  Long-term contracts still allow for price fluctuations in line with market conditions."  *Ultra-High Molecular Weight Polyethylene from Korea*, 86 Fed. Reg. 11,497 (Dep't of Commerce Feb. 25, 2021), and accompanying IDM at Cmt. 6 (final determ.) (*Polyethylene*

*from Korea*)).  Likewise, here, Commerce found that the sales made to the unaffiliated party

pursuant to the contract are a reasonable basis for a wood chips market price given that the

contract appears to allow for periodic adjustments to the wood chip prices and that the contract

contains provisions that permit revisions in response to changes in market conditions.  IDM at

55.  This is evident from the contract itself, which permits the price adjustments that Canfor

claims are absent.  *See*, *e.g.*, Contract at ¶¶ 4.1, 5.4, 5.5.  Accordingly, Commerce's conclusion

that the sales at issue are representative of a market price for purposes of the transactions

disregarded analysis is supported by substantial evidence – the Contract itself.

Lastly, Canfor contends that Commerce did not consider evidence allegedly confirming

that the prices from the Elko and Radium sawmills are not representative of market prices

because they are below other prices for chips in British Columbia during the POR.  Canfor Br. at

15-20.  But Commerce considered all arguments and evidence raised by the parties, including

Canfor's argument that "{a} comparison with the chip sale prices on the record demonstrates that

the price for chips sold by the Radium and Elko sawmills are substantially below the market

prices for chips in British Columbia."  IDM at 52 (summarizing the arguments raised in Canfor's

administrative case brief).  After considering the parties' arguments and evidence on the record,

Commerce determined that it "{does} not consider the sales at issue to be unrepresentative of a

market price for purpose of {the} transactions disregarded analysis and we continue to find that

an adjustment of Canfor's reported costs is necessary to reflect the market price of wood chips

including the sales from its Elko and Radium mills."  IDM at 55.

In any event, even if Commerce did not explicitly discuss this specific argument in the

IDM, this does not mean that Commerce did not consider it, and it is not a basis for invalidating

Commerce's reasoned determination.  "Commerce's written decision" does not need to address

"every argument raised by a party or explain every possible reason supporting its conclusion." *Al Ghurair Iron & Steel*, 65 F.4th at 1362. Here, the Court can "reasonably discern the path of Commerce's decision." *NMB Singapore Ltd. v. United States,* 557 F.3d 1316, 1323 (Fed. Cir. 2009) (internal citations omitted).

### 3.     Commerce's Adjustment To Canfor's Cost Of Electricity Is Supported By Substantial Evidence

Commerce's application of the transaction disregarded rule to transactions between Canfor's PG sawmill and its affiliate is supported by substantial evidence. IDM at 57-59; 19 U.S.C. § 1677b(f)(2). Commerce found that "the record demonstrates that a transaction for electricity took place between the PG sawmill and CPPI rather than directly between the sawmill and the unaffiliated electricity supplier." IDM at 58. Commerce explained that Canfor's affiliate CPPI functions as a middleman between all of the facilities in the Northwood area (the entities in this area include Canfor's PG sawmill) and BC Hydro and acts as a payment intermediary. *Id*. Under this arrangement, CPPI provides services to the Northwood area facilities by acting as the document handler (*e.g.,* providing documentation for allocating the costs to the different facilities, invoicing each of the Northwood area facilities, processing the receipt of payments from the Northwood area facilities) and acting as the payment intermediary. IDM at 58. Accordingly, Commerce determined that CPPI acted as an affiliated reseller of electricity from an unaffiliated supplier to the PG sawmill, and the analysis of the transactions between the mill and its affiliate was appropriate. *Id*. Consistent with its practice, Commerce compared CPPI's transfer price to an adjusted market price consisting of CPPI's average acquisition cost plus CPPI's SG&A expenses to account for the services provided. *Id*.

Canfor contends there are no actual transactions between affiliated parties that are can be subject to the transactions disregarded test. Canfor Br. at 21-26. Specifically, Canfor maintains

that CPPI does not provide electricity to the PG Sawmill, and Commerce found a transaction where no actual exchange of money for goods or services took place. *Id*. at 23-26.  Further, Canfor asserts that Commerce failed to explain its determination and its determination is inconsistent with its prior practice. *Id*.

