**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| GOVERNMENT OF CANADA, *et al.*, <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>  Defendant, <br><br> and <br><br> COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, *et al.*, <br><br>  Defendant-Intervenors. | Consol. Court No. 23-00187 <br><br> <u>Non-Confidential Version</u> <br><br> Business Proprietary Information Deleted on Pages 12-14 and 16 |

**THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AND SIERRA PACIFIC INDUSTRIES' JOINT RESPONSE TO CANADIAN PARTIES' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann

**WILMER CUTLER PICKERING HALE and DORR LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

*Counsel to Sierra Pacific Industries, including its subsidiary Seneca Sawmill Company*

September 5, 2024

Andrew W. Kentz
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Avenue NW
Suite 700
Washington, DC 20036
(202) 888-0595

*Counsel to the COALITION*

Consol. Court No. 23-00187                          NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

STATEMENT PURSUANT TO RULE 56.2(c) ............................................................. 1

    A.   The Administrative Determination Under Review ...................................... 1

    B.   Issues Presented for Review and Summary of Arguments .......................... 2

STATEMENT OF FACTS ............................................................................................... 3

STANDARD OF REVIEW .............................................................................................. 6

ARGUMENT .................................................................................................................... 6

    I.   Commerce's Application of the DPM and Its Use of the Cohen's *d* Are Supported By Substantial Evidence and Otherwise In Accordance With Law ............................ 6

        A.   This Court Has Expressly Rejected the Canadian Parties' Arguments for Why Commerce's Use of the Cohen's *d* Is Unlawful ...................................... 6

        B.   The Act Does Not Require Commerce To Analyze Alternative Causes of the Observed Pattern of Price Differences ......................................................... 8

        C.   The Canadian Parties Failed to Exhaust Their Argument That Commerce's DPM Does Not Result in a "Fair Comparison" Between Export Price and Normal Value ............................................................................................... 9

    II.   Commerce's Adjustments to Canfor's Costs Under the Transactions Disregarded Provision of the Statute Are Supported By Substantial Evidence ........................... 10

        A.   Commerce's Calculation of a Market Price for Woodchips In British Columbia Is Supported By Substantial Evidence ........................................... 11

        B.   Commerce's Adjustment to the PG Sawmill's Costs Is Supported By Substantial Evidence ..................................................................................... 14

CONCLUSION ............................................................................................................... 17

## TABLE OF AUTHORITIES

### Cases

*Best Mattresses Int'l Co. v. United States*,
   622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ........................................................................ 14

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) ................................................................................................. 9

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   608 Fed. App'x 948 (Fed. Cir. 2015) ...................................................................................... 9

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938)................................................................................................................. 6

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................................................................. 6

*CS Wind Vietnam Co. v. United States*,
   832 F.3d 1367 (Fed. Cir. 2016) ............................................................................................... 6

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ................................................................................................. 6

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) ..........................................................................................8-9

*Marmen Inc. v. United States*,
   545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ......................................................................... 7

*Marmen Inc. v. United States*,
   627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) ......................................................................... 7

*PT. Zinus Global Indonesia v. United States*,
   628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) ....................................................................... 14

*Resolute FP Canada Inc. v. United States*,
   No. 23-00095, 2024 WL 3859816 (Ct. Int'l Trade Aug. 19, 2024) ........................................ 8

*The Timken Co. v. United States*,
   179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ......................................................................... 8

*USEC Inc. v. United States*,
   259 F. Supp. 2d 1310 (Ct. Int'l Trade 2003) ......................................................................... 8

*Vandewater Int'l Inc. v. United States*,
   589 F. Supp. 3d 1324 (Ct. Int'l Trade 2022) ......................................................................... 7

Consol. Court No. 23-00187                          NON-CONFIDENTIAL VERSION

## Statutes

19 U.S.C. § 1516a ................................................................................................ 6

19 U.S.C. § 1677b .....................................................................................9, 10, 11

28 U.S.C. § 2637 ................................................................................................ 9

## Administrative Determinations

*Certain Corrosion-Resistant Steel Products From Taiwan: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 Fed. Reg. 7,408 (Dep't Commerce Feb. 3, 2023) ............................................. 17

*Certain Softwood Lumber Products From Canada: Amended Final Results of Antidumping Duty Administrative Review in Part; 2021*, 88 Fed. Reg. 61,511 (Dep't Commerce Sept. 7, 2023) ...................................................................................................... 2

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) .................................................... 1, 5

