**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| The Government of Canada, *et al.*,<br><br>    *Plaintiffs*,<br><br>Canfor Corporation, *et al.*,<br><br>    and<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations,<br><br>    *Consolidated Plaintiffs*,<br><br>Canfor Corporation, *et al.*,<br><br>    *Plaintiff-Intervenors*,<br><br>    v.<br><br>The United States,<br><br>    *Defendant*,<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, *et al.*,<br><br>    *Defendant-Intervenors*. | **Consol. Court No.**<br>**1:23-cv-00187-JCG** |

**THE CANADIAN DEFENDANT-INTERVENORS' RESPONSE TO THE JOINT MOTION AND BRIEF FOR JUDGMENT ON THE AGENCY RECORD SUBMITTED BY THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AND SIERRA PACIFIC INDUSTRIES**

September 5, 2024

/s/ Eric S. Parnes
Eric S. Parnes
Joanne E. Osendarp
Lynn Kamarck
Alan Kashdan
Tyler Kimberly
**Blank Rome LLP**
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-5479
Email: eric.parnes@blankrome.com
*Counsel to the Government of Canada*

/s/ Lynn Fischer Fox
Lynn Fischer Fox
Gina M. Colarusso
Archana Rao P. Vasa
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5601
Email: lynn.fischerfox@arnoldporter.com
*Counsel to the Government of Alberta*

/s/ H. Deen Kaplan
H. Deen Kaplan
Jonathan T. Stoel
**Hogan Lovells US LLP**
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
Tel: (202) 637-5799
Email: deen.kaplan@hoganlovells.com
*Counsel to the Government of Ontario*

/s/ Nancy Noonan
Nancy Noonan
**ArentFox Schiff LLP**
1717 K Street, NW.
Washington, DC 20006
Tel: (202) 857-6479
Email: nancy.noonan@afslaw.com
*Counsel to the Government of Québec*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
Tel:202-688-3610
Email: trade@mowrygrimson.com
*Counsel to Carrier Forest Products Ltd. and
Carrier Lumber Ltd., Olympic Industries, Inc.
and Olympic Industries ULC*

/s/ R. Will Planert
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
**Morris, Manning & Martin, LLP**
1333 New Hampshire Avenue, NW.
Suite 800
Washington, DC 20036
Tel.: (202) 216-4819
Email: wplanert@mmmlaw.com
*Counsel to Canfor Corporation, Canadian
Forest Products, Ltd., and Canfor Wood
Products Marketing Ltd.*

/s/ Donald Harrison
Donald Harrison
**Gibson, Dunn & Crutcher, LLP**
1050 Connecticut Avenue, NW.
Suite 900
Washington, DC 20036-5306
Tel: (202) 955-8560
Email: dharrison@gibsondunn.com
*Counsel to West Fraser Mills Ltd.*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.     USCIT RULE 56.2 STATEMENT ..................................................................... 2

       A.    Administrative Determination Under Review ......................................... 2

       B.    Issues Presented ..................................................................................... 2

II.    STATEMENT OF FACTS .................................................................................. 2

III.   SUMMARY OF ARGUMENT ........................................................................... 6

IV.    STANDARD OF REVIEW ................................................................................. 7

V.     ARGUMENT ...................................................................................................... 8

       A.    Commerce Correctly Determined That CVDs Are Not Deductible from U.S. Price Under the Statute................................................................. 8

       B.    It Was Reasonable for Commerce to Act Consistent with Its Practice in Basing G&A Expenses on the Financial Statement of the Entity That Produces the Subject Merchandise ............................................................ 16

CONCLUSION AND RELIEF REQUESTED ........................................................... 21

# TABLE OF AUTHORITIES

**Authority**..............................................................................................................**Page(s)**

## Cases

*Ad Hoc Shrimp Trade Action Committee v. United* States, 925 F. Supp. 2d 1367 (Ct. Int'l Trade
2013) ....................................................................................................................... 15

*AK Steel Corp. v. United States*, 988 F. Supp. 594 (Ct. Int'l Trade 1997) ............................ 13, 14

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............. 6, 10

*Rodriguez v. United States*, 480 U.S. 522 (1987) ........................................................... 9

*Syngenta Crop Protection, LLC v. Willowood, LLC*, 944 F.3d 1344 (Fed. Cir. 2019) ........... 9, 13

*U.S. Steel Grp. v. United States*, 15 F. Supp. 2d 892 (Ct. Int'l Trade 1998) ........................ 13, 14

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)...........
..................................................................................................................... 9, 13

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) .......................... 10, 11, 12

## Statutes and Legislation

19 U.S.C. § 1516a(b) ........................................................................................................ 7

19 U.S.C. § 1677a(a) ........................................................................................................ 3

19 U.S.C. § 1677a(b) ........................................................................................................ 3

19 U.S.C. § 1677a(c) ................................................................................................. passim

19 U.S.C. § 1677a(d) ........................................................................................................ 3

19 U.S.C. § 1677b(b) ........................................................................................................ 4

