IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE JENNIFER CHOE-GROVES

GOVERNMENT OF CANADA, et al.,

        Plaintiffs,

   and

CANFOR CORPORATION, et al.,

        Plaintiff-Intervenors,

   v.

UNITED STATES,

        Defendant,

   and

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,

        Defendant-Intervenors.

**NON-CONFIDENTIAL**
Business Proprietary
Information Removed from
Pages 3-8, 10

Consol. Court No. 23-00187

**PLAINTIFF-INTERVENORS' REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

**MORRIS MANNING & MARTIN LLP**
1333 New Hampshire Ave, NW
Suite 800
Washington, D.C. 20036
(202) 216-4819

/s/ R. Will Planert

R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
*Counsel to Canfor Corporation,*
*Canadian Forest Products, Ltd., and*
*Canfor Wood Products Marketing,*
*Ltd.*

Dated: October 10, 2024

*/s/ Henry D. Almond*
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko*
*Marketing & Sales Ltd. and Gilbert*
*Smith Forest Products*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Carrier Forest Products*
*Ltd., Carrier Lumber Ltd., Olympic*
*Industries Inc. and Olympic Industries*
*ULC*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de
l'Industrie forestiere du Quebec and
Ontario Forest Industries Association*

*/s/ Amy J Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW.
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com
*Counsel to the British Columbia
Lumber Trade Council*

## TABLE OF CONTENTS

I.      ARGUMENT ...................................................................................................... 2

    A.      The Record As A Whole Does Not Support Commerce's Conclusion That The Sales Of Wood Chips By Elko And Radium Mills Were Representative Of Market Prices ......................................................................................... 2

    B.      Commerce's Decision To Adjust The Reported Cost Of Electricity At The PG Sawmill Was Not Supported By Substantial Evidence. ...................................... 10

II.     CONCLUSION AND RELIEF REQUESTED ................................................ 16

III.    CERTIFICATE OF COMPLIANCE................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Risen Energy Co., Ltd. v. United States*,
   2024 WL 3842110 (Ct. Int'l Trade Aug. 16, 2024)....................................................8

*Best Mattresses Int'l Co. Ltd. v. United States*
   622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ....................................................8, 9

*PT. Zinus Global Indonesia v. United States*
   628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) ....................................................8, 9

**Statutes**

19 U.S.C. § 1677b(f)(2) ......................................................... *passim*

**Other Authorities**

*Certain Corrosion-Resistant Steel Products From Taiwan: Final Results of the
   Antidumping Duty Administrative Review and Final Determination of No
   Shipments; 2020-2021*, 88 Fed. Reg. 7,408 (Dep't Commerce Feb. 3, 2023)...................13, 14

*Chlorinated Iscoyanurates From Japan: Final Determination of Sales at Less
   Than Fair Value*, 79 Fed. Reg. 56,059 (Dep't Commerce Sept. 18, 2014) ............................11

*Light-Walled Pipe and Tube from Mexico: Final Results of Antidumping Duty
   Administrative Review; 2016-2017*, 84 Fed. Reg. 16,646 (Dep't Commerce
   Apr. 22, 2019) ....................................................................13, 14

*Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of
   Antidumping Duty Administrative Review*, 73 Fed. Reg. 7,710 (Dep't
   Commerce Feb. 11, 2008)........................................................................3

*Ultra-High Molecular Weight Polyethylene From the Republic of Korea: Final
   Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 11,497 (Dep't
   Commerce Feb. 25, 2021)........................................................................4

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| GOVERNMENT OF CANADA, et al.,<br><br>        Plaintiffs,<br><br>  and<br><br>CANFOR CORPORATION, et al.,<br><br>        Plaintiff-Intervenors,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>  and<br><br>COMMITTEE OVERSEEING ACTION<br>FOR LUMBER INTERNATIONAL TRADE<br>INVESTIGATIONS OR NEGOTIATIONS,<br><br>        Defendant-Intervenors. | **NON-CONFIDENTIAL**<br>Business Proprietary<br>Information Removed from<br>Pages 3-8, 10<br><br>Consol. Court No. 23-00187 |

## PLAINTIFF-INTERVENORS' REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

In accordance with Rule 56.2 and the Court's scheduling order,[1] Plaintiff-Intervenors

Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing, Ltd.

