## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| The Government of Canada, *et al.*,<br><br>*Plaintiffs*,<br><br>Canfor Corporation, *et al.*,<br><br>and<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations,<br><br>*Consolidated Plaintiffs*,<br><br>Canfor Corporation, *et al.*,<br><br>*Plaintiff-Intervenors*,<br><br>v.<br><br>The United States,<br><br>*Defendant*,<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, *et al.*,<br><br>*Defendant-Intervenors*. | Consol. Court No.<br>**1:23-cv-00187-JCG**<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information deleted on page 16** |

**THE CANADIAN PARTIES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE AGENCY RECORD REGARDING APPLICATION OF DIFFERENTIAL PRICING ANALYSIS**

October 10, 2024

*/s/ Eric S. Parnes*
Eric S. Parnes
Joanne E. Osendarp
Lynn Kamarck
Alan Kashdan
Tyler Kimberly
**Blank Rome LLP**
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-5479
Email: eric.parnes@blankrome.com
*Counsel to the Government of Canada*

*/s/ Lynn Fischer Fox*
Lynn Fischer Fox
Gina M. Colarusso
Archana Rao P. Vasa
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel: (202) 942-5601
Email: lynn.fischerfox@arnoldporter.com
*Counsel to the Government of Alberta*

*/s/ H. Deen Kaplan*
H. Deen Kaplan
Jonathan T. Stoel
**Hogan Lovells US LLP**
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5799
Email: deen.kaplan@hoganlovells.com
*Counsel to the Government of Ontario*

*/s/ Nancy Noonan*
Nancy Noonan
**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6479
Email: nancy.noonan@afslaw.com
*Counsel to the Government of Québec*

*/s/ Amy J. Lentz*
Amy J. Lentz
Stephanie Wang
**Steptoe LLP**
1330 Connecticut Avenue, NW
Suite 578
Washington, DC 20036
Tel: (202) 429-1320
Email: alentz@steptoe.com
*Counsel to the British Columbia Lumber Trade Council*

PUBLIC VERSION

**/s/ Mark B. Lehnardt**
Mark B. Lehnardt
**Law Offices of David L. Simon, PLLC**
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
Tel: (202) 642-4850
Email: MarkLehnardt@DLSimon.com
*Counsel to Fontaine Inc.*

**/s/ Diana Dimitriu-Quaia**
Matthew Nolan
Diana Dimitriu Quaia
Mario Torrico
**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6291
Email: diana.dimitriu-quaia@afslaw.com
*Counsel to Interfor Corporation, Interfor Sales and Marketing Ltd., Chaleur Forest Products, Inc. and Chaleur Forest Products, L.P.*

**/s/ Henry D. Almond**
Henry D. Almond
Kang Woo Lee
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel: (202) 942-5698
Email: henry.almond@apks.com
*Counsel to Tolko Industries Ltd., Tolko Marketing & Sales Ltd., and Gilbert Smith Forest Products*

**/s/ R. Will Planert**
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed
**Morris, Manning & Martin, LLP**
1333 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036
Tel.: (202) 216-4819
Email: wplanert@mmmlaw.com
*Counsel to Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing Ltd.*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
Michael S. Snarr
Ronald John Baumgarten, Jr.
Tung A. Nguyen
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036-5304
Tel: (202) 861-1679
Email: efeldman@bakerlaw.com
*Resolute FP Canada Inc., Conseil de
l'Industrie forestiere du Québec and Ontario
Forest Industries Association*

*/s/ Donald Harrison*
Donald Harrison
**Gibson, Dunn & Crutcher, LLP**
1050 Connecticut Avenue, NW
Suite 900
Washington, DC 20036-5306
Tel: (202) 955-8560
Email: dharrison@gibsondunn.com
*Counsel to West Fraser Mills Ltd*

*/s/ Jeffrey S. Grimson*
Jeffrey S. Grimson
Kristin H. Mowry
Yixin (Cleo) Li
**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
Tel:202-688-3610
Email: trade@mowrygrimson.com
*Counsel to Carrier Forest Products Ltd. and
Carrier Lumber Ltd., Olympic Industries, Inc.
and Olympic Industries ULC*

*/s/ Jay Charles Campbell*
Jay Charles Campbell
Allison Kepkay
Walter Spak
**White & Case, LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807
Tel: (202) 626-3632
Email: jcampbell@whitecase.com
*Counsel to J.D. Irving, Limited*
.
*/s/ Rajib Pal*
Rajib Pal
**Sidley Austin LLP**
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8329
Email: rpal@sidley.com
*Counsel to Delco Forest Products Ltd.,
Devon Lumber Co. Ltd., H.J. Crabbe & Sons
Ltd., Langevin Forest Products Inc.,
Marwood Ltd., North American Forest
Products Ltd., and Twin Rivers Paper Co.
Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... iii

I.      SUMMARY OF ARGUMENT ................................................................. 2

II.     ARGUMENT ........................................................................................... 4

        A.      The Standard of Review........................................................... 4

                1.      The Court's Review of the *Final Results* under *Loper Bright* .................... 4

                2.      The Standard of Review Requires the Court to Consider Whether Commerce Accurately Interprets the Statistics Literature on Which it Purports to Rely ......................................................................... 5

                3.      Commerce's Interpretations of Statistics Literature and Evaluation of the Hedges Report Are Not Entitled to Deference ........................................... 7

        B.      Commerce's Application of Cohen's *d* Cannot Be Sustained ............................... 9

                1.      The Government and the Domestic Industry Fail to Demonstrate that Cohen's *d* Provides a Meaningful Coefficient When Applied Without Regard to Cohen's Underlying Assumptions ............................................... 9

                2.      The *U* Measures of Nonoverlap and the Assumptions Are Essential to a Correct Interpretation of the Cohen's *d* Coefficient ................................. 10

                3.      Commerce Failed to Address Evidence of False Positives....................... 14

                4.      Commerce's Use of Simple Averaging in the Denominator Produces a *d* Coefficient That Cannot Be Interpreted to Identify Significant Differences ............................................................. 18

                5.      Commerce Did Not Adequately Address the Hedges Report.................. 19

                6.      Commerce's Cohen's *d* Test Conflicts With the Best Interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i)..................................... 24

        C.      Commerce's Application of its Meaningful-Difference Test to the Facts of this Review Cannot Be Sustained ......................................................... 26

D.    The Government Failed to Defend Commerce's Dismissal of the Evidence
      that Pricing Fluctuations Were the Result of Market Conditions ......................... 28

E.    Commerce's DPM Violates the Statute By Failing to Make
      Fair Comparisons ................................................................................................... 29

F.    Commerce's Ratio Test Cannot Correct for Flaws in Other Elements
      of the DPM ............................................................................................................. 31

G.    Commerce Must Recalculate the Rate Assigned to Non-Selected Companies .... 33

CONCLUSION AND PRAYER FOR RELIEF ......................................................................... 33

# TABLE OF AUTHORITIES

**Authority**                                                                                          **Page(s)**

## Cases

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017) .................................................. 17

*Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007) .................................. 30

*Algoma Steel Corp. v. United States*, 865 F.2d 240 (Fed. Cir. 1989) .......................................... 21

*Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339 (Fed. Cir. 2004) ............................... 30

*Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1929 v. Fed. Lab. Rels. Auth.*, 961 F.3d 452 (D.C. Cir. 2020) ............................................................................................................................... 13

*Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022) .................................................................. 17

*Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981) ............................................ 13, 14

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) .............. 27, 28

*Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983) ... 7

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iro Pip Co.*, 5 F.4th 1367 (Fed. Cir. 2021) ................................................................................................................................... 7

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...................................... 13, 14

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).................................... 4

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197 (1938) .................................................................. 6

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) .............................. 7, 23

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020)............................... 32, 33

*Garg Tube Exp. LLP v. United States,* 698 F. Supp. 3d 1230 (Ct. Int'l Trade 2024)............. 29, 30

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ................................................................................. 7, 8

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ........................................... passim

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) .......... 6, 18, 21

*Mid Continent Steel & Wire, Inc. v. United States*, 628 F. Supp. 3d 1316 (Ct. Int'l Trade 2023)...
.............................................................................................................................................. 6

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019) .................. 6, 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)6, 7

*Murphy v. Astrue*, 496 F.3d 630 (7th Cir. 2007)................................................................... 7, 8, 23

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804) ............................................................. 30

*Nat'l Fed'n of Fed. Emps. V. FLRA*, 369 F.3d 548 (D.C. Cir. 2004)......................................... 13

*NEXTEEL Co. v. United States*, 569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022)............................ 23

*NEXTEEL Co. v. United States*, 676 F. Supp. 3d 1345 (Ct. Int'l Trade 2023)............................. 5

*NEXTELL Co. v. United States*, 633 F. Supp. 3d 1190 (Ct. Int'l Trade 2023) ............................ 22

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ................................ 6, 14, 29

