**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| |
|---|
| GOVERNMENT OF CANADA, *et al.*, |
| Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, *et al.*, |
| Defendant-Intervenors. |

Consol. Court No. 23-00187

<u>Non-Confidential Version</u>

Business Proprietary Information Deleted on Pages 10-12 and 14-18

**REPLY BRIEF OF THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AND SIERRA PACIFIC INDUSTRIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann

**WILMER CUTLER PICKERING HALE
and DORR LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

*Counsel to Sierra Pacific Industries,
including its subsidiary Seneca Sawmill
Company*

October 10, 2024

Andrew W. Kentz
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Avenue NW
Suite 700
Washington, DC 20036
(202) 888-0595

*Counsel to the COALITION*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 1

I.  The Statute Requires That Commerce Adjust U.S. Price to Account for
    Countervailing Duty Costs ........................................................................ 1

    A.  The Removal of Countervailing Duty Costs is Necessary to Make a Fair
        Comparison Between EP and Normal Value ...................................... 3

    B.  The Federal Circuit Has Not Resolved the Issue of Whether U.S. Price Should
        be Reduced By the Amount of Countervailing Duty Costs ............................ 6

    C.  Adjusting for Countervailing Duty Costs is Consistent with the Statute's
        Purpose ......................................................................... 9

II.  Commerce's Calculation of Canfor's G&A Expense Ratio Was Arbitrary and
     Unsupported by Substantial Evidence .................................................... 13

    A.  Commerce's Conclusion that CSP and Canfor Sweden Incurred No G&A
        Expenses Must Be Remanded ................................................... 14

    B.  Commerce's Practice Accounts for Situations Where a Parent Company
        Provides Services to the Subsidiary .......................................... 18

    C.  Commerce's Practice In Earlier Segments Ignores Differences in the Factual
        Record Before Commerce in this Review ....................................... 20

CONCLUSION .................................................................................................. 21

## TABLE OF AUTHORITIES

### Cases

*AK Steel Corp. v. United States*,
    988 F. Supp. 594 (Ct. Int'l Trade 1997) .................................................................. 7

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001) ............................................................................... 7

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) .......................................................... 3

*Barnhart v. Peabody Coal Co.*,
    537 U.S. 149 (2003) .................................................................................................. 8

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    63 F.4th 25 (Fed. Cir. 2023) .................................................................................... 6

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ................................................................................................ 16

*Changzhou Trina Solar Energy Co. v. United States*,
    161 F. Supp. 3d 1343 (Ct. Int'l Trade 2016) ........................................................ 20

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .................................................................................................. 7

*Duncan v. Walker*,
    533 U.S. 167 (2001) .................................................................................................. 5

*Hoogovens Staal BV v. United States*,
    4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) .............................................................. 7

*In re Nuvasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016) ............................................................................. 15

*Loper Bright Enters. v. Raimondo*,
    603 U.S. __, 144 S. Ct. 2244 (2024) ................................................................... 7-9

*Market Co. v. Hoffman*,
    101 U.S. 112 (1879) .................................................................................................. 5

*Micron Tech., Inc. v. United States*,
    243 F.3d 1301 (Fed. Cir. 2001) ............................................................................... 2

*Mid Continent Steel & Wire, Inc. v. United States*,
    273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017) ........................................................ 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................. 16

*New York State Dept. of Social Servs. v. Dublino*,
413 U.S. 405 (1973) ............................................................................................... 12

*Peer Bearing Co.–Changshan v. United States*,
587 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) ......................................................... 20

*Pennsylvania Dep't of Pub. Welfare v. Davenport*,
495 U.S. 552 (1990) ................................................................................................. 6

*Regions Hospital v. Shalala*,
522 U.S. 448 (1998) ............................................................................................... 12

*Torrington Co. v. United States*,
146 F. Supp. 2d 845 (Ct. Int'l Trade 2001) ........................................................... 14

*United States v. Vonn*,
535 U.S. 55 (2002) ................................................................................................... 8

*Wheatland Tube Co. v. United States*,
414 F. Supp. 2d 1271 (Ct. Int'l Trade 2006) ........................................................... 9

*Wheatland Tube Co. v. United States*,
495 F.3d 1355 (Fed. Cir. 2007) ........................................................................... 8-9

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*,
50 F.4th 98 (Fed. Cir. 2022) ................................................................................. 12

## Statutes

19 U.S.C. § 1677a .......................................................................................... *passim*

19 U.S.C. § 1677b ........................................................................................... 2, 14

## Administrative Determinations

*Aluminum Extrusions From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 80,458 (Dep't Commerce Oct. 3, 2024) ............................... 19

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) ........................................................ 1

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review, and Final*

*Determination of No Shipments; 2022*, 89 Fed. Reg. 67,067 (Dep't Commerce
    Aug. 19, 2024) ......................................................................................................... 17

*Finished Carbon Steel Flanges From India: Final Results of Antidumping Duty
    Administrative Review; 2020-2021*, 88 Fed. Reg. 15,668 (Dep't Commerce
    Mar. 14, 2023) ........................................................................................................... 19

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber
    Products from Canada*, 67 Fed. Reg. 15,539 (Dep't Commerce Apr. 2, 2002) ...................... 19

**Other Authorities**

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979) ........................................ 5

# INTRODUCTION

On behalf of plaintiff Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") and plaintiff-intervenor Sierra Pacific Industries (collectively, the "Domestic Industry"), we submit this reply to the response briefs of defendant United States ("Defendant" or the "Government") and the Canadian Defendant-Intervenors,[1] regarding the final results of the U.S. Department of Commerce's ("Commerce") fourth administrative review of the antidumping duty order on certain softwood lumber products from Canada. *See Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) ("*Final Results*"), P.R. 611. As demonstrated below, the Defendant and the Canadian Defendant-Intervenors fail to demonstrate that the conclusions and determinations challenged by the Domestic Industry are supported by substantial evidence and otherwise in accordance with law. Accordingly, the Domestic Industry respectfully requests that this Court grant its motion for judgment on the agency record and remand this case to Commerce consistent with the points set forth herein.

