A-122-857
Remand
CIT 23-187
POR:  01/01/2021 – 12/31/2021
**Public Document**
E&C/OIV:  TEM

*Government of Canada et al.. v. United States*
**Court No. 23-00187(CIT June 17, 2025)**
**Softwood Lumber from Canada**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the

Court), in *Government of Canada et al. v. United States*, issued on June 17, 2025, consistent with

the opinion issued by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in

*Marmen.*[1]  This action arises out of the fourth administrative review of the antidumping order on

softwood lumber from Canada,[2] covering the period of review (POR) of January 1, 2021,

through December 31, 2021, which found that mandatory respondents Canfor[3] and West Fraser[4]

made sales at less than normal value (NV).[5]  The Court directed Commerce to review and revise

---

[1] *See Government of Canada et al. v. United States*, Court No. 23-00187, ECF No. 160 (CIT June 17, 2025)
(*Remand Order*); *see also Marmen Inc. v. United States*, No. 2023-1877, 134 F.4th 1334 (2025) (*Marmen*).
[2] *See Certain Softwood Lumber Products from Canada: Antidumping Duty Order and Partial Amended Final
Determination,* 83 FR 350 (January 3, 2018).
[3] Commerce has treated Canfor Corporation, Canadian Forest Products Ltd., and Canfor Wood Products Marketing
Ltd. (collectively, Canfor) as a single entity.
[4] Commerce has treated West Fraser Mills Ltd., Blue Ridge Lumber Inc., Manning Forest Products Ltd., and Sundre
Forest Products Inc. (collectively, West Fraser) as a single entity.
[5] *See Certain Softwood Lumber Products from Canada:  Final Results of Antidumping Duty Administrative Review
and Final Determination of No Shipments; 2021*, 88 FR 50106 (August 1, 2023) (*Final Results*), and accompanying
Issues and Decision Memorandum (IDM); s*ee also Certain Softwood Lumber Products from Canada: Amended
Final Results of Antidumping Duty Administrative Review in Part; 2021,* 88 FR 61511 (September 7, 2023)
(*Amended Final Results*).

its *Final Results* and *Amended Final Results* to conform to the Federal Circuit's opinion in *Marmen*.[6]

Pursuant to the Court's *Remand Order* and *Marmen*, Commerce has reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis. As a result of our analysis, we made revisions to both Canfor's and West Fraser's margin calculations from the *Final Results* and *Amended Final Results*, resulting in no change to the revised weighted-average dumping margins of either Canfor (*i.e.*, 5.25 percent) or West Fraser (*i.e.*, 7.06 percent). Moreover, because there has been no change to these weighted-average dumping margins, there is no change to the rate for parties not selected for individual examination (*i.e.*, 6.26 percent).

## II.    BACKGROUND

In the *Final Results* and *Amended Final Results*, Commerce calculated weighted-average dumping margins for Canfor and West Fraser using an alternative comparison method based on applying the average-to-transaction (A-to-T) method[7] to all U.S. sales.[8] The Government of Canada, Canfor, West Fraser, and several other parties, challenged the *Final Results* and *Amended Final Results* before this Court. As noted above, the Court remanded Commerce's determinations for conformance with the Federal Circuit's decision in *Marmen*.

## III.    ANALYSIS

### A.    Commerce's Application of the Cohen's *d* Test

Following the Federal Circuit's decisions in *Marmen* and *Stupp IV*,[9] Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Act, to identify whether prices for

---

[6] *See Remand Order.*
[7] *See* section 777A(d)(1)(B) of the Tariff Act of 1930, as amended (the Act).
[8] *See Final Results* IDM at Comments 2, 3, 4, and 5, unchanged in *Amended Final Results.*
[9] *See Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. 2025) (*Stupp IV*).

comparable merchandise differ significantly among purchasers, regions, and time periods.[10]  To

comply with the Federal Circuit's holdings in *Marmen*, Commerce discontinued the use of the

Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price

differences among purchasers, regions, or time periods are significant.[11]  Additionally, and

concurrent with this change, Commerce also discontinued the use of the "mixed comparison

method" in administrative proceedings.  In its revised differential pricing analysis, Commerce

adopted the "price difference test" as part of its differential pricing analysis to determine whether

prices differ significantly.  Accordingly, for these final results of redetermination, in light of

Commerce's revised approach in administrative proceedings pursuant to the Federal Circuit's

decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce

reconsidered and discontinued its application of the Cohen's *d* test as part of its differential

pricing analysis, and discontinued the use of the mixed comparison method, and, in the

alternative, applied the "price difference test," as detailed below.

     **i.**     **Comparisons to Normal Value**

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to

determine whether Canfor's and West Fraser's sales of the subject merchandise from Canada to

the United States were made at less than NV, Commerce compared the constructed export price

(CEP) to the NV as described in the "Export Price and Constructed Export Price" and "Normal

Value" sections of the *Preliminary Results*.[12]

---

[10] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).

[11] *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5.

[12] *See Certain Softwood Lumber Products from Canada: Preliminary Results of Antidumping Duty Administrative Review*, 88 FR 5306 (January 27, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 8-10.

### 1. Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average export prices (EP) (or CEPs) (*i.e.*, the average-to-average (A-to-A) method) unless Commerce determines that another method is appropriate in a particular situation.  In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the A-to-T method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in an LTFV investigation.[13]

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here.  Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

---

[13] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F.Supp.3d 1286 (CIT 2014) (*Apex*).

The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POR based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used in these final results of redetermination, the "price difference test" is applied to determine whether prices differ significantly.  For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods.  If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ

significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping

6

margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

## 2. Results of the Differential Pricing Analysis

For Canfor, based on the results of the differential pricing analysis, Commerce finds that 99.40 percent of the value of U.S. sales pass the price difference test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.[14]  For West Fraser, based on the results of the differential pricing analysis, Commerce finds that 99.82 percent of the value of U.S. sales pass the price difference test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.[15]  Further, Commerce determines with respect to both Canfor and West Fraser that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the alternative A-to-T method.  Thus, for these final results of redetermination, Commerce is applying the A-to-T method to calculate the weighted-average dumping margins for both Canfor and West Fraser.

## IV.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have discontinued the use of the Cohen's *d* test and adopted the "price difference test" to determine whether prices differ significantly.  We have also followed our discontinuance of the "mixed comparison method" in

---

[14] *See* Memorandum, "Softwood Lumber from Canada, *Government of Canada et al.. v. United States*, Court No. 23-00187(CIT June 17, 2025):  Draft Remand Analysis Memorandum for Canfor Corporation," dated December 22, 2025.

[15] *See* Memorandum, "Softwood Lumber from Canada, *Government of Canada et al.. v. United States*, Court No. 23-00187(CIT June 17, 2025):  Draft Remand Analysis Memorandum for West Fraser Mills Ltd.," dated December 22, 2025.

administrative proceedings.  With these changes in Commerce's analysis, there is no change to the weighted-average dumping margins calculated for either Canfor or West Fraser.  Further, because the weighted-average dumping margins for the two examined respondents have not changed, the weighted-average dumping margin for the non-examined companies under review does not change.

