# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| The Government of Canada, *et al.*,<br><br>*Plaintiffs*,<br><br>Canfor Corporation, *et al.*,<br><br>and<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations,<br><br>*Consolidated Plaintiffs*,<br><br>Canfor Corporation, *et al.*,<br><br>*Plaintiff-Intervenors*,<br><br>v.<br><br>The United States,<br><br>*Defendant*,<br><br>Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, *et al.*,<br><br>*Defendant-Intervenors*. | **Consol. Court No. 1:23-cv-00187-JCG**<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information deleted on page: 18 |

## PLAINTIFF CANADIAN PARTIES'[1] COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REMAND REDETERMINATION

May 11, 2026

---

[1] The Canadian Parties are the Government of Canada; the Governments of Alberta, Ontario, and Québec; the British Columbia Lumber Trade Council, Conseil de l'industrie forestière du Québec, and Ontario Forest Industries Association; as well as Canfor Corporation, Canadian Forest Products, Ltd., Canfor Wood Products Marketing Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, Fontaine, Inc., Interfor Corporation, Interfor Sales & Marketing Ltd., Resolute FP Canada Inc., Tolko Industries Ltd., Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., West Fraser Mills Ltd., Chaleur Forest Products, Inc., Chaleur Forest Products, L.P., J.D. Irving, Limited, Delco Forest Products, Ltd., Devon Lumber Co., Ltd., H.J. Crabbe & Sons, Ltd., Langevin Forest Products, Inc., Marwood, Ltd., North American Forest Products, Ltd., and Twin Rivers Paper Co.

*PUBLIC VERSION*

<div style="columns:2">

/s/ Eric S. Parnes
Eric S. Parnes
Joanne E. Osendarp
Lynn G. Kamarck
Alan G. Kashdan
**Blank Rome LLP**
1825 Eye Street, NW
Washington, DC 20006
*Counsel to the Government of Canada*

/s/ Lynn Fischer Fox
Lynn Fischer Fox
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW
Washington, DC 20001
*Counsel to the Government of Alberta*

/s/ H. Deen Kaplan
H. Deen Kaplan
**Hogan Lovells US LLP**
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
*Counsel to the Government of Ontario*

/s/ Nancy Noonan
Nancy Noonan
**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
*Counsel to the Government of Québec*

/s/ Amy J. Lentz
Amy J. Lentz
**Steptoe LLP**
1330 Connecticut Avenue, NW
Suite 578
Washington, DC 20036
*Counsel to the British Columbia Lumber Trade Council*

/s/ Mark B. Lehnardt
Mark B. Lehnardt
**Davis & Leiman P.C.**
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036
*Counsel to Fontaine Inc.*

/s/ Diana Dimitriuc Quaia
Diana Dimitriuc Quaia
**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
*Counsel to Interfor Corporation, Interfor Sales and Marketing Ltd., Chaleur Forest Products, Inc. and Chaleur Forest Products, L.P.*

/s/ Henry D. Almond
Henry D. Almond
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
*Counsel to Tolko Industries Ltd., Tolko Marketing & Sales Ltd., and Gilbert Smith Forest Products Ltd.*

/s/ R. Will Planert
R. Will Planert
**Taft Stettinius & Hollister LLP**
1333 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036
*Counsel to Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing Ltd.*

</div>

*PUBLIC VERSION*

*/s/ Elliot J. Feldman*
Elliot J. Feldman
**Baker & Hostetler, LLP**
1050 Connecticut Avenue, NW
Washington, DC 20036-5304
*Counsel to Resolute FP Canada Inc., Conseil de l'industrie forestière du Québec and Ontario Forest Industries Association*

*/s/ Donald Harrison*
Donald Harrison
**Gibson, Dunn & Crutcher, LLP**
1700 M Street, NW
Washington, DC 20036-4504
*Counsel to West Fraser Mills Ltd.*

*/s/ Kristin H. Mowry*
Kristin H. Mowry
**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
*Counsel to Carrier Forest Products Ltd. and Carrier Lumber Ltd., Olympic Industries, Inc. and Olympic Industries ULC*

*/s/ Jay Campbell*
Jay Campbell
**White & Case, LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807
*Counsel to J.D. Irving, Limited*

*/s/ Rajib Pal*
Rajib Pal
**Sidley Austin LLP**
1501 K Street, NW
Washington, DC 20005
*Counsel to Delco Forest Products Ltd., Devon Lumber Co. Ltd., H.J. Crabbe & Sons Ltd., Langevin Forest Products Inc., Marwood Ltd., North American Forest Products Ltd., and Twin Rivers Paper Co. Inc.*

*PUBLIC VERSION*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARD OF REVIEW ................................................................................ 1

III.  ARGUMENT..................................................................................................... 3

   A.   The DPM is an Interpretive Rule and Subject to Review for Conformity with the Best Reading of the Statute, Rather Than for "Reasonableness" ............. 4

   B.   The "Price Difference Test" Instantiates an Unlawful, Erroneous Interpretation of "Differ Significantly," is Unreasonable, and Generated Findings in This Case That Are Not Supported by Substantial Evidence ................................................... 6

       1.   Commerce's Categorical Treatment of Prices That Differ by More Than Two Percent as "Prices That Differ Significantly" is Neither the Best Nor a Reasonable Interpretation of the Statute............................................... 6

       2.   Commerce's Finding of Significant Price Differences in This Case is Unsupported by Substantial Evidence and Arbitrary and Capricious .......... 16

   C.   Commerce's Findings of Patterns of U.S. Prices That Differ Significantly Among Purchasers, Regions, or Periods of Time Are Contrary to Law ............. 22

   D.   Commerce's Unreasoned Abandonment of Its Mixed Methodology Practice Was Unlawful ................................................................................ 26

   E.   Commerce Cannot Satisfy the Statutory Requirement to Explain  Why the A-A Methodology Cannot Account for Time Based Differences .................. 28

       1.   The Meaningful Difference Test Does Not Produce an "Explanation," Nor Can Commerce Provide One When Time Based Differences Drive the Ratio Test's Results...................................................................................... 28

       2.   Commerce Unlawfully Ignored Record Evidence Confirming That the Identified Price Differences Were Not the Result of Targeted Dumping ........ 30

       3.   Commerce's A-T Methodology Does Not Result in the Fair Price Comparisons Required by the Statute ............................................................ 30

*PUBLIC VERSION*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ............................................................3

*Apex Frozen Foods Private Ltd. v. United States*,
862 F.3d 1322 (Fed. Cir. 2017)................................................................................5

*Apex Frozen Foods Private Ltd. v. United States*,
862 F.3d 1337 (Fed. Cir. 2017)..........................................................................5, 29

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*,
426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020) ..........................................................12

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)................................................................................... *passim*

*CS Wind Vietnam Co., Ltd. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)......................................................................2, 3, 21

*De Sylva v. Ballentine*,
351 U.S. 570 (1956)................................................................................................25

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Cir. 2020)..............................................................................25

*Dongbu Steel Co. v. United States*,
635 F.3d 1363 (Fed. Cir. 2011)........................................................................15, 26

*Garg Tube Export LLP v. United States*,
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) .......................................................8, 9

*Greater Boston Television Corp. v. FCC*,
444 F.2d 841 (D.C. Cir. 1970)..................................................................................2

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Cir. 2015)..........................................................5, 20, 21, 31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)................................................................................... *passim*

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) ......................................................................1, 20, 26

*PUBLIC VERSION*

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019)............................................................................................5

*Moctezuma-Reyes v. Garland*,
124 F.4th 416 (6th Cir. 2024) ...........................................................................................9

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...............................................................................................15, 26

*Nucor Corp. v. United States*,
927 F.3d 1243 (Fed. Cir. 2019).........................................................................................5

*OMG, Inc. v. United States*,
972 F.3d 1358 (Fed. Cir. 2020)......................................................................................6, 7

*Shalala v. Guernsey Mem'l Hosp.*,
514 U.S. 87 (1995)...........................................................................................................12

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) ....................................................................2

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)........................................................................................27

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ................................................................................. *passim*

*Timken Co. v. United States,*
179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ..................................................................21

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005)........................................................................................27

