UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| GOVERNMENT OF CANADA, *et al.*,<br><br>    Plaintiffs,<br><br>CANFOR CORPORATION, *et al.*,<br><br>    Consolidated Plaintiffs,<br><br>    and<br><br>CANFOR CORPORATION, *et al.*,<br><br>    Plaintiff-Intervenors,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>    and<br><br>COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, and SIERRA PACIFIC INDUSTRIES,<br><br>    Defendant-Intervenors. | Consol. Court No. 23-00187 |

<u>ORDER</u>

Upon consideration of plaintiffs' comments regarding the remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby ORDERED that the remand redetermination is sustained AND final judgment is entered in favor of the United States.

Date: _____                        _____
    New York, NY                                                                    JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| GOVERNMENT OF CANADA, *et al*., | ) | |
| Plaintiffs, | ) ) ) | |
| CANFOR CORPORATION, *et al*., | ) ) | |
| Consolidated Plaintiffs, | ) ) | |
| and | ) ) | |
| CANFOR CORPORATION, *et al*., | ) ) | |
| Plaintiff-Intervenors, | ) ) | |
| v. | ) ) | Consol. Court No. 23-00187 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, and SIERRA PACIFIC INDUSTRIES, | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

DEFENDANT'S RESPONSE TO THE COMMENTS ON THE
DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

Of Counsel:

VANIA WANG
Senior Counsel
Office of the Chief Counsel
    for Trade Enforcement & Compliance
Department of Commerce

June 15, 2026

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel:  (202) 353-9303

Attorneys for Defendant United States

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ....................................................................................................... ii

BACKGROUND .........................................................................................................................2

I.      Statutory Framework .......................................................................................................2

II.     The Federal Circuit Invalidates The Cohen's d Test In *Marmen* .......................................4

III.    Commerce Changes Its Administrative Practice After *Marmen* .......................................5

IV.     Commerce Followed Its New Practice On Remand ...........................................................8

ARGUMENT ...............................................................................................................................8

I.      Standard of Review...........................................................................................................8

II.     Commerce's Final Remand Results Comply With The Federal Circuit Decision In
        *Marmen* and the Remand Order........................................................................................9

III.    Commerce's Revised Differential Pricing Analysis Is Reasonable And Lawful ..............10

        A.      The Statutory Language Grants Commerce Discretion .........................................10

        B.      The Price Difference Test Reasonably Determines Significant Price
                Differences..........................................................................................................15

        C.      The Price Difference Test Is Not The P/2 Test......................................................18

        D.      Substantial Evidence Does Not Require Commerce To Make A Determination
                That It Is Not Statutorily Obligated To Make.......................................................21

        E.      The Ratio Test Is A Reasonable Interpretation Of The Statute ............................25

        F.      Commerce Adequately Explained Its Discontinuance Of The Mixed Method .....27

        G.      The Meaningful Difference Test Explains Why The A-to-A Method Cannot
                Account For Such Differences...............................................................................29

CONCLUSION...........................................................................................................................33

## TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s):**

*Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324 (Ct. Int'l Trade 1999) .........................27

*Apex Frozen Foods Private Ltd. v. United States*,
    862 F.3d 1322 (Fed. Cir. 2017) (*Apex I*)...........................................................7, 23, 28, 29

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017) (*Apex II*) ........................................................3, 20, 30, 31

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    102 F.4th 1252, 1259 (Fed. Cir. 2024) (*Asemesa*)........................................................ 11-14

*Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025)................................13

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
    5 F.4th 1367 (Fed. Cir. 2021) ..................................................................................... 12-13

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*,
    608 Fed. Appx. 948 (Fed. Cir. 2015)........................................................................24

*BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025)............................12

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) .........................................................................8

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966)......................................................................9

*Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020) .................25, 26

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996).................................................12

*Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024)..........13, 14

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015)................................. 16, 21, 23-25

*Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156 (Fed. Cir. 1994) .........................................33

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ...........................................10, 11, 14

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)........................8

*Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed. Cir. 1984) .................................12

*Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025)........................................... *passim*

## TABLE OF AUTHORITIES (continued)

**Cases (continued):**                                                                    **Page(s):**

*Marmen v. United States*, No. 20-00169, Slip Op. 26-62
    (Ct. Int'l Trade June 15, 2026)......................................................2, 9, 11, 15, 17, 25, 29, 33

*Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025)....................................................9, 11

*Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) .........24

*Nexteel Co. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022)...........................................................12

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)...............................................9

*Octal Inc. v. United States*, 539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ....................................25

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014) .......................19

*Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015).........28, 29

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168 (2025) ...................................9

*Smith-Corona Group v. United States*, 713 F.2d 1571 (Fed. Cir. 1983) .......................................12

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021)................. 3, 10, 11, 21, 26, 28, 31-32

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004).......................................................20

*Timken Co. v. United States*, 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016)............................. 23-25

*Toyo Kohan Co. v. United States*, Slip Op. 2026-54, 2026 Ct. Intl. Trade LEXIS 64,
    2026 WL 1459170 (Ct. Int'l Trade May 22, 2026) ............................10, 11, 14, 15, 19, 26

*Wolfe v. McDonough*, 28 F.4th 1348 (Fed. Cir. 2022) .................................................................31

**Statutes And Legislative History:**                                                     **Page(s):**

19 U.S.C. § 1516a........................................................................................................................8

19 U.S.C. § 1673..........................................................................................................................2

19 U.S.C. § 1673b.......................................................................................................................15

19 U.S.C. § 1673d.......................................................................................................................15

19 U.S.C. § 1677-2 .....................................................................................................................14

19 U.S.C. § 1677a.........................................................................................................................2

**TABLE OF AUTHORITIES (continued)**

**Statutes And Legislative History (continued):**                                 **Page(s):**

19 U.S.C. § 1677b................................................................................................2, 32

19 U.S.C. § 1677f-1 ................................................................................... *passim*

28 U.S.C. § 2639..................................................................................................8

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994).. 3, 4, 7, 13-15, 17, 21

**Regulations:**

19 C.F.R. § 351.106...........................................................................................18

19 C.F.R. § 351.403...........................................................................................15

19 C.F.R. § 351.414................................................................................2, 3, 30, 31

**Administrative Determinations:**

*Certain Frozen Warmwater Shrimp from India,*
    79 Fed. Reg. 51,309 (Dep't of Commerce Aug. 28, 2014)................................31

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea,*
    84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019) ..................................18

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of
    Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025)........................6

*Large Diameter Welded Pipe from the Republic of Turkey,*
    84 Fed. Reg. 6,362 (Dep't of Commerce Feb. 27, 2019) ..................................17

*Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33351 (Dep't of
    Commerce June 4, 2013) .................................................................................4

**Other Authorities:**

*Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't
    of Commerce May 19, 2025)......................................................................... 5-6

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't of
    Commerce May 9, 2014) .................................................................................4

*Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping
    Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2008)...............20

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| GOVERNMENT OF CANADA, *et al.*, ) | |
| Plaintiffs, ) | |
| CANFOR CORPORATION, *et al.*, ) | |
| Consolidated Plaintiffs, ) | |
| and ) | |
| CANFOR CORPORATION, *et al.*, ) | |
| Plaintiff-Intervenors, ) | |
| v. ) | Consol. Court No. 23-00187 |
| UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, and SIERRA PACIFIC INDUSTRIES, ) | |
| Defendant-Intervenors. ) | |

DEFENDANT'S RESPONSE TO COMMENTS ON THE
DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to comments filed by the

Government of Canada and 31 other parties (the Canadian Parties), ECF No. 178, regarding the

final results of redetermination by the United States Department of Commerce (Commerce),

ECF No. 175, pursuant to the Court's remand order, ECF No. 160.  The Court should sustain the

Final Remand Results because they are in accordance with law, supported by substantial

evidence, and comply with the Court's remand order.  Moreover, the Court's decision in

*Marmen* largely is dispositive of the issues presented in this case.  *Marmen v. United States*, No.