However, Commerce explained that it still applies the transactions disregarded rule where the affiliated services are limited to document handling and acting as a payment intermediary, as is the case here.  IDM at 58-59.  This ensures that the adjusted market price reflects an affiliate's cost of providing services.  Commerce's application of the transactions disregarded rule in this case is consistent with how Commerce treated similar fact patterns in prior cases, including the underlying investigation and the previous administrative review in this proceeding. *See, e.g., Softwood Lumber from Canada Investigation* IDM at Cmt. 27; *Softwood Lumber from Canada AR1* IDM at Cmt. 6; *Bottom Mount Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17,422 (Dep't of Commerce Mar. 26, 2012) (final determ.).

As described above, CPPI functions as a middleman because it is the payment intermediary. *Id*.  In this capacity, CPPI provided services "by acting as the document handler (*e.g.,* providing documentation for allocating the costs to the different facilities, invoicing each of the Northwood area facilities, processing the receipt of payments from the Northwood area facilities, etc.)." *Id.*  Accordingly*,* Commerce reasonably included CPPI's SG&A expenses in the electricity market price computation to account for the service CPPI provides and role as a payment intermediary. *Id.*

Canfor maintains that Commerce has previously declined to apply the transactions disregarded rule under similar circumstances where the affiliate acts only as a purchase agent and not a supplier of the input.  Canfor Br. at 24 (citing *Chlorinated Isocyanates from Japan*, 79 Fed.

Reg. 56,059 (Dep't of Commerce Sept. 18, 2014) (final determ.) (*Chlorinated Isocyanates*) and

accompanying IDM at Cmt. 4).  In *Chlorinated Isocyanates*, Commerce did not apply the

transactions disregarded rule because the respondent's affiliated party acted as a commissioned

sales agent and not a supplier of the input.  *Chlorinated Isocyanates*, IDM at Cmt. 4.  And the

respondent, rather than the affiliate, controlled all aspects of the input purchases, including

negotiating the purchases of the input with its unaffiliated suppliers, and the suppliers, not the

affiliate, invoiced the respondent directly for the input.  *Id*.  Thus, *Chlorinated Isocyanates*

differs because, here, Commerce determined that a transaction took place between the Prince

George sawmill and CPPI, such that CPPI acts as an affiliated reseller.  IDM at 58.

Finally, Canfor contends that if Commerce continues to apply the transactions

disregarded rule, it should use a different comparison.  Canfor asserts that the unaffiliated arms-

length market prices charged by BC Hydro to CPPI are available on the record and reflect what

the amount for unaffiliated electricity purchases would have been between persons who are not

affiliated.  Canfor at Br. at 25.  But Canfor failed to raise this argument in its case brief.  P.R.

547.  Rather, Canfor argued in the underlying administrative review that if Commerce continued

to make this adjustment, then the agency should revise the calculation of CPPI's SG&A rate to

exclude certain amortization expenses (*e.g.,* intangible assets) because they are unrelated to the

electricity purchases.  *Id.* at 12-13.

The "Court of International Trade shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates a congressional intent

that, absent a strong contrary reason, the court should insist that parties exhaust their remedies

before the pertinent administrative agencies."  *Boomerang Tube LLC v. United States*, 856 F.3d

908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir.

2007)).  Courts take "a 'strict view' of the requirement that parties exhaust their administrative remedies . . . in trade cases." *Corus Staal*, 502 F.3d at 1379.  And Commerce provided an explicit administrative remedy in its regulation, which Canfor disregarded.  19 C.F.R. § 351.309(c)(2) (directing that a party's "case brief must present all arguments that continue in the submitter's view to be relevant to the {} final results.").  Canfor's "failure to raise its {contention that Commerce should rely on prices charged by BC Hydro} in its administrative case brief constituted a failure to exhaust administrative remedies" and thus the Court should disregard this argument.  *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010).  In any event, Canfor's argument assumes that Commerce must ignore the SG&A expenses incurred by CPPI.  But as Commerce explained, "CPPI provided services to the Northwood area facilities by acting as the document handler . . . and acting as the payment intermediary."  Therefore, Commerce reasonably included CPPI's SG&A expenses in the electricity market price computation to account for the service CPPI provides.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain the final results and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:                                  /s/ CLAUDIA BURKE

Deputy Director (right column)

/s/ CLAUDIA BURKE
Deputy Director

OF COUNSEL:
Jared M. Cynamon
Jason Miller
Attorneys
U.S. Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement and Compliance
Washington, D.C.

/s/ STEPHEN C. TOSINI
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-5196
Email: stephen.tosini@usdoj.gov

August 22, 2024

Attorneys for Defendant

58

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and the Court's order of January 17, 2024, allowing a response brief not to exceed 45,000 words, that this brief contains 17,393 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Stephen C. Tosini</u>