*Certain Softwood Lumber Products From Canada: Preliminary Results of Antidumping Duty Administrative Review*, 88 Fed. Reg. 5,306 (Dep't Commerce Jan. 27, 2023) ................ 4

*Certain Uncoated Paper From Portugal: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 Fed. Reg. 3,105 (Dep't Commerce Jan. 20, 2016) ............................................................ 10

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16,646 (Dep't Commerce Apr. 22, 2019) ................................................................................. 10, 16

*Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France*, 70 Fed. Reg. 54,359 (Dep't Commerce Sept. 14, 2005) ................................. 11

## INTRODUCTION

Defendant-Intervenors the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") and Sierra Pacific Industries ("SPI") (collectively, the "Domestic Industry") respectfully submit this joint response in opposition to the Rule 56.2 motions for judgment on the agency record filed by the Government of Canada ("GOC"), *et al.* and Canfor Corporation ("Canfor"), *et al.* (collectively, the "Canadian Parties"). *See* The Canadian Parties' Mot. for J. on the Agency R. and Accompanying Mem. of Law and P. & A., Apr. 5, 2024 ("GOC Br."), ECF 113 (conf.), 114 (public); Pls. and Pl.-Intervenors' Br. in Supp. of the Mot. for J. on the Agency R., Apr. 5, 2024 ("Canfor Br."), ECF 111 (conf.), 112 (public).

The Domestic Industry incorporates by reference the sections of the Defendant's brief responding to the issues presented by the Canadian Parties. *See* Def.'s Resp. to Pls.' Mots. for J. on the Admin. R., Aug. 22, 2024 ("Def. Br."), ECF 118. In accordance with the scheduling order, this brief focuses on points not already discussed in the Defendant's response. For the reasons set forth below, the Domestic Industry respectfully requests that this Court deny the Canadian Parties' motions for judgment on the agency record.

## STATEMENT PURSUANT TO RULE 56.2(c)

A.    The Administrative Determination Under Review

The determination under review is the final results of the fourth administrative review of the antidumping duty order on certain softwood lumber products from Canada conducted by the U.S. Department of Commerce ("Commerce"). *See Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) ("*Final Results*"), P.R. 611, *as amended by Certain Softwood Lumber Products From Canada: Amended Final*

Consol. Court No. 23-00187                      NON-CONFIDENTIAL VERSION

*Results of Antidumping Duty Administrative Review in Part; 2021*, 88 Fed. Reg. 61,511 (Dep't

Commerce Sept. 7, 2023), P.R. 597. The determinations, findings, and conclusions challenged in

this action are set out primarily in the "Issues and Decision Memorandum" accompanying the

final results. *See* Commerce Memorandum, "Issues and Decision Memorandum for the Final

Results of the 2021 Administrative Review of the Antidumping Duty Order on Certain Softwood

Lumber Products from Canada" (July 26, 2023) ("IDM"), P.R. 585.

      B.     Issues Presented for Review and Summary of Arguments

      The GOC and Canfor challenge Commerce's determination with respect to the following

issues:

      **1)     Whether Commerce's Differential Pricing Methodology ("DPM") is supported by substantial evidence and in accordance with law?**

      Yes, Commerce's application of its standard DPM to determine whether there was a

pattern of export prices that differ significantly among purchasers, regions, or periods of time

and whether these differences cannot be taken into account using the average-to-average ("A-A")

method is supported by substantial evidence and in accordance with law. This Court and the

U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") have expressly rejected the

Canadian Parties' arguments challenging the use of Commerce's DPM. Moreover, certain

arguments that the Canadian Parties attempt to present should be rejected due to their failure to

exhaust administrative remedies.

      **2)     Whether Commerce's adjustment to Canfor's byproduct revenue offset is supported by substantial evidence?**

      Yes, Commerce's calculation of a market price for woodchips is supported by substantial

evidence as the record does not a support a conclusion that the agreement between Canfor and its

unaffiliated customer constituted unusual circumstances such that the agency should have

ignored these sales in determining a market price. Instead, the record supports Commerce's

NON-CONFIDENTIAL VERSION

factual determination that the agreement between Canfor and its customer allowed for periodic

adjustments in woodchip prices based on market conditions.

> 3)    **Whether Commerce's application of the transactions disregarded rule to adjust Canfor's reported cost of electricity at its Prince George ("PG") mill is supported by substantial evidence?**

Commerce's determination that a transaction for electricity took place between Canfor's

PG mill and an affiliated party is supported by substantial evidence. Canfor Pulp and Paper Inc.