Antidumping Act of 1921, P.L. 67-10 (May 27, 1921) ......................................................... 9, 11

## Administrative Determinations

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of
China: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 9,576
(Dep't Commerce Feb. 22, 2022) ........................................................................... 20

*Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty
Administrative Review; 2017-2018*, 85 Fed. Reg. 76,519 (Dep't Commerce Nov. 30, 2020)...
..................................................................................................................... 18

*Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from the Russian Federation*, 64 Fed. Reg. 38,626 (Dep't Commerce July 19, 1999) ................................................................................................................... 19

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Steel Concrete Reinforcing Bars from Turkey*, 62 Fed. Reg. 9,737 (Dep't Commerce Mar. 4, 1997) ............. 19

*Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France*, 69 Fed. Reg. 46,501 (Dep't Commerce Aug. 3, 2004) ........................ 10, 11, 13

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153 (Dep't Commerce Apr. 12, 2004) .................... 11

**Scholarly Literature**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)..... ................................................................................................................... 12, 13

**Other Authorities**

S. Rep. No. 67-16 (1921) ..................................................................................................... 10, 11

**THE CANADIAN DEFENDANT-INTERVENORS' RESPONSE TO THE JOINT MOTION AND BRIEF FOR JUDGMENT ON THE AGENCY RECORD SUBMITTED BY THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AND SIERRA PACIFIC INDUSTRIES**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("USCIT Rules"), and in accordance with this Court's scheduling order entered in this consolidated action,[1] Defendant-Intervenors Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing, Ltd. (collectively, "Canfor"), Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, West Fraser Mills Ltd., Government of Canada, Government of Alberta, Government of Ontario, and Government of Québec (collectively the "Canadian Defendant-Intervenors")[2] hereby respond to the April 5, 2024 Motion for Judgment on the Agency Record of Plaintiffs Committee Overseeing Action for Lumber International Trade Investigations or Negotiations and Sierra Pacific Industries, including its subsidiary Seneca Sawmill Company (collectively, the "COALITION").[3]

---

[1] *See* Scheduling Order (Jan. 17, 2024), (ECF No. 98).

[2] The Canadian Defendant-Intervenors intervened as Defendant-Intervenors in member Case No. 1:23-00189-JCG.

[3] The Coalition Overseeing Action for Lumber International Trade Investigations or Negotiations and Sierra Pacific Industries' Joint Rule 56.2 Motion for Judgment on the Agency Record (Apr. 5, 2024) (ECF Nos. 109, 110) ("COALITION Br.").

## I.    USCIT RULE 56.2 STATEMENT

### A.    Administrative Determination Under Review

The administrative determination under review is final results of the fourth administrative review of the antidumping duty order on certain softwood lumber products from Canada,[4] as amended.[5]  The period of review ("POR") is January 1, 2021 through December 31, 2021.

### B.    Issues Presented

1.  Whether the U.S. Department of Commerce ("Commerce") correctly determined that countervailing duties are not costs, charges, or expenses incident to importing subject merchandise, and thus are not to be subtracted from U.S. price pursuant to 19 U.S.C. § 1677a(c)(2)(A).

2.  Whether Commerce's decision to calculate Canfor's General and Administrative ("G&A") expense ratio using the financial statements of a consolidated entity was reasonable and supported by substantial evidence.

## II.    STATEMENT OF FACTS

In an antidumping ("AD") review, Commerce determines the dumping margin by comparing the price at which the good is sold in the foreign market (*i.e.*, "normal value" or "NV") to the price at which the good is sold in the United States (*i.e.*, "U.S. price").  When the price to the U.S. customer is set before the date of import, Commerce refers to this as "export price" ("EP") and makes a number of accounting adjustments to deduct, *inter alia*, rebates and

---

[4] *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) (P.R. 611) ("*Final Results*"), and accompanying Issues and Decision Memorandum (P.R. 585) ("I&D Mem.").  Citations to the administrative record shall be to the public or confidential record document number ("P.R." or "C.R.").

[5] *Certain Softwood Lumber Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in Part; 2021*, 88 Fed Reg. 61,511 (Dep't Commerce Sept. 7, 2023) (P.R. 597).

freight expenses in order to compare EP to NV.[6]  "Constructed export price" ("CEP") is the price at which the good is first sold in the United States by or on behalf of the producer/exporter to the first unaffiliated buyer.[7]  Commerce similarly makes statutorily prescribed adjustments to compare CEP to NV.[8]  Commerce explained these adjustments in the Decision Memorandum accompanying the *Preliminary Results*.[9]  Canfor made both EP and CEP sales during the instant review.[10]

Section 772(c) of the Tariff Act of 1930, as amended ("the statute") provides that Commerce shall deduct from EP and CEP any "costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."[11]  In its brief before the agency, as here, the COALITION argued that Commerce should have deducted from EP and CEP the countervailing duties ("CVDs") the respondents paid on the same products under review in the instant AD administrative review on the theory that the CVDs paid to U.S. Customs and Border Protection ("Customs") are costs "incident to" importing the products into

---

[6] *See* 19 U.S.C. § 1677a(a), (c).