(collectively, "Canfor"), and Plaintiff-Intervenors as Tolko Industries, Ltd., Tolko Marketing &

Sales Ltd., Gilbert Smith Forest Products Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd.,

Olympic Industries Inc., Olympic Industries ULC, the Ontario Forest Industries Association, the

Conseil de l'Industrie Forestiere du Quebec, Resolute FP Canada Inc., and the British Columbia

---

[1] Scheduling Order, *Government of Canada v. United States*, Consol. Ct. No. 23-00187 (Jan. 17, 2024), ECF No. 98.

Lumber Trade Council (collectively, "Plaintiff-Intervenors") hereby respond to the United

States' August 22, 2024 Response to Plaintiffs' Motions for Judgment on the Agency Record,

ECF No. 118 ("Def. Resp.") and the September 5, 2024 Joint Response to Canadian Parties'

Rule 56.2 Motions for Judgment on the Agency Record of Plaintiffs Committee Overseeing

Action for Lumber International Trade Investigations and Sierra Pacific Industries, including its

subsidiary Seneca Sawmill Company (collectively, "COALITION"), ECF No. 120

("COALITION Resp.").

## I.    ARGUMENT

### A.    The Record As A Whole Does Not Support Commerce's Conclusion That The Sales Of Wood Chips By Elko And Radium Mills Were Representative Of Market Prices

In the *Final Results*, the U.S. Department of Commerce ("Commerce") adjusted Canfor's

revenue from woodchip sales to affiliates in British Columbia ("BC") to reflect what Commerce

deemed to be "market value" for chips sold in BC between unaffiliated parties.  *See Certain*

*Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative*

*Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce

Aug. 1, 2023) ("*Final Results*") (P.R. 611) and accompanying Issues and Decision Memorandum

("*Final Results IDM*") (P.R. 585) at 55.[2]  Pursuant to 19 U.S.C. § 1677b(f)(2), known as the

"transactions disregarded rule," Commerce may disregard transactions between affiliated persons

if those transactions do not fairly reflect market prices in the market under consideration (*i.e.*, are

not made at arm's length).  "The Department's arm's-length test seeks to find the market value

that best represents the company's own experience in the specific markets in which it operates

---

[2] Citations to the administrative record shall be to the public or confidential record document number ("P.R." or "C.R.").

based on transactions between unaffiliated parties." *Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 7,710 (Dep't Commerce Feb. 11, 2008) and accompanying Issues and Decision Memorandum at Comment 7 (emphasis added).

Commerce included in its comparison of affiliated versus unaffiliated chip prices the sales by Canfor's Elko and Radium sawmills to an unaffiliated party even though those sales were subject to the unusual circumstances of a long-term supply contract. As Canfor demonstrated in its principal brief, the record establishes that the terms of the supply agreement resulted in chip prices that were considerably [        ] the prevailing market price for woodchips in BC and therefore these chip prices do not "fairly reflect the amount usually reflected in sales of chips in the market under consideration." *See* Canfor's Brief in Support of Its Motion for Judgment on the Agency Record, ECF No. 111 ("Canfor Br.") at 12-21. In particular, Canfor demonstrated first, that the terms of the legacy contract governing those sales were entered into long before the period of review and were intentionally set to provide the customer a favorable price without regard to current market conditions, and second, that a comparison of those prices to other contemporaneous market prices between unaffiliated parties confirmed that Radium and Elko sales prices are not reflective of market prices during the POR. Canfor Br. at 17-19 (citing C.R. 185 (P.R. 322) at Exhibits D-14 & D-15).