*NLRB v. CNN Am., Inc*., 865 F.3d 740 (D.C. Cir. 2017) ................................................ 13

*Ramaprakash v. F.A.A.*, 346 F.3d 1121 (D.C. Cir. 2003) ............................................... 13

*Resolute FP Canada Inc. v. United States*, No. 23-00095, 2024 WL 3859816 (Ct. Int'l Trade
    Aug. 19, 2024). ......................................................................... 19, 20, 21

*Samsung Int'l v. United States*, 887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012) ....................... 20, 24

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006) ........................... 10

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) ................................... passim

*Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ............................. 15

*The Timken Co. v. United States*, 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ......................... 29

*United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320 (Fed. Cir. 2013) ................... 10

*United States v. Trucker Tuck Lines, Inc.*, 344 U.S. 33 (1952) .................................... 29

**Statutes and Legislation**

19 U.S.C. § 1677f-1(d) ............................................................................ 2

19 U.S.C. § 1677f-1(d)(1)(B) ............................................................... passim

19 U.S.C. § 1677f-1(d)(2) ................................................................... 26, 28

28 U.S.C. § 2637(d) .............................................................................. 29

Statement of Administative Action accompanying the Uruguay Rounds Agreement Act, H.R.
    Doc. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040 ......................................... 30, 31, 32

**Administrative Determinations**

*Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset
    Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023)
    ................................................................................................. 20

**Regulations and Rules**

19 C.F.R. § 351.414(d) .......................................................................... 26

**Scholarly Literature**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .... 17

Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2ed 1988) ............... passim

Larry V. Hedges, *Interpretation of the Standardized Mean Difference Effect Size When
    Distributions Are Not Normal or Homoscedastic*, Educational and Psychological Measurement
    (published online Oct. 6, 2024) ............................................................. 11, 12, 24

Myles Hollander, Douglas A. Wolfe, Eric Chicken, *Nonparametric Statistical Methods* (3rd ed.
    2014) ......................................................................................... 10

Paul D. Ellis, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* (2010) ............................................................................... 22

Robert Coe, *It's the Effect Size, Stupid: What effect size is and why it is important*, presented at the Annual Conference of the British Educational Research Association (Sept. 2002) ........... 22

Robert J. Grissom, John J. Kim, *Effect Sizes for Research, Univariate and Multivariate Applications* (2ed 2012) ....................................................................................................... 22

**Other Authorities**

Cambridge Dictionary Online ..................................................................................................... 25

Concise Oxford English Dictionary of Current English (9th ed. 1995) ...................................... 32

Mem. of Points and Authorities in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Resolute (Nov. 6, 2023), ECF No. 28-1, *Resolute FP Canada Inc. v. United States, et al.*, Ct. No. 1:23-cv-00095-JAR ....................................................................................................... 20

Merriam-Webster Online Dictionary ............................................................................... 25, 28, 32

**International Materials**

Antidumping Agreement, Apr. 15, 1994, Annex 1A to the Marrakesh Agreement (Agreement on the Implementation of Article VI of GATT 1994), 1868 U.N.T.S. 201 .................................... 30

**THE CANADIAN PARTIES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR
JUDGMENT ON THE AGENCY RECORD REGARDING APPLICATION OF
DIFFERENTIAL PRICING ANALYSIS**

The Government of Canada; the Governments of Alberta, Ontario, and Québec; the

British Columbia Lumber Trade Council, the Conseil de l'Industrie Forestière du Québec, and

the Ontario Forest Industries Association; as well as Canfor Corporation, Canadian Forest

Products, Ltd., Canfor Wood Products Marketing Ltd., Carrier Forest Products Ltd., Carrier

Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, Fontaine, Inc., Interfor

Corporation, Interfor Sales & Marketing Ltd., Resolute FP Canada Inc., Tolko Industries Ltd.,

Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., West Fraser Mills Ltd.,

Chaleur Forest Products, Inc., Chaleur Forest Products, L.P., J.D. Irving, Limited, Delco Forest

Products, Ltd., Devon Lumber Co., Ltd., H.J. Crabbe & Sons, Ltd., Langevin Forest Products,

Inc., Marwood, Ltd., North American Forest Products, Ltd., and Twin Rivers Paper Co.

(collectively, the "Canadian Parties") submit this reply brief in support of their Motion for

Judgment on the Agency Record.[1]  This brief addresses the Court's review of the differential

pricing methodology ("DPM") as applied by the U.S. Department of Commerce ("Commerce")

in the challenged final results,[2] and replies to the response briefs filed by Defendant the United

---

[1] Canadian Parties' Motion for Judgment on the Agency Record Regarding Application of
Differential Pricing Analysis and Accompanying Memorandum of Law and Points of Authorities
(Apr. 5, 2024), ECF Nos. 113 & 114 (the "Canadian Parties' Brief").

[2] *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty
Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106
(Dep't Commerce Aug. 1, 2023) (P.R. 611) ("*Final Results*"), and accompanying Issues and
Decision Memorandum (P.R. 585) ("I&D Mem."), as amended by *Certain Softwood Lumber
Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in
Part; 2021*, 88 Fed Reg. 61,511 (Dep't Commerce Sept. 7, 2023) (P.R. 597) ("*Amended Final
Results*").

States (the "Government")[3] and Defendant-Intervenors the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations and Sierra Pacific Industries (collectively, the "Domestic Industry").[4]

## I.   <u>SUMMARY OF ARGUMENT</u>

The Canadian Parties have challenged Commerce's application of the elements of the DPM in this review as inconsistent with the statute and so unhinged from their foundational principles as to be not just unreasonable, but also arbitrary and capricious.  In response, the Government evades the substance of these challenges by invoking principles of deference that do not apply, repeating Commerce's fundamental misunderstandings of statistics in the face of overwhelming contrary authority, offering impermissible *post-hoc* rationalizations for Commerce's decisions, and setting up strawman versions of arguments to which the Government cannot otherwise respond.

The Government begins by attempting to cabin the Court's review within a deferential framework that no longer applies, if it ever did.  After the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*,[5] the Court may not defer to Commerce's interpretations of the key statutory terms purportedly implemented through the DPM.  Commerce's interpretations of the terms of 19 U.S.C. § 1677f-1(d) as given effect by application of the DPM failed even to satisfy a "reasonableness" standard.  They cannot survive the more exacting review mandated by *Loper Bright*.  Nor is the Government correct that the Court may defer to Commerce's positions

---

[3] Defendant's Response to Plaintiffs' Motions for Judgement on the Agency Record (Aug. 22, 2024), ECF No. 118 ("Gov't Resp. Brief").

[4] Domestic Industry Joint Response to Canadian Parties' Rule 56.2 Motions for Judgement on the Agency Record (Sept. 5, 2024), ECF Nos. 119 & 120 ("Domestic Industry's Resp. Brief").

[5] 144 S. Ct. 2244 (2024).

regarding statistical science and its readings of statistics literature. Commerce has no expertise in the field of statistics—as its positions have proven time and again—to which the Court could possibly defer.

The Government devotes the bulk of its response to defending Commerce's application of the statistical measure Cohen's *d* in this review. Commerce does not understand Cohen's *d*, and the Government cannot defend the agency's erroneous characterizations of the statistical literature or its intransigent commitment to a statistical measure that simply does not fit Commerce's intended use. In other cases, Commerce has resisted reckoning with statistics literature and offered shifting justifications for its reliance on Cohen's *d* for a purpose and under conditions never contemplated by Professor Cohen or other scholars in the field of statistics. This case presents a challenge that Commerce can no longer evade through selective, misleading reliance on cherrypicked statistics literature. Before Commerce and this Court is not only extensive statistics literature, but also detailed analysis of that literature and Commerce's positions by the preeminent scholar in the field of effect size measurement.[6] The Court should give the literature and the Hedges Report the careful attention that Commerce and the Government avoid. Those sources establish, beyond any reasonable dispute, that Commerce fails to identify "significant differences" in prices when it applies its Cohen's *d* test to the data in this review.

The Government also argues that other elements of the DPM serve their intended functions to implement the requirements of the statute and even operate to correct for

---

[6] *See generally* Government of Canada's Submission of New Factual Information (Dec. 27, 2022) ("Canada's NFI Submission"), Exh. 1 (C.R. 435, P.R. 501) (Review and Analysis of the Cohen's *d* Test as Used in the U.S. Department of Commerce's Differential Pricing Methodology, Prof. Larry V. Hedges) ("Hedges Report").

problematic application of the Cohen's *d* "significant difference" test. However, with respect to the meaningful-difference test, the Government misapprehends the Canadian Parties' position. Application of the meaningful-difference test under the circumstances of this review simply cannot be reconciled with the language of the statute. Likewise, the best reading of the statute defeats the Government's arguments that the ratio test and meaningful-difference test ensure that the requirements of the statute are met notwithstanding failures in identification of significant difference.