# ARGUMENT

## I.     The Statute Requires That Commerce Adjust U.S. Price to Account for Countervailing Duty Costs

The Domestic Industry's opening brief challenged Commerce's treatment of countervailing duty costs paid to bring softwood lumber products from Canada to the place of

---

[1] The Canadian Defendant-Intervenors in this action are Canfor Corporation, Canadian Forest Products, Ltd., Canfor Wood Products Marketing, Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, West Fraser Mills Ltd., Government of Canada, Government of Alberta, Government of Ontario, and Government of Quebec. *See* The Canadian Def.-Intervenors' Resp. to the Joint Mot. and Br. for J. on the Agency R. Submitted by the COALITION and Sierra Pacific Indus., Sept. 5, 2024, ECF 121.

delivery in the United States.  *See* COALITION and Sierra Pacific Indus.' Mem. in Supp. of

Rule 56.2 Mot. for J. on the Agency R. 7-15, Apr. 5, 2024 ("Domestic Industry Br."), ECF 109

(conf.), 110 (public).  The Domestic Industry's brief explained why the statute required

Commerce to remove these costs from the price used to establish export price ("EP") and

constructed export price ("CEP") in order for it to make the statutorily required fair comparison

between prices in Canada and the United States.  *Id.*; *see also* 19 U.S.C. § 1677b(a) (directing

Commerce to make a "fair comparison" between EP or CEP and normal value); *Micron Tech.,*

*Inc. v. United States*, 243 F.3d 1301, 1313 (Fed. Cir. 2001) (explaining that the "overarching

purpose" of the statute is to make a "fair, 'apples-to-apples' comparison between foreign market

value and United States price" (citation omitted)).

      The Government and Canadian Defendant-Intervenors defend Commerce's calculation of

U.S. price, arguing that Commerce's statutory interpretation is consistent with "the statute's plain

language."  Def.'s Resp. to Pls.' Mots. for J. on the Admin. R. 41, Aug. 22, 2024 ("Def. Br."),

ECF 118.  Their argument is incorrect.  Despite claiming that the "plain language" of the statute

supports Commerce's interpretation of section 772 of the Tariff Act of 1930, as amended (the

"Act"), both the Government and the Canadian Defendant-Intervenors attempt to support their

statutory arguments with cases decided under the now overruled *Chevron* framework.  *Id.* at 41

(citations omitted); Canadian Def.-Intervenors' Resp. to the Joint M. and Br. for J. on the Agency

R. Submitted by the COALITION and Sierra Pacific Indus. 13-14, Sept. 5, 2024 (Canadian Def.-

Int. Br."), ECF 121.  As detailed below, these parties' attempts to defend Commerce's decision

not to remove countervailing duty costs from the starting price used to establish EP and CEP

should be rejected.

A.    The Removal of Countervailing Duty Costs is Necessary to Make a Fair Comparison Between EP and Normal Value

The Domestic Industry's opening brief demonstrated that Commerce must deduct countervailing duty costs from the price used to establish EP and CEP because such costs are both: (1) "included in" the price used to establish EP and CEP; and (2) "incident to bringing the subject merchandise from the original place of shipment" in Canada to the United States. Domestic Industry Br. 9 (citing 19 U.S.C. § 1677a(c)(2)(A)).  The Domestic Industry grounded its argument in the plain language of section 772(c)(2) of the Act which requires Commerce to reduce the price used to calculate EP and CEP by:

> (A) Except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States.

19 U.S.C. § 1677a(c).  Because the statutory language is unambiguous regarding the adjustments that must be made to EP and CEP, the Domestic Industry argued that Commerce's interpretation in the final results was inconsistent with the statute and not entitled to deference.  Domestic Industry Br. 11-15; *see also Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 429 F. Supp. 3d 1325, 1342 (Ct. Int'l Trade 2020) (explaining, under *Chevron*, that when the statutory language is unambiguous, the court "need not defer" to Commerce's interpretation), *aff'd*, 102 F.4th 1252 (Fed Cir. 2024).

The Government acknowledges that the purpose of the statutorily required adjustments to EP and normal value is "so that they closely reflect the price of subject merchandise at a common point in the chain of commerce."  Def. Br. 40.  Nonetheless, it argues that Commerce's refusal to deduct countervailing duties from U.S. price was lawful because Congress did not include the term "countervailing duties" in section 772(c)(2)(A) of the Act.  *Id.* at 41.  The

Government's argument is incorrect, because it mischaracterizes the statutory text, and then bases its statutory interpretation on the mischaracterization.