Because Canfor's and West Fraser's weighted-average dumping margins and the weighted-average dumping margin for the companies not individually examined are not different from those in the *Final Results* or the *Amended Final Results*, we do not intend to issue a *Timken*[16] notice should the Court ultimately sustain these results of redetermination.

## V.    INTERESTED PARTY COMMENTS

On December 22, 2025, Commerce released its Draft Remand and invited interested parties to comment.[17]  On January 5, 2026, we received comments from the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations (COALITION)[18] and the Government of Canada; the Governments of Alberta, Ontario, and Québec; the British Columbia Lumber Trade Council, Conseil de l'industrie forestière du Québec, and Ontario Forest Industries Association; as well as Canfor Corporation, Canadian Forest Products, Ltd., Canfor Wood Products Marketing Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, Fontaine, Inc., Interfor Corporation, Interfor Sales & Marketing Ltd., Resolute FP Canada Inc., Tolko Industries Ltd., Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., West Fraser Mills Ltd.,

---

[16] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).
[17] *See* Draft Results of Redetermination Pursuant to Court Remand, *Government of Canada et al.. v. United States.* Court No. 23-00187(CIT June 17, 2025), dated December 22, 2025 (Draft Remand).
[18] *See* COALITION's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated January 5, 2026 (COALITION's Comments*).*

Chaleur Forest Products, Inc., Chaleur Forest Products, L.P., J.D. Irving, Limited, Delco Forest

Products, Ltd., Devon Lumber Co., Ltd., H.J. Crabbe & Sons, Ltd., Langevin Forest Products,

Inc., Marwood, Ltd., North American Forest Products, Ltd., and Twin Rivers Paper Co.

(collectively, the Canadian Parties).[19]  These comments are addressed below.

**Comment 1: Commerce's Decision Not to Use Cohen's *d* Test Was Correct**

*COALITION's Comments*:

> The draft redetermination conformed to the Court of International Trade's (CIT) order to conform to the Federal Circuit decision in *Marmen*, replacing the Cohen's *d* test with a price difference test to address the criterion under section 777A(d)(1)(B)(i) of the Act regarding whether U.S. sales prices differ significantly among purchasers, regions, or time periods.  Commerce did not modify the meaningful difference test, which addresses the criterion under section 777A(d)(1)(B)(ii) of the Act.  The modified analysis is a reasonable methodological approach to address the criteria set forth in section 777A(d)(1)(B)(i) of the Act.[20]

*Canadian Parties' Comments*:

> The Federal Circuit held that Commerce cannot use the Cohen's *d* coefficient where the respondents' underlying price data do not satisfy the necessary assumptions of normal distributions, equal variability, and equally and sufficiently numerous data. It is undisputed that the respondents' data in this review do not satisfy these assumptions, thus Commerce was correct to discard the Cohen's *d* test.[21]

**Commerce's Position:**  As explained above, we agree with the COALITION and the Canadian

Parties that replacing the Cohen's *d* test fulfilled the CIT's order and conformed to the Federal

Circuit holding in *Marmen*.

---

[19] *See* Canadian Parties' Letter, "Comments on the U.S. Department of Commerce's Draft Remand Results," dated January 5, 2026 (Canadian Parties' Comments).
[20] *See* COALITION's Comments at 3-6.
[21] *See* Canadian Parties' Comments at 8-9.

**Comment 2:   Whether Commerce Should Provide "Offsets" For Any Comparisons Where U.S. Price Exceeds Normal Value When Calculating Dumping Margins Using the A-A Method**

*COALITION's Comments*:

> In the event that Commerce decides to apply the A-to-A method, it should modify its practice to eliminate offsets so that the total amount of dumping equals the total positive comparison results.  Commerce's existing practice conflicts with the best reading of the statute by accepting the notion of so-called "negative" dumping margins, which is a concept not contemplated by the statute.  The Supreme Court's decision in *Loper Bright*[22] calls into question this practice.  Commerce should "zero" comparisons where normal value does not exceed U.S. price.[23]

The Canadian Parties did not comment on this issue.

**Commerce's Position:**  Commerce continues to use the A-to-T method to calculate the weighted-average dumping margins for Canfor and West Fraser in these final results of redetermination, including denying offsets for non-dumped sales.  Because Commerce did not apply the A-to-A method with offsets for non-dumped sales with respect to both Canfor and West Fraser's margin calculations, the COALITION's argument is moot.

**Comment 3: Whether the Price Difference Test Determines Significant Price Differences**

*Canadian Parties' Comments*:

> Dictionaries define "significantly" to mean "in a way that is easy to see or by a large amount," "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential, or simply "in a significant manner {or} to a significant degree."[24] Before Commerce may resort to the extraordinary A-T methodology, section 777A(d)(1)(B) of the Act requires that Commerce determine whether there "is a pattern of export prices…for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  Whether two or more things differ "significantly" from one another depends on context.  Commerce's analysis must include the relevant factual circumstances and the characteristics of the product and market to determine if price differences are consequential or meaningful.  A "mechanical, bright-line threshold of two percent…does not suffice

---

[22] *See Loper Bright Enterprises. v. Raimondo,* 603 U.S. 369 (2024) *(Loper Bright)*.
[23] *See* COALITION's Comments at 6-8.
[24] *See* Canadian Parties' Comments at 9-10.

as an assessment of whether price differences are indeed significant nor whether there is a 'pattern'."[25]

The COALITION did not comment on this issue.

**Commerce's Position:**  We disagree with the Canadian Parties.  The term "significantly" is "open-ended."  In *Garg Tube Export*,[26] the CIT found that "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the open-ended term 'differ significantly.'"  First, the CIT explained that "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."[27] Next, the CIT observed that the SAA provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute.[28]  Finally, the CIT found that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, section 777A(a) of the Act, and another subsection that exclusively allows Commerce to select averages and statistically valid samples, section 777A(b) of the Act, further confirms that Congress meant to afford the agency with flexibility and discretion.[29]  Therefore, the CIT held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under {section 777A of the Act}."[30]

The Federal Circuit held that its "conclusion, of course, does not preclude Commerce from fashioning and justifying" a different analysis instead of "Cohen's analysis of group

---

[25] *See* Canadian Parties' Comments at 10-11.
[26] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366-67 (CIT 2024) (*Garg Tube Export*).
[27] *Id.*, 740 F.Supp.3d. at 1367.
[28] *Id.* (citing Statement of Administrative Action (SAA), H.R. Doc. No. 103 – 316, vol. 1 (1994) at 843, reprinted in 1994 U.S.C.C.A.N. 4040, 4178).
[29] *Id.*
[30] *Id.*

11

differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue."[31]  Indeed, the Federal Circuit stated "Commerce may re-perform a differential pricing analysis," and the differential pricing analysis involves quantitative analysis such as the ratio test and the meaningful difference test.  Thus, we disagree with the Canadian Parties that Commerce is bound by a particular interpretation of "differs significantly" such that it cannot exercise the discretion afforded to it by Congress to implement the price difference test pursuant to the statute.