*Union Elec. Co. v. United States*,
363 F.3d 1292 (Fed. Cir. 2004)........................................................................................20

*United States v. Moore*,
613 F.2d 1029 (D.C. Cir. 1979)........................................................................................25

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)...........................................................................................................2

## Statutes and Legislative Materials

Tariff Act § 516A(b)(1)(B)(i), 19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................1

Tariff Act § 733(b)(3), 19 U.S.C. § 1673b(b)(3) ..........................................................................13

Tariff Act § 773(a)(1)(A), 19 U.S.C. § 1677b(a)(1)(A) ...............................................................31

*PUBLIC VERSION*

Tariff Act § 773(f)(2), 19 U.S.C. § 1677b(f)(2) .................................................................12

Tariff Act § 771A(d)(1), 19 U.S.C. § 1677f-1(d)(1) ......................................................3, 10

Tariff Act § 771A(d)(1)(B), 19 U.S.C. § 1677f-1(d)(1)(B)..................................... *passim*

Tariff Act § 771A(d)(1)(B)(i), 19 U.S.C. § 1677f-1(d)(1)(B)(i) ...................................22, 25, 30

Tariff Act § 771A(d)(1)(B)(ii), 19 U.S.C. § 1677f-1(d)(1)(B)(ii) ...........................................28, 30

19 U.S.C. § 3512(d) ..........................................................................................................10

Statement of Administrative Action accompanying the Uruguay Rounds
    Agreement Act, H.R. Doc. No. 103-316 (1995)................................................. *passim*

**Regulations and Rules**

19 C.F.R. § 351.403(c).......................................................................................................12

19 C.F.R. § 351.414(c)(1) .............................................................................................3, 12

19 C.F.R. § 351.414(d)(3)..............................................................................................29, 31

Rules of the U.S. Court of International Trade, Rule 56.2(h).............................................1

**Administrative Determinations**

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping
    Margin and Assessment Rate in Certain Antidumping Duty Proceedings;
    Final Modification*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012) ...........................26

*Certain Softwood Lumber Products From Canada: Final Affirmative
    Determination of Sales at Less Than Fair Value and Affirmative Final
    Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't of
    Commerce Nov. 8, 2017), and accompanying Issues and Decision
    Memorandum.................................................................................................................22

*Certain Softwood Lumber Products From Canada: Preliminary Results of
    Antidumping Duty Administrative Review*, 88 Fed. Reg. 5,306 (Dep't of
    Commerce Jan. 27, 2023) .............................................................................................26

*Certain Steel Nails from the United Arab Emirates: Notice of Final
    Determination of Sales at Not Less Than Fair Value*, 73 Fed. Reg. 33,985
    (Dep't of Commerce June 16, 2008), and accompanying Issues and Decision
    Memorandum.................................................................................................................13

*PUBLIC VERSION*

*Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,630 (Dep't of Commerce Oct. 25, 2007), and accompanying Issues and Decision Memorandum ................................................................................................13

*Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances*, 73 Fed. Reg. 62,252 (Dep't of Commerce Oct. 20, 2008), and accompanying Issues and Decision Memorandum ................................................................................................14

*Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 Fed. Reg. 60,651 (Dep't of Commerce Oct. 25, 2007)................................................................14

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................................................................................1

*Pattern*, Concise Oxford English Dictionary of Current English 1002 (9th ed. 1995) ......................................................................................................................22

*Pattern*, Webster's Ninth New Collegiate Dictionary (1989) ......................................22

*Pattern*, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/pattern) ..........................................................................22

*Significant*, Cambridge Online Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/significant (last visited May 11, 2026)...........................................................................................................7

*Significant*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/significant (last visited May 11, 2026) .....................................................................................................................7

*Significant*, Oxford Online Dictionary, *available at* https://www.oed.com/ (last visited May 11, 2026) ..................................................................................................7

*Significantly*, Cambridge Online Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/significantly (last visited May 11, 2026) ...........................................................................................7

*Significantly*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/significantly (last visited May 11, 2026) ...................................................................................................7

*Significantly*, Oxford Online Dictionary, available at https://www.oed.com/ (last visited May 11, 2026) ..................................................................................................7

*PUBLIC VERSION*

## I.    INTRODUCTION

Pursuant to Rule 56.2(h) of the Rules of the U.S. Court of International Trade and this Court's February 13, 2026 Amended Scheduling Order, the Canadian Parties submit these comments in opposition to the Final Results of Redetermination Pursuant to Court Remand, P.R.R. 6 ("Remand Redetermination")[2] issued by the United States Department of Commerce ("Commerce") pursuant to this Court's June 17, 2025, remand order directing further proceedings in conformity with the decision of the U.S. Court of Appeals for the Federal Circuit ("CAFC") in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025). Remand Order, ECF No. 160 (June 17, 2025).

## II.    STANDARD OF REVIEW

In reviewing Commerce's remand redetermination, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). In evaluating the lawfulness of Commerce's determination, the Court "must exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). The Court should "use every tool at {its} disposal to determine the best reading of the statute." *Id.* at 400, 401, 403.[3] Even when statutory

---

[2] For citations to the administrative record, we assign the prefix "P.R." for the public record and "C.R." for the confidential record. For citations to the remand record, we assign the prefix "P.R.R." for the public remand record and "C.R.R." for the confidential remand record.

[3] Such tools include, *e.g.*, the "ordinary meaning" canon (plain language and dictionary definitions of statutory terms have significant meaning); the conjunctive/disjunctive canon ("and" joins words in a conjunctive list, "or" creates a disjunctive list); and the harmonious reading canon (provisions should be construed for compatibility, not contradiction). *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012).

*PUBLIC VERSION*

text is ambiguous and Commerce has relied on a reasonable interpretation, the Court has an obligation to reach its own determination as to the best reading. *Id.* at 413. If Commerce's interpretation of the relevant statutory terms "is not the best, it is not permissible." *Id.* at 400.

Although the Supreme Court has recognized that there may be cases where "the best reading of a statute is that it delegates discretionary authority to an agency," such delegation may not be presumed. *Id.* at 395. It remains the court's obligation to interpret the relevant statute to determine whether and to what extent Congress may have "authorized {the agency} to exercise a degree of discretion." *Id.* at 394. Even when a reviewing court concludes that a statute delegates discretionary authority to an agency, the court does not become a rubber stamp for the agency's exercise of that discretion. Courts retain an active role in "effectuat{ing} the will of Congress" by "fixing the boundaries of the delegated authority, and ensuring that the agency has engaged in reasoned decisionmaking within those boundaries." *Loper Bright*, 603 U.S. at 395 (internal quotations omitted).

Finally, for the Court to find Commerce's determination supported by substantial evidence, it must be based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Commerce's determination must demonstrate that it has taken a "hard look" at the evidence and "genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970). Commerce may not rely on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence," *Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (internal quotation omitted), but must instead examine the record as a whole, including evidence that fairly detracts

2

*PUBLIC VERSION*

from its conclusions, *CS Wind*, 832 F.3d at 1373, and respond to "significant arguments and evidence which seriously undermine its reasoning and conclusions," *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

## III.    ARGUMENT

On remand, Commerce applied a modified differential pricing methodology ("DPM") to support calculating the respondents' dumping margins using the exceptional average-to-transaction ("A-T") methodology, instead of the average-to-average ("A-A") methodology that the antidumping statute, 19 U.S.C. § 1677f-1(d)(1), and Commerce's regulations, 19 C.F.R. § 351.414(c)(1), treat as the default. Commerce's modified DPM does not provide lawful grounds for applying the A-T methodology as a general matter or in this case.

First, as an interpretive rule that purports to provide Commerce's interpretation of the statutory requirements for using the exceptional A-T methodology, the DPM and its constituent tests may be upheld only if they are consistent with this Court's best reading of the statute. That is a bar that the modified DPM cannot meet. Second, Commerce's replacement for Cohen's *d*, the "price difference test," is consistent with neither the best, a reasonable, or even a defensible reading of the statutory term—"differ significantly"—that it purports to implement. Third, Commerce's "ratio test," which now receives its inputs from the price difference test, does not provide a faithful interpretation of the term "pattern" as Commerce intends. Fourth, without providing a reasoned explanation, Commerce unlawfully eliminated its longstanding "mixed methodology" outcome of the ratio test, whereby the A-T methodology would apply only to prices that "passed" the test for significant difference. Fifth, Commerce applied its "meaningful difference test" on remand, but—as before remand—did so without regard to the statutory requirement that the test purports to implement. Commerce claims that the meaningful difference test satisfies the statutory requirement for Commerce to explain why the A-A

3

*PUBLIC VERSION*

methodology cannot account for observed price differences, but the test cannot provide such an explanation, particularly in circumstances where Commerce has found price differences among calendar quarters.