20-00169, Slip Op. 26-62 (Ct. Int'l Trade June 15, 2026).

BACKGROUND

I.    Statutory Framework

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade

practices.  The antidumping provisions provide relief for injury to domestic manufacturers by

imposing duties upon imports of foreign products that are sold in the United States at less than

fair value.  19 U.S.C. § 1673.  By statute, Commerce must evaluate whether imported products

are sold in the United States at unfairly low prices.  19 U.S.C. § 1673.  If Commerce concludes

that the U.S. sales are "at less than fair value" – meaning that the products are dumped into the

U.S. market, and if the International Trade Commission (ITC) concludes that a U.S. industry has

been injured by such unfair pricing, then Commerce will direct U.S. Customs and Border

Protection to assess an "antidumping duty."  *Id.*  A sale generally is at "less than fair value"

when the price charged in the U.S. market – the "U.S. price" – is less than the "normal value,"

generally the price charged in the comparison market.  19 U.S.C. §§ 1677a(a)-(b),

1677b(a)(l)(B)(i).  The antidumping duty is equal to the "amount by which the normal value

exceeds the {U.S. price} for the merchandise."  19 U.S.C. § 1673.

In determining whether subject merchandise is being sold at less than fair value,

Commerce compares "the weighted average of the normal values to the weighted average of the

export (and constructed export prices) for comparable merchandise" unless it determines another

method is appropriate.  19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  Under this

average-to-average (A-to-A) method, Commerce compares the weighted average of a

2

respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's U.S. sales prices during the same period.  19 C.F.R. § 351.414(b)(1).

One downside of the A-to-A method is that it may fail to detect instances of "targeted" or "masked" dumping, which may occur when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods.  *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex II*)).  When Commerce uses the A-to-A method, higher-priced U.S. sales can mask these lower-priced U.S. sales that are dumped, which could potentially leave the domestic industry without a remedy from unfair trade practices.  *See* Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 (1994) at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").  If the full extent of dumping is masked, then the domestic industry may not receive the relief that the statute affords when the calculated weighted-average dumping margin based on the A-to-A method falls below the two percent *de minimis* threshold.

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B).  *See Apex II*, 862 F.3d at 1342.  Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the normal values to {U.S. prices} of individual transactions {A-to-T} for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-to-A method or transaction-to-

3

transaction method}." 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).  But Congress did not specify *how* Commerce was to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time.  Nor did Congress mandate that Commerce use statistical tests or techniques in determining if conditions specified in 19 U.S.C. § 1677f-1(d)(1)(B) exist.  The SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 843.

II.        The Federal Circuit Invalidates The Cohen's *d* Test In *Marmen*

Beginning in 2013, Commerce had used the Cohen's *d* test in all antidumping proceedings to evaluate whether U.S. prices differ significantly within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B).  *See Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722-23 & n.12 (Dep't of Commerce May 9, 2014) (citing six proceedings applying the Cohen's *d* test, including *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013) (final AD determination), and accompanying Issues and Decision Memorandum (IDM) comment 3)).  Commerce also used a ratio test to assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test.  *Id.* at 26,722-23.  If the Cohen's *d* test and the ratio test demonstrated the existence of a pattern of prices that differed significantly such that an alternative comparison method should be considered, then Commerce examined whether using only the A-to-A method can appropriately account for such differences.  *Id.* at 26,723.  In considering this question, Commerce determined whether using an alternative comparison method (such as the A-to-T method) yielded a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method.  *Id.*  Together, the Cohen's *d* test, the ratio test, and the

4

meaningful difference test, comprised Commerce's differential pricing analysis, *id.*, until *Marmen*.

In June 2025, the Court remanded this case for further proceedings in conformity with the Federal Circuit's decision in *Marmen*.  Order at 3, June 17, 2025, ECF No. 160 (Remand Order) (citing *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*)).  In *Marmen*, the Federal Circuit reviewed Commerce's application of the Cohen's *d* test as part of the agency's differential pricing analysis.  The Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly" when the underlying data did not satisfy certain statistical assumptions.  *Marmen*, 134 F.4th at 1348.  The Federal Circuit further held that on remand "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here."  *Id.*

III.     Commerce Changes Its Administrative Practice After *Marmen*

*Marmen* had a profound effect on Commerce's practice, affecting hundreds of segments of antidumping proceedings.  Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applies its differential pricing analysis to determine which comparison method – A-to-A or A-to-T – is appropriate.  Because statistical assumptions discussed by the Federal Circuit in *Marmen* are unlikely to be valid in exporters' pricing data, as a practical matter, the Federal Circuit's decision to condition the use of the Cohen's *d* test on such assumptions, rendered the Cohen's *d* test unusable in antidumping proceedings.

Following the Federal Circuit's decision in *Marmen*, Commerce changed its practice. First, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.  *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't

of Commerce May 19, 2025).  To comply with the Federal Circuit's holding in *Marmen*,

Commerce discontinued the use of the Cohen's *d* test in antidumping proceedings and adopted

the "price difference" test as the new test for determining whether price differences among

purchasers, regions, or time periods are significant.  *See*, *e.g.*, *Heavy Walled Rectangular Welded*

*Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of

Commerce July 8, 2025) (final results 2022-2023 admin. review), and accompanying IDM at 2-5

(applying the price difference test for the first time).  Additionally, and concurrent with this

change, Commerce also discontinued the use of the "mixed method" – a hybrid version of two

available comparison methods (A-to-A and A-to-T) – in antidumping proceedings, aligning its

practice more closely with the statutory language, which does not reference the "mixed method"

and authorizes Commerce to use the A-to-T method if certain conditions are satisfied. 19 U.S.C.

§ 1677f-1(d)(1)(B).  In other words, Commerce has discontinued the use of the Cohen's *d* test

and the "mixed method" as a matter of administrative policy for all antidumping proceedings,

and has introduced the price difference test to examine whether U.S. prices differ significantly.