("CPPI") invoiced the PG mill for electricity and collected payment for the electricity consumed

by the mill. Because the record demonstrates that a transaction took place between the PG mill

and CPPI, Commerce's decision to apply the transactions disregarded provision of the statute is

supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS[1]

Following initiation of this review, Commerce issued antidumping questionnaires to

Canfor and West Fraser Mills Ltd. ("West Fraser"), the two companies selected for individual

review. *See* Commerce Memorandum, "Decision Memorandum for Preliminary Results of the

2021 Antidumping Duty Administrative Review of Certain Softwood Lumber Products from

Canada" (Jan. 23, 2023) ("PDM"), at 2, P.R. 518. These questionnaires sought information

regarding the respondents' corporate organization, sales, and costs necessary to assess the

respondents' dumping margins during the period of review ("POR").

Relevant to the issues presented by the Canadian Parties in this appeal, West Fraser and

Canfor provided Commerce with information on their respective U.S. sales so that the agency

could evaluate whether there exists a pattern of prices for comparable merchandise that differ

---

[1]  Consistent with Rule 81(k), the statement of facts provided in this response are limited
to those necessary to correct inaccuracies and omissions in the Canadian Parties' briefs.

Case 1:23-cv-00187-JCG    Document 120    Filed 09/05/24    Page 8 of 22

Consol. Court No. 23-00187                    NON-CONFIDENTIAL VERSION

significantly among purchasers, regions, or periods of time. *See id.* at 8. Thus, for each U.S.

sales observation, West Fraser and Canfor reported, among other information, the purchaser's

unique customer code, the destination zip code, and the date of sale. *See id.*

Canfor's response also provided information regarding the company's sales of

byproducts,[2] as well as the PG mill's purchases of electricity from CPPI. *See* Letter from

Morris, Manning & Martin, LLP to Commerce, "Canfor's Sections B-D Initial Questionnaire

Response" (June 21, 2022) ("Canfor Sections B-D Initial Response"), at D-24–D-27,

Exhibit D-13 (Canfor's byproduct worksheets), C.R. 183-85, P.R. 321-22; Letter from Morris,

Manning & Martin, LLP to Commerce, "Canfor's Section A Initial Questionnaire Response"

(May 20, 2022) ("Canfor Section A Initial Response"), at A-18–A-19, C.R. 27, P.R. 290.

On January 27, 2023, Commerce published the preliminary results of its administrative

review. *See Certain Softwood Lumber Products From Canada: Preliminary Results of

Antidumping Duty Administrative Review*, 88 Fed. Reg. 5,306 (Dep't Commerce Jan. 27, 2023),

P.R. 526. In the preliminary results, Commerce applied its DPM to determine whether it was

appropriate to use an alternative comparison method to calculate dumping margins for West

Fraser and Canfor. *See* PDM at 8-10, P.R. 518.

Commerce also made certain adjustments to the cost information reported by Canfor. *See*

Commerce Memorandum, "Cost of Production and Constructed Value Calculation Adjustments

for the Preliminary Results – Canfor Corporation, Canadian Forest Products Ltd., and Canfor

---

[2] Various byproducts—such as woodchips, sawdust, shavings, bark/hog, trimblocks, and planer throw-outs—are generated in the production of softwood lumber. *See* Letter from Morris, Manning & Martin, LLP to Commerce, "Canfor's Sections B-D Initial Questionnaire Response" (June 21, 2022), at D-24–D-27, C.R. 183, P.R. 321. Canfor provided Commerce with information on its byproduct sales during the POR in its section D response. *See id.* at Exhibit D-13 (byproduct worksheets), C.R. 184-85, P.R. 322. Only Canfor's sales of woodchip byproducts are relevant to this appeal.

Wood Products Marketing Ltd." (Jan. 23, 2023) ("Canfor Prelim. Cost Memo"), C.R. 473,

P.R. 520.  Relevant here, Commerce adjusted Canfor's byproduct offset calculation after

comparing the average per-unit sales price of woodchips sold to affiliated parties with that price

charged to unaffiliated parties.  *Id.* at 1.  Commerce also adjusted Canfor's reported costs to

account for the PG mill's purchases of electricity from CPPI to reflect market pricing.  *Id.* at 2.