[7] *See* 19 U.S.C. § 1677a(b).

[8] *See* 19 U.S.C. § 1677a(c), (d).

[9] *Certain Softwood Lumber Products From Canada: Preliminary Results of Antidumping Duty Administrative Review; 2021* 88 Fed. Reg. 5,306 (Dep't Commerce Jan 27, 2023) (P.R. 526) ("*Prelim. Results*"), and accompanying Decision Memorandum for Preliminary Results (Jan. 23, 2023) at 11–12 (P.R. 518) ("Prelim. Mem.").

[10] Analysis For Prelim. Results: Canfor (Jan 23, 2023) at 8 (C.R. 466, P.R. 522).

[11] 19 U.S.C. § 1677a(c)(2)(A).

the United States.[12]  For the *Final Results*, Commerce rejected this argument and adhered to its

unbroken practice, which has been upheld by this the U.S. Court of International Trade ("CIT")

on multiple occasions, that CVDs are neither "costs, charges, and expenses" nor "United States

import duties" within the meaning of 19 U.S.C. § 1677a(c)(2)(A).[13]  Commerce also determined

that subtracting CVDs from U.S. price in an antidumping proceeding would result in an

inappropriate double remedy.[14]

As part of the calculation of Canfor's cost of production ("COP"), Commerce relied on

the G&A expense ratio reported by Canfor.[15]  The statute instructs Commerce to include in the

calculation of COP "an amount for selling, general, and administrative expenses based on actual

data pertaining to production and sales of the foreign like product by the exporter in question."[16]

In this review, as in prior reviews, Commerce found that Canfor Corporation, Canadian Forest

Products Ltd. ("CFP"), and Canfor Wood Products Marketing Ltd. ("CWPM") are affiliated and

should be treated as a single entity.[17]  Accordingly, Commerce "collapsed" them for purposes of

this review.[18]  Canfor reported its G&A expense ratio based on the consolidated financial

statements of Canfor Corporation, adjusted to remove the costs and expenses of Canfor's pulp

---

[12] *See* COALITION's Case Br. (Feb. 27, 2023) at 29–31 (C.R. 489, P.R. 546) ("COALITION Admin. Case Br."); COALITION Br. at 10.

[13] I&D Mem. at 46.

[14] *Id.*

[15] *See* Prelim. Mem. at 15–16.

[16] 19 U.S.C. § 1677b(b)(3)(B).

[17] *See* I&D Mem. at 60 (citing Prelim. Mem. at 5).

[18] *See id.* (citing Prelim. Mem. at 5).

operations.[19]  This is referred to by Canfor as the "CFP Legal Roll-Up"[20] statement and captures the expenses of all Canfor's Canadian lumber operations, as well as two subsidiaries of CFP: Canfor Southern Pine, which produces lumber in the United States, and Canfor Sweden, which produces lumber in Sweden.

The COALITION argued before the agency that Commerce should not have used the G&A expense ratio computed by Canfor based on the CFP Legal Roll-Up statement and should instead have calculated G&A expense using "standalone" financial information specific to CFP, the entity that owns the Canadian sawmills that produced the subject merchandise.[21]  For the *Final Results*, Commerce determined that, because there is no separate standalone financial statement prepared for CFP, the COALITION's proposed methodology would exclude from G&A expenses at the level of Canfor Corp. and CWPM expenses incurred by Canfor Corporation and CWPM that are G&A expenses related to production of subject merchandise.[22]  Commerce also concluded that Canfor's G&A expense ratio properly excludes expenses for Canfor companies—CWPM, Canfor Sweden, and Canfor Southern Pine ("CSP")—that were related to selling, rather than G&A, expenses.[23]

---

[19] *See* Canfor's Secs. B–D Initial Questionnaire Response (June 21, 2022) at D-56 to D-58 (C.R. 184, 185, 186, P.R. 322) ("Canfor's Initial Secs. B–D Initial Questionnaire Response").

[20] *See* Rebuttal Brief of Canfor Corporation (Mar. 9, 2022) ("Canfor Admin. Rebuttal Br.") at 14 (C.R. 496, P.R. 558).

[21] *See* COALITION Admin. Case Br. at 4–7.

[22] I&D Mem. at 60.

[23] *See id.*

## III.    SUMMARY OF ARGUMENT

*First*, the CIT and the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") have consistently held that CVDs are neither "United States duties" nor "costs, charges, or expenses" within the meaning of the statute for the purposes of deducting them from export price and constructed export price.  The courts have so held because CVDs, like AD duties, have long been understood to be a *type* of import duty referred to as "special duties."  The statute expressly provides for EP and CEP to be increased by the amount of "any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy."[24]  Yet, the statute also requires that EP and CEP be reduced by the amount of any "costs, charges, and expenses, and United States import duties" that are "incident" to importation.[25]  It would be illogical for Commerce to consider CVDs to be "United States import duties" or "costs, charges, or expenses," as the COALITION contends it should, because doing so would put two statutory provisions at cross purposes.  If "CVDs" and "United States import duties" are given the same meaning through the COALITION's errant reading of the statute, CVDs imposed to offset export subsidies would be *subtracted* from EP and CEP pursuant to one provision but *added* to EP and CEP pursuant to another.  Statutory provisions cannot be read in isolation, but must, as the Supreme Court of the United States instructed, be read and implemented "as a symmetrical and coherent regulatory scheme."[26]  Therefore, Commerce properly declined to reduce U.S. price by the amount of CVDs in this proceeding.