Defendant disputes Canfor's argument that price adjustments were not permitted under the agreement, by referencing a provision in the contract that permits period price adjustments. The Government ignores, however, that that provision by its express terms does not permit such adjustments until *after* the POR. *See* C.R. 185 (P.R. 322) at Exhibit D-14 p.15 (discussed in greater detail below). Canfor has not argued that long-term contracts are *per se* impermissible in

establishing market prices.  However, as noted in the very case the Government cites, prices in long-term contracts may only be used if those contracts "allow for price fluctuations in line with market conditions," which the supply agreement at issue does not allow.  *Ultra-High Molecular Weight Polyethylene From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 11,497 (Dep't Commerce Feb. 25, 2021) and accompanying Issues and Decision Memorandum at Comment 6.  Here, the agreement restricts Canfor's ability to negotiate market prices for its chips sold from the Elko and Radium mills during the POR, resulting in the reality that prices for chips from these mills are not reflective of the market price for chips, as evidenced by the difference in price for chips from Elko and Radium compared to the prices of chips from other mills in BC.  *See* C.R. 493 at 7 (Canfor's case brief before the agency).

Defendant and the COALITION argue that the contract in question permits periodic adjustments to the chip prices.  Def. Resp. at page 52-53; COALITION Resp. at 13-14. Defendant and the COALITION cite Sections [                              ] of the supply agreement for the proposition that it permitted price modifications to bring chip prices within market rates.  *Id.*  However, the pricing adjustments permitted by these sections do not allow for adjustments to reflect current market conditions during the POR.

Section [      ] states the following:

[

]

In other words, the only adjustments to pricing permitted to be "considered" under section [      ]

are [                                                      ], or where

[                    ] acquires chips [

                                ].[3]  C.R. 185 (P.R. 322) at Exhibit D-14 p.15.

Contrary to Defendant's arguments, neither clause of Section [      ] provides evidence that

prices at which Canfor sold chips from Elko and Radium were in fact subject to adjustment

under the agreement during the POR to reflect current market conditions.

        Regarding subsection (a), whether a party to the supply agreement [

                                                    ] is unrelated to Canfor's

experience in the chip market during the POR.  The "primary consideration" that would result in

price adjustment pursuant to subsection (a) are [

                                ].  C.R. 185 (P.R. 322) at Exhibit D-14 p.15

(emphasis added).  Subsection (a) price adjustments thus are not tied to the market price of chips

during the POR.

        Neither does Subsection (b) evidence that the price at which Canfor sold chips from Elko

and Radium to [                    ] were subject to adjustment to reflect market prices during the

POR.  On the contrary, the clause provides that [

---

[3] [                        ] was assigned [                ] rights pursuant to the supply agreement.

].  C.R. 185 (P.R. 322) at Exhibit D-14 p.15.  Contrary to Defendant's assertion, this "most favored nation" pricing clause does not demonstrate that the prices Elko and Radium sold chips to [        ] are at "market prices."  To the contrary, this clause is further evidence that the contract prices are understood by the parties to be [        ] the prevailing market price.  It permits adjustment to the contract prices only if [            ] actually acquires chips from another supplier at a [        ] price than the contract price with Canfor.  In other words, as long as [            ] continues to purchase chips exclusively from Canfor, it can continue to enjoy the favorable legacy prices in the contract regardless of current market prices for woodchips in British Columbia.  There is no evidence that [            ] acquired chips from any party other than Canfor during the POR.  As explained in Canfor's opening brief, the average price of chips sold from Elko during the POR was [        ] and [        ] from Radium, virtually unchanged from the [                ].  C.R. 185 (P.R. 322) at Exhibit D-15.  The record thus demonstrates that the prices were not adjusted due to any purchases by [            ] from third parties during the POR.

Defendant also claims that sections [            ] of the supply agreement provide a reasonable basis for Commerce to conclude that the contract allows for period price adjustments in response to market conditions.  Def. Br. at 53.  Section [      ] provides that [

].  C.R. 185 (P.R. 322) at Exhibit D-14 p. 14 (emphasis added).