## II.    ARGUMENT

### A.    The Standard of Review

#### 1.    The Court's Review of the *Final Results* under *Loper Bright*

Since the parties submitted their opening briefs, the Supreme Court of the United States issued *Loper Bright*, overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*[7] Commerce's application of the DPM in the *Final Results* could not be sustained as even a "reasonable" interpretation of the statute under *Chevron*. After *Loper Bright*, however, the prognosis is far worse for Commerce's strained interpretations of the statute as manifested in the challenged aspects of the DPM. This Court no longer owes deference to Commerce's statutory interpretations, but instead has an independent obligation to discern the statute's best possible reading.[8] Courts—not administrative agencies—have sole responsibility and authority for "interpretation of the laws."[9]

---

[7] 467 U.S. 837 (1984).

[8] *Loper Bright*, 144 S. Ct. at 2273.

[9] *Id.* at 2257 (citation omitted).

This important shift in the framework for reviewing Commerce's interpretations of statutory terms has implications for the Court's review in this case.[10]  As discussed in detail below, each of the tests (as well as their embedded assumptions and choices) in Commerce's DPM purports to give effect to Commerce's interpretation of specific language in the statute.  It is up to this Court, therefore, to evaluate whether each of the challenged aspects of Commerce's DPM is consistent with the Court's (not Commerce's) best reading of the statute.

2.      **The Standard of Review Requires the Court to Consider Whether Commerce Accurately Interprets the Statistics Literature on Which it Purports to Rely**

The Government argues that the Canadian Parties "wrongly invite {the Court} to 'interpret the meaning of the academic literature,' rather than 'determine whether Commerce's methodology is reasonable.'"[11]  Because the Government believes that "Commerce weighed all of the record evidence to conclude that its application of the Cohen's *d* test is consistent with the academic literature," it insists that the Court has no business inquiring into the objective accuracy of Commerce's conclusions.[12]  According to the Government, for this Court to review the literature to determine whether it indeed supports Commerce's positions or for it to even ask whether Commerce's conclusions have any basis beyond *ipse dixit* would be to impermissibly "reweigh the evidence."[13]  The Government could not be more wrong about this Court's role in reviewing Commerce's determinations.

---

[10] *Contra* Gov't Resp. Brief at 14–15 (contending that *Loper Bright* does not impact the deference due to Commerce's interpretations of the statute in antidumping duty proceedings).

[11] *Id.* at 20–21 (quoting *NEXTEEL Co. v. United States*, 676 F. Supp. 3d 1345, 1354 (Ct. Int'l Trade 2023)); *see also* Domestic Industry's Resp. Brief at 7.

[12] Gov't Resp. Brief at 20–21.

[13] *Id.* at 20.

The Supreme Court and the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") have unequivocally established that this Court has an independent obligation to conduct its own review to determine whether Commerce has adequately supported its findings and conclusions.[14] The Federal Circuit has directed Commerce either to adhere to the statistics literature or to provide a reasonable justification for departing from the essential principles set forth therein.[15] The Court cannot discern whether Commerce followed this directive without understanding what the literature actually says. The substantial evidence standard is no help—erroneous characterizations of statistical science do not amount to substantial evidence because they are not "such evidence as a reasonable mind might accept as adequate to support a conclusion."[16] Indeed, courts have reviewed Commerce's characterizations of the statistics literature and rejected them as incorrect.[17] As explained below, Commerce's characterizations of

---

[14] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent II*"), 31 F.4th 1367, 1380 (Fed. Cir. 2022) (assessing the literature on the record and concluding that "{t}he cited literature nowhere suggests simple averaging for unequal-size groups" despite Commerce's claim that the literature supports simple averaging when using populations of data); *Stupp Corp. v. United* States ("*Stupp II*"), 5 F.4th 1341, 1357–60 (Fed. Cir. 2021) (reviewing the statistics literature and concluding that it did not support Commerce's defenses for using Cohen's *d*); *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent I*"), 940 F.3d 662, 674 (Fed. Cir. 2019) (reviewing the literature to conclude that "the only cited literature for the relevant aspect of {Cohen's *d*} calls for the use of weighted averages"); *cf. Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ("To determine if substantial evidence exists, we review the record as a whole, including evidence that fairly detracts from the substantiality of the evidence.") (citation omitted).

[15] *Stupp II*, 5 F.4th at 1360; *Mid Continent II*, 31 F.4th at 1381.

[16] *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see Stupp II*, 5 F.4th at 1360; *Mid Continent II*, 31 F.4th at 1381.

[17] *See, e.g.*, *Stupp II*, 5 F.4th at 1357–60 (rejecting Commerce's characterizations of statistics literature); *Mid Continent II*, 31 F.4th at 1377–81; *Mid Continent Steel & Wire, Inc. v. United States*, 628 F. Supp. 3d 1316, 1325 (Ct. Int'l Trade 2023) ("Commerce's assertion that equation

the literature in this case are objectively wrong. The Government's attempts to invoke these characterizations in defense of Commerce's decisions must be rejected.

### 3. Commerce's Interpretations of Statistics Literature and Evaluation of the Hedges Report Are Not Entitled to Deference

A pervasive theme in the Government's brief (and Commerce's decision) is that Commerce's interpretations of the literature adequately respond to and provide an adequate basis for dismissing aspects of the Hedges Report.[18] We address the specific arguments below, but first observe that the Government's pleas for deference to Commerce's expertise in administering the dumping laws are misplaced.[19] Outside of the context of statutory interpretation, courts owe deference to agencies only with respect to decisions that can "be ascribed to . . . the product of agency expertise."[20] Courts regularly reject pleas for deference when administrative agencies act outside their expertise.[21] Commerce's responsibility for

---

(2.5.2) requires estimation from a sample while equation (2.3.2) does not require estimation from a sample, appears inconsistent with the literature.").

[18] *See, e.g.*, Gov't Resp. Brief at 33–37; Domestic Industry's Resp. Brief at 7–8.

[19] *See, e.g.*, Gov't Resp. Brief at 15 (citing *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iro Pip Co.*, 5 F.4th 1367, 1374–75 (Fed. Cir. 2021)).

[20] *State Farm*, 463 U.S. at 43; *cf. Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983) (a reviewing court owes deference to an agency determination if that agency is acting *"within its area of special expertise").*

[21] *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 266 (2006) ("The structure of the CSA, then, conveys unwillingness to cede medical judgments to an executive official who lacks medical expertise."); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020) ("{D}eference applies only when the agency is making predictions within its area of special expertise" and that the scope of the Bureau of Ocean Energy Management's expertise did "not include the economic analysis of greenhouse gas emissions . . . ."); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (the administrative law judge, in the context of Social Security Disability Benefits appeals, "cannot disregard medical evidence simply because it is at odds with the {administrative law judge's} own unqualified opinion").

administering the antidumping laws does not imply that Commerce has expertise in statistical science. While Commerce may have discretion to adopt the Cohen's *d* test to measure significant price differences,[22] nothing in the statute suggests legislative recognition of Commerce expertise in interpreting and applying such statistical tests and concepts.[23]

An agency may not disregard a competent expert's analysis based on mere conflict between that analysis and the agency's own unsupported opinions.[24] If Commerce disagrees with expert analyses or with the literature on relevant statistical science, it must explain that disagreement and support its contrary position with its own credible analysis.[25] The Government asks this Court to abdicate its role in reviewing Commerce's interpretation of statistical literature based on a broad assertion of deference. However, Commerce has no valid claim to expertise in the field of statistics, as should be plain from Commerce's consistent, unsupported departures from the literature and its shifting justifications for clinging to a statistical test that it clearly never understood.

---

[22] *Mid Continent I*, 940 F.3d at 673.

[23] *Cf. Gonzales*, 546 U.S. at 266 (Congress did not delegate to executive officials the authority to make medical judgments).

[24] *See, e.g.*, *Murphy*, 496 F.3d at 634.

[25] *Cf. id.*

### B. Commerce's Application of Cohen's *d* Cannot Be Sustained

#### 1. The Government and the Domestic Industry Fail to Demonstrate that Cohen's *d* Provides a Meaningful Coefficient When Applied Without Regard to Cohen's Underlying Assumptions

Cohen's *d* is a parametric method.[26]  Normally distributed datasets with approximately equal variances, which have unique properties, are a necessary condition for parametric methods to produce consistent, meaningful results.[27]  Applying a parametric method to data that do not have these properties produces results that cannot be interpreted according to the conventions for interpreting results of a parametric method.  With respect to Cohen's *d*, this means that a coefficient calculated for distributions that do not satisfy the assumptions of normality, equal variance, and equal size cannot be interpreted using Professor Cohen's thresholds, which refer to *d* coefficients calculated for distributions that do meet those assumptions.[28]  It is beyond dispute that Commerce calculates its *d* coefficients by comparing distributions that drastically depart from the assumptions.[29]  In performing such calculations, Commerce is not measuring "the actual effect size," as the Government claims,[30] or any value that can be interpreted using Professor Cohen's thresholds.