Specifically, the Government asserts that section 772(c)(1)(C) of the Act "provides that U.S. price shall be increased by 'the amount of any *countervailing duty* imposed on the subject merchandise.'"  Def. Br. 41 (emphasis original) (quoting 19 U.S.C. § 1677a(c)(1)(C)).  In actuality, however, section 772(c)(1)(C) of the Act states that U.S. price shall be increased by "the amount of any countervailing duty imposed on the subject merchandise *under subtitle A to offset an export subsidy*."  19 U.S.C. § 1677a(c)(1)(C) (emphasis added).  In other words, the Government has selectively quoted only the first half of the provision, which creates the false impression that section 772(c)(1)(C) of the Act encompasses all countervailing duties, as opposed to the subset of countervailing duties specifically set out therein (*i.e.*, countervailing duties applied to offset export subsidies).[2]

This mischaracterization is central to the Government's statutory interpretation, and when the missing text is restored, the Government's interpretation collapses.  Section 772(c)(2)(A) of the Act states that the price used to establish EP and CEP "shall be" reduced by the amount included in such price attributable to "any additional costs, charges, or expenses" incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, "except as provided in paragraph (1)(C)."  19 U.S.C. § 1677a(c)(2)(A).  If section 772(c)(1)(C) of the Act applied to all countervailing duties as the Government asserts, then the effect of the quoted language would be to carve all countervailing duties out of the pool of "additional costs, charges, or expenses" covered by section

---

[2]  Moreover, the Government included a period instead of an ellipsis at the end of the quoted text, which renders its partial quotation even more misleading.

772(c)(2)(A).  But that is not what the statute says.  Rather, the quoted language only carves out

the specific subset of countervailing duties described in paragraph (1)(C).  *See* 19 U.S.C.

§ 1677a(c)(2)(A).  The necessary implication is that the term "additional costs, charges, or

expenses" in section 772(c)(2)(A) of the Act does include countervailing duties other than those

"imposed on the subject merchandise under subtitle A to offset an export subsidy."  *See id.*

§ 1677a(c)(1)(C).  The Government's contrary interpretation reads the "except as provided in

paragraph (1)(C)" clause out of the statute, contrary to canons of statutory interpretation.[3]  *See*

*Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("{A} statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

insignificant." (quoting *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879)).

     For their part, the Canadian Defendant-Intervenors correctly note that the surplusage

canon of statutory interpretation states that "every word and every provision {in a statute} is to

be given effect."  Canadian Def.-Int. Br. 12 n.50 (citation omitted).  This canon of statutory

interpretation refutes (rather than supports) the Government's and Canadian Defendant-

Intervenors' attempt to buoy Commerce's flawed statutory interpretation.  Specifically, Congress,

as part of the Trade Agreements Act of 1979, amended the statute to exclude countervailing

duties imposed to offset export subsidies from the adjustments made under section 772(c)(2)(A)

of the Act.  Trade Agreements Act of 1979, Pub. L. No. 96-39, § 101, 93 Stat. 144, 182 (1979).

Had Congress intended the phrase "any additional costs, charges, or expenses, and United States

---

[3] The Government's citation of section 772(c)(1)(A) of the Act is also misleading.  *See* Def. Br. 41-42.  Although the Government correctly notes that the term "costs, charges, and expenses" also appears in that provision, it fails to note that section 772(c)(1)(A) is concerned with costs, charges, and expenses "incident to placing the subject merchandise in condition packed ready for shipment to the United States."  19 U.S.C. § 1677a(c)(1)(A).  This is a different category of costs from those covered in section 772(c)(2)(A), and one that has no relevance to countervailing duties.

import duties" of section 772(c)(2)(A) of the Act not to include countervailing duties, there would have been no reason to include language that excludes one type of countervailing duty (those imposed to offset export subsidies, as opposed to those imposed to offset domestic subsidies) from the reach of the provision.  *See, e.g.*, *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990) (explaining that courts should be reluctant "to interpret a statutory provision so as to render superfluous other provisions" of the statute (citation omitted)).  Thus, Congress's action in amending the language of section 772 in the Trade Agreements Act of 1979 demonstrates that it understood that U.S. price was to be adjusted by the amount of any countervailing duty cost imposed (except those imposed to offset an export subsidy).

> B.     The Federal Circuit Has Not Resolved the Issue of Whether U.S. Price Should be Reduced By the Amount of Countervailing Duty Costs

The Domestic Industry's opening brief discussed the Federal Circuit's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023) ("*Borusan*") where the Federal Circuit, in addressing adjustments to EP and CEP, stated that it has "not addressed" whether Commerce's practice of not deducting countervailing duties when determining EP and CEP is proper.  *See* Domestic Industry Br. 12 (citing *Borusan*, 63 F.4th at 35 ("Commerce similarly treats countervailing duties as categorically excluded from 'United States import duties.'  . . .  But there is no immediately evident circularity problem, and we have not addressed whether such treatment is proper.")).  Neither the Government nor the Canadian Defendant-Intervenors address *Borusan* or the Federal Circuit's acknowledgment in that case that it has yet to address the lawfulness of Commerce's refusal to adjust EP and CEP to account for countervailing duty costs.  Instead, these parties rely primarily on CIT decisions holding that the language in section 772(c)(2)(A) of the Act concerning adjustment to EP and CEP was "not

defined" and "unclear."  *See* Def. Br. 41 (citing *AK Steel Corp. v. United States*, 988 F. Supp. 594

(Ct. Int'l Trade 1997); *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213 (Ct. Int'l Trade

1998)).  As detailed below, these decisions are neither binding nor persuasive.