We further disagree with the Canadian Parties' argument that the two-percent threshold "does not suffice as an assessment of whether price differences are indeed significant" when, as the Canadian Parties claim, that pricing is "highly volatile" in the U.S. softwood lumber market, where prices may "vary by dramatically greater proportions than two percent."[32]  The purpose of section 777A(d)(1)(B) of the Act is to provide an alternative comparison method when one of the standard comparison methods provided for under section 777A(d)(1)(A) of the Act (*e.g.*, the A-to-A method[33]) masks dumping through offsetting lower prices with higher prices.[34]  As such, the pattern requirement, section 777A(d)(1)(B)(i) of the Act, requires that Commerce identify that conditions are present in the respondent's pricing behavior in the U.S. market where masked dumping could be occurring, *i.e.*, where lower prices offset higher prices where prices differ significantly.  This canary-in-the-coal-mine analysis should reasonably identify conditions where

---

[31] *See Marmen,* 134 F.4th at 1348; *see also Stupp Corp. v. United States,* No. 23-1663, 2025 WL 1178392 (Fed. Cir. April 23, 2025) at *3 ("Additionally, the Court remanded this very case nearly four years ago to give Commerce an opportunity to explain why meeting these assumptions is not necessary and, as *Marmen* well and thoroughly describes, Commerce did not do so in a particularly persuasive manner. *See id.* at 15-23. And this case does not call on us to assess the broader question of whether Commerce can ever reasonably rely on rules of thumb that are not statistically grounded".)

[32] *See* Canadian Parties' Comments at 11.

[33] As the transaction-to-transaction method is only used in "unusual situations," we will only reference the A-to-A method.  *See* 19 CFR 351.414(c)(2).

[34] *See* SAA at 842.

the margin calculations based on the A-to-A method could fail to unearth masked dumping. Commerce's use of a two-percent threshold correlates with other parts of its margin calculations which are found to "differ significantly," and, therefore, Commerce finds that the two-percent threshold in the price difference test is reasonable.

A two-percent threshold is used by Commerce in other contexts, and is consistent with other aspects of Commerce's practice in antidumping proceedings. For example, in the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by two percent or more, and, therefore, fail the arm's-length test, "differ significantly" from market prices.[35] When the prices to an affiliated customer are to not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade. The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV.

Further, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other

---

[35] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value,* 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik")).

words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero, whereas an estimated weighted-average dumping margin that is less than two percent, (*i.e.*, *de minimis*), results in a determination that sales are not at LTFV. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[36] If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at LTFV, then it is reasonable to conclude that a two-percent difference in U.S. prices -- *the same U.S. prices that are used in comparison with normal value* -- is significant within the context of section 777A(d)(1)(B)(i) of the Act. Furthermore, in an administrative review such as is at issue in this litigation, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative, *i.e.*, a higher threshold for defining a significant difference, and indicates a level of significance that is much greater than the level of significance when the assessment of antidumping duties are at issue.[37]

Therefore, we find the Canadian Parties' argument that the two-percent threshold must be considered in light of the volatility in the U.S. softwood lumber market to be without merit. Commerce does not look for the reasons why dumping is or may be occurring; Commerce finds dumping when U.S. prices are less than normal value.[38] The fact that the U.S. prices may be volatile would not negate that dumping or masked dumping is occurring. Indeed, Commerce's calculation of a respondent's weighted-average dumping margin is based on a respondent's

---

[36] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping...").

[37] *See* 19 CFR 351.106(c) (providing that, in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more).

[38] *See* section 771(35) of the Act.

reported U.S. prices which would reflect such volatility.  The differential pricing analysis, including the price difference test, uses those same U.S. sales to determine, first, whether a pattern of prices that differ significantly exists which demonstrates that conditions exist within the respondent's U.S. pricing behavior which could indicate potential masked dumping; and second, whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and the alternative A-to-T method which demonstrates that masked dumping exists when using the A-to-A method.  Simply identifying the reasons why masked dumping exists when using the A-to-A method does not change the fact that masked dumping is occurring.   Commerce has an obligation to address the dumping pursuant to the statute.

**Comment 4:   Whether the Price Difference Test Ignores the Case-By-Case Language in the SAA**

*Canadian Parties' Comments*:

> The SAA explains that the purpose of section 777A(d)(1)(B) of the Act is "to investigate 'targeted dumping'," and for Commerce to determine whether prices differ significantly on a case-by-case basis.  Commerce's price difference test ignores Congress' "case-by-case" directive and reflects no effort at calibration to the relevant market and instead results in unwarranted findings of targeted dumping.[39]

The COALITION did not comment on this issue.

**Commerce's Position:**  Commerce's price difference test conforms with Congress' intent that Commerce determines whether prices differ significantly on a "case-by-case basis."[40]  The SAA states that, "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one

---

[39] *See* Canadian Parties' Comments at 11-13.
[40] *See* section 777A(d)(1)(B) of the Act; *see also* SAA at 843.

15

industry or one type of product but not for another."[41] As explained above under Comment 3, Commerce's "price difference test" examines whether the weighted-average net price to a given purchaser, region, or time period is within two-percent of the weighted-average net price to all other purchasers, regions or time periods.  Thus, whether the prices to a given purchasers, regions and time periods differ significantly is determined relative to the weighted-average net price to all other purchasers, regions or time periods.  As a result, the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the respondent's pricing of comparable merchandise to all other purchasers, regions or time periods, and Commerce's analysis therefore conforms with Congress' intent that an analysis of whether a pattern of prices exists be carried out on a case-by-case basis.

We disagree with the Canadian Parties' argument that Commerce's price difference test is carried out without taking relevant market considerations into account.  The test does not stipulate an absolute value as a threshold (*e.g.*, $5 per kg) to define "differ significantly," but depends upon a threshold that measures the relative difference (*i.e.*, a percentage) on a comparison-by-comparison basis where the threshold is calculated as plus or minus two percent of the weighted-average net prices to all other purchasers, regions or time periods.  Because the difference between the weighted-average net price to a given purchaser, region, or time period and the weighted-average net price to all other purchasers, regions, or time periods is measured relative to the weighted-average net price to all other purchasers, regions, or time periods, the price difference test is not a brightline test.

---

[41] *See* SAA at 843.

16

**Comment 5:  Whether Canadian Parties Are Raising Different Grounds than *JBF RAK***

*Canadian Parties' Comments*:

> The Federal Circuit's opinion in *JBF RAK* does not appear to speak to a situation where a respondent actually demonstrates that the price differences are not the result of targeting.  The record evidence shows that the observed price differences are the result of market factors as opposed to a respondent's pricing decisions, and not targeted dumping.  The substantial evidence standard might require a different result.[42]

The COALITION did not comment on this issue.