### A.    The DPM is an Interpretive Rule and Subject to Review for Conformity with the Best Reading of the Statute, Rather Than for "Reasonableness"

The CAFC has held that "Commerce's differential pricing analysis is an interpretive rule." *Stupp Corp. v. United States*, 5 F.4th 1341, 1351 (Fed. Cir. 2021).  As the *Stupp* court explained:

> {W}hile Commerce's decision to *consider* applying the average-to-transaction method is within its discretionary power, *its determination of whether the average-to-transaction is appropriate in a particular case is not solely within its discretion, because that determination is confined by the statutory language* of 19 U.S.C. § 1677f-1(d)(1)(B):  (i) there must be a "pattern of export prices . . . that differ significantly among purchasers, regions, or periods of time," and (ii) Commerce must "explain{} why such differences cannot be taken into account" using the average-to-average method.  *Commerce's differential pricing analysis is an interpretation of that statutory language and thus constitutes an interpretive rule*.

*Id.* at 1351–52 (emphases added).  Because the tests that make up the DPM provide Commerce's interpretations of the statutory requirements of section 1677f-1(d)(1)(B), the CAFC reviewed the lawfulness of those tests under the then-applicable standard for reviewing agency interpretations of statutory language—*i.e.*, the standard in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  The deferential *Chevron* framework, under which courts upheld reasonable agency interpretations of ambiguous statutes, no longer applies.  *Loper Bright*, 603 U.S. at 412 ("*Chevron* is overruled.").  The question now is whether the tests constituting the DPM conform to this Court's best reading of the terms of section 1677f-1(d)(1)(B) that those tests purport to interpret.

In asserting that the Court should sustain Commerce's interpretations under the DPM so long as they are reasonable, Commerce relies on an out-of-context quotation from the CAFC in

*PUBLIC VERSION*

*Stupp*:  "'Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.'").  Remand Redetermination at 23 & n.70, P.R.R. 6 (quoting *Stupp*, 5 F.4th at 1353).  In *Stupp*, which was issued prior to the Supreme Court's *Loper Bright* decision, the CAFC did indeed review the lawfulness of Commerce's DPM for reasonableness.  It adopted that standard in reliance on three CAFC precedents applying *Chevron* deference to review of the DPM.  *See Stupp*, 5 F.4th at 1353 (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1346–47 (Fed. Cir. 2017); *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363, 1367 (Fed. Cir. 2015)).

In both *Apex* and *JBF RAK*, the CAFC expressly relied on *Chevron* as the basis for reviewing elements of the DPM for reasonableness.  *See Apex*, 862 F.3d at 1345–46 (applying the *Chevron* framework, concluding that Congress had not unambiguously spoken to the issue at hand, and thus reviewing Commerce's meaningful difference test under the reasonableness standard of *Chevron* step two); *JBF RAK*, 790 F.3d at 1363 (following *Chevron* in reviewing Commerce's targeted dumping analysis, and applying deferential reasonableness review under step two).  For the proposition that "{i}n carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints," the *Mid Continent* court relied on two decisions that themselves relied on *Chevron*:  *Nucor Corp. v. United States*, 927 F.3d 1243, 1248–49 (Fed. Cir. 2019) ("Our review of Commerce's interpretation of a statutory provision is governed by the two-part framework set forth in *Chevron*"), and *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1329 (Fed. Cir. 2017) ("Our review of an agency's interpretation and implementation of a statutory scheme is governed by the Supreme Court's holding in *Chevron*").  *Mid Continent*, 940 F.3d at 667.

*PUBLIC VERSION*

The deferential standard of review that Commerce asks this Court to apply to the DPM is entirely an artifact of the now-repudiated *Chevron* doctrine.  "Reasonableness" no longer sets the bar for the tests by which Commerce interprets statutory requirements.  It is for this Court to determine whether Commerce's tests embody what the Court concludes is the "best reading" of the statute.

**B.    The "Price Difference Test" Instantiates an Unlawful, Erroneous Interpretation of "Differ Significantly," is Unreasonable, and Generated Findings in This Case That Are Not Supported by Substantial Evidence**

Commerce's new "price difference test," which deems prices to "differ significantly" when the weighted average price for a given purchaser, region, or time period differs by more than two percent from the weighted average price for all other purchasers, regions, or time periods, does not in any meaningful way measure whether prices "differ significantly." Application of a categorical numerical cutoff in all cases, with no flexibility or contextualization, is not consistent with the best or even a reasonable interpretation of that term, the authoritative legislative history, Commerce's own regulation, or Commerce's past practice.  The price difference test as applied to the facts of this case also results in findings of significant price differences that are unsupported by and contrary to the substantial evidence on the record.

**1.    Commerce's Categorical Treatment of Prices That Differ by More Than Two Percent as "Prices That Differ Significantly" is Neither the Best Nor a Reasonable Interpretation of the Statute**

**a.    Commerce's Price Difference Test Contravenes, Rather Than Implements, the Plain Meaning of "Prices That Differ Significantly"**

Before Commerce may apply A-T, it determines whether there "is a pattern of export prices . . . for comparable merchandise that differ *significantly* among purchasers, regions, or periods of time." *OMG, Inc. v. United States*, 972 F.3d 1358, 1366 (Fed. Cir. 2020).  Commerce now interprets the statutory requirement of significant price differences to be met whenever

*PUBLIC VERSION*

prices differ by more than two percent.  Remand Redetermination at 22, P.R.R. 6 ("if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly").  Starting with the plain meaning of the key term—"significantly"—it is apparent that Commerce's interpretation cannot clear the bar of reasonableness, much less satisfy the applicable standard of providing the best reading of the statute.

Courts routinely consult dictionary definitions to determine the common meaning of statutory terms.  *See, e.g.*, *OMG, Inc. v. United States*, 972 F.3d 1358, 1366 (Fed. Cir. 2020).  Dictionaries define "significantly" to mean "in a way that is easy to see or by a large amount," "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential," *Significantly*, Cambridge Online Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/significantly (last visited May 11, 2026), or simply "in a significant manner {or} to a significant degree," *Significantly*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/significantly (last visited May 11, 2026); *see also Significantly*, Oxford Online Dictionary, *available at* https://www.oed.com/ (last visited May 11, 2026).  Dictionary definitions of "significant" include "having meaning, *especially*: full of import," "having or likely to have influence or effect: important," and "likely caused by something other than mere chance." *Significant*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/significant (last visited May 11, 2026).[4]

---

[4] *See also Significant*, Cambridge Online Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/significant (last visited May 11, 2026) ("important or noticeable"); *Significant*, Oxford Online Dictionary, *available at* https://www.oed.com/ (last visited May 11, 2026) (having or conveying "a particular meaning; that signifies or indicates something.").

*PUBLIC VERSION*

These definitions uniformly point to the critical role of context, because something (here, a price difference) that may be meaningful, consequential, or important in one situation will not be meaningful, consequential, or important in another.  An interpretation of the statutory mandate to identify prices that "differ significantly" is not the best reading if it ignores the context in which those prices occur.  Commerce's interpretation of "differ significantly" to mean "differ by more than two percent" does exactly that and is thus unlawful.

Commerce relies on *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1367 (Ct. Int'l Trade 2024), for the proposition that "significantly" is an "open-ended" term best interpreted as delegating discretionary authority and allowing Commerce to ignore dictionary definitions in exercising that discretion.  Remand Redetermination at 11, P.R.R. 6.  Commerce's reliance on *Garg Tube* is misplaced for at least three instructive reasons.