Under Commerce's new practice, the differential pricing analysis operates as follows.  In

the first stage, the price difference test is applied to determine whether prices for comparable

merchandise differ significantly.  Final Remand Results 5-6.  Under the price difference test,

"{i}f the weighted-average net price to the given purchaser, region or time period falls outside of

the plus or minus two percent band around the weighted-average net price to all other purchasers,

regions or time periods, then the prices to that given purchaser, region or time period are found

to differ significantly and those sales to the given purchaser, region or time period pass the price

difference test." *Id.*

Next, the ratio test assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. Final Remand Results 6. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of investigation or review. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. *Id.* If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find evidence that a pattern of prices existed during the relevant period.[1] *Id.*

Finally, if both price difference test and ratio test demonstrate evidence of a pattern of prices that differ significantly such that the A-to-T method may be considered, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method. Final Remand Results 6-7. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. *Id.* A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold. *Id.*

---

[1] Masked dumping is more likely to occur where there is a pattern of prices that differ significantly as contemplated by the statute. *See Apex I*, 862 F.3d at 1327 (citing 19 U.S.C. § 1677f-1(d)(1)(B); SAA at 843).

IV.    Commerce Followed Its New Practice On Remand

On remand, following its new practice, Commerce applied the "price difference" and "ratio" tests and found that more than 99 percent of the value of Canfor's and West Fraser's respective U.S. sales passed the price difference test, which "confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods."  Final Remand Results 7.  Commerce then applied the meaningful difference test and found that the A-to-A method cannot account for differences in the respondents' pricing behavior in the U.S. market "because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the alternative A-to-T method."  *Id.*  Accordingly, consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applied the A-to-T comparison method to Canfor's and West Fraser's U.S. sales and calculated estimated weighted-average dumping margins of 5.25 percent and 7.06 percent, respectively.  *Id.* at 36.  Commerce previously had calculated the same dumping margins under the old differential pricing analysis that used Cohen's *d* test, so the agency's change in methodology did not result in a change in the dumping margins for these respondents.  *Id.* at 2.

## ARGUMENT

I.    Standard Of Review

Commerce's decisions are "presumed to be correct."  28 U.S.C. § 2639(a)(1).  Following a remand, the Court will sustain Commerce's redetermination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

8

The possibility of drawing inconsistent conclusions from the record does not prevent Commerce's finding from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "'when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard.'" *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179-80 (2025)).

II.     Commerce's Final Remand Results Comply With The Federal Circuit Decision In *Marmen* and the Remand Order

The Court remanded this case for further proceedings in conformity with *Marmen*. Remand Order. In *Marmen*, the Federal Circuit held that "it was unreasonable to rely on the Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *Marmen*, 134 F.4th at 1348. Additionally, the Federal Circuit held that "{o}n remand, Commerce may re-perform *a* differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here." *Id.* (emphasis added). That is exactly what Commerce did on remand in this case. Following its new practice, Commerce performed *a* differential pricing analysis – without relying on the Cohen's *d* test – consistent with *Marmen*. Final Remand Results 1-2. Similarly, the Court recently sustained Commerce's new practice as consistent with the Federal Circuit's remand decision in *Marmen*. *Marmen*, Slip Op. 26-62 at 17.

9

III.     Commerce's Revised Differential Pricing Analysis Is Reasonable And Lawful

     A.     The Statutory Language Grants Commerce Discretion

The Canadian Parties argue that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369,

454 (2024), changed the standard of review for Commerce's differential pricing analysis.

Canadian Parties Comments 4.  Specifically, the Canadian Parties argue that the reasonableness

standard set out in *Stupp*, 5 F.4th at 1353, was based upon the Federal Circuit's finding that

"Commerce's differential pricing analysis is an interpretation of that statutory language and thus

constitutes an interpretive rule," and the Federal Circuit cited cases that determined that the

standard of review was reasonableness based upon *Chevron* at the time.  Canadian Parties

Comments 4-5.

     *Loper Bright* does not disturb the standard for reviewing Commerce's differential pricing

analysis.  *See Stupp*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for

reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness.");

*Marmen*, 134 F.4th at 1338 (same).  Indeed, as explained in *Marmen*, "this case begins where

*Stupp* ended – Was it *unreasonable* for Commerce to use Cohen's $d$ test as part of its differential

pricing analysis."  *Marmen*, 134 F.4th at 1345 (emphasis added).  The Federal Circuit's

application of the reasonableness standard was the basis for remanding this case.  *See Marmen*,

134 F.4th at 1348 (holding that "it was *unreasonable* to rely on Cohen's $d$ test to determine

whether prices differ significantly") (emphasis added).  The Federal Circuit's use of the

reasonableness standard in *Marmen* – post-*Loper Bright* – demonstrates that *Loper Bright* has

not changed the standard for reviewing Commerce's differential pricing analysis.

     Moreover, this Court recently applied the reasonableness standard of review in *Toyo*

*Kohan Co. v. United States*, No. 24-00261, Slip Op. 2026-54, 2026 Ct. Intl. Trade LEXIS 64,

2026 WL 1459170 (Ct. Int'l Trade May 22, 2026), in which the Court held that a plaintiff had

10

"not shown that Commerce has *unreasonably* implemented the statutory directive of section 1677f-1(d)(1)(B)." *Id.* (emphasis added).  Consistent with *Marmen*, this Court's use of the reasonableness standard in *Toyo Kohan* – post-*Loper Bright* – confirms that *Loper Bright* has not changed the standard for reviewing Commerce's differential pricing analysis.  The Court also applied the reasonableness standard after remand in *Marmen*.  *Marmen*, Slip Op. 26-62 at 12.

Additionally, the continued use of the reasonableness standard comports with this Court's finding that the language of the statute gives Commerce flexibility and discretion.  *See e.g.*, *Toyo Kohan*, Slip Op. at 7 n.12 ("Because the text and legislative history of this subsection of the statute confirm that Congress intended that Commerce have discretion in making the relevant determination, the Federal Circuit's holding in *Stupp I* is undisturbed by the Supreme Court's holding in *Loper Bright*.").  When an agency exercises discretion granted by a statute, judicial review is typically conducted under a deferential standard.  *Mosaic*, 160 F.4th at 1346.  "'Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.'"  *Id.*

The Canadian Parties also argue that the dictionary definition of "significant" means that the price difference test does not suffice to determine whether prices differ significantly.  Canadian Parties Comments 6-8.  However, the statutory provision at issue here, 19 U.S.C. § 1677f-1(d)(1)(B)(i), stating that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," is written in general terms, indicating that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce."  *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024) (*Asemesa*).