Following the preliminary results, the GOC, Canfor, and other interested parties

submitted case briefs presenting arguments relevant to Commerce's final determination.  The

GOC's case brief challenged aspects of Commerce's DPM, including its use of the Cohen's *d*.

*See* Letter from McDermott Will & Emery LLP to Commerce, "Case Brief of the Government of

Canada" (Feb. 27, 2023) ("GOC Case Brief"), C.R. 494, P.R. 548-49.  Canfor's case brief,

meanwhile, contested Commerce's adjustment to the PG mill's costs to account for electricity

purchased from CPPI.  Letter from Morris, Manning & Martin, LLP to Commerce, "Canfor's

Case Brief" (Feb. 27, 2023), at 8-13, C.R. 493, P.R. 547.  Canfor also argued that Commerce's

adjustment to its byproduct offset wrongly relied on a market price for woodchips that, according

to Canfor, was unrepresentative.  *Id.* at 1-8.

On August 1, 2023, Commerce published the final results of its administrative review.

*See Final Results*, 88 Fed. Reg. at 50,106, P.R. 611.  In the final results, Commerce maintained

its adjustments to Canfor's costs.  IDM at 52-59, P.R. 585.  Specifically, Commerce continued to

find that the transaction for electricity between the PG mill and CPPI should be subject to an

analysis under the transactions disregarded provision of the statute.  *Id.* at 55-59.  Commerce also

maintained its calculation of a market price for woodchips in British Columbia.  *Id.* at 52-55.

Finally, Commerce rejected the Canadian Parties' arguments challenging the agency's

application of its standard DPM and continued to use the average-to-transaction method to calculate the dumping margins assigned to the mandatory respondents. *See id.* at 15-44.

## STANDARD OF REVIEW

In reviewing Commerce's determinations in administrative reviews of antidumping duty orders, the Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence means such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  Under the substantial evidence standard, the agency is required to take into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)).

## ARGUMENT

I.    **Commerce's Application of the DPM and Its Use of the Cohen's *d* Are Supported By Substantial Evidence and Otherwise In Accordance With Law**

A.    This Court Has Expressly Rejected the Canadian Parties' Arguments for Why Commerce's Use of the Cohen's *d* Is Unlawful

The Government explained in detail why Commerce's application of the DPM and use of the Cohen's *d* test on the entire universe of the respondents' export sales without regard to statistical sampling criteria is supported by substantial evidence and otherwise in accordance with law.  Def. Br. 16-30.  The Domestic Industry supports the Government's arguments and hereby incorporates them by reference.

The Canadian Parties' brief ignores that this Court has affirmed Commerce's use of the Cohen's *d* test and expressly rejected their arguments regarding the statistical sampling criteria. *See* Canadian Parties Br. 31-43.  In *Marmen I*, the Court directed Commerce on remand to explain its use of the Cohen's *d* test in light of the Federal Circuit's decision in *Stupp I*, specifically concerns that the underlying data to which Commerce applies the Cohen's *d* test may violate statistical assumptions of normality, sufficient observation size, and roughly equal variances.  *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1320 (Ct. Int'l Trade 2021) ("*Marmen I*").  On remand, Commerce explained that "the assumptions of normality and roughly equal variances" are not relevant when it applies the Cohen's *d* test to the full population of export sales.  *See Marmen Inc. v. United States*, 627 F. Supp. 3d 1312, 1322 (Ct. Int'l Trade 2023) ("*Marmen II*").  This Court affirmed Commerce's explanation as reasonable under the substantial evidence standard.  *See id.*

The Canadian Parties' arguments are nearly identical to those that the Court rejected in *Marmen*, buttressed only by an expert report prepared for purposes of this proceeding, the Hedges Report.  *See* Canadian Parties Br. 16-43.  The Canadian Parties devote more than ten pages of their brief to a reiteration of the Hedges Report.  *See id.* at 16-28.  However, as the Government noted, Commerce has discretion in determining the appropriate weight to accord the evidence on the record and may accord less weight to evidence prepared for purposes of litigation.  *See Vandewater Int'l Inc. v. United States*, 589 F. Supp. 3d 1324, 1335 (Ct. Int'l Trade 2022) (noting Commerce's discretion in determining the appropriate weight to accord the evidence on the record).  Moreover, Commerce addressed the Hedges Report at length in its decision and provided a more than adequate explanation for why it did not credit the concerns raised in the Hedges Report.  *See Resolute FP Canada Inc. v. United States*, No. 23-00095, 2024

Case 1:23-cv-00187-JCG   Document 120   Filed 09/05/24   Page 12 of 22

Consol. Court No. 23-00187                          NON-CONFIDENTIAL VERSION

WL 3859816, at *8 (Ct. Int'l Trade Aug. 19, 2024).  The Court should reject the Canadian

Parties' improper invitation to re-weigh the record evidence.  *See, e.g.*, *USEC Inc. v. United*

*States*, 259 F. Supp. 2d 1310, 1317 (Ct. Int'l Trade 2003) ("The Court's function is not to

re-weigh the evidence." (citation omitted)).