---

[24] 19 U.S.C. § 1677a(c)(1)(C).

[25] 19 U.S.C. § 1677a(c)(2)(A).

[26] *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000).

*Second*, for the *Final Results*, Commerce reasonably concluded that, because certain expenses of the collapsed Canfor entity were G&A expenses incurred in the production of subject merchandise, the consolidated Canfor Corporation financial statement was properly used as the basis for Canfor's G&A expense ratio.  Only the consolidated Canfor Corporation financial statement—referred to as the "CFP Legal Roll-Up" statement—accurately captures all of the G&A expenses of the collapsed Canfor entities while also offsetting internal transactions between the sawmills and Canfor Wood Products Marketing Ltd. and removing the expenses of Canfor Pulp and Paper Inc. (which produces non-subject pulp).  This is precisely why Commerce has used the same methodology to calculate Canfor's costs in every proceeding from the original *Softwood Lumber* investigation through all three administrative reviews prior to this one.  The COALITION argues that Commerce should have determined Canfor's G&A expenses based on the financial information of the "producing company," in this case CFP.  However, the CFP Legal Roll-Up statement includes costs associated with production and sale of subject merchandise, not all of which are borne directly by CFP.  Therefore, Commerce reasonably found based on the record evidence that Canfor reconciled the Canfor entities' costs to include all G&A expenses related to sales of subject merchandise and that the COALITION's alternative calculation would not accurately capture Canfor's costs.

## IV.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an AD duty administrative review, this Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."[27]

---

[27] 19 U.S.C. § 1516a(b)(1)(B)(i).

## V.    ARGUMENT

### A.    Commerce Correctly Determined That CVDs Are Not Deductible from U.S. Price Under the Statute

The statute mandates Commerce to reduce EP and CEP by:

> (A) . . . the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, which are incident to bringing the merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . . .[28]

Courts have consistently held that CVDs are neither "United States import duties" nor "costs, charges, or expenses" within the meaning of 19 U.S.C. § 1677a(c)(2)(A). Therefore, Commerce lawfully declined to reduce U.S. price by the amount of CVDs in this proceeding.

In its brief to this Court, the COALITION does not argue that CVDs are "United States import duties," and contends only that CVDs are "costs" included in the price used to establish EP and CEP.[29] The COALITION contends that the statute is clear and unambiguous that CVDs are "costs" based on the ordinary meaning of that term.[30] The COALITION further argues that because CVD "costs" are included in U.S. price, but are not imposed on home market sales, it is necessary to deduct the CVDs from U.S. price to achieve an "apples-to-apples" comparison at the ex-factory level.[31] Both of these contentions are without merit, and Commerce's determination that CVDs are not to be deducted from U.S. price should be sustained.

---

[28] 19 U.S.C. § 1677a(c)(2)(A).

[29] COALITION Br. at 12–14.

[30] *Id.* at 11–12.

[31] *Id.* at 15.

The COALITION's plain meaning argument fails when the full language of the provision is considered in the context of the statute as a whole.[32]  As noted, 19 U.S.C. § 1677a(c)(2)(A) provides that EP and CEP will be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  This provision makes no express reference to CVDs.  However, CVDs are referred to expressly in another subsection of 19 U.S.C. § 1677a(c).  Subsection 1677a(c)(1)(C) provides that EP and CEP are to be *increased* by "the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy."  Thus, where Congress intended to refer to CVDs within this statutory provision, it has done so explicitly.[33]

Furthermore, CVDs are a type of import duty.  If CVDs are covered at all under 19 U.S.C. § 1677a(c)(2)(A) they would be categorized as "United States import duties."  However, an analysis of the legislative history of 19 U.S.C. § 1677a(c)(2)(A) and its predecessor provisions[34] shows that the term "United States import duties" was understood at the time of its

---

[32] *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme. . . .").

[33] *See Syngenta Crop Protection, LLC v. Willowood, LLC*, 944 F.3d 1344, 1361 (Fed. Cir. 2019) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (citing *Rodriguez v. United States*, 480 U.S. 522, 525 (1987)); *see also* Defendant's Response to Plaintiffs' Motions for Judgement on the Administrative Record (Aug. 22, 2024) at 41–43 (ECF No. 118) (collecting cases).