Section [      ] describes the [

], and Section [

].  C.R. 185 (P.R. 322) at Exhibit D-14 p. 1, 4, and 14.  Pursuant to Section [     ] the prices that are negotiated are the prices for [

].  C.R. 185 (P.R. 322) at Exhibit D-14 p. 14.  Thus, sections [          ] do not by their terms provide for price adjustments to the price of chips during the 2021 POR because any negotiations to consider price adjustments may not occur until the end of the [                                ], and can only affect the prices for [                           ].

Section [     ] states that [

].  C.R. 185 (P.R. 322) at Exhibit D-14 p. 10 (emphasis added).  The supply agreement does not permit Canfor to pursue [

] in setting the sales prices for chips.  Rather, during the POR, Canfor was obligated to [          ] the cost of chips delivered to [

], as Canfor explained in its opening brief.  C.R. 185 (P.R. 322) at Exhibit D-14 at p.1; Canfor Br. at 12-14.

The COALITION also cites section [          ] of the agreement for the definition of [                    ] which notes that the prices provided for in [          ] of the agreement [                              ] but the COALITION omits the crucial remainder of that clause: [                         ].  *Id.* (emphasis added).  As explained, the periodic price adjustments contemplated by the supply agreement are to be [                                 ], and could

not affect prices during the 2021 POR. C.R. 185 (P.R. 322) at Exhibit D-14 p. 4, 14.  The "price adjustments" alleged by Defendant and the COALITION do not evidence that the supply agreement permits price changes that render the chips sold pursuant to the supply agreement reflective of the market price for chips during the POR.

Defendant and the COALITION compound their misunderstanding of the supply agreement by omitting any discussion of the *actual prices* that Commerce considered.  As Canfor explained in its initial brief, the average per-unit price for chips in unaffiliated party transactions in British Columbia ("BC") is [                    ] the prices at which Elko and Radium sold chips pursuant to the legacy supply agreement.  *See* Canfor Br. at 18-19.  If the prices for chips from Elko and Radium truly were market prices, then they should have been closer to the prices for chips from other sellers in BC.  Commerce never addressed this large discrepancy in chip prices and the COALITION has failed to explain it away.  Commerce's failure to "grapple with all evidence on the record" requires reversal and remand to the agency. *Cf. Risen Energy Co., Ltd. v. United States*, 2024 WL 3842110 at *6 (Ct. Int'l Trade Aug. 16, 2024).

Finally, the COALITION argues that *PT. Zinus Global Indonesia* and *Best Mattresses International Co.* are not relevant to whether substantial evidence supports Commerce's calculation of a market price for woodchips in BC, and attempts to distinguish both cases because each dealt with surrogate values.  COALITION Resp. at 14.  But both cases address whether Commerce's interpretation of the transactions disregarded rule was in accordance with law and supported by substantial evidence where Commerce determined that the statutory term, "market under consideration," from 19 U.S.C. § 1677b(f)(2) referred only to the country under investigation or review.  *Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d, 1347,

1385 (Ct. Int'l Trade 2023); *PT. Zinus Global Indonesia v. United States*, 628 F. Supp. 3d, 1252, 1285 (Ct. Int'l Trade 2023). The court concluded that Commerce's interpretation that limited the term "market under consideration" to only the country under investigation or review was unreasonably narrow. *Id.* The court remanded the cases for Commerce to explain how the prices that it used for purposes of the transactions disregarded rule analysis "constituted a reasonable method to confirm that the affiliated prices reflect arm's length transactions under 19 U.S.C. § 1677b(f)(2)." *PT. Zinus*, 628 F. Supp. 3d at 1285. As explained in *Best Mattresses*, "where Commerce erred is that it hinged its reasoning on a faulty reading of the statute that presumed that 'market under consideration' referred to the country subject to investigation,… when it should have explained why the selection of Cambodia *constituted a '"reasonable method" to confirm that the affiliated prices reflect arm's length transactions" between respondent and {its} suppliers*." *Best Mattresses*, 622 F. Supp. 3d at 1384 (emphasis added). Thus, pursuant to *PT. Zinus* and *Best Mattresses*, Commerce's analysis of Canfor's affiliated chip prices must provide a reasonable means to confirm whether Canfor's chip sales to affiliated parties reflect arm's length transactions, which the *Final Results* fail to do. Sales of chips pursuant to the long-term supply agreement from 2012 do not reasonably reflect the price at which chips are sold between unaffiliated parties during the 2021 POR, just as it was unreasonable for Commerce to conclude in *PT. Zinus* and *Best Mattresses* that the only transactions relevant for the transactions disregarded rule analysis were those in the country under investigation or review.