---

[26] Canadian Parties' Brief at 14–29.

[27] *Id.* at 15–16.

[28] *Id.* at 15–22.

[29] *See, e.g.*, *id*. at 22, 43–45, 53–58.

[30] Gov't Resp. Brief at 17 (citing I&D Mem. at 26).

This is not the Canadian Parties' opinion or interpretation of the literature—it is a statistical fact, confirmed by multiple sources on the record.[31] The Government and the Domestic Industry do not respond to, or even mention these points, resulting in waiver.[32]

> **2. The *U* Measures of Nonoverlap and the Assumptions Are Essential to a Correct Interpretation of the Cohen's *d* Coefficient**

The Government leans heavily on Commerce's characterizations of the literature to support its arguments that Commerce need not observe the three essential assumptions underlying Cohen's *d* or produce *d* coefficients that correlate to the *U* measures. However, Commerce's characterizations are inaccurate and cannot support its use of Cohen's *d*. The Government cannot overcome Commerce's fundamental errors through arguments on appeal.

First, the Government, like Commerce, insists that the *U* measures are necessary only when measuring percent nonoverlap, which Commerce claims it is not doing,[33] and that Commerce's use of populations obviates the need to observe the assumptions.[34] These positions are not supported by the statistics literature.

Commerce makes the unjustified inferential leap that the *U* measures are optional based almost entirely on Professor Cohen's use of real-world examples to help researchers

---

[31] *See* Canadian Parties' Brief at 23 n.81 (collecting sources); *see also* Hedges Report at 17, 23–24, Example (c) (describing how nonnormality skews calculations of *d*).

[32] *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

[33] Gov't Resp. Brief at 16–18, 24–26.

[34] *Id.* at 16–17. Again, nothing in the statistics literature suggests that the assumptions do not need to be observed when using populations. To the contrary, the necessity to observe the assumptions flows from the fact that Cohen's *d* is a parametric measure. *See* Canada's NFI Submission, Exh. 4 (C.R. 435, P.R. 501) (Myles Hollander, Douglas A. Wolfe, Eric Chicken, *Nonparametric Statistical Methods* at 1–2 (3rd ed. 2014)).

conceptualize the magnitudes of differences indicated by his thresholds.[35]  Professor Cohen

never suggests that the real-world illustrations—rather than the mathematical derivations that he

painstakingly documents and interprets—form the foundation for his thresholds.[36]  Nor does

Professor Cohen even imply that the *U* measures are just "one 'approach{} to illustrate his

proposed small, medium and large effect size thresholds.'"[37]  To the contrary, Professor Cohen

repeatedly reinforces the inextricable link between *d* values and the *U* measures.[38]  The *U*

measures are not optional—they are fundamental and their mathematical relationship to Cohen's

*d* depends on the assumptions being met.[39]  Even the real-world illustrations described by

Professor Cohen rely on data that adhere to the assumptions of normality and equal variances

(and thus, correspond to the *U* measures).[40]  Commerce cannot disregard these facts in favor of

its own unsupported characterization of scholarly literature.[41]

---

[35] *See* Canada's NFI Submission, Exh. 7 (C.R. 436, P.R. 501) (Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* at 24–37 (2ed 1988) ("Cohen, *Statistical Power Analysis*")).

[36] *See* Hedges Report at 11; *see also id.*, App'x II at xii.

[37] Gov't Resp. Brief at 18 (emphasis in Gov't Resp. Brief) (quoting I&D Mem. at 24).

[38] *See* Cohen, *Statistical Power Analysis* at 21–27.

[39] Hedges Report at 9; Cohen, *Statistical Power Analysis* at 21.

[40] *See* Canadian Parties' Brief at 28–29 & n.104 (citing Hedges Report, App'x II at xiii).

[41] Recently, a peer-reviewed journal published a research article by Professor Hedges that reinforces the principle that Cohen's *d* is appropriate only when comparing normal distributions with equal variances, even if one is comparing populations.  *See* Larry V. Hedges, *Interpretation of the Standardized Mean Difference Effect Size When Distributions Are Not Normal or Homoscedastic*, Educational and Psychological Measurement at 2 (published online Oct. 6, 2024) ("Hedges, *Standardized Mean Difference*") (explaining that, when dealing with "a population parameter," the interpretations of Cohen's *d* "can change when the form of the distributions being compared is not normal" or share the same variance), *available at* https://journals.sagepub.com/eprint/5YRZDBNF3VFVQGCKUFXC/full.  Commerce has taken the position that the Court may not consider articles like Hedges, *Standardized Mean Difference* if not placed on the record of the review.  However, such articles are not "evidence" in the sense

The Government also asserts that Professor Cohen acknowledges that the *U* measures are optional.[42] This is incorrect. The relevant section explains that equation 2.3.2[43] can be used when the assumption of equal variances is violated "provided that sample sizes are about equal" and the distributions are normally distributed.[44] Without the assumption of equal variances, the *U* measures "generally" do not hold to the calculated relationships described by Professor Cohen.[45] But as Professor Hedges demonstrates, the relationship between *d* and *U₃* (or the other *U* measures) *does hold* when the assumption of equal variances is slightly violated—the relationship simply needs to be adjusted based on the ratio of standard deviations between the two groups.[46] Contrary to the Government's assertion, the *U* measures are definitional, not illustrative.[47]

---

of adjudicative facts that constitute "the facts of the particular case." Fed. R. Evid. 201, cmt. (a) (articulating the well-established distinction between "adjudicative facts" and "legislative facts," the latter of which generally are not subject to formalized treatment as "evidence"); *see also* 28 U.S.C. § 2641(a). In *Stupp II*, the Federal Circuit examined statistics literature not on the record in that proceeding and relied on it to probe Commerce's decision. 5 F.4th at 1349–51. The Court should take the same approach with respect to Hedges, *Standardized Mean Difference*.

[42] Gov't Resp. Brief at 24 (citing Cohen, *Statistical Power Analysis* at 44).

[43] Professor Cohen provides equation 2.3.2 as a method to calculate the denominator of Cohen's *d* by simple averaging the standard deviations of the groups being compared. Professor Cohen defines equation 2.3.2 as

$$\sigma' = \sqrt{\frac{\sigma_A^2 + \sigma_B^2}{2}}$$

Where $\sigma_A$ is the standard deviation of population A and $\sigma_B$ is the standard deviation of population B. *See* Cohen, *Statistical Power Analysis* at 43–44.

[44] *Id.* at 43.

[45] *Id.* at 44.

[46] Hedges Report at 16.

[47] Consistent with Professor Hedges's analysis, Professor Cohen articulates additional requirements limiting the use of equation 2.3.2: two other variables (*r* and *r²*) must be

Second, the Government denies the relevance of previous Commerce decisions acknowledging the intrinsic relationship between *d* and the *U* measures.[48]  According to the Government, the Court should ignore these decisions because there are only two of them and they were issued eight-to-ten years ago.[49]  The number of decisions and their timing are irrelevant.  When Commerce "depart{s} from its precedent," it "must supply a reasoned analysis" demonstrating that its prior decisions are not being "casually ignored."[50]  Here, Commerce rendered decisions showing its understanding that the *U* measures of overlap are intrinsic to measuring *d* and changed its position without providing any explanation.[51]  Absent a reasoned explanation, this change is arbitrary and capricious.[52]

---

"completely unaffected" by the lack of equal variances.  Cohen, *Statistical Power Analysis* at 44.  The variables *r* and $r^2$ reflect the correlation (*i.e.*, the strength of the linear relationship) between the means of the two groups and the proportion of total variance of a variable in the combined populations subject to Cohen's *d*, respectively.  *Id.* at 23–24.  Commerce has never suggested that *r* and $r^2$ support its use of Cohen's *d*, and thus, Commerce has failed to adequately justify its use of equation 2.3.2 when the assumption of equal variances is violated.

[48] Gov't Resp. Brief at 25.

[49] *Id.*

[50] *Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1929 v. Fed. Lab. Rels. Auth.*, 961 F.3d 452, 457 (D.C. Cir. 2020) (quoting *Nat'l Fed'n of Fed. Emps. V. FLRA*, 369 F.3d 548, 553 (D.C. Cir. 2004)).  The Government's argument also misconstrues the Canadian Parties' position.  We are not positing that Commerce's prior decisions constitute agency practice or policy, only that they are agency precedent acknowledging a mathematical fact that Commerce now denies.  *See* Canadian Parties' Brief at 37 n.132 (collecting cases).

[51] *See* Canadian Parties' Brief at 36–37.