As an initial matter, judges of this court are not "bound to march in lockstep" and are free

to "depart from the holding of a brother judge . . . if {they are} convinced through independent

analysis that the holding of {their} colleague is incorrect." *Am. Silicon Techs. v. United States*,

261 F.3d 1371, 1381 (Fed. Cir. 2001) (citations omitted).  Thus, the cases cited by the

Government and the Canadian Defendant-Intervenors should be closely examined by this Court.

Importantly, the cases relied on by the Government and the Canadian Defendant-

Intervenors were decided under the *Chevron* framework, which required courts to defer to

"permissible" agency interpretations. *See Chevron U.S.A. Inc. v. Natural Resources Defense

Council, Inc.*, 467 U.S. 837 (1984).  The U.S. Supreme Court has now overruled *Chevron*,

holding in *Loper Bright*, that courts, not administrative agencies, must say what the law is. *Loper

Bright Enters. v. Raimondo*, 603 U.S. __, 144 S. Ct. 2244, 2266 (2024).  Under *Loper Bright*,

courts are generally no longer to defer to "permissible" interpretations of the law but are to

instead apply the "full interpretative toolkit" to arrive at the relevant statute's "best meaning."

*Id.*, 603 U.S. at __, 144 S. Ct. at 2271.

Deference to Commerce's interpretation under *Chevron* was significant to the holdings of

both *AK Steel* and *Hoogovens Staal BV*.  In *AK Steel*, the CIT deferred to Commerce's "rational

explanation for {its} policy" of not deducting antidumping duties. *AK Steel Corp. v. United

States*, 988 F. Supp. 594, 608 (Ct. Int'l Trade 1997).  Similarly, in *Hoogovens Staal BV*, the

court, applying *Chevron*, deferred to "a permissible construction of the statute." *Hoogovens

Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998).  Post-*Loper Bright*,

courts may no longer defer to an agency interpretation of the law simply because the statute is

ambiguous.  *Loper Bright*, 603 U.S. at __, 144 S. Ct. at 2273.  Thus, while neither *AK Steel* nor

*Hoogovens Staal* were ever binding, the holdings of these cases must be carefully scrutinized as

the decisions in those cases failed to search for the single best meaning of the statutory term

"costs, charges, or expenses, and United States import duties," but instead treated silence as a

delegation and deferred to the agency's interpretation.

        In this case, the best reading of the statute is that Congress intended for Commerce to

reduce the starting price for EP and CEP by the amount of countervailing duty costs.  As

explained above, had Congress meant for countervailing duties not to be included among the

downward adjustments covered by the phrase "any additional costs, charges, or expenses, and

United States import duties" of section 772(c)(2)(A) of the Act, there would have been no reason

to exclude one type of countervailing duty from the reach of the provision.  Given Congress'

decision to explicitly exempt from the downward adjustment countervailing duties imposed to

offset export subsidies, it can only reasonably be concluded that countervailing duties imposed to

offset non-export subsidies "were excluded {from the exemption} by deliberate choice, not

inadvertence."  *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citing *United States v.*

*Vonn*, 535 U.S. 55, 65 (2002)).

        The Government and the Canadian Defendant Intervenors also cite the Federal Circuit's

decision in *Wheatland Tube*, but that case is inapposite.  *See* Def. Br. 42-43; Canadian Def.-Int.

Br. 10-12.  *Wheatland Tube* concerned the question of whether EP and CEP should be reduced by

the amount of any safeguard duties imposed on the merchandise, not countervailing duties.  *See*

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007).  The CIT had reversed

Commerce's refusal to deduct safeguard duties from EP.  *Wheatland Tube Co. v. United States*,

414 F. Supp. 2d 1271, 1286 (Ct. Int'l Trade 2006).  In doing so, the CIT found that the language of the statute to be ambiguous but held that Commerce's statutory interpretation was not reasonable because it did not "satisfy the objectives of the statute or trade remedy legislation in general."  *Id.* at 1280-81.  While ultimately sustaining Commerce's statutory interpretation that EP and CEP should not be adjusted downward by the amount of safeguard duties imposed on subject merchandise, the Federal Circuit did not address the statutory interpretation question before this court:  that is, whether a downward adjustment should be made for countervailing duties.

Further, the Federal Circuit's holding in *Wheatland Tube* was grounded in the substantial deference accorded to Commerce's interpretation under the *Chevron* framework.  The Federal Circuit began its opinion by emphasizing that the case concerned "statutory construction and agency deference."  *Wheatland Tube*, 495 F.3d at 1357.  It did not hold that Commerce's interpretation of section 772(c)(2)(A) was the "best," but only that "the trial court's reasoning is insufficient to overcome the deference that should be accorded to Commerce's interpretation."  *Id.* at 1365.  This Court is no longer required to defer to Commerce's interpretation of ambiguous statutory text.  Rather, the Court is charged with exercising its independent judgment in determining the best interpretation of the statute.  *See Loper Bright*, 603 U.S. at __, 144 S. Ct. at 2273.  Thus, *Wheatland Tube* does not dictate the outcome of this case.