**Commerce's Position:**  Commerce disagrees with the Canadian Parties and continues to find that Commerce is not required to consider the reasons that prices differ significantly among purchasers, regions, and time periods, consistent with the Federal Circuit's precedent in *JBF RAK*.[43]  In *JBF RAK*, the Federal Circuit held that Commerce is not required to determine why there is a pattern of export prices that differs significantly among purchasers, regions or time periods, such as, as Canadian parties argue, market factors.[44]

Canadian Parties argue that *Timken* distinguishes the holding in *JBF RAK* because that opinion holds that given record evidence, Commerce "might" be required to consider record evidence that price differences result from market factors rather than pricing decisions.[45]  However, where, as here, the statute does not require Commerce to engage in a particular type of analysis or inquiry, if a party submits evidence that is not relevant to the statutory requirements, such evidence does not override the statute to require Commerce to engage in analysis or inquiry

---

[42] *See* Canadian Parties' Comments at 13-14.

[43] *See JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) (*JBF RAK*).

[44] *Id.* at 1368 ({the statute} does not require Commerce to determine the reason why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions or time periods… the CIT did not err in finding that there is no intent requirement in the statute").

[45] *See* Canadian Parties' Comments at 13-14 (citing *Timken Co. v. United States*, 179 F. Supp 3d 1168, 1179 n.12 (CIT 2016) (*Timken 2016*)).

17

that the statute does not require.  In *Timken 2016*, the CIT followed, as it must, the Federal Circuit's decision in *JBF RAK*.[46]

The Canadian Parties' reliance on *dicta* in *Timken 2016* to justify ignoring the Federal Circuit precedent is unpersuasive in light of the actual holding in *Timken* as well as holdings of other CIT and Federal Circuit cases, which followed the Federal Circuit decision in *JBF RAK*. For example, in *Borusan*, Borusan contested Commerce's use of the A-T method without consideration of Borusan's alternate explanation for the observed pricing pattern – increased raw material costs – but the Federal Circuit cited the precedential *JBF RAK* opinion as addressing this issue.[47]  The Federal Circuit found that "{n}othing in the language of the statute requires Commerce to take the extra analytical step proposed by Borusan—consideration of Borusan's alternate explanations for the pricing patterns observed through use of" an alternative methodology.[48]

Similarly, in *Nan Ya*,[49] Nan Ya Plastics Corp. (Nan Ya) contended that Commerce did not consider whether differences were due to fluctuations in Nan Ya's cost of production and that even if Commerce is not required to investigate the reasons for observed price differences, Commerce is not free to ignore evidence that demonstrates prices differences do not reflect targeted dumping.  However, based upon *JBF RAK* and *Borusan*, the CIT found that "Commerce is under no obligation to consider evidence that factors other than targeted dumping may account for price patterns that the agency identifies through targeted dumping analyses."[50]  Even in *Apex*

---

[46] *See Timken 2016*, 179 F Supp. 3d at 1179 ("in the light of the Federal Circuit's decision, whether NTN's U.S. sales were not intentionally targeted or whether the price differences were due to an external factor, such as shifting exchange rates, Commerce's methodology lawfully identifies a pattern of export prices that differ significantly.") (citations omitted).

[47] *See Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (*Borusan*)

[48] *Id.*

[49] *See Nan Ya Plastics Corp. v. United States,* 128 F.Supp.3d 1345 (CIT 2015) (*Nan Ya*).

[50] *Id.* at 1357-58.

*II*,[51] the Federal Circuit's analysis demonstrates that the price differences identified do not need to be caused by masked or targeted dumping. In *Apex II*, the Federal Circuit found that the use of "such differences" in the statute does not "dictate how Commerce is to make the determination whether the A-A methodology can account for *potential* targeted or masked dumping." [52]

Therefore, Commerce is not required to consider whether market prices are the reason for significant price differences between purchasers, regions, and time periods, and does not do so here.

**Comment 6: Commerce Previously Rejected the P/2 Test**

*Canadian Parties' Comments*

> In investigations such as *Coated Free Sheet Paper from Korea*[53] and *Sodium Metal from France,*[54] Commerce stated that the P/2 test does not account for price variations specific to the market in question. Commerce then solicited public comments to develop a new test that led to the adoption of the Nails test, first applied in *Nails from China*[55], explaining again that a two-percent test "does not account for price variations specific to the market in question" and "may find targeted dumping in many cases when arguably no such dumping is occurring."[56]

The COALITION did not comment on this issue.

**Commerce's Position:** Commerce has never used the "P/2 test" as part of its differential pricing analysis. The P/2 test and the price difference test are not equivalent to each other. The P/2 test examined whether the weighted-average U.S. prices of allegedly "targeted" sales were two

---

[51] *See Apex Frozen Foods Pvt. Ltd v. United States*, 862 F.3d 1337, 1348-49 (Fed. Cir. 2017) (*Apex II*).

[52] *Id.*, 862 F.3d at 1345 (emphasis added).

[53] *See Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007) (*Coated Free Sheet from Korea*), and accompanying IDM at 10.

[54] *See Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances,* 73 FR 62252 (October 20, 2008), and accompanying IDM at 10.

[55] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008) (*Nails from China*), and accompanying IDM.

[56] *See* Canadian Parties' Comments at 14-16.

percent lower than the weighted-average U.S. prices of non-targeted sales with the stated aim of

identifying "targeted dumping."  As discussed below, the P/2 test was the basis for the

petitioner's targeted dumping allegation in *Coated Free Sheet from Korea*.[57]  Given Commerce's

lack of experience at that time in addressing section 777A(d)(1)(B) of the Act, Commerce relied

on the petitioner's analysis in that investigation.[58]  However, in the following LTFV

investigations in which the petitioner submitted a similar targeted dumping allegation,

Commerce developed its own analysis to address section 777A(d)(1)(B) of the Act, *i.e.*, the

"Nails Test."[59]  Commerce found that the P/2 test is not "a reliable indicator that {obvious}

*targeted dumping* has occurred…"[60]

Finally, Commerce has substantially more experience than in 2008.  In *Coated Free*

*Sheet from Korea*, Commerce employed the P/2 test to examine whether use of an alternative

comparison method was permitted and addressed petitioner's targeted dumping allegation.[61]

Subsequently, in the final determination in *Nails from China,* Commerce explained:

> Prior to { *Coated Free Sheet from Korea* }, {Commerce's} only experience with
> analyzing targeted dumping in an antidumping duty investigation was the case-
> specific analysis in the court remand that followed the antidumping investigation
> of certain pasta from Italy (*see Borden, Inc., Gooch Foods, Inc., and Hershey Foods*
> *Corp. V. United States*, Slip Op. 99-50, CIT, June 4, 1999), also referred to as the
> "Pasta Test."  The petitioner's allegations of targeted dumping in { *Coated Free*
> *Sheet from Korea* } presented {Commerce} with a host of issues that it had not
> previously confronted.  Given the short time available in that proceeding to address
> these issues, {Commerce} stated:
>
> In the years since the Pasta Test was developed, {Commerce} has had no further
> experience analyzing targeting and we are examining how the Pasta Test standards
> and thresholds could be modified in developing a standard practice for addressing
> targeting allegations. In view of {Commerce}'s uncertainty regarding the general