First, *Garg Tube* reads "significantly" as an "open-ended qualifier" that, similar to terms like "appropriate" or "reasonable," "necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."  *Garg Tube*, 740 F. Supp. 3d at 1367.  However, there is no authority for treating "significantly" as conferring discretionary authority comparable to when Congress directs an agency to act as "appropriate" or "reasonable."  Those terms connote a degree of subjectivity and judgment that "significantly," which connotes both quantitative and qualitative elements, does not.[5]

---

[5] The *Garg Tube* court also observed that "Congress prefaced its direction to Commerce with the word 'may,'" which made "clear that Commerce would be exercising discretion in determining whether prices 'differ significantly.'"  740 F. Supp. 3d at 1367.  This reading of the statute's use of "may" is at odds with the CAFC's reading of the provision in *Stupp*, where it concluded that "Commerce's decision to *consider* applying the average-to-transaction method is within its discretionary power," but then went on to explain that Commerce's "determination of whether the average-to-transaction is appropriate in a particular case is not solely within its discretion, because that determination is confined by the statutory language of 19 U.S.C. § 1677f-1(d)(1)(B)."  5 F.4th at 1351–52 (emphasis added).

8

*PUBLIC VERSION*

Second, *Loper Bright* does not stand for the proposition that mere use of broad or open-ended language in a statute signifies intent to delegate discretionary authority for the agency to adopt authoritative interpretations of that language. *See Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) ("If broad language alone triggered deference, we'd unwittingly return to construing less than precise words as implicit delegations to the agency that warrant deference . . . That can't be right. The case that declared '*Chevron* is overruled' didn't quietly reinstate it."). The "actual statutes that *Loper Bright* cited as examples of delegations that may call for deference don't only have broad language. They pair that language with words that expressly empower the agency to exercise judgment," like "in {its} judgment" or "if the Administrator finds." *Id.* The relevant statutory provision in this case, section 1677f-1(d)(1)(B), contains no such language of empowerment for the agency, rather than the courts, to determine the meaning of "differ significantly."

Third, even if the statute delegates discretion in selecting methodologies to determine significant price differences, *Loper Bright* confirms this Court's obligation to "fix the boundaries of delegated authority." *Loper Bright*, 603 U.S. at 395 (quotations and alterations omitted). Even while misinterpreting "differ significantly" as conferring broad discretionary authority, the *Garg Tube* decision still recognized that any discretion conferred to Commerce in assessing significance would be for the purpose of allowing flexibility "depending on the particular context." *Id.* Commerce's interpretation of "significantly" to mean "two percent or more" is inflexible and ignores context. The price difference test disregards the boundaries of any discretion arguably conferred on Commerce to interpret "differ significantly." A context-sensitive assessment of whether prices "differ significantly" is precisely what the plain language of the statute requires and, as discussed below, what Congress clearly intended.

*PUBLIC VERSION*

> **b. Congress Intended for Commerce to Analyze Targeted Dumping on a Case-By-Case Basis**

Congress set forth its authoritative interpretation of the relevant provisions of the trade remedies law in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316 (1994).  *See* 19 U.S.C. § 3512(d) (the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."). Addressing the provisions of 19 U.S.C. § 1677f-1(d)(1), the SAA explains the legislative intent that:

> in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.

SAA at 843.  In conflict with this express intent, Commerce has adopted a categorical test that employs a fixed threshold and reflects no effort to account for characteristics of particular industries, products, or markets.  To give effect to Congress's intent, any test that Commerce applies to identify patterns of significant price differences must reflect what is "significant" with respect to the industry and product in question.

In the U.S. lumber market, pricing is volatile and subject to dramatic shifts across time, which was especially true during the pandemic-affected period of review in this case.[6]

---

[6] *See* Canadian Parties Rule 56.2 Motion and Brief (Apr. 5, 2024) ("Canada 56.2 Brief") at 65–71 (citing Canadian Parties' Response to PMS Allegation (Dec. 6, 2022), Exh. PMS-9, Attach. 32 (the wood products industry is "cyclical and may be characterized by (i) periods of excess product supply due to industry capacity additions, variable production rates or capacity utilization and other factors; and (ii) periods of insufficient demand due to weak general economic conditions."), P.R. 438–448; Exh. PMS-23 at 8, P.R. 487; West Fraser's Response to April 29, 2022 Section A Initial Questionnaire (May 20, 2022), Exh. WF-AR4-A-23 at 15–16, P.R. 289 (describing the impact of the COVID-19 pandemic and inflationary market pressure on prices); Government of Canada's Submission of New Factual Information (Dec. 27, 2022), at

*PUBLIC VERSION*

Commerce's mechanically applied two-percent threshold does not account for the characteristics of the softwood lumber industry relevant to an assessment of the significance of price differences.

Commerce contends that it fulfills Congress' case-by-case directive because it uses different data from different respondents in its purchaser, region, and time period comparisons. Remand Redetermination at 16, P.R.R. 6. However, analyzing each respondent's data in a vacuum fails to assess the significance of prices in the context of the industry and product at issue as Congress intended. Commerce also suggests that using a percentage threshold, rather than a fixed value, implements Congress' directive for a case-by-case analysis. Remand Redetermination at 15–16, P.R.R. 6. But a fixed-percentage threshold inflexibly applied to all industries and products does not account for differences in price variability and other factors among different industries and products. A difference of two percent may be significant in some industries, but not in others. Commerce defies the express intent of Congress by applying the same percentage threshold to determine whether prices differ significantly for every industry and product. To conform with Congress's intent, and thus the best reading of the statute, Commerce's method for assessing significance must be capable of calibration to the specific industry and product in question.

Commerce's own regulation also reinforces the importance of case-by-case analysis in identifying the circumstances that may warrant application of the exceptional A-T methodology.

---

Exh. 11, P.R. 501); *see also* Canada Case Brief at 39–40, P.R. 548–549 (identifying the record evidence "establishing the lumber market fluctuated during the POR and explaining how market fluctuations affected the respondents' overall costs, earnings, and pricing patterns."); Central Canada Case Brief at 31–32, P.R. 544 (identifying record evidence allowing "a qualitative assessment of factors impacting lumber prices, including the Covid 19 pandemic, and business cycles.").

*PUBLIC VERSION*

19 C.F.R. § 351.414(c)(1) provides that Commerce "will use" A-A unless it determines that "another method is appropriate *in a particular case*." (emphasis added). In adopting its regulation governing its own "choice of method," Commerce thus recognized the need to conduct case-specific analyses rather than adopting categorical, one-size-fits-all rules for all— rather than particular—cases.

### c. Commerce's Citations to Different Uses of a Two-Percent Threshold Carry No Weight

Commerce claims the two-percent threshold is reasonable for identifying prices that differ significantly because the same threshold applies in other contexts that involve what it views as comparable assessments: the arm's-length test and *de minimis* dumping margins in investigations. *Id.* at 13–14. That Commerce applies a two-percent threshold in these two different contexts, and for different reasons, has no bearing on the best (or even reasonable) interpretation of "differ significantly" as used in 19 U.S.C. § 1677f-1(d)(1).

Like the DPM, the arm's-length test is an interpretive rule, *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 426 F. Supp. 3d 1395, 1414 (Ct. Int'l Trade 2020), that cannot override the Court's own interpretation of the statutory language that the rule interprets, much less the different language at issue here. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) ("Interpretive rules . . . do not have the force and effect of law and are not accorded that weight in the adjudicatory process."). Moreover, neither the statutory provision that Commerce purports to implement through its arm's-length test, the SAA's discussion of that provision, or Commerce's regulation even *mentions* the term "significantly" or any variation thereof. *See* 19 U.S.C. § 1677b(f)(2); SAA at 827, 839–40; 19 C.F.R. § 351.403(c). That Commerce has adopted a two-percent threshold to interpret different language in a different statutory provision has no bearing on this Court's interpretation of "differ significantly" in the

12

*PUBLIC VERSION*

targeted dumping provision.  Likewise, that a Commerce decision memorandum once described prices that failed its arm's-length test as "differ{ing} significantly," *see* Remand Redetermination at 13 & n.35, P.R.R. 6, has no bearing on what Congress intended in using that term.