11

Indeed, the Supreme Court "did not throw out the administrative discretion baby with the *Chevron* deference bathwater." *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025).  As this Court has recognized, "{i}t will sometimes be the case that the best reading of the statute is that it delegates discretionary authority to an agency.  Broad and open-ended grants of authority … are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion." *Id.*  As this Court concluded, "{i}n those circumstances … the [C]ourt's role is to ensure that the {agency's} action is both reasonable and reasonably explained." *Id.*

Here, there is such an open-ended grant of authority through use of "general" statutory language. *See Asemesa*, 102 F.4th at 1261.  As the Federal Circuit has recognized, the statute is often written in general terms because Congress is not "prescient" and cannot anticipate in legislation all the factual and legal intricacies that may arise in each proceeding.  *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984).  For this reason, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided one year prior to *Chevron*).  Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (internal citations omitted, applying this distinct deference separately from and concurrently with *Chevron* deference in force); *accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu*, 88 F.3d at 1039); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75

(Fed. Cir. 2021).  Therefore, terms such as "significant," "appropriate," or "comparable" are indefinite, open-ended, or general terms that implicitly delegate authority to Commerce and leave Commerce with flexibility.  *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025).  The provision at issue here, 19 U.S.C. § 1677f-1(d)(1)(B), is written in general terms that leave open-ended how Commerce may assess whether a "pattern" exists and whether prices differ "significantly" – indicating that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce."  *See Asemesa*, 102 F.4th at 1259.

This Court reached the same conclusion in *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024), when addressing the statutory requirement that there be a pattern of prices that "differ significantly" among purchasers, regions, or time periods.  In *Garg Tube*, this Court held that "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the open-ended term 'differ significantly.'" 740 F. Supp. 3d at 1366-67.  As the Court explained, "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."  *Id.* at 1367.  The Court added that the SAA provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute.  *Id.* (citing SAA at 843).  Finally, the Court explained that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, 19 U.S.C. § 1677f-1(a), and another subsection that exclusively allows Commerce to select averages and statistically valid samples, 19 U.S.C. § 1677f-1(b), further confirms that Congress meant to afford the agency with flexibility and discretion.  *Id.*  Therefore,

13

the Court held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.* Contrary to the Canadian Parties' arguments, this Court interpreted the case-by-case language of the SAA to allow Commerce flexibility, and this flexibility was confirmed by the statutory context in 19 U.S.C. § 1677f-1, which gives Commerce "flexibility and discretion" for sampling, selecting averages, and declining to make adjustments that are insignificant. *Id.*

Nevertheless, the Canadian Parties assert that there is no authority for "significantly" to confer discretionary authority and that *Loper Bright* does not stand for the proposition that use of broad or open-ended language signifies intent to delegate discretionary authority. Canadian Parties Comments 8-9. However, the term "significantly" is similar to the term "substantially," which was at issue in *Asemesa*, where the Federal Circuit held that Congress invokes its "ability to delegate power under broad general directives" by using nonspecific statutory language. The Federal Circuit explained that Congress's use of the term "substantially dependent" in 19 U.S.C. § 1677-2, as opposed to specifying a minimum percentage, reflected "an expression of its well-considered judgment as to the degree of administrative authority which it was necessary to grant." *Asamesa,* 102 F.4th at 1259-60; *see also* 19 U.S.C. § 1677-2. The Federal Circuit declined to apply *Chevron* in reaching its determination, explaining that "{b}ecause we regard the term 'substantially dependent' as general but not ambiguous, we believe this case is more properly viewed as one involving implied delegation of adjudicative authority to the agency rather than deference to the agency's interpretation of an ambiguous statute." *Asamesa,* 102 F.4th at 1261. Additionally, in *Toyo Kohan*, in sustaining Commerce's price difference test and that two percent reasonably determines that prices differ significantly, the Court held that "{t}he language of the statute affords Commerce discretion to fashion its methodology" and that the

SAA confirmed Congress's delegation of authority. *Toyo Kohan*, Slip Op. at 7 n.12, 9. The Court also sustained Commerce's price difference test as reasonable in *Marmen*. *Marmen*, Slip Op. 26-62 at 17. The Canadian Parties' arguments to the contrary are unpersuasive.

      B.      <u>The Price Difference Test Reasonably Determines Significant Price Differences</u>

Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." Final Remand Results 5. Commerce explained the reasons for adopting this numerical threshold in the price difference test as a reasonable measure of significance. *Id.* at 12-14. Specifically, Commerce explained that this threshold is used in the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c), which determines whether sales prices made by a respondent to an affiliated party in the comparison market are made in the ordinary course of trade, and, therefore, usable in Commerce's margin calculations. *Id.* at 13. Commerce also explained that under 19 U.S.C. § 1673b(3) and 19 U.S.C. § 1673d(a)(4), "the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent." *Id.* at 13-14. Commerce added that this threshold is higher than the *de minimis* threshold in an administrative review, which suggests that the two percent threshold in an investigation is a more conservative measure. *Id.* at 14.

The Canadian Parties argue that, even if the statutory language confers discretion to Commerce, Commerce's has gone beyond the bounds of its delegated authority. Canadian Parties Comments 9. Specifically, the Canadian Parties assert that the price difference test ignores the "case-by-case" language in the SAA, and that Commerce should consider evidence

15

of volatility in the lumber market as the reason for why prices may differ significantly. Canadian

Parties Comments 10-12. However, there is no such requirement to do so in the statute, and

consistent with the Federal Circuit precedent, Commerce lawfully did not determine the *reasons*

for significant price differences. In *JBF RAK,* the Federal Circuit held that Commerce is *not*

required to determine *why* there is a pattern of export prices that differs significantly among

purchasers, regions, or time periods. *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed.

Cir. 2015). The Federal Circuit reasoned that there is no intent requirement in the statute, and

that requiring Commerce to determine the reasons for masked dumping "would create a

tremendous burden on Commerce that is not required or suggested by the statute." *Id.*

Moreover, Commerce's analysis is consistent with Congress's intent for determining

whether there is a pattern of prices that differ significantly to be carried out on a case-by-case

basis. The Canadian Parties argue that the two percent threshold in the price difference test is

fixed and does not account for price variability. Canadian Parties Comments 10-11. However,

as Commerce explained, "whether the prices to a given purchasers, regions and time periods

differ significantly is determined relative to the weighted-average net price to all other

purchasers, regions or time periods." Final Remand Results 16. As with the arm's-length test

and the *de minimis* threshold, the price difference test does not use an absolute value, but a

percentage, which measures a relative difference on a case-by-case basis using the pricing data

on the record of a particular case. *Id.* Indeed, "the data on which Commerce relies in

performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the

respondent's pricing of comparable merchandise to all other purchasers, regions or time

periods." *Id.* The two percent test measures relative differences in case-specific data regarding

the industry and products at issue.  As explained above and as this Court has held, two percent is a reasonable measure of significant price difference.  *Marmen*, Slip Op. 26-62 at 17.

The Canadian Parties argue further that Commerce's use of two percent for the threshold in the arms-length test and for the *de minimis* threshold in investigations is irrelevant.  Canadian Parties Comments 12.  Specifically, Canadian Parties argue that the arms-length test is an interpretative rule and that neither the statutory provision, the SAA, nor the regulations use the word significantly.  *Id.* at 12-13.  However, under the arm's-length test, Commerce has long recognized that "the average prices to an affiliated party customer that differ by at least two percent, and therefore fail the arm's-length test, 'differ significantly' from market prices, are outside of the ordinary course of trade, and, thus, would be excluded from calculations."  Final Remand Results 13; *see also*, e.g., *Large Diameter Welded Pipe from the Republic of Turkey,* 84 Fed. Reg. 6,362 (Dep't of Commerce Feb. 27, 2019) (final AD determination), and accompanying IDM at comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party)").  On remand, Commerce explained that "{w}hen the prices to an affiliated customer are to not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade" and "{t}he distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, e.g., excluded from the calculation of {normal value}."  Final Remand Results 13.