      B.    <u>The Act Does Not Require Commerce To Analyze Alternative Causes of the
Observed Pattern of Price Differences</u>

The Canadian Parties allege that Commerce failed to "undertake a searching inquiry" as

to the reasons for the observed significant price differences.  Canadian Parties Br. 66.  These

parties point to the COVID-19 pandemic, forest fires, excess supply, and "mounting inflationary

pressures" as possible explanations for the observed significant price differences between time

periods.  *See id.* at 67-68.  As explained by the Government, the Federal Circuit has held that the

statute does not require Commerce to determine the reasons why prices differ significantly.  Def.

Br. 38 (citing *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015)).

The Canadian Parties cite a footnote in the U.S. Court of International Trade's opinion in

*The Timken Co. v. United States*, where the court noted that "the Federal Circuit expressed

concern that 'requiring Commerce to determine the intent of a targeted dumping respondent

would create a tremendous burden on Commerce that is not required or suggested by the statute'

. . . such a burden might not exist where the respondent itself provides that information."  *The*

*Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1179 n.12 (Ct. Int'l Trade 2016).  However,

the Federal Circuit's statement in *JBF RAK* regarding the burden on Commerce is merely *dicta*.

The court's holding was that section 1677f-1(d)(1)(B) of the Tariff Act of 1930, as amended (the

"Act"), does not require Commerce to determine the reasons why there is a pattern of differing

export prices.  *JBF RAK LLC*, 790 F.3d at 1368.

Further, while *JBF RAK* is dispositive of this question of statutory interpretation, the Domestic Industry adds that the Federal Circuit, in a separate decision issued the same day as *JBF RAK*, agreed with that holding and concluded "nothing in the language of the statute requires Commerce" to consider "Borusan's alternate explanations for the pricing patterns observed" by Commerce. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 Fed. App'x 948, 950 (Fed. Cir. 2015). As the Federal Circuit's holdings are dispositive of this issue, the Court should reject the Canadian Parties' argument.

      C.    <u>The Canadian Parties Failed to Exhaust Their Argument That Commerce's DPM</u>
           <u>Does Not Result in a "Fair Comparison" Between Export Price and Normal Value</u>

The Canadian Parties argue that Commerce's use of the DPM in this review prevented a "fair comparison" between export price and normal value. Canadian Parties Br. 73-75 (citing 19 U.S.C. § 1677b(a)). According to the Canadian Parties, "the A-T methodology is more likely to produce an unfair comparison for seasonal commodities with price volatility" than the A-A methodology. *Id.* at 74. As a result, these parties conclude that Commerce failed to achieve the "fair comparison" required by section 773(a) of the Act. *Id.* at 75. The Court should find that the Canadian Parties failed to exhaust their administrative remedies as to this line of argument as it was not presented at the agency level. *See* GOC Case Brief, C.R. 494, P.R. 548-49. The "Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The Federal Circuit has explained that this statute "indicates a congressional intent that . . . the court should insist that parties exhaust their remedies before" the agency. *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citation omitted). Because the GOC failed to present this argument in its case brief, the Court should hold that the Canadian Parties have failed to exhaust their administrative remedies and disregard this challenge to the DPM.

## II.   Commerce's Adjustments to Canfor's Costs Under the Transactions Disregarded Provision of the Statute Are Supported By Substantial Evidence

In calculating a respondent's cost of production ("COP"), Commerce disregards transactions between affiliated parties where the transaction does not reflect fair market values (i.e., if they are not made on an arm's length basis).  *See* 19 U.S.C. § 1677b(f)(2).  Specifically, section 773 of the Act provides that:

> A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration.

*Id.*  This provision is colloquially referred to as the "transactions disregarded rule."