[34] Because the statute does not define the "United States import duties" that are to be deducted from EP and CEP, *see* 19 U.S.C. § 1677a(c)(A), the legislative history of the Antidumping Act of 1921, P.L. 67-10 (May 27, 1921) ("Antidumping Act of 1921"), in which that term first appeared is an appropriate interpretative tool.

incorporation into the statute to refer to regular customs duties, while AD duties were considered "special dumping duties."[35]  If "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) were interpreted to include all import duties other than AD duties (*i.e.*, both regular duties and CVDs), then that term would necessarily include *all* CVDs, including CVDs imposed to offset an export subsidy.  Such a reading would, however, render the statute nonsensical, as CVDs imposed to offset export subsidies would be subtracted from EP and CEP pursuant to 19 U.S.C. § 1677a(c)(2)(A) (as "United States import duties") but *added* to EP and CEP pursuant to section 1677a(c)(1)(C) (which expressly provides that EP and CEP are to be increased by the amount of "any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy").[36] Commerce's analysis on this point, in both the I&D Memorandum[37] and *Low Enriched Uranium From France*[38] is correct.  Additionally, the Federal Circuit has held that Commerce's distinction between "special duties" and "normal Customs duties," rooted in its "obligation to avoid collecting" double remedies, is a reasonable understanding of Congressional intent.[39]  The Senate Report on the bill referred to AD duties as "special dumping dut{ies}" and referred to "United States import duties" as normal Customs duties, which were distinguished and treated differently

---

[35] S. Rep. No. 67-16 at 4 (1921) (referring "United States import duties" as separate from a "special dumping duty").

[36] *See Brown & Williamson*, 529 U.S. at 133 ("A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into a harmonious whole.'") (citations omitted).

[37] *See* I&D Mem. at 46.

[38] *Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France*, 69 Fed. Reg. 46,501, 46,505 (Dep't Commerce Aug. 3, 2004) ("*Low Enriched Uranium From France*").

[39] *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1358, 1361–63 (Fed. Cir. 2007).

from "special dumping duties."[40]  This interpretation is bolstered by the fact that the

Antidumping Act of 1921 specifically provided that "special dumping duties" could be applied

to "duty-free" merchandise.[41]  "Duty-free . . . must mean . . . free from normal Customs

duties."[42]  In other words, it was understood that AD duties, as "special" remedial duties, could

be imposed *in addition to* "normal Customs duties," *i.e.*, the standard tariff rate that applies to a

given good.

The COALITION argues that "the Federal Circuit has not addressed the reasonableness

of Commerce's refusal to adjust U.S. price by the amount of CVD costs."[43]  However, in

*Wheatland Tube*, the Federal Circuit upheld Commerce's practice of not deducting Section 201

duties from EP.[44]  That rationale—the distinction between "special duties" and "normal Customs

duties" and the "objective" of the statutory framework to avoid double-counting—was the same

reasoning Commerce had applied to not deducting AD/CVD duties.[45]  Moreover, in finding that

Section 201 safeguard duties should not be deducted from EP, the Federal Circuit acknowledged

---

[40] *Id.* at 1361 (citing S.Rep. No 67-16 at 4 (1921)); *see also Low Enriched Uranium From France*, 69 Fed. Reg. at 46,504–05. The same year as *Low Enriched Uranium From France*, Commerce adopted the same policy with respect to safeguard duties, which it defined as other "special duties" based on the same legislative history.  *See Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153, 19,159 (Dep't Commerce Apr. 12, 2004).  *Wheatland Tube* was an appeal from this determination.  495 F.3d at 1358.

[41] Antidumping Act of 1921, Sec. 202(a).

[42] *Low Enriched Uranium From France*, 69 Fed. Reg. at 46,505.

[43] COALITION Br. at 12.

[44] 495 F.3d at 1361 ("{W}e hold that . . . Commerce's interpretation—that § 201 safeguard duties are not 'United States import duties' and thus are not deducted from the EP in calculating the dumping margin—is reasonable.")

[45] *Id.*

that AD duties and CVDs are not "considered 'United States import duties'" and "neither one is deducted from the EP in calculating dumping margin."[46]

Perhaps recognizing the difficulty inherent in arguing that CVDs are to be deducted from EP and CEP because they are "United States import duties," the COALITION argues instead that CVDs are nevertheless deductible as "additional costs, charges or expenses" incident to bringing the merchandise into the United States.[47]  However, the COALITION's argument that CVDs are costs, charges or expenses is contrary to principles of statutory interpretation.  First, it is illogical to interpret the statutory term "United States import duties" to exclude CVDs—which, as Commerce observed, are indisputably duties imposed on imports—but then interpret the term "costs, charges, and expenses" as including CVDs.[48]  Second, if CVDs could be considered such costs merely because they represent an amount that is "paid or charged,"[49] then *all* import duties, including regular customs duties, would qualify as costs, charges, and expenses.  The term "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) would then be superfluous, contrary to law.[50]

Finally, re-classifying CVDs as a "cost, charge or expense" leads to an impermissible interpretation of the statute when considered as a whole.  Interpreting the text in light of the

---

[46] *Id.* at 1363.

[47] COALITION Br. at 10–12.

[48] I&D Mem. at 46.

[49] COALITION Br. at 11.