Lastly, Commerce falls back on the argument that it need not "explicitly discuss this specific argument" to show that it considered Canfor's argument that Commerce failed to address the price differential between the Elko and Radium chip prices compared to other unaffiliated chip prices during the POR. Def. Resp. at 53-54. However, Commerce has not

explained *how* the chips sold by the Elko and Radium can plausibly be considered to reasonably reflect market prices in the face of evidence that POR sales prices for chips in BC between other unaffiliated parties are [                              ] the prices at which Elko and Radium sold chips pursuant to the legacy supply agreement.  The failure to meaningfully address record evidence that is directly contrary to Commerce's conclusion renders Commerce's determination unsupported by substantial evidence.

For the foregoing reasons, the price of chips sold pursuant to the supply agreement did not "fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration" in accordance with the statute.  19 U.S.C. § 1677b(f)(2).  Therefore, Commerce should not have included these sale prices in its comparison for purposes of applying the transactions disregarded rule to determine whether Canfor's affiliated chip sales are at arm's length.

**B.  <u>Commerce's Decision To Adjust The Reported Cost Of Electricity At The PG Sawmill Was Not Supported By Substantial Evidence.</u>**

In the *Final Results*, Commerce adjusted Canfor's cost of manufacturing to account for what it deemed were "transactions" for electricity between Canfor's affiliate Canfor Pulp Products Inc. ("CPPI") and Canfor's PG Sawmill.  *See* P.R. 585 at 57.  As explained in Canfor's principal brief, because a single electricity line serves four Canfor entities on adjacent land in the Northwood area, including CPPI and the PG Sawmill, CPPI serves as the conduit for paying the collective electric bill owed to the utility company, BC Hydro.  The PG Sawmill pays its share of the collective bill to CPPI, who then pays the collective bill to BC Hydro.  Commerce has declined to apply the transactions disregard rule in similar circumstances, such as when the record shows that the affiliate acts only as a *purchase agent* and is *not the supplier* of the input. *See Chlorinated Iscoyanurates From Japan: Final Determination of Sales at Less Than Fair*

*Value*, 79 Fed. Reg. 56,059 (Dep't Commerce Sept. 18, 2014) and accompanying Issues and

Decision Memorandum at Comment 4.  However, in the *Final Results* Commerce treated CPPI

as a reseller of electricity to the PG Sawmill and added an amount for CPPI's selling, general and

administrative ("SG&A") expenses to the price the PG Sawmill paid for electricity.  *See* C.R.

511 (P.R. 587) at 1.

       The Government argues that, as a "document handler" for the facilities in the Northwood

area, "CPPI acted as an affiliated reseller of electricity from an unaffiliated supplier to the PG

sawmill."  Government Resp. at 54.  Similarly, the COALITION argues that Commerce properly

treated CPPI as a reseller of electricity to the PG Sawmill for purposes of applying the

transactions disregarded rule because CPPI invoices Canfor for its portion of the electricity bill.

COALITION Resp. at 15-16.  Defendant also claims that *Chlorinated Iscoyanurates From Japan*

is distinguishable because here, "Commerce determined that a transaction took place between the

Prince George sawmill and CPPI, such that CPPI acts as an affiliated reseller," and in

*Chlorinated Iscoyanurates From Japan*, "the respondent, rather than the affiliate, controlled all

aspects of the input purchases" and the supplier "invoiced the respondent directly for the input."

Def. Resp. at 56.