[52] *See NLRB v. CNN Am., Inc*., 865 F.3d 740, 751 (D.C. Cir. 2017) (citing *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  Further, the Government's assertion concerning the timing and number of decisions is inappropriate *post hoc* reasoning that was not provided by Commerce, and it must be rejected.  *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

### 3. Commerce Failed to Address Evidence of False Positives

The Canadian Parties presented evidence demonstrating that Commerce's Cohen's *d* comparisons in this review overwhelmingly and profoundly violated at least one of the three essential assumptions.[53]  Commerce never addressed this evidence.[54]  The Government attempts to salvage Commerce's failure by advancing four arguments disputing its relevance.[55]  The first three of the Government's arguments discussed below are *post hoc* justifications not articulated by Commerce, and should be rejected on that basis alone.[56]  The Court should reject all the arguments as asking the Court to sustain Commerce's mechanical application of a test under circumstances that produce arbitrary results.

First, the Government argues that Commerce's use of whole populations, rather than samples, makes it impossible for Commerce's Cohen's *d* test to ever produce false positives.[57]  Commerce, however, never claimed that its supposed use of populations obviates the possibility of false positives.  Such a claim, even if properly before the Court, would be without merit.  The Federal Circuit and the U.S. Court of International Trade ("CIT") have recognized that

---

[53] Canadian Parties' Brief at 43–44, 56–57; Case Brief of the Gov't of Canada (Feb. 27, 2023) at 38–41 (C.R. 494, P.R. 548, 549) ("Canada's Case Brief"), Attach. 1.  We recognize that in one section of our brief, we refer to the number of *passing* comparisons, while in another, we refer to the same data as representing the *total* comparisons.  *Compare* Canadian Parties' Brief at 43–44, *with id.* at 56–57.  We clarify that in both sections, the references are intended to be to *total* comparisons.  Given the overwhelming proportion of comparisons that violated at least one assumption, regardless of whether the data reflects passing comparisons or total comparisons, the data show that Commerce's comparisons were affected by false positives.

[54] *Nippon Steel*, 337 F.3d at 1379.

[55] Gov't Resp. Brief at 26–28.

[56] *Am. Textile Mfrs.*, 452 U.S. at 539; *Burlington*, 371 U.S. at 168–69.

[57] Gov't Resp. Brief at 26–27.

Commerce's calculation of Cohen's *d* for groups that violate the three assumptions can and does produce *d* coefficients of 0.8 or greater when there is not actually a significant difference between the prices being compared.[58]  The Government appears to disagree that the term "false positive" accurately describes this problem, but that is beside the point.[59]  The Canadian Parties use the term to refer to instances in which Commerce calculates a *d* coefficient greater than 0.8 for groups that do not meet Professor Cohen's assumptions.  Whatever the Government would prefer to call these instances, they entail Commerce's treatment of 0.8-or-greater *d* coefficients as establishing significant difference even though such coefficients are arbitrary figures that do not represent the same degree of difference reflected in Professor Cohen's threshold for "large" effect size.

Second, the Government criticizes the adequacy of record evidence because the Canadian Parties purportedly did not provide the "underlying calculations or source data" for the identified false positives.[60]  This is an odd criticism given that the "source data" are Commerce's own data files, and the calculations are clearly presented and explained.[61]  Moreover, the Government does

---

[58] *See Stupp II*, 4 F.5th at 1359 (describing situations in which Cohen's *d* passes may be exaggerated and when "{a}n objective examiner . . . would be unlikely to conclude" that the prices differ significantly despite passing the Cohen's *d* test); *see also Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1324 n.9, 1327–28 (Ct. Int'l Trade 2023) (repeatedly referring to "false positives").

[59] The Government suggests that, in *Stupp II*, the Federal Circuit understood a "false positive" to mean that a *d* was equal to 0.8 or greater, even though one of the groups had few data points or minimal variances.  Gov't Resp. Brief at 29.  The Federal Circuit did not adopt such a limited conception of false positives; rather, it found that any violation of the "assumptions can subvert the usefulness of the interpretive cutoffs" and transform them into "meaningless comparator{s}." *Stupp II*, 5 F.4th at 1360.

[60] Gov't Resp. Brief at 29.

[61] The calculations were based on data files "DP_REGION, DP_PURCHASER, and DP_PERIOD for Canfor and West Fraser, respectively, as generated by {Commerce's} preliminary margin program for Analysis for the Fourth Antidumping Duty Administrative

not challenge the results of these calculations or explain why any additional information would be necessary.

Third, the Government insists that the Canadian Parties were required to show exactly which comparisons were false positives, not just how many comparisons did not satisfy one or more assumptions.[62]  The gist of the Government's argument is that the figures the Canadian Parties provided do not amount to evidence fairly detracting from Commerce's conclusion.[63]  This is incorrect.  [          ] of the comparisons failed to satisfy at least one assumption.  It follows that [          ] passing comparisons also failed to satisfy at least one assumption and were based on data that were either nonnormal or exhibited disparate variances and had disparate group sizes (undermining Commerce's use of equation 2.3.2).[64]  Contrary to the Government's argument, this is conclusive evidence that false positives "were prevalent enough to overcome the 33 percent ratio test threshold," and the 66 percent ratio test threshold.[65]

---

Review of Certain Softwood Lumber Products from Canada."  Canada's Case Brief, Attach. 1; *see also id.* at 17 n.47 (citing Canfor's Prelim. Analysis Mem. (Jan. 23, 2023), Attach. 2 (C.R. 472); West Fraser's Prelim. Analysis Mem. (Jan. 23, 2023), Attach. II (C.R. 475)); *id* at 17–23 (providing a detailed description of our methodology).

[62] Gov't Resp. Brief at 29–30.

[63] The Government asserts that the Canadian Parties did "not contend that *any* of the test and comparison groups had few data points" or the types of variances that would create false positives.  *Id.* at 29.  This is false.  We would urge the Court to examine the limited examples in which Commerce provided Cohen's *d* comparisons because the test groups for [          ] comparisons had [          ] such that Commerce's application of Cohen's *d* could not generate reliable *d* coefficients.  Canfor's Analysis Mem. (July 26, 2023) (C.R. 513, P.R. 589), Attach. 2 at 119–56; West Fraser's Final Analysis Mem. (July 26, 2023) (C.R. 500, P.R. 586), Attach. II at 292–347 (C.R. 503–04, 510).  Similarly, the standard deviations for the test and comparison groups differ drastically in virtually all the examples.  *See* Canfor's Analysis Mem., Attach. 2 at 119–56; West Fraser's Final Analysis Mem., Attach. II at 292–347.

[64] Canada's Case Brief, Attach. 1.

[65] Gov't Resp. Brief at 30.

Finally, the Government contends that the language of the statute allows Commerce to deploy the ratio test and the meaningful-difference test to compensate for false positives in the Cohen's *d* test.[66]  However, before Commerce may apply the exceptional A-T methodology, the text of the statute requires that Commerce must meet three distinct conditions.  Commerce must: (1) identify U.S. prices that differ significantly among purchasers, regions, or periods of time; (2) identify a pattern of such differing prices; and (3) explain why the A-A or the transaction-to-transaction methodologies cannot account for "such differences."[67]  It would be inconsistent with the plain language of the statute and the rule against surplusage to allow Commerce to apply the A-T methodology when any one of the three conditions has not been met.[68]  The Court should reject the Government's position that Commerce may fail to find significant price differences (or may arbitrarily find such differences), yet nonetheless apply the A-T methodology as long as it finds a pattern using its ratio test and a difference in margins using its meaningful-difference test. The statute sets forth three distinct requirements.  The best—and only reasonable—reading of the statute[69] is that each requirement must be met before Commerce may resort to the exceptional A-T methodology.

---

[66] *Id.* at 28.

[67] 19 U.S.C. § 1677f-1(d)(1)(B).

[68] *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 174–79 (2012)); *cf. Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1905 (2022) (cautioning against an interpretation of the statute that would "eviscerate . . . significant aspects of the statutory text").

[69] *Loper Bright*, 144 S. Ct. at 2266.

### 4. Commerce's Use of Simple Averaging in the Denominator Produces a *d* Coefficient That Cannot Be Interpreted to Identify Significant Differences

The Government presumes that all of the Canadian Parties' arguments concerning simple averaging are premised solely on the observation that Commerce's reasoning in this case was rejected by the Federal Circuit in *Mid Continent II*.[70]  That is incorrect.  Commerce's reasons for simple averaging "are merely distractions" and attempt "to avoid compliance with the Federal Circuit's decision in *Mid Continent II*."[71]  The Canadian Parties did not rely solely on *Mid Continent II* but, instead, made clear that Commerce's calculation of the denominator is unreasonable, arbitrary, and contrary to sound statistical science for reasons including, but beyond, those already identified by the Federal Circuit.[72]

Professor Cohen and others have established standards for calculating the denominator if the resulting Cohen's *d* is to be interpreted as intended.  These rules are necessary to ensure that

---

[70] Gov't Resp. Brief at 32.

[71] Canadian Parties' Brief at 46–47.