C.       Adjusting for Countervailing Duty Costs is Consistent with the Statute's Purpose

The Canadian Defendant-Intervenors argue that reducing the price used to establish EP and CEP by the amount of countervailing duty costs would create a dumping margin "that is not the product of any pricing behavior by the exporter."  Canadian Def.-Int. Br. 15.  They claim that deducting countervailing duties would create "the type of double remedy that the statute undertakes to prevent."  *Id.* (citation omitted).  The Court should reject this argument, as it is

inconsistent with record evidence regarding how Canadian exporters sell into the United States market. As detailed below, Commerce must reduce U.S. price by the amount of countervailing duty costs if it is to capture the full extent of Canadian respondents' dumping activity, as the statute requires.

The Domestic Industry's opening brief detailed how Canfor Corporation ("Canfor") and West Fraser Mills Ltd. ("West Fraser") act as the importer of record for certain sales of subject merchandise.[4] Domestic Industry Br. 10; *see also* Letter from Morris, Manning & Martin, LLP to Commerce, "Canfor's Sections B-D Initial Questionnaire Response" (June 21, 2022) ("Canfor Sections B-D Initial Response"), at C-70 (reporting that "Canfor is the importer of record for all sales of subject merchandise during the POR"), C.R. 182, P.R. 320. The sample sale documents submitted by West Fraser illustrate why it is necessary to reduce U.S. price by the amount of countervailing duty costs. Those documents show that [

]. Letter from Gibson, Dunn & Crutcher LLP to Commerce, "Response to April 29, 2022 Section A Initial Antidumping Duty Questionnaire" (May 20, 2022), at Exhibit WF-AR4-A-8 ([

]), C.R. 21, P.R. 289. That [

]. *Id.* ([                    ]). However, West Fraser [

]. *Id.* ([                    ]).

This information refutes the Canadian Defendant-Intervenors' argument as it shows that

---

[4] West Fraser's U.S. sales file reports that West Fraser, [                    ], is [
]. Letter from Gibson, Dunn & Crutcher LLP to Commerce, "Response to April 29, 2022 Section B, C, and D Initial Antidumping Duty Questionnaire" (June 21, 2022), at Exhibit WF-AR4-C-10 (US Sales File Printout), C.R. 121, P.R. 318.

[

]. *See* 19 U.S.C.

§ 1677a(c)(2)(A).

An example using simple, made-up numbers demonstrates how Commerce's interpretation of the statute understates the extent of a respondent's dumping behavior when the foreign exporter acts as the U.S. importer of record. Suppose that a foreign producer's total duty paid sales price in the United States for subject softwood lumber is $500. Assume further that the subject merchandise is subject to a zero rate for "normal" duties, but is subject to a countervailing duty cost of $50, a freight expense of $50, and a brokerage/handling fee of $10. Presented with this factual scenario, CBP would assess duties on the value of subject merchandise derived by subtracting the (a) invoiced amount for duty deposit, (b) freight, and (c) brokerage/handling fees from the delivered duty paid price of $500 ($500 - $50 - $50 - $10). The dutiable value, then, would be $390. Commerce, on the other hand, would derive U.S. price by subtracting only two of the three invoiced costs, charges, or expenses considered by CBP. Under Commerce's interpretation of the statute, the delivered price of $500 would be reduced by the amount of the freight expenses ($50) and the amount of the brokerage/handling fee ($10) ($500 - $50 - $10). The net U.S. price (or "ex-factory" price), then, would be considered to be $440.

In these circumstances, if the normal value of subject merchandise is found to be $550, the Department would find a dumping margin of 25.00 percent ((550-440)/440 = 0.25). This margin would represent a $110 difference between the U.S. price ($440) and the normal value ($550) of subject merchandise. CBP, however, would apply the 25.00 percent antidumping duty rate to the lower dutiable value of $390, thereby collecting only $97.50. In sum, there would be

a substantial difference between the level of dumping that Commerce intended to be offset

($110) and what Customs actually would collect ($97.50).  Commerce's failure to correctly

interpret section 772(c)(2)(A) of the Act means that the antidumping duties imposed do not fully

offset the level of price discrimination occurring in the market.

     Commerce's deduction of countervailing duties from U.S. price, therefore, would not

constitute a type of double remedy as the Canadian Defendant-Intervenors assert.  Rather, this

adjustment would ensure that Commerce calculated dumping margins that fully offset the

amount of unfair trade occurring in the U.S. market.  *See, e.g.*, *New York State Dept. of Social*

*Servs. v. Dublino,* 413 U.S. 405, 419-20 (1973) ("We cannot interpret federal statutes to negate

their own stated purposes.").  Adjusting for countervailing duty costs is no more "double

counting" than adjusting for freight or customs broker fees when the terms of sale provide that

the producer pays these costs on behalf of the customer.  The purpose of the antidumping law is

to ensure that pricing in the U.S. market is fair, with the goal of permitting U.S. companies to

compete on a level playing field with foreign competitors.  *Xi'an Metals & Minerals Imp. & Exp.*

*Co. v. United States*, 50 F.4th 98, 101 (Fed. Cir. 2022) (describing the trade remedy laws as

designed to neutralize unfair trade practices and "level the playing field" for domestic

producers); *see also Regions Hospital v. Shalala*, 522 U.S. 448, 460 n.5 (1998) (instructing

courts to "look to the provisions of the whole law, and to its object and policy" (citations

omitted)).  As the example above shows, where merchandise is sold on a "duty-paid" basis, [

                            ], the exporter's pricing decision

must take into account the additional countervailing duty costs for which the exporter is

responsible.  Specifically, the exporter must adjust its U.S. price upwards to reflect the additional

cost incurred by assuming the countervailing duty obligation.  This additional cost is attendant

only to the exporter's U.S. sales and does not affect its prices in its home market.  The deduction

or removal of these costs is required precisely in order to determine the price paid for the

merchandise by the U.S. customer on the same terms as the price paid by the customer of the

foreign like product.  Accordingly, the Court should reject the Canadian Defendant-Intervenors'

claim that deducting countervailing duties from U.S. price is "not necessary" to accurately

measure dumping.