---

[57] *See Coated Free Sheet from Korea* IDM at Comment 1.
[58] *Id.*
[59] *See Nails from China* IDM.
[60] *Id.* at 23 (emphasis added).
[61] *See Coated Free Sheet from Korea* IDM; *see also Coated Free Sheet Paper from the Republic of Korea:  Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*,72 FR 30766 (June 4, 2007).

applicability of the Pasta Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, {Commerce} accepts the petitioner's targeting allegation without endorsing the petitioner's test standards and procedures as a general practice.[62]

At the same time, {Commerce} signaled its intention to develop a standardized targeted dumping test to replace the P/2 test for application in subsequent investigations. Thus, while allowing the petitioner's targeted dumping allegation to proceed to conclusion in {*Coated Free Sheet from Korea* }, {Commerce} simultaneously announced in {*Coated Free Sheet from Korea* } at Comment 2 that it would develop "a new, more standardized test" (*i.e.*, a replacement for the P/2 test) through a proceeding open to public input, which we initiated simultaneously with the publication of {*Coated Free Sheet from Korea* }. *See* {*Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 FR 60651 (October 25, 2007)}.

As such, Commerce introduced a new analysis, what became known as the "Nails Test," to examine whether the statutory requirements under section 777A(d)(1)(B)(i) and (ii) were satisfied.[63]   Afterwards, Commerce would replace the Nail Test with a methodology called the "differential pricing analysis."[64]   Specifically, Commerce stated:

While the Nails Test is a statutorily consistent and statistically sound methodology for identifying whether the average-to-transaction method might be appropriate, {Commerce} has continued to seek to refine its approach with respect to the use of an alternative comparison method. Given {Commerce} 's experience over the last several years, and based on {Commerce} 's further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the average-to-transaction method, {Commerce}is developing a new approach for determining whether application of such a comparison method is appropriate in a particular segment of a proceeding pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act. The new approach is referred to as the "differential pricing" analysis, as a more precise

---

[62] *See Coated Free Sheet from Korea* at Comment 2.

[63] *See*, *e.g.*, *Certain Steel Nails from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 FR 3928 (January 23, 2008) (*Nails from China Prelim*).

[64] *See Differential Pricing Analysis; Request for Comments,* 79 FR 26720, 26722 (May 9, 2014) (*Differential Pricing Analysis*); *see also Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 78 FR 33351 (June 4, 2013) (*Xanthan Gum*).

characterization of the purpose and application of section 777A(d)(1)(B) of the Act.[65]

After performing the differential pricing analysis since 2013, Commerce has continued to gain experience in addressing the statutory requirements provided under section 777A(d)(1)(B) of the Act. With the issuance of the mandate following *Marmen*,[66] Commerce introduced the price difference test to determine whether prices for comparable merchandise differ significantly among purchasers, regions, or time periods. In contrast to the P/2 test described above, the price difference test examines whether U.S. prices differ significantly among purchasers, regions, and time periods. Specifically, the price difference test examines whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods. If the difference between the two weighted-average prices is within two percent of the weighted-average U.S. price to all other purchasers, then the sale prices to the individual purchaser, region, or time period do not differ significantly. Alternatively, if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly.

The only common aspect of the P/2 test and the price difference test is the two percent threshold. However, the P/2 test only examines whether prices to alleged "targets" are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales. As discussed above, the price difference test shares the two percent threshold with the arms-length test (with the same four percent band around the price),

---

[65] *See Differential Pricing Analysis*, 79 FR at 26722.
[66] *See Marmen*, 134 F.4th at 1343-1348.

which is the basis for whether the prices of comparison market sales made to an affiliate are at

arm's length.  Thus, the price difference test is simply a different test than the P/2 test.

**Comment 7:   Whether Commerce Is Required to Provide Evidence to Use the Price
Difference Test in this Review**

*Canadian Parties' Comments*

> Commerce provides no attribution to any statistical literature, qualitative or
> quantitative pricing data, nor any other evidence to support its choice of a two-
> percent threshold to measure significant price differences.[67]

> The Canadian Parties have presented evidence that pricing in the overall U.S.
> lumber market is highly volatile and was subject to dramatic changes over the
> course of the POR, and Commerce must account for this evidence.[68]

> When prices within a control group themselves differ by more than two percent
> from the average, it is illogical to automatically treat variations of the same
> magnitude within the test group as differing significantly from prices in the
> control group.[69]

The COALITION did not comment on this issue.

**Commerce's Position:**  As an initial matter, the Federal Circuit has established that Commerce's

differential pricing analysis is evaluated under a reasonableness standard, not substantial

evidence.[70]  A two-percent threshold is a reasonable measure of significance and is consistent

with other aspects of Commerce's practice in antidumping proceedings.

As discussed above, there are other aspects of its dumping analysis where Commerce

considers two percent to be a measure of significance.  In the arm's-length test Commerce uses a

two-percent threshold to determine whether the prices to an affiliated customer are at arm's

length, and, therefore, whether such sales are within or outside of the ordinary course of trade.

---

[67] *See* Canadian Parties' Comments at 16.
[68] *Id.* at 16-17.
[69] *Id.* at 17.
[70] *See Stupp III*, 5 F.4that 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.") (citations omitted).

Further, in an LTFV investigation, the *de minimis* threshold for an estimated weighted-average dumping margin is two percent such that an estimated weighted-average dumping margin of at least two percent is significant, and an estimated weighted-average dumping margin of less than two percent results in a negative determination of sales at less than fair value. Thus. we find that a two-percent threshold satisfies the statutory directive to determine whether prices "differ significantly" under section 777A(d)(1)(B)(i) of the Act.

Under Comment 3 above we also discussed the relationship of the Canadian Parties' claimed volatility of prices in the U.S. market with Commerce's dumping analysis. As Commerce reasoned above: (1) a pattern of price that differ significantly may indicate masked dumping, and (2) the meaningful difference test is what actually measures the amount of masked dumping that the A-to-A method cannot account for. The Canadian Parties' argument that the price difference test "does not grapple with the fact that price differences *within* comparison groups frequently vary by more than two percent from the means of those groups"[71] only highlights the fact that the pattern requirement is a blunt tool to identify the conditions which may indicate masked dumping. The Canadian Parties demonstrate that its higher prices are offsetting lower prices within averaging groups used in the price difference test, and which are not being included within the results of the price difference and ratio tests. Nonetheless, if Commerce finds that a pattern of prices that differ significantly exists even when that price difference test is based on averaging U.S. prices, the meaningful difference test, where the alternative comparison method is based on each individual U.S. price with no averaging groups, will fully quantify the amount of masked dumping when using average U.S. prices and the A-to-A method. Thus, we find that the Canadian Parties' argument that the volatility of prices in the

---

[71] *See* Canadian Parties' Comments at 17 (emphasis in the original, internal citation omitted).