The two-percent threshold for *de minimis* margins in investigations is even less relevant, as it is specified by statute.  19 U.S.C. § 1673b(b)(3).  Had Congress intended for Commerce to apply such a fixed threshold and eschew context-specific analysis in assessing whether prices "differ significantly," it could have taken the same approach in the targeted dumping statute.  It did not.  Neither the statutory provision setting forth the *de minimis* threshold nor the SAA passage addressing it makes any reference to significance.  *See* 19 U.S.C. § 1673b(b)(3); SAA at 844–45.  Once again, the use of a two-percent threshold for a different purpose has no bearing on the interpretation of "differ significantly" in the targeted dumping provision.

### d.  Commerce Has Failed to Reasonably Explain Its Departure from Past Practice Rejecting a Two-Percent Test

Prior to adopting the Cohen's *d* test for significant price differences, Commerce itself had repeatedly rejected application of a uniform two-percent threshold for finding that prices differ significantly because such a bright-line threshold would be inconsistent with legislative intent and fail to account for conditions specific to the relevant industry.  For example:

- Commerce rejected the two percent threshold applied in a previous case (*Pasta from Italy*).  *See Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,630 (Dep't of Commerce Oct. 25, 2007), and accompanying Issues and Decision Memorandum at 6–8.

- Commerce explained that "a single, bright-line price threshold of two percent to define targeted dumping" is a test "that does not account for price variations specific to the market in question." *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value*, 73

13

*PUBLIC VERSION*

> Fed. Reg. 33,985 (Dep't of Commerce June 16, 2008) and accompanying Issues and Decision Memorandum at 24.
>
> • Commerce reiterated that the "two-percent price difference threshold advocated by the petitioner does not account for price variations specific to the market in question." *Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances*, 73 Fed. Reg. 62,252 (Dep't of Commerce Oct. 20, 2008), and accompanying Issues and Decision Memorandum at 10.
>
> • In developing the now-defunct *Nails* test, the predecessor to the DPM, Commerce continued to reject a two-percent threshold, explaining that it "does not account for price variations specific to the market in question" and "may find targeted dumping in many cases when arguably no such dumping is occurring." *Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 Fed. Reg. 60,651 (Dep't of Commerce Oct. 25, 2007).

Commerce has now reversed course to rely on that very same mechanical, brightline two-percent threshold that it previously rejected.

Commerce attempts to distinguish the two-percent test rejected in those proceedings from the two-percent price difference test used here. Remand Redetermination at 20–22, P.R.R. 6. The principal argument seems to be that, whereas the earlier "P/2" test looked to whether the average U.S. prices for allegedly targeted sales were more than two percent lower than the average U.S. price of non-targeted sales, the price difference test looks at whether average prices differ by more than two percent (in either direction) among purchasers, regions, or time periods. *Id.* That argument only highlights what a dramatic reversal in position Commerce has made. Commerce previously found a two-percent threshold to be overly inclusive even when it applied only to transactions that were specifically alleged to involve targeted dumping and only when the prices were *lower* in those allegedly targeted sales. Commerce applies the price difference test far more broadly, to *all* transactions, and the threshold applies regardless of the direction of the price difference. Commerce's distinction fails even to address the core issue of "variations specific to the market in question" that it previously found unaccounted for by a two-percent

14

*PUBLIC VERSION*

threshold.  Commerce has not and cannot offer a reasoned explanation for embracing a two-percent threshold that it previously found inappropriate.  *See*, *e.g.*, *State Farm*, 463 U.S. at 57 ("an agency changing its course must supply a reasoned analysis" for the change); *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

### e.  Commerce's Price Difference Test Purports to Identify Patterns of Prices That Differ Significantly in Nearly Every Case and Across Nearly Every Dimension

Commerce's price difference test has consistently yielded abnormally high pass rates across numerous proceedings and has translated into near universal findings of the existence of "patterns" of significant price differences—in 87 percent of instances in which the price difference test has been applied—and findings in a majority of instances that over 90 percent of prices "differ significantly."  *See* Attachment 1 to Canadian Parties' Comments on Draft Remand Results, P.R.R. 5 (collecting pass-rates for the price difference test as applied in all of the preliminary and final results issued from July 2025 through December 2025 and showing that, of the 100 applications by Commerce of the price difference test, 87 resulted in pass rates higher than 33% and 51 resulted in pass rates higher than 90%).

A "test" that produces the same finding on nearly every occasion is not reasonable, as it tests for nothing at all.  A test that deems commonplace, near-universal levels of price differentiation to satisfy the statutory requirement of prices that "differ significantly" does not give effect to the plain meaning of the statutory term "significantly," or the intent that Commerce

*PUBLIC VERSION*

engage in case-by-case assessments of significance.  Under the price difference test, the statutory term loses its meaning.  When everything is significant, nothing is.[7]

### 2. Commerce's Finding of Significant Price Differences in This Case is Unsupported by Substantial Evidence and Arbitrary and Capricious

The Court can and should reject Commerce's price difference test as inconsistent with the best—or even any reasonable—interpretation of the statutory requirement that Commerce identify prices that "differ significantly" among purchasers, regions, or time periods.  The Court can and should also reject application of the price difference test in this case as unsupported by substantial evidence and, because Commerce failed to provide an adequate explanation for its result, as arbitrary and capricious.

The (pre-*Loper Bright*) CAFC decisions reviewing Commerce's interpretive methodological tests for reasonableness rather than for support by substantial evidence do not foreclose challenges to Commerce's determinations based on the evidence on the record.  Likewise, Commerce's decision to apply a methodological test that is reasonable as a general matter—which the price difference test is not—would not erase Commerce's obligation to address evidence on the record that detracts from the conclusions that it draws from that test.

To be sure, *Stupp* rejected substantial evidence review of the challenges to the DPM raised in that case and, based on precedent relying on the *Chevron* framework, applied a reasonableness standard.  5 F.4th at 1353–1354.  But the *Stupp* court held that the substantial evidence standard did not apply to the plaintiff's specific challenge to Commerce's DPM, "a general approach that Commerce defined in a prior publication, . . . as a methodology for implementing the statutory directive in section 1677f-1(d)(1)(B)."  *Id.* at 1354.  That is an

---

[7] *Cf.* THE INCREDIBLES (Walt Disney Pictures 2004) ("SYNDROME: 'And when everyone's super, . . . no one will be.'").

*PUBLIC VERSION*

unremarkable holding.  The court simply addressed as a matter of law, rather than as a matter of evidence, the challenges to Commerce's interpretation of a statutory directive through the DPM. Indeed, the *Stupp* court made clear that the plaintiff:

> {W}as free to make factual arguments regarding why it was inappropriate to apply the ratio test {i.e., another component of the DPM}, but it chose not to do so. Instead, {the plaintiff} has challenged the appropriateness of the ratio test in the abstract . . . and wrongly attempts to place the burden on Commerce to justify the use of that test as a matter of substantial evidence in light of the facts of this case.

*Id.* at 1355.

Unlike the plaintiff in *Stupp*, the Canadian Parties in this case challenge both the lawfulness of the components of the DPM as a general matter *and* Commerce's inability—and refusal even to try—to support its factual findings as to the preconditions for applying A-T on the record of this review.  *See* Canadian Parties Comments on Draft Remand Results at 8–20, P.R.R. 5.  Commerce cannot evade its obligation to explain the absurdity of the results that its test produces when applied to the facts of this case by hiding behind a defense of the test as reasonable in the abstract.

The evidence on the record confirms the absurdity of Commerce's findings of significant price differences on the record of this case.  That is evident at the outset when the results of the Price Difference Test are compared to the results from analyzing the same data under the Cohen's *d* test, which Commerce defended as a reasonable measure of significant difference for nearly a decade.  As reflected in the table below, under the Cohen's *d* test applied to the respondents' data, nearly all of the comparisons exhibiting "significant" price differences were comparisons among time periods, but the price difference test dramatically increases the pass rates across all three categories, and to nearly identical degrees.[8]

---

[8] *See* Canadian Parties Comments on Draft Remand Results at 17–19, C.R.R. 11.