The Canadian Parties also argue that the *de minimis* threshold in investigations is not relevant because it is an example of Congress giving a fixed threshold as opposed to requiring context-specific analysis with "differ significantly."  Canadian Parties Comments 13.  However,

17

the Canadian Parties' argument highlights that the statutory language for 19 U.S.C. § 1677f-1(d)(1)(B) is an implied delegation of authority to Commerce.  Moreover, Commerce exercised its discretion when considering the appropriate test for determining whether "prices differ significantly," and looked to the statutory *de minimis* threshold because the agency routinely and synonymously has referred to non-*de minimis* levels of dumping as a "significant amount of dumping."  Final Remand Results 14 (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019), and accompanying IDM at comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping") (*Pipe from Korea*).[2]  Commerce explained that if a two percent difference between U.S. price and normal value is sufficient to make an affirmative finding of sales at less than fair value, then it is reasonable to conclude that a two-percent price difference is significant in the context of 19 U.S.C. § 1677f-1(d)(1)(B).  Final Remand Results 14.  Further, when the *de minimis* threshold has not been specified in the statute, Commerce's regulation, in administrative reviews, has defined the *de minimis* threshold at a different, 0.5 percent, threshold.  19 C.F.R. § 351.106(c)(1).

      C.      The Price Difference Test Is Not The P/2 Test

The Canadian Parties take issue with the differences between the P/2 test and the price difference test, suggesting that they highlight a reversal.  Canadian Parties Comments 14-15.  Commerce explained that the P/2 test and the price difference test are not the same.  Final Remand Results 19.  "The P/2 test examined whether the weighted-average U.S. prices of allegedly 'targeted' sales were two percent lower than the weighted-average U.S. prices of non-

---

[2] In addition to *Pipe from Korea*, Commerce has referred to a "non-*de minimis*" amount of dumping as a "significant" amount of dumping in at least 25 other final determinations during the past ten years in the context of both investigations and administrative reviews.

targeted sales *with the stated aim of identifying 'targeted dumping.'*" *Id.* at 19-20 (emphasis added). In contrast, the price difference test examines whether U.S. prices differ significantly – *i.e.*, whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods – within the context of a differential pricing analysis that also includes the ratio test and the meaningful difference test. *Id.* at 23. As Commerce explained, "{t}he only common aspect of the P/2 test and the price difference test is the two percent threshold." *Id.* at 22. The price difference test shares the two percent threshold with the arms-length test with the same four percent band around the price, which is the basis for whether the prices of comparison market sales made to an affiliate are at arm's length. *Id.*

Addressing the same argument made by the Canadian Parties here, in *Toyo Kohan*, the Court stated that "{w}hether Commerce previously used and rejected the two percent price difference test does not influence the court's reasoning on the reasonableness of the test." *Toyo Kohan*, Slip Op. at 5 n. 9 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)). Indeed, Commerce is not using the P/2 test and Commerce's departure from the P/2 test is not evidence that the price difference test is unreasonable. As Commerce explained 20 years ago when it relied on the P/2 test, the agency lacked experience in addressing 19 U.S.C. § 1677f-1(d)(1)(B). Since that time, Commerce has gained experience, changing its approach to addressing 19 U.S.C. § 1677f-1(d)(1)(B). Final Remand Results 20-22. For example, the Canadian Parties imply that analyzing sale prices both above and below the two percent threshold is over inclusive, when the P/2 test only looked at prices lower than the average price to identify alleged "target dumped" sales. Canadian Parties Comments 14-15. However, the P/2 test included no comparison with normal value, and therefore was

19

fundamentally incapable of identifying dumping of any sort.  It is manifest that Commerce's

approach has evolved considerably since then with the benefit of additional experience.

Further, masked dumping may occur when higher prices offset lower dumped prices, and

such conditions may be present when there exists a pattern of prices that differ significantly.

*Timken Co. v. United States*, 354 F.3d 1334, 1343 (Fed. Cir. 2004); *Apex II*, 862 F.3d at 1341.

Accordingly, higher prices are just as relevant to masked dumping as lower prices, and because a

pattern of prices that differ significantly among purchasers, regions, or time periods is the

condition in which masked dumping may be occurring, both must be considered when examining

whether there is a pattern of prices that differ significantly.  Final Remand Results 29-30.

Indeed, in 2008, Commerce withdrew its targeted dumping regulations because it lacked any

experience when these regulations had been promulgated, and the agency was concerned that it

"may have established thresholds or other criteria that have prevented the use of this comparison

methodology to unmask dumping, contrary to the Congressional intent."  *Withdrawal of the*

*Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73

Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2008).  As explained above, the only common

aspect between the P/2 test and the price difference test is the two percent threshold, and the

current revised differential pricing analysis, including the price difference test, is the present

culmination of Commerce's experience over the last 20 years in addressing masked dumping.

Further, given Commerce's practice in antidumping proceedings, the two percent threshold is

reasonable measure of significance as shown in the arms-length test and as the *de minimis*

threshold in investigations.  Final Remand Results 16, 22.

The Canadian Parties also argue that the price difference test yields an abnormally high

pass rate across proceedings.  Canadian Parties Comments 15-16.  However, "the fact that

20

Commerce finds prices often, but not always, differ significantly among purchasers, regions, or time periods indicates that Commerce is carrying out a case-by-case analysis as envisioned in the SAA." Final Remand Results 26. Commerce found this type of argument "implies that Commerce engages in results-oriented analysis and should look to the results for whether a methodology is reasonable," and "there must a specific amount of determinations in which Commerce should not be finding that prices differ significantly." Final Remand Results 25. Indeed, the Canadian Parties fail to cite any plain language or legislative history evidencing Congressional intent for Commerce to find significant price differences to exist with a certain frequency or in a certain percentage of proceedings.

D.    Substantial Evidence Does Not Require Commerce To Make A Determination That It Is Not Statutorily Obligated To Make

The Canadian Parties argue that the substantial evidence standard applies because Canadian Parties are challenging the lawfulness of the tests in Commerce's revised differential pricing analysis, and Commerce's support for its factual findings, which the plaintiff in *Stupp* did not do. Canadian Parties Comments 16-17. As explained above, the standard of review for Commerce's differential pricing analysis is reasonableness, not substantial evidence, and Commerce's two percent test is reasonable. *Marmen*, 134 F.4th at 1338. Moreover, the cited evidence of alleged price volatility does not detract from the reasonableness of the two percent threshold in Commerce's price difference test, when two percent is the measure of when Commerce considers a sale outside the ordinary course of trade under the arms-length test and when dumping goes above the *de minimis* threshold, regardless of the extent of any volatility in the market. In short, their argument about price volatility is just another way of saying that the reason for a pattern of significant price differences was a particular market force, but Commerce is not required to consider the reasons why such pattern exists. *See JBF RAK*, 790 F.3d at 1368.