Commerce's practice in applying the transactions disregarded rule is to compare the transfer price between the affiliated parties with available market prices.  *See, e.g.*, *Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16,646 (Dep't Commerce Apr. 22, 2019) ("*Light-Walled Pipe and Tube from Mexico*"), and accompanying IDM at Comment 5.  "Available market prices may relate to a respondent's purchases of the same input directly from unaffiliated suppliers, and/or an affiliated reseller's average acquisition price plus the affiliated reseller's SG&A expense."  *Id.* The statutory text does not "direct the Department to apply a particular methodology in determining market prices," but instead affords Commerce the discretion to determine an arm's length price on a case-by-case basis.  *Certain Uncoated Paper From Portugal: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 Fed. Reg. 3,105 (Dep't Commerce Jan. 20, 2016), and accompanying IDM at 8.

A.    Commerce's Calculation of a Market Price for Woodchips In British Columbia Is Supported By Substantial Evidence

Canfor challenges Commerce's adjustment to the respondent's byproduct revenue offset related to its sales of woodchips in British Columbia.  *See Canfor Br. 12-21.*  According to Canfor, evidence does not support Commerce's calculation of a market price for woodchips in British Columbia.  *See id.*  Canfor asserts that Commerce "failed to recognize" the impact that contractual terms had on the price of woodchips sold to an unaffiliated customer in British Columbia.  *Id.* at 10.  Canfor claims that these obligations amounted to "unusual circumstances" requiring Commerce to exclude such sales in determining a market price.  *Id.* at 16 (citations omitted).  As detailed below, Commerce's calculation of a market price for woodchips in British Columbia that was inclusive of woodchips sold from the Elko and Radium mills was supported by substantial evidence.

As described above, Commerce disregards transactions between affiliated parties where the transaction does not reflect fair market values.  *See* 19 U.S.C. § 1677b(f)(2).  Absent evidence of "unusual circumstances," Commerce will typically use a respondent's own sales to unaffiliated parties to determine a market price.  *See, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France*, 70 Fed. Reg. 54,359 (Dep't Commerce Sept. 14, 2005), and accompanying IDM at 7.  In this review, Commerce found that an adjustment to Canfor's reported costs was necessary as the average sales price of woodchips to affiliated customers in British Columbia exceeded that of the average sales price to unaffiliated customers.[3]  *See* Canfor Prelim. Cost Memo at 1, C.R. 473, P.R. 520.  In making this

---

[3]  Commerce reduces the cost of manufacturing included in the COP by the amount of a respondent's byproduct revenue.  Because byproduct sales revenue functions as an offset to costs, Commerce adjusts byproduct revenue from affiliated parties to the extent that such sales prices exceed sales prices to unaffiliated parties.  If Commerce declined to analyze a respondents' byproduct sales under the transactions disregarded rule, a respondent could inflate

finding, Commerce compared the average sales price of the woodchips sold by Canfor's mills located in British Columbia to unaffiliated customers to the average sales price of the woodchips sold by the same mills to affiliated parties to see if the transactions between affiliated parties were made on an arm's length basis. *See id.* at Attachment 1, C.R. 474, P.R. 521. Commerce's calculation of an average sales price to unaffiliated customers included in its analysis the prices of woodchips sold from Canfor's Elko and Radium sawmills to [                    ],[4] which were made pursuant to a supply contract. *See* IDM at 55 (continuing to include the price of woodchips sold from Canfor's Elko and Radium mill in calculating a market price), P.R. 585.

Commerce's decision to include the Elko and Radium mills' sales of woodchips to an unaffiliated party in its calculation of a market price for woodchips is supported by substantial evidence because Commerce reasonably concluded that there were no unusual circumstances surrounding these mills' sales of woodchips to Canfor's unaffiliated customer. Canfor's initial section D response explained that the company sold woodchips to both affiliated and unaffiliated customers.[5] Canfor Sections B-D Initial Response at D-25, C.R. 183, P.R. 321. Canfor further described the sales of woodchips from its Radium and Elko mills, stating that the woodchips generated by these mills were sold to [                    ] pursuant to an agreement executed in 2012 when Canfor purchased the facilities from [          ]. *Id.*

_____

its affiliated byproduct sales to artificially lower its true cost of manufacturing and, thereby, its dumping margin.

    [4] The supply contract [                                        ]. Canfor Sections
B-D Initial Response at D-25–D-26, C.R. 183, P.R. 321. [                    ] then assigned the supply contract to [                                        ]. *Id.*

    [5] CPPI is Canfor's largest affiliated purchaser of woodchips. *See* Canfor Sections B-D Initial Response at D-25, C.R. 183, P.R. 321.