[50] *See e.g.,* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 174 (2012) ("If possible, every word and every provision is to be given effect. . . .  None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

provision as a whole is a traditional tool of statutory construction.[51]  If CVDs are a "cost" within the meaning of 19 U.S.C. § 1677a(c)(2)(A), then CVDs would constitute a cost whether imposed to offset export subsidies or domestic subsidies.  This construction would again conflict with the express requirement in 19 U.S.C. § 1677a(c)(1)(C) that CVDs imposed to offset export subsidies are to be added to EP or CEP.  Thus, the COALITION's plain-meaning argument is contradicted by the text and structure of 19 U.S.C. § 1677a(c), which clearly indicate that when Congress intended to refer to CVDs it did so expressly, and that Congress could not have intended to include CVDs within the term "costs, charges, or expenses" incident to the importation of the merchandise.[52]  Commerce properly identified this error in *Low Enriched Uranium From France*.[53]

The COALITION's argument that CVDs must be removed from U.S. price in order to ensure the overarching goal of an "apples-to-apples" comparison with normal value also fails.  To the contrary, the U. CIT has previously upheld Commerce's determination not to deduct actual CVDs in order to avoid a double remedy.[54]  In *AK Steel Corp. v. United States*,[55] the CIT upheld as reasonable Commerce's explanation that "antidumping duties are intended to offset the effect of discriminatory pricing between . . . two markets," and that "making an additional

---

[51] *See id.* at 167–69; *United Sav. Ass'n of Tex.*, 484 U.S. at 371 ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme. . . .").

[52] *See Syngenta*, 944 F.3d at 1361.

[53] 69 Fed. Reg. at 46,502–05.

[54] *See U.S. Steel Grp. v. United States*, 15 F. Supp. 2d 892, 900 (Ct. Int'l Trade 1998) ("The court has upheld Commerce's interpretation that countervailing duties should not be deducted from U.S. price, based on Commerce's position against double-counting.").

[55] 988 F. Supp. 594 (Ct. Int'l Trade 1997).

deduction from {U.S. price} for the same antidumping duties that correct this price discrimination would result in double-counting."[56]  In *U.S. Steel Group*, the CIT found that this reasoning applied equally to the deduction of CVDs, holding that: "Commerce has already corrected for the subsidies on the subject merchandise in the countervailing duty order, thereby granting the domestic industry a remedy.  To deduct such countervailing duties from U.S. price would create a greater dumping margin, in effect a second remedy for the domestic industry."[57]

The reasoning behind these holdings is clear.  Section 1677a(c)(1)(C) provides that, in the case of CVDs that have been imposed to offset an export subsidy, EP and CEP are to be increased by the amount of the CVD.  Export subsidies affect only exported goods, by reducing the cost (and thus price charged) for exported goods.  Pursuant to the CVD law, Commerce imposes CVDs on the imported good equal to the amount of the subsidy.  However, because an export subsidy has no impact on the domestic price, when there is also an antidumping proceeding on the same product, the export subsidy would generate a price differential between normal value and EP or CEP.  In the absence of an offsetting adjustment, that price differential would increase the dumping margin, resulting in a double remedy in which the same export subsidy amount is offset twice:  once as a CVD and then a second time as an AD duty.  To avoid such a double remedy, 19 U.S.C. § 1677a(c)(1)(C) provides that at the U.S. price should be adjusted upward by the amount of the CVDs.  Commerce correctly determined that subtracting CVDs would create an impermissible double remedy that conflicts with the clearly indicated

---

[56] *Id.* at 607.

[57] 15 F. Supp. 2d at 900.

intent of the statute that the separate imposition of CVDs should have a neutral impact on the dumping margin calculation.[58]

Such an offsetting adjustment is not necessary in the case of CVDs imposed to offset domestic subsidies, however, because domestic subsidies affect domestic and exported goods equally. Thus, domestic subsides do not contribute to price differences between domestic and export prices, and the CVD law can impose a CVD on the imported product to offset the subsidy without distorting the price comparison between U.S. and home market prices in the antidumping calculation. However, if Commerce were to subtract the CVDs imposed from EP or CEP, this would create precisely the type of double remedy that the statute undertakes to prevent in 19 U.S.C. § 1677a(c)(1)(C). Deducting CVDs would create a price differential between normal value and U.S. price purely as the result of the imposition of a remedy to offset the domestic subsidy. As demonstrated above, subtracting CVDs from U.S. price would not lead to an "apples-to-apples" comparison, but the exact opposite—it would create a price differential between normal value and EP or CEP that is not the product of any pricing behavior by the exporter, but rather is a consequence of a separate trade remedy imposed to offset a subsidy.[59]

---

[58] I&D Mem. at 46.

[59] *See Ad Hoc Shrimp Trade Action Committee v. United* States, 925 F. Supp. 2d 1367, 1374 (Ct. Int'l Trade 2013) (holding that "Commerce's long-standing and judicially-approved practice . . . {of} not reduce{ing} the (adjusted) export price by the amount of the importer's deposit . . . {so that} the importer appropriately pays only the fair price" is "logical").