       Both Defendant's and the COALITION's arguments ignore the fact that there is one

transmission line by which the utility company BC Hydro, *not CPPI*, transmits electricity to the

Northwood area in which there are four Canfor entities on adjacent properties.  *See* C.R. 493

(P.R. 547) (Canfor's case brief before the agency) at 9.  CPPI is not capable of providing

electricity to the PG mill because *BC Hydro provides the electricity* via a single transmission line

that serves the four Canfor entities in the Northwood area.  In other words, there is no *quid pro

quo* that renders CPPI a reseller.  BC Hydro, not CPPI, is the supplier of the electricity to the PG

Sawmill. As Commerce previously verified, the volume of the electricity used by the PG Sawmill (which is tracked in the normal course of business by internal meters) is the volume of electricity for which BC Hydro charged, and matches the amount that the PG Sawmill paid to CPPI to cover its share of the bill from BC Hydro. *See* Canfor Br. at 24 (citing C.R. 186 (P.R. 322) at Exhibit D-34 p.19). Commerce's conclusion that CPPI is an "affiliated reseller" of electricity because it provides alleged "document handling" or "payment intermediary" services to Canfor is unsupported by the record and contrary to 19 U.S.C. § 1677b(f)(2). *See* P.R. 585 at 58. Nor can it be said that CPPI is providing a "service" to Canfor. If anything, Canfor is providing a service to CPPI by paying its portion of the electricity bill rather than leaving CPPI to shoulder the entire bill.

Neither Defendant's nor the COALITION's arguments establish that the price that the PG sawmill paid for electricity "does not fairly reflect" the amount usually reflected in sales of electricity in the market under consideration, or that the price that the PG sawmill actually paid for electricity is not "what the amount would have been if the transaction had occurred between persons who are not affiliated" pursuant to 19 U.S.C. § 1677b(f)(2). The transactions disregarded rule provides that:

> A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2). The arguments by Defendant and the COALITION fail to establish that the electricity prices paid by the PG sawmill during the POR "do not fairly reflect" the price of

electricity or would be different had the transaction occurred between persons who are not affiliated.

The COALITION cites *Light-Walled Pipe and Tube from Mexico* and *CORE from Taiwan* to argue that Commerce reasonably adjusted Canfor's electricity purchases by CPPI's SG&A expenses. COALITION Resp. at 16-17. But the cases that the COALITION cites actually support Canfor's position, not the COALITION's. When it comes to Commerce's calculation of market price for the purpose of applying the transactions disregarded rule, Commerce noted in *Light-Walled Pipe and Tube from Mexico* that "available market prices" include "a respondent's purchases of the same input directly from unaffiliated suppliers." *Light-Walled Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16,646 (Dep't Commerce Apr. 22, 2019) and accompanying Issues and Decision Memorandum at 14. That is precisely what is occurring here: Canfor's PG Sawmill is buying electricity from an unaffiliated supplier, BC Hydro, and splitting the bill with CPPI. In this case, Commerce inexplicably ignored what it had considered a reasonable market price for electricity in *Light-Walled Pipe and Tube from Mexico* — the cost of electricity charged to the PG mill by the unaffiliated provider, BC Hydro.

*CORE from Taiwan* is also distinguishable from the instant case because, there, Commerce found that the affiliated supplier was an actual reseller of the input at issue in that case, hot-rolled coil, unlike CPPI. *See Certain Corrosion-Resistant Steel Products From Taiwan: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 Fed. Reg. 7,408 (Dep't Commerce Feb. 3, 2023) and accompanying Issues and Decision Memorandum at 6-7. As discussed above and in Canfor's initial brief, CPPI is not a reseller of electricity. BC Hydro transmits the electricity *directly* to

13

the PG Sawmill via a single transmission line.  The PG Sawmill pays CPPI merely to cover its share of the single electric bill that BC Hydro sends to Canfor to cover *all* electricity charges on the common transmission line to the Northwood area.  Neither *Light-Walled Pipe and Tube from Mexico* nor *CORE from Taiwan* provide justification to sustain the *Final Results* in this case.