[72] *See id.* at 45–51.  The Government relies on Commerce's characterization of equations 2.5.1 and 2.5.2 to support simple averaging, but does not respond to our observation that that equations 2.5.1 and 2.5.2 are used to measure $d_S$, which is different from *d*.  *Id.* at 49–50.  The Government also wrongly asserts that the Canadian Parties conceded the irrelevance of conventions on the use of Latin and Greek variables.  *Id.* 32–33.  Observing that Commerce wrongly fixated on this issue does not amount to a concession.  *See* Canadian Parties' Brief at 51.  As explained, Professor Algina demonstrates that Professor Cohen did not follow the convention of using Greek variables to indicate population values, but instead used Latin variables to indicate population values.  *Id.*  The Government's claim that the point has been conceded seems to be an effort to avoid addressing this inconvenient fact.

the denominator of the *d* coefficient contextualizes the difference measured in the Cohen's *d* numerator (*i.e.*, the difference in means).[73]  Equation 2.3.2 provides such a rule.

According to Professor Cohen, equation 2.3.2 may be used when the assumption of equal variances is violated, so long as the groups are normally distributed *and* the assumption of equal size is observed.[74]  If the assumptions of normality or equal size are also violated, equation 2.3.2 will not contextualize the numerator of the *d* coefficient, and thus, the *d* coefficient will not meaningfully or consistently quantify the differences between the groups.[75]  A "Cohen's *d* coefficient" thus calculated is not—in any non-arbitrary sense—a Cohen's *d* coefficient at all.  It is just a number that provides no reliable information about the relationship between the two groups being compared.  The Government does not respond to this analysis, and thus, any argument on the topic should be deemed waived.

### 5. Commerce Did Not Adequately Address the Hedges Report

The Government contends that Commerce adequately considered the Hedges Report for the following reasons:  (1) in *Resolute FP Canada Inc. v. United States*,[76] the court found that Commerce adequately engaged with the Hedges Report in that case; (2) Commerce explained that the academic literature did not support Professor Hedges's assessment that Professor Cohen's thresholds depend on the assumptions; (3) Commerce found that the literature did not agree with Professor Hedges's assessment of equation 2.3.2 and simple averaging; and (4)

---

[73] Canadian Parties' Brief at 21, 25–28.

[74] Cohen, *Statistical Power Analysis* at 43–44.

[75] Canadian Parties' Brief at 27–28.

[76] No. 23-00095, 2024 WL 3859816 (Ct. Int'l Trade Aug. 19, 2024).

*Samsung International v. United States*[77] provides an adequate and analogous basis for rejecting the Hedges Report.[78]  None of the Government's arguments is persuasive.

First, *Resolute* is inapposite.  In that case, the plaintiff placed the Hedges Report on the record to demonstrate that there was "good cause" for Commerce to consider price, cost, market or economic factors (other than those provided in 19 U.S.C. § 1675a(c)) to determine whether dumping is likely to continue in an expedited sunset review.[79]  Commerce addressed its use of Cohen's *d* in the context of explaining whether, absent the DPM, Commerce would have found that the plaintiff was dumping at all in prior reviews.[80]  The court concluded that Commerce's analysis adequately addressed the issues presented in the Hedges Report for the specific purposes of the expedited sunset review, but emphasized (twice) that the court was not opining on whether Commerce's analysis "would be sufficient during . . . an annual review."[81]

In contrast, the Canadian Parties challenge the Cohen's *d* test as applied in *this annual review*.  The Hedges Report and published sources of statistics literature[82] demonstrate that

---

[77] 887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012).

[78] Gov't Resp. Brief at 33–37.

[79] *See* Mem. of Points and Authorities in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Resolute (Nov. 6, 2023), ECF No. 28-1 at 34–35, *Resolute FP Canada Inc. v. United States, et al.*, Ct. No. 1:23-cv-00095-JAR.

[80] *Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023), and accompanying Issues and Decision Mem. ("Sunset Review I&D Mem.") at 9–18.

[81] *Resolute*, 2024 WL 3859816, at *7–8, *9 n.19.

[82] Unlike in this review, the literature was not on the record of the expedited sunset review, and thus, not considered by Commerce or the Court.  *See generally Resolute*, 2024 WL 3859816; Sunset Review I&D Mem.  We note, however, that this should not have prevented consideration of relevant statistics literature, as the published statistics literature does not constitute adjudicative facts that must be on the administrative record to be considered.

Commerce did not satisfy the Federal Circuit's requirement either to adhere to the statistics literature or to provide a reasonable explanation for departing from it.[83] Neither Commerce nor the CIT in *Resolute* considered the implications of using a parametric measure on data that do not satisfy the assumptions, which is detailed in the Hedges Report and at the center of this appeal.[84] Nor did the court consider the following points in *Resolute*, which are detailed in this appeal and supported by the Hedges Report and the accompanying literature: Commerce's supposed use of populations does not permit it to ignore the assumptions;[85] the $U$ measures are fundamental to interpreting $d$;[86] Professor Cohen relies on the $U$ measures and the assumptions in developing his thresholds;[87] and Commerce's use of equation 2.3.2 leads to a $d$ coefficient that cannot be meaningfully interpreted.[88] Therefore, the *Resolute* court's decision is not persuasive here because the Hedges's Report and the analyses based on it are presented for reasons that were not considered in *Resolute*.[89]

Second, the Government relies on Commerce's claims that the literature conflicts with Professor Hedges's conclusions. These claims flow from Commerce's unreasonable inferences and interpretations of the literature, buttressed by intransigence and the agency's baseless

---

[83] *Stupp II*, 5 F.4th at 1360; *Mid Continent II*, 31 F.4th at 1381.

[84] Canadian Parties' Brief at 23–29.

[85] *Id.* at 31–34.

[86] *Id.* at 20–22.

[87] *Id.* at 34–38.

[88] *Id.* at 45–51.

[89] Moreover, this Court is not bound by CIT decisions in other cases. *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

confidence in its command of a field as to which it has no apparent expertise. In contrast, it would be difficult to overstate the prominence of Professor Hedges in the field of statistics. His work on effect size is relied upon as authoritative in virtually every piece of academic literature on which Commerce purports to rely, including the work of Professor Cohen.[90] It is beyond unreasonable and arbitrary for Commerce simply to pronounce its disagreement—unsupported by any meaningful analysis—with Professor Hedges's explanation of the works of Cohen, Coe, Ellis, and Grissom & Kim, all of whom rely on his expertise in their work. For example, Commerce rejects Professor Hedges's thorough analyses showing that Cohen's $d$ cannot be reliably interpreted when the assumptions are violated such that the $U$ measures do not match the appropriate $d$ value.[91] Commerce claims that the $U$ "measures were not used by Dr. Cohen in the development of his proposed thresholds."[92] Commerce's assertion—and its rejection of Professor Hedges's analysis to the contrary—depends entirely on Commerce's unwavering confidence in its unique perspective on the statistics literature.[93] That confidence is unwarranted.

---

[90] *See* Cohen, *Statistical Power Analysis* at 66; Canada's NFI Submission, Exh. 5 (C.R. 435, P.R. 501) (Robert J. Grissom, John J. Kim, *Effect Sizes for Research, Univariate and Multivariate Applications* at 66–70 (2ed 2012); Exh. 8 (C.R. 436, P.R. 501) (Robert Coe, *It's the Effect Size, Stupid: What effect size is and why it is important*, presented at the Annual Conference of the British Educational Research Association at 11 (Sept. 2002); Exh. 19 (C.R. 439, P.R. 502); Paul D. Ellis, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* at 10, 26–27 (2010). No party put the relevant pages from Professor Cohen's book and Ellis's book on the record of this review, but they are cited by Commerce in its decision, *see* I&D Mem. at 30–31 nn.173–75, 177, and are appropriately considered by this Court, *see NEXTEEL Co. v. United States*, 633 F. Supp. 3d 1190, 1203 (Ct. Int'l Trade 2023).

[91] I&D Mem. at 25 n.142; *see* Hedges Report, App'x II at iii (incorporating by reference Hedges Report at 15–26).

[92] I&D Mem. at 25 n.142; *see also id.* at 27.

[93] *See supra* Section II.B.2.

Commerce lacks, and has never asserted, expertise in the field of statistics.[94]  Mere disagreement with a qualified expert, whose conclusions are supported by analyses, illustrations, and the entire relevant body of statistics literature, cannot suffice to reject that expert's findings.[95]

Third, the Government cannot defend Commerce's claim that it "considered the contents of the Hedges Report,"[96] especially with respect to Commerce's use of equation 2.3.2.[97] Commerce claims that Professor Hedges did not address equation 2.3.2,[98] but he did.[99]  The Government merely asserts that Commerce's failure to consider Professor Hedges's explanation on this issue "is beside the point."[100]  It is not beside the point—it is exactly the point. Commerce failed to engage with evidence detracting from its conclusion.  This requires a remand.[101]

---

[94] *See supra* Section II.A.3.