## II.    Commerce's Calculation of Canfor's G&A Expense Ratio Was Arbitrary and Unsupported by Substantial Evidence

The Domestic Industry's opening brief established how Commerce erred in its calculation

of a general and administrative ("G&A") expense ratio for Canfor using the information of the

'CFP Legal' entity.  *See* Domestic Industry Br. 15-20.  The Domestic Industry's opening brief

explained how Commerce departed from its regular practice of relying on a G&A expense ratio

specific to the company producing the merchandise under review and, instead, chose to rely on a

G&A expense ratio fashioned by Canfor for the made-up 'CFP Legal' entity.  *Id.* at 17-19.  The

Domestic Industry further illustrated how Commerce failed to include all G&A expenses

attributable to the 'CFP Legal' entity in the numerator of the G&A expense ratio calculation.  *Id.*

at 19-20.  For these reasons, the Domestic Industry asked the Court to remand the final results

for Commerce to reconsider its calculation of the G&A expense ratio that it used to determine

Canfor's cost of production ("COP").

In arguing that the Court should sustain Commerce's G&A expense ratio calculation, the

Government and the Canadian Defendant-Intervenors contend that the agency offered a

reasonable explanation of its decision.  *See* Def. Br. 45-49; Canadian Def.-Int. Br. 16-20.  These

parties further claim that substantial record evidence supports Commerce's decision to exclude

certain expenses reported by Canfor Southern Pine, Inc. ("CSP") and Canfor Sweden (Forest

Products) AB ("Canfor Sweden") from the numerator of the 'CFP Legal' G&A expense ratio

calculation, as these were selling expenses related to non-subject merchandise.  *See* Def. Br. 49;

Canadian Def.-Int. Br. 20-21.  As explained below, the Court must reject these attempts to

defend the flawed G&A expense ratio that Commerce relied on to determine Canfor's COP.

> A.    Commerce's Conclusion that CSP and Canfor Sweden Incurred No G&A
>        Expenses Must Be Remanded

The statute requires Commerce to include "an amount for selling, general, and

administrative expenses based on actual data pertaining to production and sales of the foreign

like product by the exporter in question" in calculating a respondent's COP.  19 U.S.C.

§ 1677b(b)(3)(B).  "G&A expenses are generally understood to mean expenses which relate to

the activities of the company as a whole rather than to the production process."  *Torrington Co. v.*

*United States*, 146 F. Supp. 2d 845, 885 (Ct. Int'l Trade 2001) (internal quotations omitted).

Commerce calculates a respondent's G&A expense ratio by dividing the expenses attributable to

the general operations of the company by the company-wide cost of goods sold ("COGS").  *See,*

*e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1161, 1166 (Ct. Int'l

Trade 2017) (describing Commerce's G&A practice), *aff'd in part, remanded in part*, 940 F.3d

662 (Fed. Cir. 2019).

In this review, Canfor reported to Commerce a G&A expense ratio that it created using

the expenses and costs of the 'CFP Legal' entity.  *See* Canfor Sections B-D Initial Response at D-

56–D-58, C.R. 184, P.R. 321.  'CFP Legal' is not an actual legal entity [

                                                    ].  *See* Letter from Morris, Manning & Martin, LLP to

Commerce, "Canfor's Section A Initial Questionnaire Response" (May 20, 2022) ("Canfor

Section A Initial Response"), at [                          ], C.R. 27, P.R. 290.  Rather, 'CFP Legal' is

defined by the respondent as "Canfor Corporation less {Canfor Pulp Products Inc. ("CPPI")}."

Canfor Sections B-D Initial Response at D-56, C.R. 184, P.R. 321.  Because of this definition,

'CFP Legal' [                                                    ], *see* Canfor Section A Initial Response at

Exhibit A-2 (Canfor's organizational structure), C.R. 27, P.R. 290, and includes Canfor's lumber

operations in Sweden and the United States.  Canfor Sections B-D Initial Response at D-56 n.23,

C.R. 184, P.R. 321.

 In responding to the Domestic Industry's argument that the numerator of the 'CFP Legal'

G&A ratio fails to include all of the G&A expenses of the 'CFP Legal' entity, the Government

argues that the G&A expense ratio that Commerce relied upon achieved an "apples-to-apples"

comparison and that there was no asymmetry between the G&A expenses included in the

numerator and the COGS in the denominator.  Def. Br. 47; *see also* Canadian Def.-Int. Br. 20-21.

According to the Government, Commerce properly excluded expenses "specifically recorded" by

CSP and Canfor Sweden because they were composed entirely of selling expenses.  Def. Br. 46-

47 (citing IDM at 60, P.R. 585).  But Commerce's analysis of this issue in the final results offers

nothing more than mere "conclusory statements."  *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1383

(Fed. Cir. 2016) (explaining that an agency acts arbitrarily when it rejects arguments without

explanation or offers mere "conclusory statements" for its decision).