24

U.S. market only supports the need to consider whether masked dumping is accounted for by the

A-to-A method, and does not detract from Commerce's use of a two-percent threshold in the

price difference test which is used on other aspects of Commerce's dumping analysis to define

differences that are significant.

**Comment 8: Whether the Price Difference Test Yields an Abnormally High Rate of Passing**

*Canadian Parties' Comments*

> Commerce's new price difference test has found near universal findings of the existence of patterns of significant price differences, specifically 87 percent of instances in which the price difference test has been applied, and findings in a majority of instances that over 90 percent of prices "differ significantly." Any "test" that results in the same finding on nearly every occasion it is applied cannot be considered reasonable, as it tests for nothing at all. The statutory term "significantly" loses its meaning. In this instance the price difference test dramatically increases the proportion of price differences classified as "significant," from the previously applied Cohen's *d* test.[72]

The COALITION did not comment on this issue.

**Commerce's Position:** Canadian Parties' argument implies that Commerce engages in results-oriented analysis and should look to the results for whether a methodology is reasonable. It also implies there must a specific amount of determinations in which Commerce should not be finding that prices differ significantly. Neither of these implications are correct. Commerce implemented the price difference test as a means of performing its post-*Marmen* analysis regarding whether prices "differ significantly among purchasers, regions, or periods of time" in accordance with section 771A(d)(1)(B)(i) of the Act. The test establishes a methodology that can be used to carry out the statute's intended purpose on a case-by-case basis, and the Canadian Parties themselves demonstrate that the test does not guarantee a particular outcome. Contrary to the Canadian Parties' claims, Commerce implemented a methodology that uses measures of

---

[72] *Id.* at 17-20.

significance that are consistent with various other sections of the statute that rely on a two-percent threshold. Thus, the fact that Commerce finds prices often, but not always, differ significantly among purchasers, regions, or time periods indicates that Commerce is carrying out a case-by-case analysis as envisioned in the SAA. Moreover, considering that the Federal Circuit held that certain statistical assumptions were required in order to apply the Cohen's $d$ test, the increased finding of prices that differ significantly under the price difference test may indicate that Commerce's Cohen's $d$ test did not detect significant price differences fulsomely. As with the Canadian Parties' highlighting of price volatility in the U.S. market, such may be found in the difference in the results in this redetermination.

**Comment 9: Whether Commerce Must Reconsider Its Ratio Test**

*Canadian Parties' Comments*

> In the Draft {Remand}, Commerce used the ration test to determine whether a pattern of prices existed during the POR. Commerce "must reconsider its ration test for two reasons. First, the ratio test contravenes Congress' intent and the plain meaning of the statutory term 'pattern.' Second, the statute's language does not authorize {Commerce's} aggregation of sales values across purchasers, regions or periods of time."[73]

The COALITION did not comment on this issue.

**Commerce's Position:** Commerce determines to continue applying the revised differential pricing analysis, including the ratio test. The ratio test is consistent with the ordinary meaning of the word "pattern," which can be defined as "a frequent or widespread incidence."[74] This definition supports Commerce's approach because the ratio test quantifies the extent of the significant price differences.[75] If more than thirty-three percent of prices differ significantly,

---

[73] *Id.* at 20-23.

[74] *See* Pattern, Merriam-Webster Online Dictionary, available at https://www.merriamwebster.com/dictionary/pattern (last visited February 10, 2026).

[75] *See, e.g., Large Residential Washers from Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 85 FR 81450 (December 16, 2020).

then the prices differing significantly are not an outlier.  The Federal Circuit has held that the ratio test is a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act, and that "there is no statutory language telling Commerce how to detect patterns of significantly differing export prices, much less how to aggregate and quantify pricing comparisons across product groups in order to select a statutorily defined comparison method.  Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive."[76]

In *Dillinger*,[77] the Federal Circuit addressed arguments that Commerce's ratio test fails to implement the pattern requirement because Commerce aggregates prices found to differ among different purchasers, different regions, and different time periods, into a single pattern.  In construing section 777A(d)(1)(B)(i) of the Act, the Federal Circuit held that Commerce's "aggregation" methodology is the proper interpretation of the pattern requirement.[78]  Moreover, courts have long acknowledged that "or" can mean "and."[79]  The statutory interpretation that the Federal Circuit sustained in *Dillinger* is the best interpretation of the statute and the Canadian Parties' disagreement with the binding Federal Circuit precedent is not a basis for reconsideration of Commerce's ratio test.

**Comment 10: Commerce Must Either Retain the Mixed Methodology or Explain Its Decision to Abandon It**

*Canadian Parties' Comments*

> Commerce must either explain why it abandoned the mixed comparison method. Commerce's change in practice is beyond the scope of the Federal Circuit's decision in *Marmen*, and the CIT's remand.[80]

---

[76] *See Stupp III,* 5 F.4th at 1354.
[77] *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020) (*Dillinger*).
[78] *Id.*
[79] *See, e.g.*, *United States v. Moore*, 613 F.2d 1029, 1040 (D.C. Cir. 1979); *De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956).
[80] *See* Canadian Parties' Comments at 24-25.

The COALITION did not comment on this issue.

**Commerce's Position:**  The mixed method was introduced when Commerce adopted the

Cohen's *d* test.[81]  The statute does not require Commerce to use a "mixed" method as an

alternative comparison methodology.  While the statute permits Commerce's previous policy that

adopted a hybrid version of two available comparison methodologies, Commerce's new practice

in administrative proceedings aligns more closely with the statutory text, which permits

Commerce to use the A-to-T method when certain conditions set forth in sections

777A(d)(1)(B)(i) and (ii) of the Act are satisfied.  In light of the foregoing, Commerce does not

consider it necessary to continue to use the mixed method, particularly when discontinuation of

the mixed method enhances the ability to address masked dumping, which is consistent with the

objective of the statute, and more closely aligns with the statutory language that expressly

authorizes the use of the A-to-T comparison method when the conditions set forth in section

777A(d)(1)(B) of the Act are satisfied.

**Comment 11: Whether the A-to-A Method Already Accounts for Time-Based Differences**

*Canadian Parties' Comments*

> Even if Commerce continues to find that "prices differ significantly among time periods, {Commerce} must grapple with the fact that the A-A methodology, applied on a monthly basis, fully accounts for such price differences."  While the price difference test identifies prices that differ significantly based on quarters during the POR, the A-to-A method is applied in an administrative review on a monthly basis.  Therefore, under Commerce's A-to-A method, average prices in one month, *e.g.*, January, cannot mask average prices in another month, *e.g.*, September.  This argument was not raised or addressed in the Federal Circuit's decisions in *Apex* and *Stupp IV*, therefore, Commerce cannot rely on those decisions to address this argument.[82]
>
> A 25 percent relative change in calculated weighted-average dumping margins between the A-to-A method and the A-to-T method, or a movement of those margins across the *de minimis* threshold, is not an explanation for why the monthly

---

[81] *See Xanthan Gum* IDM at 28.
[82] *See* Canadian Parties' Comments at 25-27.