*PUBLIC VERSION*

| Categories | Cohen's *d* Test<br>Canfor / West Fraser | Price Difference Test<br>Canfor / West Fraser |
|---|---|---|
| Time period | [     ] / [      ] | [     ] / [     ] |
| Region | [    ] / [    ] | [     ] / [     ] |
| Purchaser | [    ] / [    ] | [     ] / [     ] |

*{Canfor and West Fraser BPI}*

Based on the evidence of ordinary market-driven price fluctuations for softwood lumber, one would expect to find price differences among calendar quarters.[9] This evidence confirms that prices in the U.S. softwood lumber market are volatile and subject to changes over time, all for reasons beyond the respondents' control. In context, each respondent's average prices in particular quarters did not "differ significantly" from that respondent's average prices in other quarters because the differences merely reflect normal movement of overall prices subject to market forces. The close correlation between measures of price difference for the two respondent companies reinforces that conclusion.

The results of Commerce's price difference test are not defective merely with respect to comparisons of prices among different time periods. Failure to control for price variability over time infects the results across regions and purchasers as well. Unless sales to all regions and all purchasers are evenly and uniformly distributed over time market fluctuations over time will manifest as differences among the other categories as well. Substantial evidence does not support treating time-based price differences as prices that differ significantly among purchasers and regions.

---

[9] *See supra* note 6 (identifying sources of evidence on price fluctuations in the softwood lumber market).

18

*PUBLIC VERSION*

Substantial evidence also cannot support application of a two-percent threshold to determine that prices *among* groups (of purchasers, regions, or time periods) differ significantly when the evidence shows that price differences *within* comparison groups frequently exceed that threshold.[10] When prices within a control group themselves differ by more than two percent from the average, it is irrational to automatically treat variations of the same magnitude by the test group as differing significantly from prices in the control group.

In response, Commerce insists that the requirement to identify a pattern of prices that differ significantly is a "blunt tool to identify the conditions which may indicate masked dumping," Remand Redetermination at 24, P.R.R. 6, effectively conceding that its analysis does not proceed on a "case-by-case basis" to account for the fact that what is significant for one industry will not be for another. In Commerce's view, once it has applied that blunt tool to identify conditions that *may* indicate masked dumping, it has no obligation to address evidence that those conditions do not, in fact, indicate masked dumping. Instead, Commerce deploys its "meaningful difference test" that treats every downward price movement as targeted dumping that must be unmasked through zeroing. It is important to emphasize that, as explained above in Part III.B.1.e, Commerce's price difference test and ratio test "identify the conditions which may indicate masked dumping" in nearly 90 percent of their applications. This leaves Commerce's

---

[10] According to Commerce's own DPM calculations, a considerable number of the standard deviations show that the respondents' U.S. lumber prices deviate by more than two percent from the averages within the respective groups. *See* Draft Remand Analysis Memorandum for Canfor Corporation, from Thomas Martin to the File (Dec. 22, 2025) ("Canfor Analysis Memo") at 315, C.R.R. 1 (unchanged for Remand Redetermination); Draft Remand Analysis Memorandum for West Fraser, from Thomas Martin to the File (Dec. 22, 2025) ("West Fraser Analysis Memo") at 360–61 (describing the overall statistics of each control number), and 389, 390, 402, 403, 413, and 414 (calculating the control group standard deviations), C.R.R. 6 (unchanged for Remand Redetermination).

*PUBLIC VERSION*

"meaningful difference test" as the only instrument even potentially implementing the statutory terms for limiting application of the alternative A-T methodology.

However, the CAFC has been clear in rejecting Commerce's attempts to rely on the operation of its meaningful difference test to evade the obligation to lawfully identify a pattern of prices that differ significantly. *See Marmen*, 134 F.4th at 1344 n.3. The court explained: "Commerce did not use a meaningful difference test in a way that was independent of the first two steps, both of which depend on the use of Cohen's *d* test. If the use of Cohen's *d* test at the first and second steps is unsupported here, then we have no basis to find that error was harmless by using the meaningful difference test." *Id.* The same logic applies when replacing the Cohen's *d* test with the price difference test.

Commerce next responds to evidence demonstrating the absence of targeted dumping by insisting that *JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015), absolves it of any obligation to consider evidence beyond the results of its DPM tests. Remand Redetermination at 22, P.R.R. 6. However, the CAFC in *JBF RAK* addressed different arguments and evidence than those the Canadian Parties raise here and thus does not control. *See Union Elec. Co. v. United States*, 363 F.3d 1292, 1297 (Fed. Cir. 2004) ("Even if *Maine Yankee* were reviewed as implicitly rejecting the direct tax argument, we have repeatedly held that the disposition of an issue by an earlier decision does not bind later panels of this court unless the earlier opinion explicitly addressed and decided the issue."). The court in *Timken Co. v. United States* summarized this difference, confirming that:

> The Federal Circuit's opinion in *JBF RAK* does not appear to speak to a situation where a respondent actually demonstrates that the price differences are not the result of targeting. Although the Federal Circuit expressed concern that "requiring Commerce to determine the intent of a targeted dumping respondent would create a tremendous burden on Commerce that is not required or suggested by the

*PUBLIC VERSION*

statute," . . . such a burden might not exist where a respondent itself provides that information.

179 F. Supp. 3d 1168, 1179 n.12 (Ct. Int'l Trade 2016).

Commerce argues that the existence of such evidence "does not override the statute" to compel an analysis of that evidence. Remand Redetermination at 17–18, P.R.R. 6. This position is at odds with Commerce's obligation to support its determinations with substantial evidence and to address evidence detracting from its conclusions. *See CS Wind*, 832 F.3d at 1373. Moreover, given that the purpose of the relevant provision is to identify and empower Commerce to unmask targeted dumping, *see generally* SAA at 842; *JBF RAK*, 790 F.3d at 1368, consideration of evidence that bears on whether targeted dumping exists *effectuates*, rather than overrides, the statute.

Commerce then claims that price volatility in the U.S. market would not negate that dumping or masked dumping is occurring, and that "simply identifying the reasons why masked dumping exists . . . does not change the fact that masked dumping is occurring." Remand Redetermination at 13–14, P.R.R. 6. But market-specific evidence of price volatility dispels the notion that targeted dumping is occurring *at all*, and also proves that a mechanical two percent threshold is inadequate to measure significance in the U.S. lumber market.

Nor is there any basis for Commerce's conclusory point that the SAA supports Commerce's high pass rates or that it is now detecting significant price differences more "fulsomely." *Id.* Commerce's position is based on circular, question-begging logic that assumes that more "passing" results must mean its new test is working. This is baseless and wrong. It is also especially pernicious given that Commerce refuses to consider evidence that its test is not, in fact, identifying targeted dumping or prices that are significant in any meaningful way. Commerce should be compelled to address the extensive evidence that contradicts its conclusion

21

*PUBLIC VERSION*

that the market-driven price differences identified by its price difference test are not significant as that term is used in the statute.

### C.    Commerce's Findings of Patterns of U.S. Prices That Differ Significantly Among Purchasers, Regions, or Periods of Time Are Contrary to Law

Commerce purports to follow the terms of the statute by applying the exceptional A-T methodology only if "there is a pattern of . . . prices . . . that differ significantly among purchasers, regions, or periods of time."  19 U.S.C. § 1677f-1(d)(1)(B)(i); *see* Remand Redetermination at 4–6, P.R.R. 6.  Here, Commerce used its "ratio test" to find the existence of such a pattern.  However, as applied by Commerce to the results of the price difference test, the ratio test does not faithfully interpret the statutory "pattern" requirement.

Commerce has previously explained that, "{i}n the case of identifying a pattern of pricing differences, a 'pattern' is a reliable sample of traits, acts, tendencies or other observable characteristics, with frequent or widespread incidences."  *Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't of Commerce Nov. 8, 2017), and accompanying Issues and Decision Memorandum at 57 (citing Webster's Ninth New Collegiate Dictionary (1989) at 863–64).  In its remand redetermination, Commerce notes that pattern "can be defined as 'a frequent or widespread incidence.'"  Remand Redetermination at 26, P.R.R. 6 (citing *Pattern*, Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/pattern)).  Pattern can also be defined as a "a regular or logical form, order, or arrangement of parts (behavior pattern; the pattern of one's daily life)."  *Pattern*, Concise Oxford English Dictionary of Current English 1002 (9th ed. 1995).  All of these definitions support the best reading of "pattern" as data points that are interrelated, appear together, and are logically connected.