21

The Canadian Parties nevertheless assert that the price difference test has increased the proportion of prices found to differ significantly than that from the Cohen's *d* test. Canadian Parties Comments 17-18. Because the Federal Circuit invalidated the Cohen's *d* test finding it "unsound as a gauge of the group difference," the Canadian Parties attempt to use the results of Cohen's *d* test as a benchmark in assessing the reasonableness of price difference test is unsound. *See Marmen*, 134 F.4th at 1348.

The Canadian Parties also argue that the reason for changes in average prices is the normal movement of prices beyond the respondents' control, that market-specific evidence of price volatility dispels the notion of masked dumping, and that a two-percent threshold is inadequate. Canadian Parties Comments 18, 21. As Commerce explained, however, volatility of U.S. prices does not negate that dumping, or masked dumping, is occurring. Final Remand Results 14. The Canadian Parties cannot seriously dispute that the respondents set the prices at which they sell subject merchandise. Commerce's calculation of a respondent's weighted-average dumping margin is based on a respondent's reported U.S. prices, which reflects market conditions, including any alleged volatility. *Id.* at 14-15. The weighted-average dumping margin based on the A-to-A method for a respondent may mask dumping. "Simply identifying the reasons why masked dumping exists when using the A-to-A method does not change the fact that masked dumping is occurring." *Id.* at 15. Although there may be a variety of potential reasons which result in the dumping of subject merchandise, "Commerce does not consider reasons to explain away the observed dumping whether based on 'intent' or other factors which may or may not be within the control of the respondent." *Id.* at 34.

Next, the Canadian Parties argue that price differences *within* each group vary more than two percent from the means. However, the statute requires that Commerce consider whether

22

significant price differences exist "among" certain groups, not within each group.  19 U.S.C. § 1677f-1(d)(1)(B)(i).  Moreover, the Canadian Parties' argument acknowledges that higher prices are offsetting lower prices within the averaging groups, thus potentially masking even more dumping than Commerce's differential pricing analysis can detect.  Final Remand Results 24.  Commerce's focus on the price differences "among" the categories specified in 19 U.S.C. § 1677f-1(d)(1)(B)(i) is reasonable and consistent with the statutory language.

The Canadian Parties also contend that Commerce is required to address evidence that a pattern of U.S. prices that differ significantly does not indicate masked dumping.  Canadian Parties Comments 19-20.  But the statute requires Commerce to determine whether there is a pattern with respect to U.S. prices, not whether those U.S. prices are dumped with a comparison of normal value in the comparison market.  19 U.S.C. 1677f-1(d)(1)(B)(i).  Likewise, the Federal Circuit has rejected the argument that the statute limits the A-to-T method to sales that were found to be dumped.  *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1333 (Fed. Cir. 2017) (*Apex I*) (explaining:  "The statute defines the preconditions for applying the {A-to-T} methodology, but it does not limit in any way the application of the {A-to-T} methodology, should the preconditions be met.").  Further, as noted, the statute does not require Commerce to consider the reasons why there exists a pattern of U.S prices that differ significantly.  *JBF RAK*, 790 F.3d at 1368.  Commerce properly followed the statute when it determined that there exists a pattern of significant U.S. price differences.

The Canadian Parties argue that *JBF RAK* is distinguishable because of price volatility, citing dicta from *Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1179 n.12 (Ct. Int'l Trade 2016).  Canadian Parties Comments 20-21.  However, in *JBF RAK*, JBF RAK argued that it was arbitrary, capricious and an abuse of discretion for Commerce to refuse to consider evidence

which would tend to establish that the pricing pattern was not due to "targeted sales" but, instead, was for a valid business purpose. *JBF RAK*, 790 F.3d at 1368. The Federal Circuit rejected this argument and held that "Section 1677f-1(d)(1)(B) does not require Commerce to determine reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}" *JBF RAK*, 790 F.3d at 1368.

Similarly, in *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-precedential), Borusan contested Commerce's use of the A-to-T method without consideration of Borusan's alternate explanation for the observed pricing pattern – increased raw material costs – but the Federal Circuit cited the precedential *JBF RAK* opinion as addressing this issue. The Federal Circuit found that "{n}othing in the language of the statute requires Commerce to take the extra analytical step proposed by Borusan – consideration of Borusan's alternate explanations for the pricing patterns observed through use of" an alternative methodology. *Id.*

Additionally, in *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015), Nan Ya contended that Commerce did not consider whether differences were due to fluctuations in Nan Ya's cost of production and that even if Commerce is not required to investigate the reasons for observed price differences, Commerce is not free to ignore evidence that demonstrates prices differences do not reflect targeted dumping. However, based upon *JBF RAK* and *Borusan*, this Court found that "Commerce is under no obligation to consider evidence that factors other than targeted dumping may account for price patterns that the agency identifies through targeted dumping analyses." *Id.* at 1357-58.

Moreover, the Canadian Parties' reliance upon dicta in *Timken* to justify ignoring Federal Circuit precedent is unpersuasive in light of the actual holding in *Timken*. In *Timken*, this Court

24

followed, as it must, the Federal Circuit's decision in *JBF RAK*. *Timken*, 179 F. Supp. 3d at 1179 ("in the light of the Federal Circuit's decision, whether NTN's U.S. sales were not intentionally targeted or *whether the price differences were due to an external factor*, such as shifting exchange rates, Commerce's methodology lawfully identifies a pattern of export prices that differ significantly.") (emphasis added) (citations omitted).  Therefore, when, as here, the statute does not require Commerce to engage in a particular type of analysis or inquiry, if a party submits evidence that is not relevant to the statutory requirements, such evidence does not override the statute to require Commerce to engage in analysis or inquiry that the statute does not require.  The substantial evidence standard does not necessitate Commerce to consider evidence that the statute does not require the agency to consider.  *See*, *e.g.*, *Octal Inc. v. United States*, 539 F. Supp. 3d 1291, 1299-1300 (Ct. Int'l Trade 2021) (rejecting arguments that ITC's analysis was not based on substantial evidence because the ITC did not account for other reasons that subject imports may have increased and finding that the statute does not require the ITC to consider the effect of subject imports in its volume analysis).

        E.        The Ratio Test Is A Reasonable Interpretation Of The Statute

Commerce's ratio test is lawful and the Federal Circuit has sustained it.  *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020).  Moreover, this Court recently sustained Commerce's ratio test after remand in *Marmen*.  *Marmen*, Slip Op. 26-62 at 21.