In arguing that Commerce should have ignored Canfor's woodchip sales to [

] in calculating a market price, Canfor contends that the price of the Elko and Radium

mills' sales of woodchips "do not 'fairly reflect the amount usually reflected in sales of chips in

the market under consideration' because the chips were sold pursuant to a long-term supply

contract." Canfor Br. 12 (quotation omitted). Canfor's argument is grounded in its claim that

"{t}he chip prices established in the agreement were divorced from market conditions." Canfor

Br. 17. But the record supports Commerce's conclusion that the supply agreement at issue

permits price changes by reference to industry publications. IDM at 55, P.R. 585. Specifically,

the agreement allows woodchip prices [                                    ]. Canfor

Sections B-D Initial Response at Exhibit D-14 ([                        ]), C.R. 185,

P.R. 322. The agreement also provided the parties [

]. *Id.* ([                        ]).

Thus, the record supports Commerce's factual determination that these sales prices for the Elko

and Radium mills' woodchips provide "a reasonable basis" for determining a market price for

wood chips. IDM at 55, P.R. 585.

Other information in the supply agreement further refutes Canfor's claim that the prices

of the Elko and Radium mills' sales of woodchips should not be used in determining a market

price. For example, the agreement provides for [

]. Canfor Sections

B-D Initial Response at Exhibit D-14 ([                        ]), C.R. 185, P.R. 322. The

agreement also states "[

]." *Id.*

([                        ]). Finally, the [                ] incorporated into the agreement

[

]. *Id.* ([                                ]).  Based on its review of the agreement

language, Commerce reasonably decided to include the prices of the Elko and Radium mills'

sales of woodchips in calculating a market price.

Finally, the cases cited by Canfor provide no basis to disturb Commerce's factual

determination.  In both *Best Mattresses* and *PT. Zinus Global Indonesia*, the Court remanded

Commerce's interpretation of the statutory language "market under consideration."  *See Best*

*Mattresses Int'l Co. v. United States*, 622 F. Supp. 3d 1347, 1384 (Ct. Int'l Trade 2023); *PT.*

*Zinus Global Indonesia v. United States*, 628 F. Supp. 3d 1252, 1285 (Ct. Int'l Trade 2023).

Those cases are not relevant to the issue of whether substantial evidence supports Commerce's

calculation of a market price for woodchips in British Columbia, as Commerce possessed

information on Canfor's sales of woodchips to unaffiliated parties in British Columbia such that

it was unnecessary for it to consider surrogate input price information as it had to do in both *Best*

*Mattresses* and *PT Zinus Global Indonesia*.  As such, the Court should sustain Commerce's

finding that the prices of the Elko and Radium mills' sales of woodchips to an unaffiliated party

did not constitute unusual circumstances such that the agency should have ignored these sales in

determining a market price.

B.    Commerce's Adjustment to the PG Sawmill's Costs Is Supported By Substantial
      Evidence

In calculating Canfor's COP, Commerce adjusted Canfor's reported cost of

manufacturing after analyzing transactions between the PG mill and CPPI.[6]  IDM at 55-59,

P.R. 585; *see also* Canfor Prelim. Cost Memo at 2, C.R. 473, P.R. 520.  Commerce made this

---

[6]  The PG sawmill and CPPI are separate legal entities.  *See* IDM at 58, P.R. 585.

adjustment after reviewing record evidence and concluding "that a transaction for electricity took place between the PG sawmill and CPPI."  IDM at 58, P.R. 585.  Commerce determined that application of the transactions disregarded rule was appropriate as CPPI prepared documents and processed payment related to the electricity consumed by the PG mill.  *Id.*  Because the PG mill had no purchases of electricity from unaffiliated providers, Commerce used CPPI's acquisition price and its SG&A rate to determine a market price for electricity.  Canfor Prelim. Cost Memo at Attachment 4, C.R. 474, P.R. 521.

Canfor argues that the record cannot support a conclusion that a transaction for electricity occurred between the PG sawmill and CPPI because there was no transaction between affiliates. Canfor Br. 21-26; *see also id.* at 22 (claiming "there is no 'transaction' . . . for Commerce to disregard").  Canfor maintains that the PG mill "purchase{d} its electricity from an unaffiliated supplier," such that there was no factual basis that could support application of the transactions disregarded rule.  *Id.* at 24.