**B.      It Was Reasonable for Commerce to Act Consistent with Its Practice in Basing G&A Expenses on the Financial Statement of the Entity That Produces the Subject Merchandise**

For the *Final Results*, Commerce reasonably concluded that, because certain expenses of the collapsed Canfor entity were G&A expenses incurred in the production of subject merchandise, the consolidated Canfor Corporation financial statement was properly used as the basis for Canfor's G&A expense ratio.[60]  Only the consolidated Canfor Corporation financial statement captures all of the G&A expenses of the collapsed Canfor entities (including overall corporate activities of Canfor Corporation) while also fully offsetting internal transactions between the sawmills (included in the CFP Ltd. entity) and Canfor Wood Products Marketing Ltd. (the sales arm of the consolidated entity).[61]  However, because the Canfor Corporation financial statement also consolidates the expenses of Canfor Pulp and Paper Inc. (which produces pulp) Commerce found it necessary to remove those operations, using the internally prepared CFP Legal Roll-Up Statement.[62]

The COALITION argues that by doing so, Commerce "depart{ed} from its established practice of determining a respondent's G&A expenses based on the financial information of the producing company," in this case CFP.[63]  However, this argument ignores the fact that Commerce has followed this same methodology in *every* past segment of *Softwood Lumber from Canada* proceedings and that expenses incurred by Canfor Corporation and CWPM, in addition

---

[60] *See* I&D Mem. at 60.

[61] Canfor Admin. Rebuttal Br. at 12.

[62] I&D Mem. at 60.

[63] COALITION Br. at 15–16.

to CFP, are properly considered G&A expenses of the consolidated entity.[64]  The COALITION also takes issue with the particular adjustments Canfor made in order to isolate costs that should properly be considered G&A expenses.[65]  However, Commerce reasonably found based on the record evidence that Canfor reconciled the Canfor entities' costs to include all G&A expenses related to sales of subject merchandise and that the COALITION's alternative calculation would not accurately capture Canfor's costs.[66]

First, contrary to the COALITION's argument that Commerce's methodology for reporting G&A expenses in this case "strayed from its established practice,"[67] the methodology Commerce used here is identical to the methodology Commerce used in the original *Softwood Lumber* investigation and all three administrative reviews prior to this one.[68]  Here, as in those prior segments:  (1) Canfor Corporation, CWPM, and CFP were collapsed into one entity for the purposes of Commerce's review;[69] and (2) Canfor reconciled the individual entities' financial information to the CFP Legal Roll-Up statement and to the audited Canfor Corporation consolidated financial statement.[70]  Canfor's reporting, and Commerce's methodology, have thus

---

[64] I&D Mem. at 60 ("As we have done in the underlying investigation and the three subsequent administrative reviews, we have collapsed Canfor Corporation, CWPM Ltd, and CFP into one entity.").

[65] *See* COALITION Br. at 17–20.

[66] I&D Mem. at 60.

[67] COALITION Br. at 17.

[68] I&D Mem. at 60; *see also* Canfor's Initial Secs. B–D Initial Questionnaire Response, Exh. D-34.

[69] I&D Mem. at 60.

[70] Canfor's Initial Secs. B–D Initial Questionnaire Response, Exhs. D-27 & D-35.

remained consistent based on the reasoning Commerce provided in the first administrative review:

> The financial reporting of Canfor is structured such that Canfor Corporation and the companies it wholly owns directly or indirectly . . . are heavily intertwined operationally and by transactions, and thus, to efficiently account for costs, they are treated as one accounting entity. . . .  Canfor reconciled the reported costs to the only audited financial statements containing Canfor's reported costs on the record, which are the consolidated records of Canfor Corporation.[71]

Not only has Commerce's practice remained consistent, but Commerce also explained its reasoning for this methodology, based on its decision to collapse Canfor Corporation, CWPM, and CFP again in this review.[72]

Second, Canfor accurately reported, and Commerce reasonably used, the G&A expenses reflected in the CFP Legal Roll-Up financial statement.  Commerce collapsed the three entities in this review, as it did in the first review, because they are found at the same location, have overlapping management, and share sales information and production decisions.[73]  The COALITION disagrees with the accounting process by which Canfor arrived at the G&A expense ratio using the CFP Legal Roll-Up statement.[74]  But, as Canfor explained before Commerce, that process starts with the audited financial statement of Canfor Corporation—thus including all affiliated entities and excluding all intra-company transactions—and subtracts the results of Canfor Pulp Products Inc. ("CPPI") (which purchases CFP's pulp byproduct and

---

[71] *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 76,519 (Dep't Commerce Nov. 30, 2020) and accompanying Issues and Decision Memorandum ("AR1 IDM") at 19–20.

[72] *See* I&D Mem. at 60; Prelim. Mem. at 5.

[73] Prelim. Mem. at 5; AR1 IDM at 22.