Defendant argues that Canfor failed to exhaust its argument because Canfor allegedly failed to argue in its administrative case brief that the affiliated arm's-length prices charged by BC Hydro to CPPI should be used instead of the price charged by BC Hydro to the PG sawmill. *See* Government Response Br. at 56.  Defendant's argument hinges on the phrasing that Canfor used in its opening brief where it stated that the "unaffiliated, arm's length market prices charged by BC Hydro *to CPPI* for electricity are on the record and demonstrate what the amount would have been if the transactions for electricity had occurred between unaffiliated persons."  Canfor's R. 56.2 Br. at 25 (emphasis added).  Defendant's argument must be rejected because it misrepresents the record and Canfor's arguments before the agency.

First, the prices charged by BC Hydro to Canfor and to CPPI *are the same*: the companies are splitting the single bill.  Of course Canfor argued that Commerce should use the prices paid by the PG sawmill.  Canfor's position is that there is no transaction between the PG sawmill and CPPI to disregard pursuant to the transactions disregarded rule.

Second, Canfor exhausted its argument that the unaffiliated prices charged by BC Hydro should be used without any adjustment to include CPPI's G&A expenses.  Canfor argued before the agency that Commerce should not adjust the prices for electricity charged *by BC Hydro* because the BC Hydro prices are arm's-length market values that reflect "what the amount would have been if the transaction had occurred between persons who are not affiliated."  For example, in its case brief, Canfor argued the following:

14

> *The purpose of the statutory transactions disregarded rule is to ensure that actual costs are not understated by less than arm's-length dealing among affiliated parties.* Here, the Department has seized on a bookkeeping convenience to distort the true nature of the transactions being examined. BC Hydro, and not CPPI, is the supplier of the electric power to the PG Sawmill, and *the price the PG Sawmill paid is the market price set by BC Hydro.* The fact that CPPI facilitates payment of the bill does not convert CPPI into the supplier of electricity to the PG Sawmill. *There is no possibility of the PG Sawmill's cost of electric power being understated* by this arrangement because the record establishes that (1) the supplier of the electricity is BC Hydro, the electric power company in BC; (2) Canfor is not affiliated with BC Hydro; (3) *BC Hydro – not CPPI – sets the price for the electricity consumed by the PG Sawmill*; and (4) the PG Sawmill actually paid the exact price for the electricity that was set by BC Hydro. *There is thus no basis for the Department to adjust these actual electricity costs paid to an unaffiliated supplier.* If BC Hydro had elected to send the entire electricity bill to the PG Sawmill instead of the Northwood Pulp Mill, then there would be no adjustment made to the PG Sawmill's actual electricity costs even though the substance of the transaction would be exactly the same. The Department's treatment therefore elevates form over substance and amounts to an arbitrary and unjustified increase in the cost of manufacturing of the PG Sawmill over and *above its actual cost of acquiring electricity from the unaffiliated supplier.*

C.R. 493 (P.R. 547) at 10-11. Additionally, Canfor argued that "the PG sawmill's cost of manufacturing includes the actual cost of the electricity supplied by BC Hydro, which is not affiliated with Canfor." *Id.* at 12. The court should reject Defendant's exhaustion argument.

Accordingly, Commerce's *Final Results* are unsupported by substantial evidence and not in accordance with law. The court should remand them to the agency for it to reconsider its calculation of Canfor's cost of manufacturing.

15

## II.    CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Canfor respectfully requests that this court find the arguments raised by Defendant and the COALITION are without merit and grant Canfor's motion for judgment on the agency record.

Respectfully submitted,

MORRIS MANNING & MARTIN LLP
1333 New Hampshire Ave, NW
Suite 800
Washington, D.C. 20036
(202) 216-4819

/s/ R. Will Planert

R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

Dated: October 10, 2024

*Counsel to Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing, Ltd.*

*/s/ Henry D. Almond*
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW.
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko Marketing & Sales Ltd. and Gilbert Smith Forest Products*

16

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc. and Olympic Industries ULC*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de l'Industrie forestiere du Quebec and Ontario Forest Industries Association*

*/s/ Amy J Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW.
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com
*Counsel to the British Columbia Lumber Trade Council*

17

III.     **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 4,799 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ R. Will Planert
R. Will Planert

Dated:  October 10, 2024

18