[95] *See Murphy*, 496 F.3d at 634; *Ctr. for Biological Diversity*, 982 F.3d at 740.

[96] I&D Mem. at 27 n.150.

[97] Commerce dismisses Professor Hedges's criticism that Commerce did not adequately support its claim that the literature only contemplates weighted averaging when using samples such that Commerce must resort to simple averaging when using full populations.  *See id.* at 32 n.180. Commerce relies on Professor Cohen, Dr. Coe, and Ellis for this proposition.  *Id.* (citations omitted).  At no point do any of the cited sources suggest that simple averaging is permissible when using populations or that weighted averaging may only be used when working with sampled data.

[98] Canadian Parties' Brief at 58–64.

[99] Hedges Report, App'x II at vi; *see also id.* at 6.

[100] Gov't Resp. Brief at 35.

[101] Commerce's failure to adequately engage with the Hedges Report makes this case similar to (not different than) *NEXTEEL Co. v. United States*, 569 F. Supp. 3d 1354, 1368–69 (Ct. Int'l Trade 2022).

Finally, the Government follows Commerce's lead by relying on a footnote in the CIT's *Samsung* decision, which addressed expert witness opinions in determining the meaning of tariff-classification terms. The Government erroneously finds a broad legal proposition in the court's statement that "{e}xpert opinions are merely advisory, however, and are given weight only to the extent that they are consistent with the lexicographic and other *reliable* sources."[102] However, the context of that observation and the express reference to consistency with "lexicographic" sources bely the notion that *Samsung* establishes a general rule for the treatment of expert reports. The Government does not explain why it would even be coherent to require that reports by expert statisticians be consistent with lexicographic sources. To the extent consistency with "other reliable sources" may be a requirement for Commerce to give weight to an expert report, the Government cannot reasonably deny that the Hedges Report is consistent with reliable statistics literature.[103] In fact, it is Commerce whose characterizations of the statistics literature are inconsistent with the literature.[104]

**6.      Commerce's Cohen's *d* Test Conflicts With the Best Interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i)**

As explained above, the *d* coefficient cannot be understood to meaningfully measure differences between U.S. prices when the data violate the assumptions or when Commerce calculates the denominator contrary to the literature. Commerce attempts to use the Cohen's *d* test to carry out the statutory directive to identify U.S. prices "that differ significantly" and

---

[102] Gov't Resp. Brief at 21 (emphasis in Gov't Resp. Brief) (quoting *Samsung*, 887 F. Supp. 2d at 1338 n.18).

[103] Canadian Parties' Brief at 23 & n.81, 62–64; *see also* Hedges, *Standardize Mean Difference*.

[104] Canadian Parties' Brief at 13–38, 45–51.

interprets "differ significantly" to mean a Cohen's *d* coefficient of 0.8 or greater.[105]  Commerce has insisted that its use of Cohen's *d* to measure whether U.S. prices differ significantly is entitled to deference under *Chevron*.[106]  Under *Loper Bright*, this Court must review Commerce's use of Cohen's *d* and determine whether it constitutes the "best meaning" of the statutory term "differ significantly."[107]  It does not.

The Cohen's *d* test measures "significant differences" only if it identifies categories of U.S. prices that differ among purchasers, regions, or periods of time, by noticeably[108] and measurably large[109] amounts as compared to other U.S. prices.  Cohen's *d* coefficients of 0.8 or greater cannot indicate noticeably or measurably large price differences when those coefficients are not calculated according to the conditions articulated by Professor Cohen and cannot be interpreted using Professor Cohen's thresholds.  The alleged differences identified by Commerce's Cohen's *d* test are simply arbitrary numbers that have no relationship to any objective measure of difference or its significance.[110]  When *d* is calculated using data that do not satisfy the assumptions (as in Commerce's application of Cohen's *d*) or when the denominator is calculated contrary to the principles in the literature, then a *d* of 0.8 does not mean that the

---

[105] 19 U.S.C. § 1677f-1(d)(1)(B)(i).

[106] I&D Mem. at 18.

[107] 144 S. Ct. at 2266.

[108] *Significant*, Cambridge Dictionary Online, *available at* https://dictionary.cambridge.org/us/dictionary/english/significant (last visited Oct. 10, 2024).

[109] *Significant*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/significant (last visited Oct. 10, 2024).

[110] *See Stupp II*, 5 F.4th at 1360.

groups "differ significantly."[111]  For these reasons, Commerce's use of the Cohen's *d* test to

interpret the term "differ significantly" in the statute cannot be sustained.

### C.  Commerce's Application of its Meaningful-Difference Test to the Facts of this Review Cannot Be Sustained

The Government misapprehends the Canadian Parties' fundamental challenges to

Commerce's use of the meaningful-difference test in this review.[112]  As the Canadian Parties

explained, Commerce bases its decision to apply the A-T methodology entirely on purported

significant price differences between sales by each of the respondents during different calendar

quarters.[113]  This case is entirely about differences in prices over time—specifically in different

quarters.  If Commerce were faithfully applying the statute and its own regulations, this fact

should come as a relief.  After all, both the statute[114] and the regulation[115] require Commerce to

calculate weighted averages on a monthly basis in applying the A-A methodology in an annual

review.  As a matter of arithmetic, the A-A methodology thus applied (*i.e.*, based on monthly

averages) will *necessarily* always account for or "unmask" any pattern of significant price

differences between calendar quarters.

The Canadian Parties provided an example to illustrate the basic arithmetical

consequences of averaging as applied to the time-period differences identified by Commerce.[116]

---

[111] *See supra* Sections II.B.1, 2, & 4.

[112] *See* Canadian Parties' Brief at 72–73.

[113] *See id.* at 72.

[114] 19 U.S.C. § 1677f-1(d)(2).

[115] 19 C.F.R. § 351.414(d)(3).

[116] Canadian Parties' Brief at 73.

The Government—again missing the point—latches on to the "hypothetical example" as grounds to dismiss the general proposition: "Commerce's determination that the A-A method cannot account for the disparate pricing exhibited in the U.S. market here is not drawn into question by whatever might be the situation in some hypothetical scenario."[117] But the scenario described is not hypothetical. It is simply an illustration of the arithmetic relationship between price differences and margin calculations that will always exist when Commerce applies its A-A methodology on a monthly basis. The Government has no answer to this.

Importantly, and contrary to the Government's argument, this is not a question that the Federal Circuit has addressed. The Government relies on *Apex Frozen Foods Private Ltd. v. United States* ("*Apex II*"),[118] for the proposition that "the meaningful difference test does reasonably implement" 19 U.S.C. § 1677f-1(d)(1)(B)(ii).[119] Although *Apex II* did approve of Commerce's use of the meaningful-difference test in that case to explain why the A-A methodology could not account for the identified disparate pricing, that case did not involve a challenge to Commerce's inability to explain why the monthly averaging mandated by the statute and regulation could not account for quarterly price differences.[120] Accordingly, this Court's consideration of the Canadian Parties' position in this case is not limited by *Apex II*.

Further, even to the limited extent that *Apex II* could apply to the issues raised in this appeal, it does not provide a basis for sustaining the *Final Results*. In *Apex II*, the Federal Circuit made no attempt to discern the plain meaning of the statute, including both sections

---

[117] Gov't Resp. Brief at 37–38.

[118] 862 F.3d 1337 (Fed. Cir. 2017).

[119] Gov't Resp. Brief at 37 (citing *Apex II*, 862 F.3d at 1348–49).

[120] 862 F.3d at 1345–48.

1677f-1(d)(1)(B)(ii) and 1677f-1(d)(2), before inquiring whether Commerce's interpretation was reasonable under *Chevron* step two.[121]  This is not "mere reliance" on *Chevron*.[122]  The Federal Circuit has never applied *Chevron* step one in this context, and it is appropriate for this Court to engage in the necessary statutory interpretation, which is now governed by *Loper Bright*.

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") makes clear that Congress intended for Commerce to "establish *and* provide an explanation why it cannot account for" targeted dumping using the A-A methodology.[123]  The verb "explain" means "to give the reason for or cause of," or "to show the logical development or relationship of."[124]  Identifying the two differing margins does not "give the reason or {the} cause of" the different margins.  Neither does Commerce's meaningful-difference test logically develop why the A-A methodology cannot account for such differences.  Commerce's use of the meaningful-difference test must be remanded.

### D.  The Government Failed to Defend Commerce's Dismissal of the Evidence that Pricing Fluctuations Were the Result of Market Conditions

Next, the Government objects that Commerce was not required to examine evidence that the fluctuations in prices were attributable to market conditions, and thus, not targeted.  The Government merely repeats the proposition that Commerce is not required to *investigate* the reasons for pricing differences.[125]  That the statute does not impose an obligation for Commerce

---

[121] *See id*. at 1345–48.

[122] *Loper Bright*, 144 S. Ct. at 2273.