 Commerce's analysis of this issue in the decision memorandum accompanying the final

results states in its entirety as follows:

> The petitioner asserts that Commerce was incorrect to exclude expenses identified
> for {Canfor Wood Products Ltd.}, Canfor Sweden and Canfor Southern Pine, but
> the removed expense amounts for all three companies were identified as relating to
> selling, rather than general and administrative expenses, and so were properly
> excluded.

IDM at 60, P.R. 585.  The Department cites to the "summary" worksheet of Canfor's G&A

expense ratio calculation in support of its conclusion that the excluded expenses related to

selling, rather than G&A.  *Id.* at 60 n.318 (citing Letter from Morris, Manning & Martin, LLP to

Commerce, "Canfor's Sections B-D Supplemental Questionnaire Response" (Dec. 7, 2022)

("Canfor Dec. 7 Supp. Sections B-D Response"), at Exhibit D-37, C.R. 423, P.R. 488).

Commerce's analysis of this issue in the final results fails to meet the basic requirement

of administrative law that an agency must provide reasoned explanations for its decisions that

"examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Here, Canfor's G&A

expense ratio worksheet begins with a "Canfor Corporation SG&A expense" figure of

C$[       ] taken from Canfor Corporation's income statement.  Canfor Dec. 7 Supp.

Sections B-D Response at Exhibit D-37 ("Summary – G&A 2021" worksheet), C.R. 423,

P.R. 488.  From this starting amount, Canfor deducts CPPI's expenses of C$[       ], thus

leaving a "Total CFP" administrative cost amount of C$[       ].  *Id.*  Within this sum,

[                              ] related to the selling, general, and administrative expenses of CSP

and Canfor Sweden, respectively.  *Id.*  Canfor declared that these amounts were "not part of GA"

because they were comprised of selling expenses for CSP and Canfor Sweden.  *Id.*  By claiming

that CSP and Canfor Sweden incurred no G&A expenses, Canfor shrunk the numerator of its

G&A expense ratio by more than [     ] percent.[5]

In defending the G&A expense ratio that Commerce used to calculate Canfor's COP, the

Government asserts that "there is nothing inherently inaccurate" about CSP and Canfor Sweden

"not explicitly recording G&A expenses."  Def. Br. 49.  However, as noted in the Domestic

_____

[5] The numerator of the 'CFP Legal' G&A expense ratio was C$[       ].  Canfor Dec. 7 Supp. Sections B-D Response at Exhibit D-37 ("Summary – G&A 2021" worksheet), C.R. 423, P.R. 488.  This sum excluded amounts of C$[       ] and C$[       ], which were labelled by Canfor as "selling" expenses for CSP and Canfor Sweden, respectively.  *Id.*  If these amounts were not excluded, the numerator would have been C$[       ].  *See id.*

Industry's opening brief, CSP and Canfor Sweden are not simply paper or holding companies. *See* Domestic Industry Br. 19. Rather, Canfor Sweden and CSP are both operating companies engaged in the production and distribution of lumber products in Sweden and the United States, respectively. *See* Canfor Section A Initial Response at A-11 (describing CSP as "own{ing} and operat{ing} a number of sawmills and related entities that are engaged in the production and sale" of lumber in the United States and Canfor Sweden as "operat{ing} a number of entities in Sweden that distribute Swedish-origin lumber"), C.R. 27, P.R. 290. Thus, regardless of any "intertwined" operations, *see* Def. Br. 46 (citation omitted), Commerce's finding that these entities incurred no G&A expenses runs counter to record evidence regarding these affiliates' operations.

Indeed, Commerce acknowledged in the following segment of this proceeding that excluding the G&A expenses of CSP and Canfor Sweden from the numerator of the 'CFP Legal' G&A expense ratio calculation "create{s} an 'apples and oranges' situation where the items in the numerator do not correspond to the items in {the} denominator." *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review, and Final Determination of No Shipments; 2022*, 89 Fed. Reg. 67,067 (Dep't Commerce Aug. 19, 2024) ("*AR5 Final Results*"), and accompanying IDM at 16. Specifically, Commerce concluded in that administrative review that the G&A expenses incurred by CSP and Canfor Sweden must be included in the numerator of the G&A expense ratio calculation as the denominator included those companies' COGS. *Id.*

In this case, Commerce overlooked an important aspect of the problem when it failed to analyze Canfor's selling and general expense information before deciding to exclude the C$[        ] of expenses belonging to CSP and Canfor Sweden. The "SGA Details" worksheet

of Canfor's G&A expense exhibit [                        ] Canfor Sweden or CSP's administrative

expenses [                                                    ].  *See* Canfor Dec. 7 Supp.

Sections B-D Response at Exhibit D-37 ("SGA details" worksheet), C.R. 423, P.R. 488.  Rather,

Canfor Sweden's administrative expenses are reported [

                                                    ].  *Id.*  This [

        ] provides no evidentiary support for Commerce's conclusion that the amounts

excluded from the numerator of the 'CFP Legal' G&A expense ratio calculation related entirely

to the selling expenses of CSP and Canfor Sweden.  Rather the [

        ] suggests expenses related to the activities of the company as a whole.

Accordingly, the Department erred in the final results by not including all of the G&A expenses

incurred by the 'CFP Legal' entity in the numerator of the G&A expense ratio calculation.