A-to-A method cannot account for the differences found in the price difference test.[83]

For these reasons, among others, {Commerce} must apply the A-A methodology in the final remand results.[84]

The COALITION did not comment on this issue.

**Commerce's Position:**  We disagree with the Canadian Parties that the A-to-A method, when based on monthly weighted-average U.S. prices, accounts for differences in prices over time as exhibited in the respondent's pricing behavior in the U.S. market.

First, the Canadian Parties argue that the price difference test examines prices by quarter during the POR, and because the A-to-A method in administrative reviews is based on monthly weighted-average U.S. prices,[85] this method must account for all of the prices that differ significantly.  The logic of the Canadian Parties is flawed, and, thus, fails to support their conclusion.  As discussed above, the pattern requirement considers whether conditions exist in the respondent's pricing behavior in the U.S. market which could indicate conditions where masked dumping may occur.  For time periods in the price difference test, Commerce examines whether the weighted-average net price to a given quarter differs significantly (*i.e.*, by more than plus or minus two percent) of the weighted-average net price of all other sales (*i.e.*, in all other quarters during the period).  If this is found to be true, then that simply indicates that prices differ significantly for that quarter, and counts as one red flag that there may be an opportunity for masked dumping.  Subsequently, in the ratio test, if there are enough red flags, *i.e.*, "evidence,"[86] then Commerce determines that there is a pattern of prices that differ significantly which

---

[83] *Id.* at 28-29.
[84] *Id.* at 29.
[85] *See* section 777A(d)(2) of the Act.
[86] *See*, *e.g.*, Draft Remand at 5 ("If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.").

indicates that Commerce should consider whether masked dumping is occurring, *i.e.*, where lower prices are offset by higher prices.

The A-to-A method, whether based on period-wide or monthly weighted-average U.S. prices, will include both implicit and explicit offsetting of lower prices with higher prices. Implicitly, within each weighted-average U.S. price the A-to-A method offsets lower prices with higher prices. The A-to-T method eliminates implicit offsets through the use of individual U.S. prices rather than weighted-average U.S. prices. Furthermore, explicitly in the A-to-A method, offsets for lower prices in one weighted-average U.S. price can be made by higher prices in a different weighted-average U.S. price. For example, the Canadian Parties conclusion that "dumping in January, for example, cannot be masked by activity in September"[87] is erroneous. If lower prices sales in January are dumped, and higher priced sales in September are not dumped, then because the A-to-A method grants explicit offsets for non-dumped sales, the negative comparison results for September will certainly offset the dumping found in January. The A-to-T method eliminates explicit offsets by zeroing negative comparison results for non-dumped sales. Thus, contrary to the Canadian Parties' assumption, the A-to-A method is not necessarily capable of addressing the offsetting of lower prices by higher prices when masked dumping is found, and Commerce may resort to the alternative A-to-T method to expose masked dumping.[88]

Lastly, the Canadian Parties' assumption that monthly weighted-average U.S. prices with the A-to-A method in an administrative review will fully account for the price differences in a respondent's pricing behavior ignores that the pattern of prices also include evidence of prices

---

[87] *See* Canadian Parties' Comments at 27.

[88] *See Union Steel v. United States*, 713 F.3d 1101, 1109 (Fed. Cir. 2013) ("When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping.").

that differ significantly among purchasers and regions.  The A-to-A method in an administrative

review based on monthly weighted-average U.S. prices is not the panacea that the Canadian

Parties claim.

We also disagree with the Canadian Parties that the two thresholds within the meaningful

difference test fail to explain why the A-to-A method in an administrative review cannot account

for the prices differences evident in a respondent's pricing behavior in the U.S. market.  The

meaningful difference test quantifies the amount of masked dumping that remains hidden in the

calculation of the weighted-average dumping margin using the A-to-A method.  When

Commerce finds that the magnitude of the masked dumping meaningfully changes the calculated

results using the A-to-A method, then it concludes that the A-to-A method cannot account for

these prices differences and it may resort to the alternative A-to-T method.  The A-to-T method

is the alternative provided for in the statute by which Commerce may address masked, or

"targeted," dumping, where lower U.S. prices are offset by higher U.S. prices.  As discussed

above, the A-to-A method, even when based on monthly weighted-average U.S. prices, still

offsets lower prices with higher prices and is, therefore, not a remedy for masked dumping.

Finally, we note that the Federal Circuit has upheld the meaningful difference test, as a

component of the differential pricing analysis, on multiple occasions.[89]  Commerce does explain

through the results of the meaningful difference test itself why the monthly A-A methodology

can or cannot account for the differences found in the price difference test, and the Federal

Circuit sustained Commerce's explanation.[90]  If there is no meaningful difference between the

---

[89] *See, e.g., Stupp III,* 5 F.4th at 1355-56; and *Apex,* 862 F.3d. at 1346-48 ("We find Commerce's provided rationales in support of its meaningful difference analysis to be reasonable…We affirm Commerce's decision to analyze all of Devi's and Falcon's sales in conducting its meaningful difference analysis as a reasonable exercise of its delegated authority.")

[90] *See*, *e.g.*, *Apex*, 862 F.3d at 1346 ("First, we agree that the difference in the actual antidumping rates that would be assessed—below de minimis when calculated with the A-A methodology; above de minimis when calculated with

31

results under the A-to-A method and the A-to-T method, then the price differences exhibited in the respondent's pricing behavior in the U.S. market can be taken into account by using the A-to-A method.  However, if there is a meaningful difference, then that difference provides the evidence that the A-to-A method cannot account for the respondent's pricing behavior in the U.S. market because the A-to-T method unmasks a meaningful amount of masked dumping that the A-to-A method fails to unmask.  The results of the meaningful difference test demonstrates whether the standard method can adequately account for the respondent's pricing behavior in the U.S. market, and that is precisely why the statute provides Commerce with the alternative methodology.  In *Apex*, the Federal Circuit held that "the difference in the actual antidumping rates that would be assessed—below *de minimis* when calculated with the A-A methodology; above *de minimis* when calculated with an alternative methodology—indeed informs the question of whether the A-A methodology can adequately account for a pattern of significant price differences 'because A-A masked the dumping that was occurring as revealed by the A-T calculated margin.'"[91]  The Federal Circuit also rejected attempts to distinguish *Apex* in *Stupp III*, where the plaintiff argued that *Apex* did not hold that comparisons of margin calculations are always sufficient in and of themselves.[92]  The Federal Circuit held:  "(1) Commerce's meaningful difference test is a reasonable response to the statutory directive to explain why the average-to-average method is inadequate in certain cases, and (2) the meaningful difference test is sufficient to satisfy that directive."[93]  If the selection of the alternative A-to-T method does not result in a meaningful difference in the weighted-average dumping margins, then that is evidence that the

---

an alternative methodology—indeed informs the question of whether the A-A methodology can adequately account for a pattern of significant price differences 'because A-A masked the dumping that was occurring as revealed by the A-T calculated margin.'").