22

*PUBLIC VERSION*

The SAA confirms that Congress intended "pattern" to be read in relation to the objective of section 1677f-1(d)(1)(B). That objective was to provide a mechanism for addressing targeted or masked dumping; *i.e.*, when an exporter sells into the U.S. at less than fair value only for particular customers, regions, or time periods, which is obscured by averaging with non-dumped sales to other customers, regions, or time periods. SAA at 842–43. Thus, the relevant "pattern" must comprise U.S. sales reasonably giving rise to an inference of targeted dumping, *i.e.*, dumped prices to a particular customer, in a particular region, or during a particular time period that are concealed by non-dumped prices to other customers, in other regions, or during different time periods.

Commerce's ratio test does not look for any such pattern. Instead, it simply aggregates the value of U.S. sales that "pass" the price difference test by exhibiting differences of greater than two percent from comparison groups. Remand Redetermination at 26–27. When the value of U.S. sales that pass the price difference test exceeds thirty-three percent of the total value of U.S. sales by that respondent, Commerce purports to find a pattern. *Id.* The only rationale that Commerce articulates for why this test identifies a pattern is that the thirty-three percent cutoff indicates that "the prices differing significantly are not an outlier." *Id.* It is not at all clear on what basis Commerce has reached that conclusion. Nothing in the plain meaning of "pattern" or the purpose of the statute to identify targeted dumping suggests that the best reading of "pattern" is "greater than thirty-three percent of sales differing by greater than two percent from other sales," as the ratio test reflects.

Instead of attempting to explain why the current iteration of its ratio test represents the best reading of "pattern" in the statute, Commerce insists that the CAFC "has held that the ratio test is a reasonable method for addressing the pattern requirement." *Id.* (citing *Stupp*, 5 F.4th at

*PUBLIC VERSION*

1354).  It is true that, in *Stupp*, the CAFC sustained the ratio test as challenged in that case.

However, while *Loper Bright* directs that *stare decisis* applies to prior holdings "that specific

agency actions are lawful" in cases that relied on *Chevron*—as *Stupp* did (*see supra* at Part

III.A)—the "specific agency action" upheld in *Stupp* is not the one challenged here.

There are two critical differences between the ratio test sustained as reasonable in *Stupp*

and the ratio test challenged in this case.  First, the ratio test challenged in *Stupp* applied to prices

found to "differ significantly" under the Cohen's *d* test.  On remand in this case, Commerce

applied the thirty-three percent threshold of its ratio test to prices that Commerce found to "differ

significantly" under its price difference test.  That may be a similar test, but it is not the same

"specific agency action" that the *Stupp* court reviewed.

Second, apart from changing the input to the ratio test on remand in this case, Commerce

adopted a new and materially different version of the ratio test.  In *Stupp*, the court reviewed a

ratio test that found two different types of patterns at two different thresholds.  That ratio test

found a pattern supporting only partial A-T when the value of U.S. sales passing the test for

significant difference fell between 33% and 66% and a pattern supporting full A-T only above

66%.  *Stupp*, 5 F.4th at 1355.  This is a material distinction.  In sustaining Commerce's ratio test,

the Stupp court relied on the dual cutoffs:  "Commerce's approach is less rigid {than possible

alternatives}, providing a middle ground between 33% and 66%, in which the average-to-

transaction method is only partially applied.  That approach provides a better fit . . ..  We

conclude that Commerce's cutoffs are reasonable in light of the alternatives."  *Id.*

The ratio test applied by Commerce on remand in this case is not the ratio test sustained

by the CAFC in *Stupp* or any other case.  This Court is not bound to uphold Commerce's new

ratio test based on that precedent.  To the contrary, after *Loper Bright*, the Court has an

24

*PUBLIC VERSION*

obligation to assess whether interpretation of "pattern" through Commerce's ratio test is consistent with the best reading of the statute. As explained above, it is not.

Commerce's aggregation of random price variations is also contrary to the statute's plain language because it supplants the disjunctive "or" with the conjunctive "and," misreading the language of section 1677f-1(d)(1)(B)(i) as "among purchasers, regions, *and* periods of time." Congress used the disjunctive "or" because the inference that targeted dumping may be occurring depends on consistency in the relationship between U.S. prices that have been found to differ significantly. Aggregating U.S. sales that are differentially priced to purchasers with U.S. sales that are differentially priced to regions or time periods, without making any distinction of whether those sales are above or below the "normal value" amounts, cannot support an inference of targeted dumping. There is no regularity to such a pattern that would suggest any masked dumping of a product to a targeted purchaser, a targeted region, or during a targeted time period.

Commerce relies on *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325–26 (Fed. Cir. 2020), to support its aggregation of price differences across categories in application of the ratio test. Remand Redetermination at 27, P.R.R. 6. Even if that case had addressed the same ratio test that Commerce now applies, it did not engage with the same arguments raised here concerning the tools of statutory construction and how to discern the meaning of "pattern," nor did it ultimately define that term. Commerce's position also finds no support from *United States v. Moore*, 613 F.2d 1029, 1040 (D.C. Cir. 1979), and *De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956). See Remand Redetermination at 27 n.79, P.R.R. 6. Those decisions concerned different statutes and were clear that interchangeability of "or" with "and" depends on legislative intent, *Moore*, 613 F.2d at 1040, and the statute's "proper context," *De Sylva*, 351 U.S. at 573.

*PUBLIC VERSION*

Nothing in the statute, its legislative history, or its context suggests that Congress intended for "or" to mean "and."

      **D.    Commerce's Unreasoned Abandonment of Its Mixed Methodology Practice Was Unlawful**

On remand, Commerce modified its DPM not only by eliminating reliance on Cohen's *d* in accordance with *Marmen* and this Court's Remand Order, but also by altering the DPM's ratio test to eliminate its "mixed methodology."  *See* Remand Redetermination at 28, P.R.R. 6. Since the inception of Commerce's DPM, Commerce consistently applied its ratio test to produce either of two outcomes for each respondent as to which it found a pattern.[11]  If the U.S. sales values that "pass" the test for significant difference (previously Cohen's *d*, now the price difference test) exceeded 66% of all U.S. sales value, then Commerce applied the A-T methodology, with zeroing, to all of the respondent's sales.  *Id.*  If the U.S. sales values that "pass" the significant-difference test fell between 33 and 66 percent of all U.S. sales value, then Commerce applied the A-A methodology to the non-passing sales and the A-T methodology, with zeroing, to the passing sales.  *Id.*  The latter element of the DPM was referred to as the mixed methodology.  Commerce's decision to abandon the mixed methodology on remand in this proceeding constituted an arbitrary and capricious change, without adequate explanation, of a longstanding and consistent practice.

Commerce must provide a reasoned explanation for changing practices.  *State Farm*, 463 U.S. at 42; *Dongbu Steel Co.*, 635 F.3d at 1371.  Explanations are not reasoned if they "entirely

---

[11] *See, e.g.*, *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101, 8,104 (Dep't Commerce Feb. 14, 2012); *Certain Softwood Lumber Products From Canada: Preliminary Results of Antidumping Duty Administrative Review*, 88 Fed. Reg. 5,306 (Dep't of Commerce Jan. 27, 2023), P.R. 526, and accompanying Preliminary Decision Memorandum at 9, P.R. 518.

*PUBLIC VERSION*

fail to consider an important aspect of the problem." *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011). The only justifications that Commerce offered for abandoning its longstanding practice are that the mixed methodology is not statutorily required and that discontinuing it "enhances the ability to address masked dumping, . . . and more closely aligns with the statutory language . . .." Remand Redetermination at 28, P.R.R. 6.

The first justification—that the statute never required Commerce to use the mixed methodology—does not explain the change in practice. Instead, it is an implicit assertion that Commerce may freely alter longstanding policies and practices at a whim, so long as its prior position was not expressly mandated by statute. When an agency changes its practices and treats similar situations differently, it must provide a reasoned explanation for doing so. *See SKF USA Inc.*, 630 F.3d at 1374 ("In *Timken*, we rejected the International Trade Commission's argument that its obligation is limited to addressing statutorily enumerated factors and that it was not compelled to consider adverse effects of its decision, calling the position untenable and not consistent with *State Farm*." (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed. Cir. 2005))).