Undeterred, the Canadian Parties assert that the ratio test does not identify a pattern under the plain meaning of pattern because the statute does not authorize aggregation of results within groups.  Canadian Parties Comments 22-25.  The Canadian Parties further assert that a pattern must give rise to an inference of targeted or masked dumping.  *Id.* at 23.  As Commerce explained, however, the definition of pattern as "a frequent and widespread incidence" is

25

commonly used in the ordinary English language, and using the ratio test to quantify the extent of the significant price differences is consistent with congressional intent of addressing masked dumping through 19 U.S.C. § 1677f-1(d)(1)(B).  "If more than thirty-three percent of prices differ significantly, then the prices differing significantly are not an outlier."  Final Remand Results 26-27 & n.74 (citing Merriam-Webster Online Dictionary).

The Canadian Parties assert that *Stupp* and *Dillinger* are irrelevant because those precedents upheld the ratio test that was part of an older version of the differential pricing analysis.  But in the previous version of Commerce's differential pricing analysis, Commerce aggregated the results, just as it does so now.  In *Stupp*, the Federal Circuit stated, "{a}t the highest level of abstraction, Commerce is using a conventional method for quantifying comparisons across discrete groups:  counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices. We hold that general approach to be reasonable."  *Stupp*, 5 F.4th at 1354.  In *Dillinger*, the Federal Circuit rejected arguments that Commerce's ratio test fails to implement the pattern requirement because Commerce aggregates prices found to differ among different purchasers, different regions, and different time periods, into a single pattern.  *Dillinger*, 981 F.3d at 1325-26.  Construing section 1677f-1(d)(1)(B)(i), the Federal Circuit held that Commerce's "aggregation" methodology is a proper interpretation of the pattern requirement.  *Dillinger*, 981 F.3d at 1325-26.  In *Toyo Kohan*, the Court applied this Federal Circuit precedent finding that the ratio test reasonably implements the statutory requirement and found that the argument that the ratio test does not identify a pattern.  *Toyo Kohan* at 8 n. 13, 15.  "Just as before, Commerce's new differential pricing analysis evaluates all U.S. sales by purchaser, region, and time period."  *Id.*  Therefore, the Federal Circuit precedent upholding Commerce's aggregation

26

under the ratio test as a reasonable interpretation of the statute is still applicable here.  The Canadian Parties' arguments are without merit.

      F.        <u>Commerce Adequately Explained Its Discontinuance Of The Mixed Method</u>

The Canadian Parties argue that Commerce did not articulate an adequate justification to discontinue the mixed method.  Canadian Parties Comments 27.  As an initial matter, discontinuation of the mixed method has *no effect* on margin calculations here because the requisite conditions for applying the mixed method are not present.  For Canfor and West Fraser, Commerce determined that 99.40 and 99.82 percent of their respective U.S. sales by value passed the price difference test.  Final Remand Results 7.  Accordingly, the Court need not reach the issue regarding discontinuation of the mixed method to resolve this case.

Even if the Court were inclined to address the issue, Commerce explained why it discontinued the mixed method as part of the overall change to its administrative practice with respect to the differential pricing analysis.  Although the statute *permitted* Commerce's old policy of using the hybrid version of the two available comparison methods, the statute did not *require* the mixed method, and to align more closely with the statute, Commerce has discontinued the mixed method as a matter of administrative policy for all antidumping proceedings.  Final Remand Results 28.  Commerce consistently applies its revised differential pricing methodology including discontinuation of the mixed method across all proceedings, including remand redeterminations.  *See Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) (holding that "it is especially important for all parties that consistent methods be sustained when possible" and that "the agency demonstrated a consistent administrative practice which is reasonable and permitted by the statute.").

Additionally, Commerce explained that discontinuation of the mixed method enhances the ability to address masked dumping. Final Remand Results 28. The Canadian Parties incorrectly argue that this is inconsistent with *Stupp*. Canadian Parties Comments 27. Commerce previously employed the mixed method only *after* the "ratio test" had confirmed there was a pattern. Under both the previous version and the current version of the differential pricing analysis, Commerce has used the ratio test to find that a pattern exists when more than 33 percent of the total sales value of the sales with prices that differ significantly. Previously, once the existence of the requisite pattern was established (*i.e.*, the greater than 33 percent threshold of ratio test was satisfied), if the A-to-A method could not adequately account for the pricing behavior of the respondent in the U.S. market, then as a matter of discretion, Commerce considered the mixed method as an alternative comparison methodology when between 33 percent and 66 percent of the sales value of the respondent's U.S. sales were found to be at prices that differ significantly, which was neither required nor prohibited by the statute. *See* 19 U.S.C. § 1677f-1(d)(1)(B). Therefore, Commerce is not prevented from discontinuing the mixed method just because *Stupp* upheld the ratio test.

After Commerce discontinued the mixed method, Commerce replaced it with A-to-T method for all sales, consistent with 19 U.S.C. § 1677f-1(d)(1)(B), as a matter of administrative policy for all antidumping proceedings. Both the Federal Circuit and this Court previously have affirmed Commerce's application of the A-to-T method to all U.S. sales "to remedy masked dumping" under the *Nails* test, a predecessor to the differential pricing analysis. *See Apex I*, 862 F.3d at 1333; *Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359, 1375 (Ct. Int'l Trade 2015). In *Samsung*, for example, this Court assessed whether Commerce's application of the A-to-T method to all U.S. sales under the *Nails* test was consistent with the statute.

*Samsung*, 72 F. Supp. 3d at 1373-76.  The plaintiffs in *Samsung* had argued (1) that Commerce could not apply the A-to-T method to U.S. sales not passing the *Nails* test because "the phrase such differences does not apply to those other transactions that do not have such differences," *Id.* at 1374, and (2) that the statute "creates a strong presumption for using the A-to-A or T-to-T methodologies because the A-to-T methodology is a limited exception."  *Id.* at 1375.  Rejecting these arguments, the Court reasoned that the statute establishes "preconditions that must exist before Commerce may apply the A-to-T methodology."  *Id.* at 1374-75.  The Court explained that the statutory language does not "instruct Commerce on how to apply the A-to-T methodology" after the preconditions are met.  Rather, 19 U.S.C. § 1677f-1(d)(1)(B) "permits Commerce to {apply the A-to-T method} without specifying whether those export prices or constructed prices must be drawn only from targeted sales."  *Id.* at 1375.  The Federal Circuit reached substantially the same conclusion in *Apex I*, 862 F.3d at 1333.

Although Commerce has continued to refine various aspects of addressing 19 U.S.C. § 1677f-1(d)(1)(B) over the years, the broad discretion conveyed in the statute remains the same.  Here, the Canadian Parties do not, and cannot, identify statutory language prohibiting Commerce from applying the A-to-T method to all U.S. sales under circumstances presented here or any unreasonableness in Commerce's decision to eliminate the mixed method and apply the A-to-T method to all U.S. sales after a pattern of prices has been found to exist.  The Court sustained Commerce's discontinuation of the mixed method after remand in *Marmen*, and the Court should reach the same result here.  *See Marmen*, Slip Op. 26-62 at 21.

G.  The Meaningful Difference Test Explains Why The A-to-A Method Cannot Account For Such Differences

The Canadian Parties argue that observing the difference between two comparison methods cannot "explain" why the A-to-A method cannot account for these differences.