Evidence supports Commerce's factual finding that a transaction took place between affiliated parties that warranted application of the transactions disregarded rule.  Canfor's section A response described the company's operations in the Northwood area and explained how CPPI's Northwood pulp mill received invoices from BC Hydro for the electricity consumed by all Canfor facilities in the Northwood area.[7]  Canfor Section A Initial Response at A-18– A-19, C.R. 27, P.R. 290.  CPPI then invoiced the PG mill for the electricity consumed by that facility.  *Id.*; *see also* Canfor Sections B-D Initial Response at Exhibit D-18 (Canfor's affiliated

_____

[7]  Canfor initially treated this information as business proprietary but later agreed to the public release of the fact that BC Hydro is the electricity supplier to the Northwood pulp mill and that the Northwood pulp mill splits the bill between the Canfor facilities in Prince George.  *See* Letter from Morris, Manning & Martin, LLP to Commerce, "Canfor's Section A Supplemental Questionnaire Response" (Nov. 17, 2022), at 1, C.R. 209, P.R. 364.

party transactions), C.R. 185, P.R. 322.  The PG mill then remitted payment to CPPI for the amount owed.  Canfor Section A Initial Response at A-18–A-19, C.R. 27, P.R. 290.  This arrangement was verified by Commerce in the underlying investigation where the agency noted that [

].

Canfor Sections B-D Initial Response at Exhibit D-34 p.19, C.R. 186, P.R. 322.  This record evidence supports Commerce's adjustment to Canfor's COP.

While Canfor maintains that there was no transaction between CPPI and the PG mill, *see, e.g.*, Canfor Br. 21 (referring to the PG's purchases from CPPI as "so-called 'transactions'"), the fact that CPPI issued invoices to and collected payment from the PG sawmill for electricity supports Commerce's determination that a transaction took place between affiliates.  *See* IDM at 58, P.R. 585.  Canfor's argument that "CPPI does not provide electricity to the PG sawmill," Canfor Br. 23, also ignores record evidence showing that CPPI invoiced the PG mill for electricity consumed and that the PG mill paid CPPI, rather than BC Hydro, for that electricity.  Thus, the record provides ample evidence supporting Commerce's application of the transactions disregarded rule to Canfor's PG mill's transactions with CPPI.

Finally, Commerce reasonably included CPPI's SG&A expenses in the electricity market price calculation.  As noted above, "{a}vailable market prices may relate to . . . an affiliated reseller's average acquisition price plus the affiliated reseller's SG&A expense."  *Light-Walled Pipe and Tube from Mexico IDM* at 14.  For example, in *CORE from Taiwan*, the Department applied the transactions disregarded rule to a respondent's purchases of inputs from an affiliate.  *See Certain Corrosion-Resistant Steel Products From Taiwan: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 Fed.

Reg. 7,408 (Dep't Commerce Feb. 3, 2023), and accompanying IDM at 6-7. There, Commerce used the price the respondent's affiliated supplier paid to its unaffiliated suppliers for the input plus the affiliated supplier's SG&A expense to determine a market price. *Id.* In this case, Commerce reasonably followed the same approach as the structure of the transaction between CPPI and the PG mill has the effect of shifting administrative expenses such as processing the bill and remitting payment from the PG mill to CPPI. Thus, Commerce properly included CPPI's SG&A expenses in calculating a market price for electricity.

## CONCLUSION

For the foregoing reasons, the Domestic Industry respectfully requests that this Court sustain the determinations, findings, and conclusions challenged by Canadian Parties in this appeal.

Respectfully submitted,                          Respectfully submitted,

*/s/ Jeffrey I. Kessler*                           */s/ Zachary J. Walker*

David J. Ross                                    Zachary J. Walker
Jeffrey I. Kessler                               Andrew W. Kentz
Stephanie E. Hartmann

**WILMER CUTLER PICKERING HALE**            **PICARD KENTZ & ROWE LLP**
   **and DORR LLP**                            1155 Connecticut Avenue NW
2100 Pennsylvania Avenue NW                      Suite 700
Washington, DC 20037                             Washington, DC 20036
(202) 663-6000                                   (202) 888-0595

*Counsel to Sierra Pacific Industries,*          *Counsel to the COALITION*
*including its subsidiary Seneca Sawmill*
*Company*

17

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this brief complies with the 7,000 word-count limitation set in the Court's January 17, 2024 scheduling order. *See* ECF 98. This brief contains 5,124 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

*/s/ Zachary J. Walker*
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
*Counsel to the COALITION*

September 5, 2024