[74] COALITION Br. at 17–18.

processes it into non-subject merchandise) and internal commission income, resulting in a financial statement that reflects *only* the costs and revenues associated with Canfor's softwood lumber operations.[75]  It makes sense to start with an audited financial statement, even if it is consolidated, because Commerce has expressed a preference for using audited financial statements over unaudited ones.[76]  Moreover, Commerce reviewed Canfor's reported data and agreed that the collapsed entities, including CSP and Canfor Sweden, contribute expenses related to the sale of subject merchandise that should be captured in Canfor's G&A expense ratio, and that CPPI's expenses related to non-subject merchandise should be "removed from the G&A ratio calculation."[77]

The COALITION proposes an alternative calculation based on CFP's tax return, but this alternative is unworkable because it leaves out a significant portion of Canfor's actual G&A expenses.  Specifically, the COALITION points to differences between costs reported in CFP's tax return and costs recognized in the G&A expense ratio calculated by Canfor and accepted by Commerce.[78]  However, as explained above, the CFP Legal Roll-Up statement includes costs associated with production and sale of subject merchandise, *not all of which are borne directly*

---

[75] Canfor Admin. Rebuttal Br. at 7–8.

[76] *See, e.g.*, *Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from the Russian Federation*, 64 Fed. Reg. 38,626, 38,639 (Dep't Commerce July 19, 1999) ("{T}he Department has established a clear preference to use audited financial statements when available."); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Steel Concrete Reinforcing Bars from Turkey*, 62 Fed. Reg. 9,737, 9,740 (Dep't Commerce Mar. 4, 1997) ("{B}ecause the Department prefers to use figures from audited financial statements, we revised the SG&A and financing expense rates for COP and CV using amounts reported in Colakoglu's 1995 audited financial statements."); *see also* AR1 IDM at 20.

[77] I&D Mem. at 60.

[78] COALITION Br. at 18.

*by CFP.*  For instance, the COALITION's proposed alternative for the G&A expense calculation would not include the expenses of CWPM, which Canfor has reported (and Commerce has confirmed) are G&A expenses incurred in the sale of subject merchandise in the United States.[79] Moreover, Canfor reconciled the tax returns of each of the three collapsed entities to the CFP Legal Roll-Up financial statement.[80]  This reconciliation allowed Commerce to tie the individual G&A costs of the selected companies to Canfor's overall G&A expense and ensured that the G&A expense ratio accurately reflects all G&A costs of the collapsed companies.

Finally, the COALITION claims that the G&A expense ratio used by Commerce is flawed because it is based on an inconsistent numerator and denominator, but Commerce properly excluded from the G&A calculation selling expenses related to non-subject merchandise, consistent with agency practice in other cases.  The exclusion of selling expenses related to non-subject merchandise from the numerator is consistent with Commerce's calculation of the G&A expense ratio in other cases.[81]

However, while Canfor isolated and removed selling expenses related to sales in other markets from the numerator, the CFP Legal Roll-Up financial statement appropriately *includes*

---

[79] *See* Canfor's Sec. Suppl. Questionnaire Response (Nov. 17, 2022), Attach. at 7 (C.R. 209, P.R. 364) ("Canfor's Suppl. Questionnaire Response"); *id*., Exh. A-38 (C.R. 213); I&D Mem. at 60.

[80] Canfor's Suppl. Questionnaire Response at 7; *see also id*., Exhs. A-36, A-37, A-38.

[81] *See, e.g.*, *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 9,576 (Dep't Commerce Feb. 22, 2022) and accompanying Issues and Decision Memorandum at 18–19 (excluding research and development ("R&D") expenses related to models produced in a country other than the home market); *Brass Sheet and Strip From Canada; Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 37,520 (Dep't Commerce June 15, 2000) and accompanying Issue and Decision Memorandum at Cmt. 2 (permitting respondent to exclude R&D expenses related to a different product that was not under review).

the cost of goods sold of CSP and Canfor Sweden in the denominator.  Those companies are part of CFP, and thus, of the collapsed Canfor entity under review.[82]  CFP and Canfor Corporation thus both incur G&A expenses on behalf of those entities.  Thus, Canfor's G&A expense ratio is not "unbalanced" as the COALITION presumes.[83]  Rather, the COALITION's claims regarding Canfor's G&A expense ratio merely display a misunderstanding of the financial information on the record.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Canadian Defendant-Intervenors respectfully request that this Court find the COALITION's arguments to be without merit and deny the COALITION's USCIT Rule 56.2 motion for judgment on the agency record.[84]

---

[82] *See* Canfor's Sec. A Initial Questionnaire Response (May 20, 2022), Exh. A-5 (C.R. 27).

[83] *Cf.* COALITION Br. at 20.

[84] ECF Nos. 109, 110.

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and 2(B)(2), the undersigned certifies that this brief complies with the limitation requirement of 7,000 words. The word count for the Canadian Defendant-Intervenors' Response to the Joint Motion and Brief for Judgment on the Agency Record Submitted by the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations and Sierra Pacific Industries as computed by Blank Rome LLP's word processing system (Microsoft Word) and manual count of words contained in images that are not counted by the word processing system, is 4,365 words.

*Eric S. Parnes*
—————————————————
Eric S. Parnes