[123] H.R. Doc. No. 103-316, vol. 1, at 843, reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78.

[124] *Explain*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/explain (last visited Oct. 10, 2024).

[125] Gov't Resp. Brief at 38.

to affirmatively investigate and discover the reasons for pricing differences does not negate Commerce's obligation to address evidence detracting from its conclusions.[126]  Here, there is evidence on the record detracting from Commerce's conclusion that the mandatory respondents' pricing was the result of targeted dumping.[127]  Commerce was required to address this evidence, regardless of whether it was obligated to investigate the reasons for the pricing differences.

### E.  Commerce's DPM Violates the Statute By Failing to Make Fair Comparisons

The Domestic Industry and the Government claim that the Court should sustain Commerce's use of the DPM, even though it does not make fair comparisons, because:  (1) the Canadian Parties did not exhaust administrative remedies for this issue; and (2) the statute does not impose a seasonality or fair comparison requirement.

The Domestic Industry's exhaustion arguments[128] are misplaced.  Although the doctrine of exhaustion generally requires parties to raise objections before the administrative agency,[129] the requirement is not absolute and courts, in exercising their discretion, have fashioned several exceptions.[130]  In this case, there is no exhaustion problem because Plaintiffs Resolute FP Canada, Inc., the Conseil de l'Industrie Forestière du Québec, and the Ontario Forest Industries Association (collectively, "Central Canada") raised the issue of "fair comparison" in the

---

[126] *Nippon Steel*, 337 F.3d at 1379; *The Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1179 n.12 (Ct. Int'l Trade 2016).

[127] Canadian Parties' Brief at 67–71.

[128] Domestic Industry's Resp. Brief at 9.

[129] *United States v. Trucker Tuck Lines, Inc.*, 344 U.S. 33, 37 (1952).

[130] *See, e.g.*, *Garg Tube Exp. LLP v. United States,* 698 F. Supp. 3d 1230, 1239-40 (Ct. Int'l Trade 2024); *see generally* 28 U.S.C. § 2637(d) (conferring discretion on this Court in considering whether the exhaustion requirement is appropriate).

administrative review.[131]  In fact, Commerce summarizes and responds to Central Canada's position on the A-T methodology and offsets, citing to the very section of Central Canada's Case Brief where the "fair comparison" language was discussed.[132]  Even if the Court were to agree with the Domestic Industry's exhaustion contention, the fair-comparisons issue is a pure question of law—statutory interpretation—such that exhaustion was not required.[133]

Next, the Government contends that the Canadian Parties are creating a "non-existent carve-out into the statute" for seasonal commodities.[134]  Far from "re-writ{ing} the statute,"[135] the proffered interpretation is consistent with the ordinary meaning of the statutory text.[136]  The plain language of the statute permits recourse to the A-T methodology only if:  (1) Commerce finds a pattern of significant price differences across time periods, regions, or purchasers; and (2)

---

[131] *See* Central Canada's Case Brief (Feb. 27, 2023) ("Central Canada's Case Brief") at 34 & n.90; 35 & n.93 (P.R. 544)).  Article 2.4 of the Antidumping Agreement, Apr. 15, 1994, Annex 1A to the Marrakesh Agreement (Agreement on the Implementation of Article VI of GATT 1994), 1868 U.N.T.S. 201, establishes guidelines for comparing normal value and export price to calculate the margin of dumping.  It includes a general requirement that comparisons be fair and provides specific requirements to achieve this, including requirements that comparisons be made at the same level of trade, normally at the ex-factory level, and between sales made as nearly as possible at the same time. Article 2.4.2 establishes the targeted dumping methodology as reflected at 19 U.S.C. § 1677f-1(d)(1)(B).  *See* SAA at 810, 820.  Hence Article 2.4 is relevant to inform the interpretation of the statutory provision implementing it.  *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339, 1348 (Fed. Cir. 2004)).

[132] I&D Mem. at 41–42.

[133] *Garg Tube Exp. LLP*, 698 F. Supp. 3d at 1240 (citing *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007)).

[134] Gov't Resp. Brief at 39.

[135] *Id.*

[136] *See* 19 U.S.C. § 1677f-1(d)(1)(B); *see also* Canada's Case Brief at 39–40.

Commerce explains why the A-A methodology cannot account for those differences.[137]
Commerce applies a rote, quantitative "meaningful difference" test to meet the "explanation"
requirement of the statute.[138]   Therefore, it is Commerce that would have this Court rewrite the
statute by rendering the explanation requirement meaningless.

### F.  Commerce's Ratio Test Cannot Correct for Flaws in Other Elements of the DPM

The Government argues that "the other steps of the DPA can compensate for what the
Canadian parties call false positives," and specifically invokes the so-called "ratio test" as
protective against the effects of erroneous application of Cohen's *d*.[139]   As explained above,
however, Commerce cannot evade its statutory obligation to satisfy each independent
requirement for application of the A-T methodology.[140]   The Government's reliance on the ratio
test to "compensate" for other failures of the DPM is also misplaced because the ratio test itself
conflicts with the statutory text that it purports to implement.   Commerce uses the ratio test to
identify a "pattern of export prices . . . that differ significantly among purchasers, regions, or
periods of time." [141]   Commerce aggregates the value of U.S. sales that pass the Cohen's *d* test,
and divides that aggregate value by the total value of all of the respondent's U.S. sales during the

---

[137] 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).

[138] *Contra* SAA at 843 ("Commerce will proceed on a case-by-case basis, because small
differences may be significant for one industry or one type of product, but not for another.").

[139] Gov't Resp. Brief at 28.

[140] *See supra* Section II.B.3.

[141] 19 U.S.C. § 1677f-1(d)(1)(B)(i).

period of review.[142]  However, Commerce's ratio test aggregates dissimilar data points and contravenes the plain meaning of statutory term "pattern."

Section 1677f-1(d)(1)(B) uses the term "pattern" to identify circumstances where an exporter appears to be engaged in discriminating pricing behavior.  A pattern must be something that is readily identifiable, and that consists of coherently interrelated data points.[143]  This plain meaning of "pattern" is further confirmed by the SAA, which explains that 19 U.S.C. §1677f-1(d)(1)(B) was added to the statute to address targeted dumping.[144]  The explanation in the SAA regarding "targeted dumping" reflects a concern that higher priced U.S. sales may mask the dumping to "targeted" customers, regions, or time periods.  Commerce's ratio test disregards that plain meaning because the test does not explain whether the offending U.S. prices occur in a regular or "interrelated" manner, are logically connected, or share *any* single, observable characteristic.  Commerce is merely calculating the sum of all sales that passed its Cohen's *d* test.

The Federal Circuit has affirmed Commerce's use of the ratio test under step two of *Chevron*.  In *Dillinger France S.A. v. United States*, the Federal Circuit found that "{t}he statute is silent as to how Commerce must determine a 'pattern.'"[145]  With no inquiry into the meaning of the statutory language, the Federal Circuit deferred to Commerce's interpretation as

---

[142] Decision Memorandum for Preliminary Results (Jan. 23, 2023) at 9–10 (P.R. 518).

[143] *Pattern*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/pattern (last visited Oct. 10, 2024); *Pattern*, Concise Oxford English Dictionary of Current English 1002 (9th ed. 1995).

[144] SAA at 842–43.

[145] 981 F.3d 1318, 1325 (Fed. Cir. 2020).

"reasonable."[146] This superficial analysis, which contravened the court's obligation to discern the meaning of the statutory text under *Chevron* step one, cannot stand under *Loper Bright*.[147]

### G.  Commerce Must Recalculate the Rate Assigned to Non-Selected Companies

The Government argues that the Court should not direct Commerce to recalculate the rate assigned to non-selected companies (upon recalculating the margins for the mandatory respondents).[148] Contrary to the Government's contentions, we are not asking the Court to do anything extraordinary or contrary to the statute. Rather, we are simply asking the Court to do what it normally does and ensure that changes to the mandatory respondents' margins are reflected in a recalculated rate for non-selected companies.[149]

### CONCLUSION AND PRAYER FOR RELIEF

For the reasons set forth above, the Canadian Parties request that the Court enter judgment on the administrative record in their favor and remand the *Final Results*, as amended by the *Amended Final Results*, with respect to the issues raised in this brief.

---

[146] *Id.*

[147] *See Loper Bright*, 144 S. Ct. at 2266.

[148] Gov't Resp. Brief at 39–40.

[149] *See* Canadian Parties' Brief at 76 n.293.

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and 2(B)(2), the undersigned certifies that this brief complies with the limitation requirement of 10,000 words.  The word count for the Canadian Parties' Reply Brief in Support of their Motion for Judgment on the Agency Record Regarding Application of Differential Pricing Analysis as computed by Blank Rome LLP's word processing system (Microsoft Word) is 9,916 words.

*Eric S. Parnes*
Eric S. Parnes