> B.     <u>Commerce's Practice Accounts for Situations Where a Parent Company Provides
>         Services to the Subsidiary</u>

The Government and the Canadian Defendant-Intervenors contend that calculating a

G&A expense ratio using CFP's tax return, as proposed by the COALITION, is "not possible"

and "unworkable" because it would omit any G&A expenses that Canfor Corporation undertakes

on behalf of the individual companies included in the consolidated entity.  Def. Br. 48; Canadian

Def.-Int. Br. 19-20.  These parties attempt to portray the fact that Canfor Corporation incurred

G&A expenses on behalf of its subsidiaries as a unique circumstance that makes Commerce's

regular G&A practice inappropriate.  The Court should reject this argument as it overlooks the

fact that Commerce's antidumping questionnaire instructs respondents to "{i}nclude in your

reported G&A expenses an amount for administrative services performed on your company's

behalf by its parent company or other affiliated party."  *See* Canfor Sections B-D Initial

Response at D-68, C.R. 184, P.R. 321.  In *Carbon Steel Flanges from India*, Commerce

explained that its regular practice is "to allocate a parent company's G&A expenses to its subsidiary in situations where the parent company provided services to the subsidiary or incurred expenses on its behalf." *Finished Carbon Steel Flanges From India: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,668 (Dep't Commerce Mar. 14, 2023), and accompanying IDM at 13-14 (citation omitted); *see also Aluminum Extrusions From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 80,458 (Dep't Commerce Oct. 3, 2024), and accompanying IDM at 33 (including a portion of the parent company's operating losses in the producing company's G&A expenses after finding that the parent company existed solely for the benefit of the subsidiaries). Thus, Commerce's regular practice is designed to deal with situations where a parent company (such as Canfor Corporation) provides administrative services to the producer of the merchandise (in this case, Canadian Forest Products Ltd.).

Commerce has applied its regular practice in calculating Canfor's G&A expense ratio in prior lumber proceedings. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,539 (Dep't Commerce Apr. 2, 2002), and accompanying IDM at Comment 19. In the final results of Commerce's less-than-fair-value investigation in *Lumber IV*, the agency rejected Canfor's argument that its G&A expense ratio should be calculated using the expenses and costs reported in its consolidated financial statements. *Id.* Responding to Canfor's argument, Commerce emphasized its "consistent and predictable practice for calculating and allocating G&A expenses," including its practice of including "a portion of G&A expenses from the parent company." *Id.* This practice, according to Commerce, avoids respondents adopting a "results-oriented approach" on a proceeding-by-proceeding basis. *Id.* Because Commerce failed to provide a reasoned

explanation for its departure from its established practice of relying on the G&A expenses of the

producing company, adding an amount to account for the G&A expenses of the parent, its

determination is arbitrary and must be remanded.

  C.  Commerce's Practice In Earlier Segments Ignores Differences in the Factual
      Record Before Commerce in this Review

    Finally, in defending Commerce's reliance on the G&A experience of the 'CFP Legal'

entity, the Canadian Defendant-Intervenors argue that Commerce's methodology was consistent

with past segments of this proceeding.  Canadian Def.-Int. Br. 16-18.  This line of argument

attempts to gloss over factual differences between the record of this review and other segments

of this proceeding.  *See, e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 161 F. Supp.

3d 1343, 1348 (Ct. Int'l Trade 2016) (observing that each "proceeding is based on its own unique

record" (citations omitted)); *Peer Bearing Co.–Changshan v. United States*, 587 F. Supp. 2d

1319, 1325 (Ct. Int'l Trade 2008) (noting that each administrative review is a separate

proceeding with distinct facts, and stating that "if the facts remained the same from period to

period, there would be no need for administrative reviews" (citation omitted)).  In this segment,

Canfor included its "newly purchased European lumber operations" in the 'CFP Legal' entity.

*See* Canfor Sections B-D Initial Response at D-56 n.23, C.R. 184, P.R. 321.  This change had the

obvious impact of increasing the denominator of the 'CFP Legal' G&A expense ratio calculation.

However, because Commerce excluded Canfor Sweden's expenses from the numerator of the

calculation, the resulting ratio was distorted.  Thus, Commerce's practice in the underlying

investigation, prior to Canfor's acquisition of its European operations, cannot support the

lawfulness of Commerce's determination in the final results of this segment.

## CONCLUSION

For the foregoing reasons, and as further detailed in the Domestic Industry's opening brief, the Domestic Industry respectfully requests that this Court hold unlawful the determinations, findings, and conclusions addressed above and remand the final results to Commerce for redetermination consistent with the Court's opinion.

Respectfully submitted,                                        Respectfully submitted,

*/s/ Jeffrey I. Kessler*                                          */s/ Zachary J. Walker*

David J. Ross                                                    Zachary J. Walker
Jeffrey I. Kessler                                               Andrew W. Kentz
Stephanie E. Hartmann

**WILMER CUTLER PICKERING HALE**          **PICARD KENTZ & ROWE LLP**
   **and DORR LLP**                                         1155 Connecticut Avenue NW
2100 Pennsylvania Avenue NW                    Suite 700
Washington, DC 20037                              Washington, DC 20036
(202) 663-6000                                         (202) 888-0595

*Counsel to Sierra Pacific Industries,*               *Counsel to the COALITION*
*including its subsidiary Seneca Sawmill*
*Company*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that this brief complies with the 7,000 word-count limitation set in the Court's January 17, 2024 scheduling order. *See* ECF 98. This brief contains 6,469 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

*/s/ Zachary J. Walker*
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
*Counsel to the COALITION*

October 10, 2024