[91] *Id.*

[92] *See Stupp III*, 5 F.4th at 1365.

[93] *Id.*

respondent's pricing behavior in the U.S. market can be adequately addressed through the standard A-to-A method.

Additionally, the "meaningful difference" test provides additional tailoring of the differential pricing analysis to the specifics of each respondent.  The question of whether the A-to-A method or the A-to-T method is warranted is specific to the administrative segment as well as the respondent under examination.  For example here, when running the meaningful difference test, both the A-to-A method and the A-to-T method both use contemporaneous month comparisons as is Commerce's practice in administrative reviews pursuant to its regulations.  As such, the difference that is revealed is the dumping masked in the A-to-A method, and because the difference is meaningful, the A-to-A method is inadequate to account for such differences.  Accordingly, Commerce's determination of whether the A-to-T method is permitted under section 777A(d)(1)(B) of the Act is determined on a case-specific basis.  Therefore, although Canadian Parties' precise argument is not made directly to the Federal Circuit panels in *Apex* and *Stupp III*, *Apex*, and *Stupp III* are still applicable because meaningful amount of dumping is still being unmasked in the A-to-T method that is masked in the A-to-A method.

Moreover, in the underlying administrative review for *Apex*, Commerce explained that A-A monthly comparisons are insufficient in unmasking dumping because there may still be implicit masked dumping within the monthly averaging groups.[94]

**Comment 12: Whether *JBF RAK* is Applicable to Section 777A(d)(1)(B)(ii) of the Act**

*Canadian Parties' Comments*

> *JBF RAK* upheld Commerce only with respect to the price difference test, and did not extend to the meaningful difference test, and whether the A-to-A method or the A-to-T method will ultimately be applied to the respondents' U.S. sales.  *JBF RAK*

---

[94] *See Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review,* 79 FR 51309 (August 28, 2014), and accompanying IDM at 11.

does not prevent Commerce from discerning the intent of the respondents through the consideration of record evidence.[95]

The COALITION did not comment on this issue.

**Commerce's Position:** The meaningful difference test quantifies the amount of masked dumping by comparing the results of the margin calculations using the standard A-to-A method and the alternative A-to-T method. While there may be many potential reasons which results in the dumping of imported merchandise, as discussed above, Commerce does not consider reasons to explain away the observed dumping whether based on "intent" or other factors which may or may not be within the control of the respondent.[96] The Canadian Parties have presented no precedence, and Commerce knows of none, which would require Commerce to assess the reasons why a respondent's U.S. sales would be sold at a given price, or would be dumped or not dumped. There is no indication by the statutory language or case precedents that Commerce is required to take into account the intent of the respondents.

**Comment 13: Fair Comparison and the A-to-A Method versus the A-to-T Method**

*Canadian Parties' Comments*

> The A-T methodology cannot result in the 'fair comparison' envisioned through the statute. Commerce's use of the A-to-T method overlooks the statutory requirement that the margin calculations must be based on a fair comparison, including when a transaction-specific price may be an "outlier" when compared to the weighted-average price of all transactions during a given period. When pricing for merchandise is seasonal and subject to changes over time, as is true for lumber in

---

[95] *See* Canadian Parties' Comments at 29-30.
[96] For example, an exporter usually ships merchandise by ocean freight to the United States, but for one customer, the exporter uses more expensive air freight. If the exporter sells at the same price to all customers, the net price to the air-freight customer will be lower because of the increased movement expense and may be dumped. Just because the reason for the lower price and possible dumping is known does not excuse the dumping if the U.S. price is less than normal value.

both Canada and the United States, the A-to-A method is the appropriate means to take into account such price differences.[97]

The COALITION did not comment on this issue.

**Commerce's Position:**  We disagree with the general proposition by the Canadian Parties that the A-to-T method cannot result in a fair comparison.  It is well settled "that a statute must, if possible, be construed in such a fashion that every word has some operative effect."[98]  Section 777A(d)(1) of the Act explicitly provides for three distinct comparison methods, each of which can result in a "fair comparison" pursuant to section 751(a) of the Act.  Section 773(a) of the Act states in part that "{i}n order to achieve a fair comparison with export price or constructed export price, normal value shall be determined as follows…"  Section 773(a) of the Act stipulates how to determine normal value in order to achieve a fair comparison.  It states nothing on how to determine export price or constructed export price, *i.e.*, U.S. price, or what type of comparison method to use.  Independent of the comparison methodology under section 777A(d)(1) of the Act,[99] Commerce determines normal value to ensure a fair comparison in the same manner pursuant to section 773 of the Act.  Accordingly, the claim by the Canadian Parties is without merit.

We also disagree with the logic of the Canadian Parties that an "outlier" price, presumably lower and dumped, is present in the U.S. market.  This is exactly the situation that resort to the A-to-T method is meant to address, where an exporter may sell at a dumped price for a specific transaction, while selling at higher prices for other sales.[100]  If this individual sale with an "outlier" price is dumped, then it may be taking a sale away from the domestic industry

---

[97] *See* Canadian Parties' Comments at 30-31.
[98] *See United States v. Nordic Village Inc.*, 503 U.S. 30, 36 (1992).
[99] *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012) (for a discussion of Commerce's selection of the appropriate comparison methodology in an administrative review).
[100] *See* SAA at 842.

which has incurred injury as a result of the respondent's pricing behavior in the U.S. market. Given that the purpose of the antidumping statute is to remedy injurious unfair trade, [101] the logic of the Canadian Parties that ignoring the "outlier" sale would be appropriate is not persuasive.

## VI.    FINAL RESULTS OF REDETERMINATION

For these final results of redetermination, we have made no changes to the margin calculations from the Draft Remand, resulting in no change to the revised weighted-average dumping margins of either Canfor (*i.e.*, 5.25 percent) or West Fraser (*i.e.*, 7.06 percent). Moreover, because there has been no change to these weighted-average dumping margins, there is no change to the rate for parties not selected for individual examination (*i.e.*, 6.26 percent). Accordingly, we do not intend to issue a *Timken* notice should the Court sustain these final results of redetermination.

3/30/2026

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[101] *See Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156, 1159 (Fed. Cir. 1994) ("The purpose of the antidumping statute is to protect domestic manufacturing against foreign manufacturers who sell at less than fair market value. Averaging U.S. prices defeats this purpose by allowing foreign manufacturers to offset sales made at less-than-fair value with higher priced sales.  Commerce refers to this practice as 'masked dumping.'  By using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it.  We cannot say that this is an unfair or unreasonable result." (internal citations omitted)).