The second justification—that discontinuing the mixed methodology enhances the ability to address masked dumping—lacks any empirical basis. It is also inconsistent with the conclusion of the CAFC in *Stupp* that the mixed methodology provided a "better fit, minimizing both the assessment of anti-dumping duties that are too high and the assessment of duties that are too low." *Stupp*, 5 F.4th at 1355. On remand, if Commerce continues to apply its ratio test, it should be required either to reinstitute its mixed methodology or provide a reasoned explanation for abandoning it.

*PUBLIC VERSION*

E.    **Commerce Cannot Satisfy the Statutory Requirement to Explain
Why the A-A Methodology Cannot Account for Time Based Differences**

Pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(ii), the A-T methodology may be used to calculate dumping margins only if Commerce "explains why such differences cannot be taken into account using {A-A}." Commerce interprets this explanation requirement to be satisfied when its "meaningful difference test" reveals that margins calculated using A-T differ sufficiently from margins calculated using A-A. This test does not faithfully interpret the statute's explanation requirement. On the facts of this case, the A-A methodology accounts for observed price differences, and Commerce thus cannot satisfy the explanation requirement. Moreover, when Commerce applies A-T based on the results of the meaningful difference test, it does not conduct the fair comparison of prices required by the statute.

1.    **The Meaningful Difference Test Does Not Produce an "Explanation," Nor
Can Commerce Provide One When Time Based Differences Drive the Ratio
Test's Results**

By comparing the margins produced by the A-A and A-T methodologies, Commerce claims the meaningful difference test "explains" why the former cannot account for the identified price differences. Remand Redetermination at 31, P.R.R. 6. Simple margin comparisons cannot "establish" or adequately "explain" why such differences cannot be accounted for by the A-A methodology. The Court should hold that "explanation," as informed by the plain language and the SAA, requires more than what the meaningful difference test purports to offer.

Furthermore, Commerce's test cannot "explain" why the identified price differences cannot be taken into account using the A-A methodology. As the SAA explained, "reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'" SAA at 842. With respect to prices that differ among time periods, however, Commerce has addressed this concern by refining its A-A methodology to

28

*PUBLIC VERSION*

average prices at a more granular level than Commerce's price difference test identifies. Commerce's regulation provides that the A-A methodology is applied to *monthly* averages, 19 C.F.R. § 351.414(d)(3), which necessarily accounts for any time-based price differences identified by the price difference test, which compares *quarterly* averages. That fact does not render the specification of "time periods" surplusage in the statute. Commerce ensured it can account for quarterly price differences in this case using its normal, monthly A-A methodology. Having thus ensured that it can account for such price differences, Commerce cannot satisfy the statutory requirement to explain why it cannot.

The Canadian Parties have not ignored price differences across purchasers or regions as Commerce argues. *See* Remand Redetermination at 30–31, P.R.R. 6. The reality in this case is that Commerce adopted an acontextual numerical test for patterns of prices that differ significantly, applying a threshold of two percent that is so disconnected from market reality that it flags nearly all price differences as "significant." The Canadian Parties referred Commerce to the record evidence demonstrating that the variability in respondents' pricing overwhelmingly correlates to pricing changes in the lumber market. *See* Canadian Parties Comments on Draft Remand Results at 7, P.R.R. 11 (citing evidence summarized in the Canada 56.2 Brief). Commerce has declined to address the evidence that any price differences across purchasers or regions that might be identified by a contextually appropriate test reflect no more than the time-based differences arising from market variability in the period of review.

The Court should not be persuaded by Commerce's reliance on the CAFC's decision in *Apex*, 862 F.3d at 1346–48. Remand Redetermination at 31–33, P.R.R. 6. The CAFC in *Apex* held only that the meaningful difference test reasonably "informs the question of whether the A-A methodology can adequately account for a pattern of significant price differences," not that the

29

*PUBLIC VERSION*

test is *dispositive* of whether the A-A methodology can adequately account for such differences. *Id.* at 1346.

### 2. Commerce Unlawfully Ignored Record Evidence Confirming That the Identified Price Differences Were Not the Result of Targeted Dumping

Those "such differences" mentioned in the statute refer to the price differences identified pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i), which Commerce purports to implement with the DPM's first step. In this case, the Canadian Parties presented evidence that identified price differences reflected generally applicable market factors rather than targeted dumping. Commerce did not address that evidence, but instead insisted that it had no obligation to do so. Commerce was wrong.

Commerce contends that it may disregard evidence that rebuts or undermines a finding of targeted dumping. Remand Redetermination at 34, P.R.R. 6. This proposition was incorrect when applied to evidence contradicting a finding of a pattern of significant price differences, but is even less defensible when applied to evidence showing that there is no targeted dumping for which A-T is needed to account. The CAFC in *JBF RAK*, which Commerce invokes, upheld Commerce's refusal to consider evidence pertaining to the requirements of section 1677f-1(d)(1)(B)(i) (a pattern of prices that differ significantly) rather than to the requirement of section 1677f-1(d)(1)(B)(ii) that Commerce explain why A-A cannot account for observed price difference. *JBF RAK*, 790 F.3d at 1367–68. *JBF RAK* does not relieve Commerce of its obligation to address record evidence that explains why Commerce *can* account for observed price differences by using its normal A-A methodology.

### 3. Commerce's A-T Methodology Does Not Result in the Fair Price Comparisons Required by the Statute

Commerce's use of the A-T methodology when the observed price differences are predominately prices from different time periods, overlooks the statutory requirement that the

*PUBLIC VERSION*

dumping calculation must be based on a "fair comparison." *See* 19 U.S.C. § 1677b(a)(1)(A) ("In order to achieve a fair comparison with the export price or constructed export price . . . {t}he normal value of the subject merchandise shall be the price . . . at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price"); Canada 56.2 Brief at 73–75.  Commerce has chosen, by regulation, to apply its A-A methodology on a monthly basis in administrative reviews.  19 C.F.R. § 351.414(d)(3).  Thus, the A-A methodology makes comparisons "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(A). The A-A methodology can, therefore, "take into account" price differences among time periods, the only category expressly addressed in 19 U.S.C. § 1677b(a)(1)(A), to ensure that a "fair comparison" is achieved.

Where pricing for merchandise is subject to volatile changes over time, like in the U.S. lumber market, the A-A methodology is the most appropriate means to take into account such time-based price differences.  This rationale does not render any statutory provision void of operative effect, but rather supports the conclusion that the A-A methodology, applied on a monthly basis, more accurately calculates dumping margins in the context of the relevant industry in this case.

The A-T methodology, in contrast, increases the risk of unfair comparisons based on aberrant price differences because a transaction price on any given day may be an outlier when compared to a price that is the weighted average of all transactions during a given period.  Price volatility driven by seasonality magnifies the chances of a single price becoming an outlier, especially when zeroing is used because a weighted average inherently produces a number different from the outlier prices in a distribution.  Rather than grapple with the inaccuracies of

31

*PUBLIC VERSION*

the A-T methodology when applied to the U.S. lumber market, Commerce merely dismisses this argument by mischaracterizing those outliers as dumped sales.  Remand Redetermination at 35–36, P.R.R. 6.  The Court should not accept Commerce's handwaving.

## CONCLUSION AND PRAYER FOR RELIEF

The Canadian Parties respectfully request that the Court hold that Commerce's Remand Redetermination is not in accordance with law and unsupported by substantial evidence, and to remand this matter to Commerce to issue a revised redetermination in accordance with this Court's decision, and grant the Canadian Parties such additional relief as the Court may deem just and proper.

*PUBLIC VERSION*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedures 2(B)(1) and 2(B)(2), the undersigned certifies that this brief complies with the limitation requirement of 10,000 words. The word count for the Canadian Parties' Comments in Opposition to the Final Results of Remand Redetermination as computed by Blank Rome LLP's word processing system (Microsoft Word) is 9,925 words.

/s/ Eric S. Parnes
Eric S. Parnes