29

Canadian Parties Comments 28.  Commerce addressed why the meaningful difference test determined whether the A-to-A method could account for such difference, explaining that "the meaningful difference test quantifies the amount of masked dumping that remains hidden in the calculation of the weighted-average dumping margin using the A-to-A method."  Final Remand Results 31.  If there is a meaningful difference, then that difference provides evidence that the A-to-A method cannot account for the respondent's pricing behavior in the U.S. market because the A-to-T method unmasks a meaningful amount of masked dumping that the A-to-A method fails to unmask.  *Id.* at 32.  As Commerce explained, "{t}he results of the meaningful difference test demonstrates whether the standard method can adequately account for the respondent's pricing behavior in the U.S. market, and that is precisely why the statute provides Commerce with the alternative methodology."  *Id.*  The Federal Circuit has sustained the meaningful difference test, holding that "the difference in the actual antidumping rates that would be assessed – below *de minimis* when calculated with the {A-to-A} methodology; above *de minimis* when calculated with an alternative methodology – indeed informs the question of whether the {A-to-A} methodology can adequately account for a pattern of significant price differences 'because {the A-to-A method} masked the dumping that was occurring as revealed by the {A-to-T} calculated margin.'"  *Apex II*, 862 F. 3d at 1346 (citations omitted).

The Canadian Parties also assert that because the A-to-A method in an administrative review uses monthly weighted-average U.S. prices pursuant to 19 C.F.R. § 351.414(d)(3), the A-to-A method accounts for time-based price differences.  Canadian Parties Comments 28-29.  Regardless of the duration of the averaging period under the A-to-A method, including the use of monthly weighted-average U.S. prices, the A-to-A method continues to permit offsetting both implicitly and explicitly.  The A-to-A method continues to permit offsets implicitly because

30

within each weighted-average U.S. price, where higher prices offset lower prices.  Final Remand

Results 30.  *See also Certain Frozen Warmwater Shrimp from India*, 79 Fed. Reg. 51,309 (Dep't

of Commerce Aug. 28, 2014) (final results AD review), and accompanying IDM at 11.  "The A-

to-T method eliminates implicit offsets through the use of individual U.S. prices rather than

weighted-average U.S. prices."  Final Remand Results 30.  The A-to-A method also continues to

permit offsets explicitly because lower dumped prices in one weighted-average U.S. price can be

offset by higher prices in a different weighted-average U.S. price.  "The A-to-T method

eliminates explicit offsets by zeroing negative comparison results for non-dumped sales."  *Id.* at

30-31.

The Canadian Parties argument reads "period of time" out of the plain language of 19

U.S.C. § 1677f-1(d)(1)(B)(i), because they claim that the A-to-A method will account for time-

based price differences simply through using shorter averaging periods for U.S. price pursuant to

19 C.F.R. § 351.414(d)(3).  *See Wolfe v. McDonough*, 28 F.4th 1348, 1354-55 (Fed. Cir. 2022)

("a statute should be construed so that effect is given to all its provisions, so that no part will be

inoperative or superfluous, void or insignificant.") (quotations omitted).  If the A-to-A method

using monthly averaging periods for U.S. prices categorically accounts for all time-based

differences, then Commerce would never be permitted to use the A-to-T method to address

patterns of prices that differ significantly "among … periods of time."  19 U.S.C. 1677f-

1(d)(1)(B)(i).

In short, the Canadian Parties fail to meaningfully engage with the Federal Circuit

precedent and attempt to read out "period of time" from the plain language of the relevant

statutory provision.  *See Stupp*, 5 F.4th at 1356 ("Our prior decision in *Apex II* disposes of

SeAH's challenges to the 'meaningful difference' test."); *id.* (holding that "(1) Commerce's

31

meaningful difference test is a reasonable response to the statutory directive to explain why the average-to-average method is inadequate in certain cases, and (2) the meaningful difference test is sufficient to satisfy that directive.").  The A-to-T method reveals dumping that is both implicitly and explicitly masked by the A-to-A method.  Final Remand Results 31.  When the A-to-T method unmasks a meaningful amount of dumping undetected by A-to-A method, this result sufficiently demonstrates that the A-to-A method cannot account for masked dumping.

The Canadian Parties argue that Commerce must address record evidence of market factors in explaining that the A-to-A method cannot account for such differences.  Canadian Parties Comments 30-32.  However, in the meaningful difference test, Commerce uses the U.S. prices, which encompass all of the price differences in the respondent's U.S. pricing behavior, in the A-to-A method and the A-to-T method, to quantify the amount of dumping that is masked in the A-to-A method.  Although there may be a variety of potential reasons which result in the dumping of subject merchandise, Commerce does not consider reasons to explain away the observed dumping, whether based on intent or other factors which may or may not be within the control of the respondent.  Final Remand Results 34.

The Canadian Parties argue further that the A-to-T method does not result in a fair comparison of U.S. price and normal value, citing 19 U.S.C. § 1677b(a)(1)(A), which provides: "{i}n order to achieve a fair comparison with export price or constructed export price, normal value shall be determined as follows … at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." Canadian Parties Comments 30-31.  However, section 1677b(a)(1)(A) prescribes how to determine *normal value* to achieve a fair comparison, and does not address how to determine U.S. price or what type of comparison method to use.  In any event, both the A-to-A method and the A-to-T method both use

32

contemporaneous monthly comparisons pursuant to Commerce's regulations.  Final Remand Results 33.

Finally, the Canadian Parties assert that the A-to-T method magnifies "outlier" sales and that Commerce mischaracterized those outliers as dumped sales.  Canadian Parties Comments 31-32.  As Commerce explained, however, the A-to-T method is meant to address the situation where an exporter may sell at a dumped price for a specific transaction, while selling at higher prices for other sales.  Final Remand Results 35.  Just because the Canadian Parties label a given sale as an "outlier" (with no definition of what an "outlier" means, except to imply that it is dumped by a large amount), the dumping of a so-called "outlier" sale causes injury to the domestic industry just as any other dumped sale, except to a *larger* degree.  Yet the Canadian Parties argue that these sales and the resulting harm to the domestic industry should be ignored.  This argument is contrary to the remedial purpose of the antidumping statute.  *See Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156, 1159 (Fed. Cir. 1994).  The Court sustained Commerce's three-part differential pricing analysis after remand in *Marmen*, and the Court should reach the same result here.  *Marmen*, Slip Op. 26-62 at 23-25.

CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

                                                     s/ Douglas Edelschick
Of Counsel:                                          DOUGLAS G. EDELSCHICK
                                                     Senior Trial Counsel
VANIA WANG                                           Commercial Litigation Branch
Senior Counsel                                       Department of Justice
Office of the Chief Counsel                          P.O. Box 480, Ben Franklin Station
    for Trade Enforcement & Compliance               Washington, DC 20044
Department of Commerce                               Tel:  (202) 353-9303

June 15, 2026                                        Attorneys for Defendant United States

CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2026, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.


  s/ Douglas G. Edelschick

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 9,992 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

  s/ Douglas G. Edelschick